## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

ALLIED INTERNATIONAL UNION, an unincorporated
labor organization,

                    Plaintiff,

         v.

SERVICE EMPLOYEES INTERNATIONAL
UNION, LOCAL 32BJ, an unincorporated labor
organization, MICHAEL FISHMAN, an individual,
ANDREW FRIEDMAN, an individual, NEIL DIAZ,
an individual, SERVICE EMPLOYEES INTERNATIONAL
UNION, LOCAL 1877, an unincorporated labor organization,
and SERVICE EMPLOYEES INTERNATIONAL UNION,
an unincorporated labor organization,

                    Defendants.

Civil Action No. 08-cv-3357 (AKH)
Judge: Hon. Alvin K. Hellerstein
ECF CASE

**COMPLAINT**

Jury Trial Demanded

Plaintiff, Allied International Union ("AIU"), by its attorneys, Strobl & Sharp, P.C., and Stark & Stark, P.C., alleges as follows for its Complaint against Defendants Service Employees International Union, Local 32BJ ("SEIU 32BJ"), Michael Fishman, Andrew Friedman, Neil Diaz, Service Employees International Union, Local 1877 ("SEIU Local 1877") and Service Employees International Union ("SEIU International"):

### NATURE OF ACTION

1.  This is an action for damages and other appropriate relief for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) 18 USC §1961, *et seq.* Plaintiff also asserts New York common law tortious interference and civil conspiracy claims against Defendants.

2.     AIU's claims arise from a pattern of continuing racketeering activity in which Defendants engage in multiple and ongoing acts of extortion, coercion and fraud in order to raid AIU's membership, destroy AIU's ability to represent its members effectively and force AIU out of business in order to supplant AIU as the exclusive bargaining representative of thousands of security officers in the New York City metropolitan area, Los Angeles, California, and elsewhere.

3.     AIU brings this action to halt a coercive, malicious campaign against AIU by Defendants that threatens the very existence of AIU, and jeopardizes the well-being of thousands of its members.

## JURISDICTION AND VENUE

4.     This court has subject matter jurisdiction pursuant to 28 U.S.C. §1331, and supplemental jurisdiction of Plaintiff's state law interference and civil conspiracy claims pursuant to 28 U.S.C. § 1367.

5.     Personal jurisdiction and venue are proper in this judicial district pursuant to 28 U.S.C. §1391(b) and 18 U.S.C. §1965, because Defendants are found in, have agents in, and/or transact business and affairs in, this district, and a substantial part of the events or omissions giving rise to these claims occurred in this district.

## THE PARTIES AND THE RICO ENTERPRISE

6.     Allied International Union is a labor organization with its principal place of business in Mineola, New York.  Allied International Union is a guards-only union representing security guards in the New York City metropolitan area and elsewhere.

2

7.      SEIU 32BJ is a service workers union, representing cleaners, doormen, porters, maintenance workers, window cleaners, and security guards in the New York City metropolitan area and elsewhere.  SEIU 32BJ has its principal place of business at 101 Avenue of the Americas, New York, New York.  SEIU 32BJ is a local union affiliated with Service Employees International Union.  SEIU 32BJ is a mixed union in that it represents guards and non-guards.

8.      Michael Fishman, an individual residing in New York County, is President of SEIU 32BJ and a Vice President of SEIU International.

9.      Andrew Friedman, an individual residing in New York County, is an Organizer of SEIU 32BJ and a Field Researcher of SEIU International.

10.     Neil Diaz, an individual residing in New York County, is an Organizer of SEIU 32BJ.

11.     SEIU Local 1877 is a service workers union, representing janitors, porters, maintenance workers and security guards in the Los Angeles metropolitan area and elsewhere. SEIU Local 1877 has its principal place of business at 1247 West 7th Street, Los Angeles, CA 90017. SEIU Local 1877 is a local union affiliated with Service Employees International Union. SEIU Local 1877 is a mixed union in that it represents guards and non-guards.

12.     SEIU International is an unincorporated labor organization having its principal place of business located at 1800 Massachusetts Avenue, NW, Washington, DC 20036. It has approximately 1.9 million members, which include service workers in multiple industries and lines of work.  Its members include approximately 25,000 private sector security guards.  SEIU International is a mixed union, in that it represents guards and non-guards.

13.     Plaintiff is a "person" under 18 U.S.C. §§ 1961(3) and 1964(c).

14.     Each Defendant is a "person" under 18 U.S.C. §§ 1961(3) and 1962(c).

15.     All Defendants participated in and/or operated an enterprise that existed to

3

organize security officers throughout the country (the "Stand for Security Enterprise").

16.    The Stand for Security Enterprise constitutes an association-in-fact enterprise pursuant to 18 U.S.C. §§ 1961(4) and 1962(c), that engaged in and affected interstate commerce in the United States.

17.    Information concerning the Stand for Security Enterprise can be found at its website www.standforsecurity.org.

18.    The Stand for Security Enterprise has continuity of structure and personnel, including the fact that many of the same agents of the enterprise have been attempting to increase guard membership for SEIU International, SEIU 32BJ and other SEIU local unions for several years.

19.    The Stand for Security Enterprise has a common or shared purpose of increasing guard membership for SEIU International, SEIU 32BJ and other SEIU local unions, and thereby increasing their revenues.

20.    The Stand for Security Enterprise has an ascertainable structure distinct from the pattern of racketeering in which Defendants have been and continue to be engaged, because the Stand for Security Enterprise has goals other than just racketeering, including, but not limited to, legitimate union organizing activities and political activism.

<div align="center">FACTUAL BACKGROUND</div>

**A.    AIU'S Longstanding Representation of Guards.**

21.    AIU is the exclusive bargaining representative for approximately 6,800 security professionals (guards), who are employed by various security companies operating in New York, New Jersey, Washington, D.C. and California.

22.    AIU's membership consists only of security guards, and does not admit to membership non-guard employees. As a result, AIU is permitted to seek representation elections

<div align="center">4</div>

conducted by the National Labor Relations Board ("NLRB") in connection with its effort to organize guard units. If successful, AIU then becomes the "certified" bargaining representative of those guards.

23.     To the contrary, federal law provides that a union that represents guards *and* non-guards ("mixed union") cannot petition the NLRB for representation elections and cannot become the certified representative of guards.    29 U.S.C. § 159(b)(3) ("Section 9(b)(3)"). Section 9(b)(3) provides that "no labor organization shall be certified as the representative of employees in a bargaining unit of guards" if that labor organization is a mixed union.

24.     Generally, AIU's members are employees of security companies that have service contracts with building owners, universities, state and municipal agencies and airports in the New York City metropolitan area, Washington, D.C. and Los Angeles.

25.     AIU has relationships not only with its members and their employers, but also with the site owners and managers at whose locations AIU members work.

26.     For more than 35 years, AIU has effectively represented guards, and protected and promoted their rights with respect to such issues as wages, benefits, safety and health issues, and job security.

**B.     SEIU's History of Employing a Win-At-All-Cost Strategy to Increase Its Membership.**

27.     For many years, SEIU International has attempted to drive independent, guard-only unions out of the security industry through the use of intimidation and coercion.

28.     SEIU engaged in a win-at-all-cost battle to raid the membership of the Security, Police and Fire Professionals of America (SPFPA).  The SPFPA, like AIU, is a guards-only union.

29.     In August 2003, David L. Hickey, International President of the SPFPA, described SEIU's tactics in his union's newsletter:

5

> SEIU is attempting to take over the security industry and destroy independent
> security unions through threats, intimidation and other violations of the law.

See Exhibit A.

     30.    Hickey wrote to Thomas Balanoff, a Vice President of SEIU International, in July 2003, condemning SEIU's "five-year plan to take over the security industry and destroy independent security officer unions." Exhibit A.

     31.    Upon information and belief, the SPFPA reached an agreement with SEIU International to stop SEIU International's raid of the SPFPA.

     32.    For decades, SEIU International had been an AFL-CIO affiliate. In June 2005, however, SEIU International and several other unions formed a rival organization called "Change to Win" and publicly broke away from the AFL-CIO. The Change to Win coalition broke away partly because of its intent to devote maximum resources to grow union membership at all costs.

     33.    Prior to its divorce from the AFL-CIO, SEIU International was bound by Article XX of the AFL-CIO Constitution. Article XX prohibits the raiding by one affiliate union of another.

     34.    Since parting ways with the AFL-CIO, SEIU International, led by its outspoken President, Andrew Stern, has raided several established labor unions around this country.

     35.    Stern has stated publicly that SEIU International does not promote raiding, but his actions, and those of SEIU International, belie this assertion:

> [Stern] said SEIU had no interest in raiding, the age-old practice of hitting on
> another union's members to get them to switch affiliations. Yet as he spoke, his
> operatives in California were in the midst of raiding an AFSCME local for 10,000
> home-care workers under contract with Riverside County.

Joann Wypijewski, *States of Disunion*, The Nation, August 29, 2005, attached as Exhibit B.

     36.    The aggressive raid against AFSCME in Riverside County, California, began the

day after SEIU International's 2005 split from the AFL-CIO. Stern notified public authorities in Riverside County that SEIU International would petition to overturn AFSCME's union status in light of the fact that SEIU International was no longer bound by Article XX.

37.    Upon information and belief, AFSCME reached an agreement with SEIU International to stop SEIU International's raid of AFSCME.

38.    In 2007 and 2008, SEIU 32BJ conducted a raid of the membership of Local One Security Officers ("Local One"), a guards-only labor union based in Brooklyn, New York.

39.    Local One represents approximately 700 security guards. Approximately half of its members are employed by New York University.

40.    Part of SEIU 32BJ's raiding effort included the attempted take over of Local One by unlawfully supporting a surrogate candidate running for president of Local One.

41.    From approximately 2005 to 2007, SEIU 32BJ conducted an aggressive raiding campaign against the Special & Superior Officers Benevolent Association ("SSOBA"). The SSOBA is a guards-only labor union based in Babylon, New York.

42.    The SSOBA represents approximately 2,300 members in the New York metropolitan area.

43.    Upon information and belief, the SSOBA lost a substantial portion of its membership as a result of SEIU 32BJ's raiding campaign.

44.    Upon information and belief, the SSOBA reached an agreement with SEIU 32BJ to halt the raiding campaign. The president of SSOBA during the raiding, Bruce Lichtenstein, became a paid consultant for SEIU 32BJ's security guard campaign.

45.    Additionally, SEIU International conducted several other raids of unions in other cities, such as Houston and Philadelphia.

46.    Recently, Stern's controversial tactics drove the president of a large SEIU local

7

union in California to resign from the SEIU International Executive Committee.

47.    Sal Rosselli, President of the 140,000-member SEIU local United Healthcare Workers-West (UHW), resigned from his position on February 9, 2008, in protest over SEIU International's "overly zealous focus on growth – growth at any cost, apparently . . ." Exhibit C.

48.    In Rosselli's scathing resignation letter, he condemned SEIU's "undemocratic practices," including the fact that SEIU International's officers and staff "manipulated voting procedures" at the local level. Exhibit C.

49.    Rosselli further stated, in a local newspaper, that SEIU International has "charted a course that values growth above all other principles."  Exhibit D, Matt Smith, *Local Union Leader Rosselli Blasts SEIU Boss Andy Stern*, S.F. Weekly, February 20, 2008.

**C.    Defendants' Raiding Campaign Against AIU.**

50.    In early 2006, SEIU 32BJ on behalf of SEIU International and by its agents including Defendants Fishman, Friedman and Diaz, initiated an ongoing campaign against AIU to increase its guard membership in New York.   Particularly, this campaign includes a coordinated effort to raid the membership of AIU.  Defendants harassed and coerced AIU and its members in an attempt to extort from AIU a relinquishment of its role as the exclusive bargaining representative of its members.

51.    The campaign against AIU is part of a nationwide effort by SEIU International, as described above, to increase its overall membership by organizing and representing security officers in multiple industries.

52.    In September and October 2006, SEIU International provided $200,000 to SEIU 32BJ to organize security guards.

53.    In October and November 2006, shortly following SEIU International's $200,000 payments, SEIU 32BJ dispatched over 20 paid organizers to raid AIU members at over 40

worksites.

54.    SEIU International provided an additional $600,000 in "subsidies" to SEIU 32BJ throughout 2006.  Upon information and belief, SEIU International provided additional funding to SEIU 32BJ in 2007 for its security guard organizing efforts.

55.    SEIU International is a powerful organization that has relied heavily upon top-down organizing (aka "corporate campaigns") as a model for growing its membership.  A corporate campaign is a multifaceted attack against an employer aimed at pressuring the employer to voluntarily recognize SEIU as the bargaining representative of its employees.  This is a departure from traditional union organizing models, in which the union conducts a grass-roots effort to gain employee support, followed by a secret-ballot election conducted by the National Labor Relations Board.  Upon information and belief, SEIU has engaged in coordinated efforts to train its local unions, such as SEIU 32BJ and SEIU Local 1877, and its officers and agents, such as Defendants Fishman, Friedman and Diaz, to conduct these campaigns effectively.

56.    Although Defendants launched a campaign to organize guards in the New York City area and other locations, SEIU 32BJ cannot add new guards to its membership by utilizing the NLRB's secret-ballot election procedures, because it is a mixed union.

57.    Accordingly, Section 9(b)(3) prevents SEIU 32BJ from seeking to have AIU members choose between AIU and SEIU 32BJ in a federally-conducted election.

58.    As a result of the Section 9(b)(3) restrictions placed on SEIU 32BJ, Defendants have worked in concert to disparage AIU and its officers and interfere with AIU's business relationships to bring about sufficient pressure to coerce AIU and others to cede the representation of their members to Defendants.

59.    Defendants have systematically attempted to interfere with AIU's internal officer elections.  Defendants have wrongfully used funding, resources and personnel from SEIU

International, SEIU 32BJ and SEIU Local 1877 to campaign for its surrogates, who have attempted and continue attempting to wrest control of AIU from its long-standing leadership and deprive AIU's members of their right to democratic participation in their internal elections.

60.    In early 2007, prior to AIU's internal officer elections, Defendants approached several AIU members, including William Watson and Larry Binyard, and promised them increases in pay and benefits if they assisted SEIU 32BJ in taking over AIU.

61.    In April 2007, Defendants told these and other individuals that SEIU 32BJ would assist them in running for officer positions within AIU.   Particularly, Defendant Friedman utilized the offices of SEIU 32BJ to organize and conduct meetings with these surrogates.   He took their photographs and told them that SEIU 32BJ would "take care of everything," including creating and distributing campaign flyers.    Examples of campaign flyers, which contain Defendant Friedman's name and contact information, are attached as Exhibit E.

62.    In April 2007, SEIU Local 1877 organized and conducted meetings with Jesus Govea, to provide support and resources in Govea's campaign for Vice President of AIU.   SEIU Local 1877 campaigned for Govea at Los Angeles International Airport and elsewhere, held meetings with AIU members employed by Aviation Safeguards, Inc. and created and distributed Govea campaign flyers.

63.    In June 2007, after the AIU officer elections, Defendant Friedman told William Watson, among others, that SEIU 32BJ's lawyer, Susan Jennik, would handle any and all legal problems Watson might encounter as a result of the AIU officer elections.   He gave Watson the business card of Attorney Jennik, and told him to contact her and that Jennik would "take care of everything."   SEIU International, SEIU 32BJ and/or one of their organizing "front" entities paid Jennik's law firm to represent the election surrogates, including Watson.

64.    Defendants sought and obtained the assistance of SEIU Local 1877 in Los

Angeles, California, in connection with their effort to place surrogates in officer positions with AIU. On at least one occasion, SEIU Local 1877 used its office equipment, including its facsimile machine, to provide documents to Susan Jennik and/or lawyers in her firm for the purpose of assisting those lawyers representing Defendants' surrogates, in violation of federal law. Exhibit F, pp. 5-6.

65.    Defendants have also engaged in a coordinated smear campaign of the three highest-ranking AIU officers to drive a wedge between AIU and its members, as well as the site owners and managers where AIU's members work. The smear campaign includes provably false and defamatory statements by SEIU 32BJ agents to AIU members and others that AIU officers are engaged in adulterous sexual activity and that AIU's vice president is a "corrupt" and "fake" lawyer. These AIU officers have initiated a defamation action in New York state court arising from these statements.

66.    Defendants have applied coercive pressure to third parties, such as Fordham University, Columbia University, NYC Human Resources Administration, JetBlue Airways, FJC Security Services, Inc., Summit Security Services, Inc., Aviation Safeguards, Inc. and Allied Security, LLC d/b/a AlliedBarton Security Services.

67.    Defendants have pressured Fordham University to take steps to remove AIU as the bargaining representative of security guards at Fordham's campuses by blocking Fordham's planned expansion of its Lincoln Center campus buildings in New York City. The building expansion will create work for many individuals, including AIU members, but Defendants have placed their own financial interests above the benefits to AIU members and others of Fordham's planned expansion.

68.    Defendants sought and obtained the assistance of several elected officials in New York, including but not limited to U.S. Representative Jerrold Nadler, State Senator Thomas

Duane and Assemblyman Adam Clayton Powell, IV, in their effort to block Fordham's building expansion.

69.    Additionally, a website has been created that purports to publicize working conditions of Summit security officers at Fordham.  The Internet address of that website is www.standforfordhamsummitsecurityofficers.org.  Defendants have created or assisted in the creation of this website.

70.    A link on the above-mentioned website, titled "Take Action to Support Security" opens a separate website page that contains an online petition directed to Fordham University President Father Joseph McShane to stop the Lincoln Center expansion.  The petition claims that the building expansion would create overcrowding, noise and air pollution and would "exaggerate the fortress-like layout of the Lincoln Center campus."  These "concerns" are a ruse, however, with the real intent of the petition being to further Defendants' financial interests. Exhibit G.

71.    In December 2006, AlliedBarton succeeded Tri-Star Security as the guard service provider for New York City's Department of Citywide Administrative Services ("DCAS").  At that time, all guards working at DCAS sites were represented by AIU.  AlliedBarton hired over 50 percent of the AIU-represented guards who had been employed by Tri-Star Security.

72.    Initially, AlliedBarton advised AIU that it would fulfill its legal obligation to bargain with AIU over the terms and conditions of employment of its guard employees.

73.    Shortly thereafter, SEIU 32BJ pressured AlliedBarton into unlawfully recognizing SEIU 32BJ as the bargaining representative of the DCAS guards.  This in turn resulted in AlliedBarton refusing to bargain with AIU.

74.    AIU filed an Unfair Labor Practice Charge with the National Labor Relations Board, protesting AlliedBarton's failure and refusal to bargain with AIU.

75.    In January 2008, AlliedBarton and SEIU 32BJ signed a settlement agreement with the NLRB, by which AlliedBarton agreed to bargain in good faith with AIU, and by which SEIU 32BJ agreed that AIU's status as the exclusive bargaining agent shall be insulated from any challenges for a period of 120 days while AIU and AlliedBarton engage in bargaining.

76.    As a result of this interference by SEIU 32BJ, security guards employed by AlliedBarton at DCAS sites where not represented by any union for more than one year, to the detriment of those guards.

77.    Defendants have also brought pressure upon JetBlue Airways, which contracts with Summit Security for security guard services at JFK Airport.  Approximately 100 AIU members are employed by Summit Security, working for JetBlue.

78.    A November 19, 2007 Newsday article chronicled some of the events surrounding SEIU 32BJ's effort to "replace Allied."  In the article, a Summit Security spokesperson said that SEIU 32BJ's campaign is "an effort to discredit our company and coerce our already unionized employees" to join SEIU 32BJ.  Exhibit H.

79.    SEIU International created and maintains a website that purports to publicize poor customer service and flight delays at JetBlue. The Internet address of that website is www.itsnoteasybeingblue.info.  While SEIU International ostensibly utilizes this website to raise customer service issues, the real intent of the website is to further Defendants' financial interests by placing pressure on third parties, namely JetBlue and Summit Security, to replace AIU in favor of SEIU 32BJ.  Exhibit I.

**D.    Defendants Will Not Stop Their Campaign Until AIU Is "Crushed" or Cedes Representation of Its Members.**

80.    In furtherance of Defendants' raiding of AIU, Defendant Fishman advised AIU leadership that SEIU 32BJ will do "whatever it takes" to supplant AIU and take control of its membership.

81.    Defendant Friedman told AIU members that SEIU 32BJ's goal is to "corner the market" on representation of security guards in the New York City area.  In November 2007, at a Fordham University site, Friedman yelled at several AIU members, saying that Fishman "will be the president" of AIU.

82.    In October 2007, Defendant Diaz told AIU representatives that it is in AIU's best interest to "give in to us."

83.    In about March 2008, SEIU International Vice President Thomas Balanoff stated that SEIU International was "coming after Allied hard and will crush" AIU.

**E.    Defendants' Raiding Campaign Constitutes Extortion and/or Attempted Extortion, Designed To Harm AIU For Defendants' Financial Gain.**

84.    Defendants are engaged in a systematic campaign against AIU and its officers, including the foregoing conduct, which constitutes a pattern of extortionate activity and attempted extortion, designed to drive AIU out of existence and obtain AIU's business for Defendants' own financial gain.

85.    An additional element of Defendants' extortionate conduct directed at AIU involves Defendants' aggressive efforts to use AIU members as surrogates to file decertification and deauthorization petitions with the National Labor Relations Board in New York and Los Angeles.

86.    In 2007 and 2008, Defendants have harassed AIU members and persuaded a small number of them to file petitions with the NLRB.  Region 2 of the NLRB, in New York City, conducted a mail ballot deauthorization election in February and March 2008 for a unit of approximately 900 AIU members.  The ballots were counted at Region 2's office on March 10, 2008, at which over 11 agents of SEIU 32BJ and/or SEIU International were present.  Only 299 of the 900 members voted to deauthorize (remove a union security provision from the AIU collective bargaining agreement covering these members), well below the required majority.

14

87.     On the day following the Region 2 deauthorization vote count, Defendants distributed a flyer that misleadingly stated a "majority of voters indicated" that AIU members are unhappy with AIU. The flyer also falsely accused AIU of unlawful conduct in connection with the deauthorization vote. The flyer states that the NLRB is "currently investigating charges that Allied made illegal threats to workers regarding their votes." The flyer does not state, however, that SEIU 32BJ is the entity that filed those charges. The flyer is attached as Exhibit J.

88.     Defendants have engaged in the kind of conduct that they accuse union-busting employers of utilizing to rid workplaces of labor organizations. Defendants' efforts to gin up support for deauthorization petitions parallel those of the National Right to Work Foundation (http://www.nrtw.org/deauthorization-election).

89.     In March 2008, SEIU 32BJ pressured Summit Security into suspending its long-standing practice of deducting AIU dues from the paychecks of its employees who are AIU members ("AIU Summit Members"). The dues had been deducted based on authorization forms unilaterally created and distributed by Summit Security, not AIU.

90.     Defendants were successful in coercing Summit Security as mentioned in the foregoing paragraph, in part as a result of the political pressure Defendants brought to bear on Fordham University. In this regard, Fordham opened up bidding on its security contract with Summit Security in response to Defendants' aggressive and coercive campaign, including the ongoing disruption of the Lincoln Center expansion.

91.     Approximately one week prior to suspending Summit Security's long-standing practice of deducting AIU dues from the paychecks of its employees, Summit Security's President, Bob Auletta, told AIU President Peggy Vanson that in order for Summit Security to keep its contract with Fordham, AIU must carve out a portion of its Fordham guard unit to allow SEIU 32BJ to represent those guards. Auletta said that if AIU refused, then SEIU 32BJ would

15

"do something" to make Summit Security cease deducting representational dues.

92.    Vanson also received multiple telephone calls from Auletta urging her to meet with SEIU 32BJ to relinquish a major portion of AIU's membership to SEIU 32BJ in order to save his company, because SEIU 32BJ was intent on putting Summit Security out of business.

93.    Vanson refused the demand by Summit Security. Approximately one week later, Summit Security ceased dues deductions, as described above.

94.    On the same day that Summit Security ceased dues deductions, SEIU 32BJ distributed a flyer, in an effort to persuade AIU Summit Members to stop making lawful voluntary dues payments to AIU. Exhibit K, p. 1.

95.    In the flyer, SEIU 32BJ asked the misleading and fraudulent question, "Has Allied International Union been taking your dues illegally?" In a separate flyer mailed to AIU members, Defendants further falsely accuse AIU of illegally taking dues from its members. Exhibit K, pp. 2-3. SEIU 32BJ is attempting to mislead AIU members into refusing to pay dues altogether, which, under the lawful union security clause in the AIU/Summit collective bargaining agreement, could lead to the termination of employment of those members. SEIU 32BJ's sole purpose for this action is to cut off much-needed representational funds to AIU in an effort to coerce AIU into surrendering to Defendants' extortionate demands.

96.    Defendants have succeeded in pressuring and misleading third parties, such as NYC Human Resources Administration, FJC Security and Summit Security, and some of AIU's own members, to disrupt AIU's business. Moreover, Defendants' campaign shows no sign of stopping, unless AIU accedes to their demands.

97.    Defendants have also misled many AIU members into signing forms and petitions that Defendants later used to harass AIU. For example, Defendants have been inundating AIU with up to 20 requests per day over the last several months for such things as member bulletin

16

boards, internal union information and documents requests.  In most cases, the AIU members who sign Defendants' forms are not aware that they are requesting anything from AIU.

### F.    Defendants Unlawful Interference With AIU's Internal Officer Election Constituted Extortion and/or Attempted Extortion.

98.    Defendants engaged in the following pattern of extortionate activity and attempted extortion, designed to deprive AIU members of their right to democratic participation in their election of AIU officers and to obtain that right for Defendants' own financial gain:

a.    On multiple days in May 2007, at various work locations in New York City, Defendants and other agents of SEIU 32BJ unlawfully interfered with AIU's officer elections and campaigns by supporting the candidacy of their surrogates, including Jesus Govea, Melvin Garland and Larry Binyard, by holding rallies of members, distributing flyers to members, speaking to members personally and by telephone.  Defendants, in this regard, attempted to, and did, interfere in AIU's internal officer elections in violation of Section 401(g) of the Labor Management Reporting and Disclosure Act (LMRDA), 29 USC 481(g);

b.    Paid agents of SEIU 32BJ and SEIU International, including Defendant Friedman, in May 2007, falsely stated to AIU members that Govea's opponent in the election, MaryBeth Stafford, was a corrupt and fake lawyer;

c.    Paid agents of SEIU 32BJ and SEIU International, upon information and belief, wrongfully confiscated AIU internal election ballots, in part by fraudulently representing themselves as AIU members, and distributed them only to AIU members who agreed to vote for SEIU 32BJ's surrogate candidates;

d.    Paid agents of SEIU International, SEIU 32BJ and SEIU Local 1877 misled hundreds of AIU members who work for Summit Security, FJC Security and Aviation Safeguards to believe that the AIU internal officer election was an election between AIU and SEIU 32BJ;

17

e.  SEIU 32BJ, on multiple instances throughout May 2007, provided the use of its telephones, fax machines, copy machines, computers, stamps, paper and envelopes to unlawfully campaign for its surrogates in violation of LMRDA 401(g);

f.  SEIU 32BJ directed AIU members, verbally and in writing, to contact its paid union organizers for information about AIU's internal election and for AIU election ballots;

g.  SEIU 32BJ, by its agents, used the interstate mails and wires as part of its effort to mislead AIU members into believing the AIU officer election was an election to choose SEIU 32BJ as the exclusive bargaining representative of AIU members;

h.  While working on behalf of Govea during his campaign for AIU Vice President, as well as the campaigns of other surrogates, paid agents of SEIU 32BJ also solicited AIU members to sign materials to become members of SEIU 32BJ;

i.  Paid agents of SEIU 32BJ engaged in campaigning on behalf of Govea that was so disruptive that it denied Govea's opponent the opportunity to campaign; and

j.  The New York law firm of Kennedy, Jennik & Murray, P.C., has provided legal services on behalf of Govea, Watson, Binyard, Garland and other surrogates throughout most of 2007, paid for by SEIU International, SEIU 32BJ and/or one of their organizing "front" entities, to protest the AIU internal elections in furtherance of SEIU 32BJ's attempt to gain control of AIU.

**G.    The Effects of Defendants' Extortion and/or Attempted Extortion.**

99.    Defendants have had success in leveraging their political muscle to create circumstances that are harmful to AIU, such as Defendants ongoing efforts to block the Fordham University building expansion.    As discussed above, several elected officials have assisted Defendants in their campaign to block the building expansion.

100.    Defendants have made it clear to AIU that their extortionate activity will not stop

18

until AIU "gives in" to Defendants.

101.    AIU now recognizes that Defendants have sufficient financial and political power to either drive AIU out of existence, or make AIU surrender to Defendants' effort to take over AIU.

102.    AIU's fears are based, in part, on its understanding of SEIU International's and SEIU 32BJ's success in raiding other unions such as AFSCME, SPFPA, Local One and SSOBA, and forcing those unions to reach agreements beneficial to Defendants.

103.    Defendants' overall campaign against AIU, including their disparaging, misleading, harassing conduct and comments, is intended to instill in AIU the fear of economic harm. Furthermore, Defendants have succeeded in instilling such fear.

104.    Additionally, Defendants have wrongfully, tortiously and maliciously interfered with AIU's relationship with its members as part of Defendants' overall attempt to raid AIU's membership by, among other actions, the conduct described above.

105.    Defendants' overall raiding campaign has damaged AIU financially and has resulted in a decrease in AIU's membership total and representational dues, as Defendants intended.

## COUNT I

### VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1961, *et seq.*

106.    Plaintiff repeats and reiterates each and every allegation contained in paragraphs 1 to 105 as if fully set forth herein.

### Defendants' Prior Schemes and Predicate Acts

107.    Defendants have engaged in an unlawful conspiracy to extort things of value from AIU. Defendants have aggressively raided AIU's membership either to drive AIU out of existence or force AIU to surrender to Defendants' extortion.

108.    Defendants have engaged in repeated and ongoing activities designed to destroy the image of AIU to the public and its members, destroy the reputations of the elected officers of AIU, inflict severe economic damage on AIU and disrupt or destroy AIU's relationships with its members and the third parties referenced in this Complaint.   Defendants' conduct includes fraudulent, misleading and untrue comments about AIU and its officers, unlawful interference with AIU's business relationships, false and defamatory statements that AIU officers engaged in adulterous sexual affairs and false allegations of the corrupt and unlawful practice of law by an AIU officer.

109.    Defendants have harassed and coerced AIU's members at their homes and workplaces, threatened them with the prospect of filing federal charges against them and misled them into suspending dues payments and questioning the loyalty of AIU officers.

110.    Defendants misleadingly claim to act in the interests of AIU members by facilitating, promoting and funding deauthorization and decertification petitions aimed at bringing economic pressure on AIU.   Defendants' actions, however, are taken not in the interests of AIU members, but solely for their own financial benefit.

111.    The things of value Defendants have extorted and/or attempted to extort include: AIU's agreement to surrender to SEIU 32BJ its role as the certified, exclusive bargaining representative of approximately 6,800 security guards; AIU's relinquishment of control over its organization; AIU's relinquishment of its relationships with its members; and substantial representational dues from AIU's members.

112.    Defendants have further engaged in an orchestrated scheme, carried out by themselves or their paid agents, to deprive AIU's members of democratic participation in the AIU internal officer election for the purpose of placing SEIU 32BJ surrogates in AIU officer positions to gain control of AIU.   Defendants engaged in this scheme as part of their overall

effort to increase SEIU International's and SEIU 32BJ's security guard membership by raiding AIU, and to unlawfully drive AIU out of the marketplace.

113.    Specifically, Defendants, by the intentional acts of themselves and/or their agents in the course of their employment and/or agency relationship with Defendants, engaged in racketeering activity by: a) violating the Hobbs Act, 18 U.S.C. § 1951, by obstructing, delaying and affecting interstate commerce by attempting to and obtaining the property of individuals induced by Defendants' wrongful use of fear of economic harm; b) violating the Travel Act, 18 U.S.C. § 1952, by traveling in interstate commerce, using the mail or a facility in interstate commerce with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment or carrying on of extortion; c) violating the federal mail fraud statute, 18 U.S.C. § 1341, by causing the use of the mails and/or private carriers for the purpose of executing their scheme to defraud; d) violating the federal wire fraud statute, 18 U.S.C. 1343, by causing the use of interstate wires for the purpose of executing to defraud; e) attempted extortion under New York's Extortion Act, McKinney's Penal Law §§ 110.00, 155.05(2)(e); and f) other extortionate activity.

114.    In light of the success SEIU International has had in the past in union raiding efforts, as well as the actions to date of Defendants in this raiding campaign, AIU has a reasonable belief both that Defendants have the ability to harm AIU economically, and that Defendants will exploit that ability to coerce AIU into surrendering to Defendants' raiding efforts. Each act of Defendants in furtherance of its raiding campaign against AIU has been an attempt to obtain property from AIU through the wrongful use of threats of economic fear, and each such act constituted extortion and/or attempted extortion by Defendants in violation of the Hobbs Act.

21

115.    Defendants' efforts to gain control of AIU through its unlawful funding and support of surrogate campaigns for AIU officer positions was an attempt to obtain the property of AIU members – their right to democratic participation on the AIU internal officer election – through the wrongful use of threats of economic fear.  Each act of Defendants in furtherance of this effort constituted extortion and/or attempted extortion by Defendants in violation of the Hobbs Act.

116.    Defendants have used facilities in interstate commerce, such as telephones, mail and email, to promote, manage, establish, carry on, or facilitate the promotion, management, establishment or carrying on of the above-described extortion and/or attempted extortion of AIU and AIU's members.  Each use of the telephones, mail and emails for this purpose constituted a violation by Defendants of the Travel Act.

117.    During the relevant time period and in furtherance of and for the purpose of executing the scheme and artifice to defraud, Defendants on numerous occasions used and caused to use wire communications in interstate commerce by both making and causing to be made telephone calls and other wire communications as proscribed and prohibited by 18 U.S.C. §1343.  In addition to instances referenced in this Complaint, a schedule of some of the relevant uses of the interstate wires is included in Exhibit L and incorporated by reference.

118.    During the relevant time period and in furtherance of and for the purpose of executing the scheme and artifice to defraud, Defendants on numerous occasions used and caused to be used mail depositories of the United States Postal Service by both placing and causing to be placed mailable matter in said depositories and by removing and causing to be removed mailable matter from said depositories, each such use of the mails in connection with the scheme and artifice to defraud and to obtain property of others by means of false pretenses, constituting the offense of mail fraud as proscribed and prohibited by 18 U.S.C. §1341.  In

addition to instances referenced in this Complaint, a schedule of some of the relevant uses of the mail is included in Exhibit L and incorporated by reference.

119.    The acts of racketeering activity described above, for which Defendants could have been charged and indicted were continuous.

        a.    The racketeering activity described above, for which Defendants could have been charged and indicted constituted repeated conduct over a substantial period of time.

        b.    Alternatively, the racketeering activity described above, for which Defendants could have been charged and indicted constituted conduct of racketeering involving a continued threat of future racketeering.

120.    The acts of racketeering activity described above, for which Defendants could have been charged and indicted were related to each other because they have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.

121.    The acts of racketeering activity described above, for which Defendants could have been charged and indicted constituted a pattern of racketeering activity consisting of more than two acts of racketeering activity, all of which occurred after the effective date of 18 U.S.C. § 1961 *et seq.*, and the last of which occurred within ten years after the commission of a prior act of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

<div align="center">

**Violations of RICO**

**Section 1962(c) and (d) Violations – Defendants**

</div>

122.    Defendants are associated with the Stand for Security Enterprise.

123.    Defendants conducted or participated, directly or indirectly, in the conduct of the Stand for Security Enterprise through the pattern of racketeering activity described above, which

<div align="center">23</div>

directly and proximately resulted in substantial economic loss to AIU's business or property, including costs incurred in establishing an independent committee to investigate complaints arising from the above-described pattern of racketeering activity, loss of representational dues and loss of goodwill, in violation of 18 U.S.C. § 1962(c).

124.    Defendants have conspired to conduct or participate, directly or indirectly, in the conduct of the Stand for Security Enterprise through the pattern of racketeering activity described above, which directly and proximately resulted in substantial economic loss to AIU's business or property, including costs incurred in establishing an independent committee to investigate complaints arising from the above-described pattern of racketeering activity, loss of representational dues and loss of goodwill, in violation of 18 U.S.C. § 1962(d).

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in its favor and against Defendants in an amount to be determined at trial, including treble damages and attorney fees pursuant to RICO, and such further relief as the Court deems just, proper and equitable.

<div align="center">

**COUNT II**

**TORTIOUS INTERFERENCE WITH BUSINESS
RELATIONS AND ECONOMIC ADVANTAGE**

</div>

125.    Plaintiff repeats and reiterates each and every allegation contained in paragraphs 1 to 124 as if fully set forth herein.

126.    Defendants wrongfully and tortiously interfered with AIU's business relations and activities with its members, third party security service providers and facility owners and managers by the unlawful conduct described above, which has led to the disruption of those relations and activities.

127.    Defendants intentionally and without any excuse or justification interfered with AIU's reasonable expectation of economic advantage.

<div align="center">24</div>

128.    Defendants' actions described above have been taken with the sole purpose of harming AIU, and by means that are dishonest, unfair and/or improper.

129.    Defendants' wrongful conduct and tortious interference with AIU's business relations and activities have caused AIU to suffer financial loss, the cost of retaining counsel to repair those relations and pursue court intervention, and the loss of future revenue.

130.    As a direct and proximate result of the Defendants' tortious interference with AIU's prospective economic advantage, AIU has suffered damages, including but not limited to lost representational dues and reasonably foreseeable consequential damages.

131.    In furtherance of its overall interference with the relationship between AIU and its members, Defendants are currently funding an aggressive deauthorization campaign against AIU with the National Labor Relations Board by exploiting its intimidation of members described above, and using the information wrongfully obtained by, among other actions, that conduct.

132.    By reason of the foregoing, Defendants are indebted and liable to AIU for damages suffered in an amount to be proven at trial, together with interest thereon at the legal rate and an award of reasonable attorneys' fees.

WHEREFORE, Plaintiff AIU demands judgment in its favor against Defendants in an amount to be proven at trial, as well as interest, costs and reasonable attorney fees, and for such other and further relief as this Court deems just and proper.

## COUNT III

## CIVIL CONSPIRACY

133.    Plaintiff repeats and reiterates each and every allegation contained in paragraphs 1 to 132 as if fully set forth herein.

134.    Defendants entered into an agreement or understanding to unlawfully harm Plaintiff by willfully, systematically and maliciously defaming AIU's officers, interfering with AIU's business relationships and conducting the above-describe extortionate campaign.

135.    Defendants committed one or more overt acts pursuant to and in furtherance of their conspiracy to unlawfully harm Plaintiff.

136.    Defendants were motivated solely by ill will and engaged in these actions with intent to harm.

137.    As a result of the conduct described above, Plaintiff has suffered (and continues to suffer) damages, including injury to their names, reputations and financial interests.

138.    By reason of the foregoing, Plaintiff demands an award of compensatory damages in an amount to be determined at trial.

139.    Because of the willful, wanton and intentional nature of Defendants' conduct, Plaintiff also demands an award of punitive damages in an amount to be determined at trial.

WHEREFORE, Plaintiff AIU demands judgment in its favor against Defendants in an amount to be proven at trial, as well as interest, costs and reasonable attorney fees, and for such other and further relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment against Defendants to compensate Plaintiff for compensatory and consequential damages to Plaintiff's business and property in an amount to be proven at trial, including treble damages pursuant to RICO and exemplary and/or punitive damages for Defendants' intentional, willful, wanton, outrageous or malicious misconduct. Plaintiff further prays for reimbursement of attorney fees and costs and other further relief as the Court deems just and proper.

Plaintiff demands a jury trial of all issues so triable.

Dated: April 3, 2008

Respectfully Submitted,

**STARK & STARK, P.C.**

Kevin M. Hart
Scott I. Unger
One Penn Plaza Center
250 West 34th Street, 36th Floor
New York, New York 10119
(212) 629-3298
*Attorneys for Plaintiff*

Respectfully Submitted,

**STROBL & SHARP, P.C.**

Dennis M. Devaney (admission pending)
Michael M. Jacob (admission pending)
Jeffrey D. Wilson (admission pending)
300 E. Long Lake Road, Suite 200
Bloomfield Hills, MI 48304
(248) 540-2300
*Attorneys for Plaintiff*

J:\DOCS\77021\009\PLDG\SB233068.DOC

E
X
H
I
B
I
T

A

# EXHIBIT "A"



August 2003

# THE VISION IS REAL!



| Howard Johannssen | Daniel Payne | David Hickey | Caleb Gray-Burriss |
|---|---|---|---|
| FOPSCO | AFSO | SPFPA | NASPSO |

*(Pictured above) Presidents of the International Union, Security, Police, and Fire Professionals of America (SPFPA); Federation of Police, Security and Correction Officers (FOPSCO); American Federation of Security Officers (AFSO); National Association of Special Police and Security Officers (NASPSO); (Pictured below) Arizona Armored Car Association; Raytheon Guard Association; and United States Court Security Officers (USCSO) announce the merger of their seven unions.*

# 7-WAY UNIFICATION MAKES HISTORY!

## ...and It's Making News All Around the Country!

Seven of the most prominent Security Unions in the nation announced they are joining together to form the *largest* and *strongest* security union in history. This merger will protect security professionals and their families and will be the nucleus of President Hickey's vision for uniting the security industry to protect all security unions and gain "One Union, One Strong Voice" for our members internationally.









### National Alliance Police, Security and Corrections Organizations (NAPSCO)

*President Hickey announces the addition of two more independent security unions to the National Alliance, Police, Security and Corrections Organizations.*

**Page 2** *America's Union for Security Professionals*

# International Executive Board

 

David L. Hickey
International President

Dennis T. Eck
International Secretary-Treasurer

     

Mike Swartz
Vice President
Region 3

James L. Allen
Vice President
Region 4

Kerry C. Lacey
Vice President
Region 6

Daniel Payne
Vice President
Region 7

Bobby R. Jenkins
Vice President
Region 10

Terry J. Fowler
Vice President
Region 11

  

Bernard Hadley
International Trustee
Local 127, Florida

Joe Durbin
International Trustee
Local 502, Pennsylvania

Louis Washington
International Trustee
Local 256, Texas

## Department Directors

      

Steve Maritas
Organizing

Caleb Gray-Burriss
Washington, DC
Operations

Harold Trigg
National Securitas

Rick Mallory
Research/
Communication

Ron Upton
Information/
Technology

Rick O'Quinn
DOD/NASA/
Aerospace

Robert A. Inman
COP

      

Harvey Key
DOE/NRC

Brian Gibbons
CAST

Dean Hess
Homeland Security

Penny Warner
Securitas

Mathew Sandlin
Securitas

Anthony Nelons
Securitas

Joe Brucato
CASH

*To be Announced* Court Security Officers (CSO) Director; DaimlerChrysler Director

## Full-Time International Office Staff

       

Kim Berra
Executive
Secretary

Carol Azar
Executive
Secretary

Elaine Bellack
Bookkeeper

Gloria Sanders
Assistant
Bookkeeper

Kari Kriebel
Assistant
Bookkeeper

Joanne Vance
Secretary

Mary Mulvaney
Receptionist

Sylvia Galindo
Secretary
West Coast Office

## International Union, Security, Police and Fire Professionals of America (SPFPA)

### International Representatives

Jack Russell
Douglas Farkas, Local 64
Ricky O'Quinn, Local 127
James Allen, Local 451
John Cummins, Local 110
Rick Mallory, Local 114
Anthony Neloms, Local 168
Joseph Durbin, Local 502
Frank Guerin, Local 502
Howard Simpson, Local 690
Pat Baldwin, Local 235
Neal McGregor, Local 251
Terry Hutchinson, Local 709
Kevin Hulse, Local 3
Robert Inman, Local 823

### International Office Staff

Elaine Bellack
Carol Azar
Kim Berra
Gloria Sanders
Kari Kriebel
Joanne Vance
Mary Mulvaney
Sylvia Galindo, West Coast

### Organizers

Joseph McCray
Shedrie Jones
Bryant Jones
Richard Osinski
Douglas Lewis
Elisa Torres
Robert Inman

### Legal Counsel

Gordon A. Gregory
Jim Moore
Mark Heinen
Scott R. Brooks
Rachel Helton

International Union,
Security, Police and Fire
Professionals of America
25510 Kelly Road
Roseville, MI 48066

Office:      (586) 772-7250
Fax:        (586) 772-9644
Organizing: (800) 228-7492
Website:   www.SPFPA.org

# America's Union for Security Professionals

The International Union, Security, Police and Fire Professionals of America (SPFPA) is the largest, most professional security union in the country. The SPFPA represents thousands of security professionals who provide security service for business, industry, hospitals, universities, prisons, casinos, and a broad range of government facilities, including many regulated by the U.S. Department of Defense, Court Security Officers, the U.S. Department of Energy, and Nuclear Regulatory Commission. SPFPA is proud of our members and the service they provide to our nation.

**For more information, contact**
**(800) 228-7492**
Visit our Website www.SPFPA.org

## Mission Statement

**Vision**
To be recognized by our members, companies, and other unions as the leading labor organization specializing in the representation of security, police, and fire professionals in the world.

**Goal**
To provide improved, consistent service to our members and locals by dedicating ourselves to the steps necessary to move our Union forward and maintain a level of excellence.

**Mission**
To better serve our Locals through improved communication, while maintaining a strong financial base and staying committed to the overall needs of our members and their families.

**Values**
Uncompromising honesty, unyielding integrity, dedication, trust and respect.

### Inside this Issue

## Message from the President
# SPFPA STANDS STRONG!



*David L. Hickey*
*International President*

Dear Brothers and Sisters:

My article for this issue is the letter I was forced to send to Tom Balanoff, President Local 1 SEIU, Chicago, because of the SEIU's continuing attack on our union (i.e. sending out false literature and anti-union SPFPA videos, creating false websites with misinformation and lies about SPFPA and threatening the livelihoods and careers of our members). As I have explained, SEIU is attempting to take over the security industry and destroy independent security unions through threats, intimidation and other violations of the law.

The battle began when the SPFPA did not accept the SEIU's self-serving version of a supposed "no raid" agreement, which was in reality a jurisdictional agreement that left nothing but "manufacturing" representation open to SPFPA. If SPFPA accepted such an agreement it would have meant a slow death to our organization and its 55 year as a service union. SPFPA, in good faith, met with representatives of SEIU three times together to solve our differences. After the third meeting it appeared we had reached terms that were acceptable to both organizations. Unfortunately, when we received a written version that did not reflect what was tentatively agreed upon at the table.

SPFPA members have encountered numerous threats from the SEIU, (IUSPB) and the Project Preview organization through phone calls and unwelcomed visits to their homes and union videos and propaganda. SEIU has no intention of running a campaign that will only result in hurting all unions. The SPFPA will never change its policy of protecting its members, their families and security professionals. It is, and has always been willing to reach a legitimate no raid understanding with any union. To date, seven other security unions have emerged and joined with us to protect themselves and our industry, and together, we will continue to gain strength.

As International President, I pledge that the SPFPA will continue to protect its members and at all costs lead in the battle to keep the SEIU from destroying this industry. The letter written to me by the late SEIU's Tom Balanoff, dated May 16, 2002, Balanoff states in part, SPFPA "focused our energy on organizing workers, improving standards and fighting unfair employers". Today, the SEIU is funding campaigns and paper organizations that say exactly the opposite about our union. This leaves SEIU and Balanoff with absolutely no credibility and forces me to let our members read for themselves the truth about SEIU's leader-ship and their attempt to dominate the industry and destroy legitimate security unions like the SPFPA. Our battle continues, and our membership strengthens. I thought it better to confront the SEIU and those that would harm our union. **"We are America's Union for Security Professionals; we are strong, we are committed, and we will succeed!"**

*Letter sent to Tom Balanoff, President Local 1, SEIU*

Dear Mr. Balanoff:

I am in receipt of your letter dated 6/16/03 announcing your idea for a federation of security unions, and the proposed September meeting in Chicago. It begins in part with the line "I write to you as a fellow security officers' union leader". Though not the first lie you and your despicable organization have spewed, it's time to set the record straight. You are not the leader of a security officer union. You are the Local President of a mixed union, spending more time attacking legitimate 9(b)(3) security unions than servicing the unfortunate service employees it currently claims to represent. The non-impressive Security/Division title granted you by the SEIU is only that, a title; and your idea for a "federation" as you well know is three years behind what the SPFPA has already accomplished. In January 2000, the SPFPA announced the formation of the National Alliance of Police, Security and Corrections Organizations (NAPSCO), an alliance of security unions for the purpose of improving the security industry through legislation, training and mutual support. I'm sure this is not news to you, as I personally shared it with your newly seized puppet-union, UGSOA, and its supposed President, J. Vissar, in March of 2000 in Colorado. I also shared it with the former International Union of Security Officers (IUSO) Executive Board at a meeting they requested in California prior to your questionable take-over of that union, and with your own California SEIU representative at a meeting held in Detroit.

Since its inception, NAPSCO and its coalition of unions has grown, and the positive response to the SPFPA vision of **"One Union – One Strong Voice"** for security professionals continues to gain strength. Through this "vision", seven other legitimate 9(b)(3) security unions have merged with the SPFPA, including the Raytheon Guard Association, Arizona Armored Car Officers of America, National Alliance of Special Police and Security Officers, American Federation of Security Officers, American Federation of Security Officers, American Security Union (a California Security Union that rejected the SEIU's interference), and the United States Court Security Officers (USCSO) (350 former Police Officers out

*continued on page 5*

*continued from page 4*

## SPFPA STANDS STRONG

of New York who left the poor representation of the crumbling, SEIU controlled UGSOA, just to name a few.

The fact is 9(b)(3) security unions don't need SEIU interference or your self-serving jurisdictional agreements. As true Security Union Leaders, we know what our legal jurisdiction is, and so do you. These SEIU jurisdiction agreements only help the SEIU; a mixed union that cannot have NLRB certified representation elections for guards. Your agreements are designed to eliminate competition from the SEIU's five-year plan to take over the security industry and destroy independent security officer unions.

In our phone conversation over a year ago, you accused the SPFPA of raiding the SEIU, an accusation I vehemently disagreed with. It is the SEIU and the "skirt names" it hides behind like (Prewitt Organizing/Front

Line Project/NUSP/Former SPFPA Members) that has the history of raiding. The tactics being used by your organization and its prostitutes are against the basic concept of unionism, and have been nothing more than a small distraction to our union and its goals; not the SPFPA ruination you state in your letter attempting to deceive those that don't know the truth. The SPFPA has won on every issue that your organization has created. You were defeated in Seattle (twice) for over 500 officers, who are now in SFPPA; in Michigan (NUSP, your paper-union, received only 181 votes out of 1900 possible, with SPFPA winning by the overwhelming majority); The SEIU-run NUSP also lost to us in Sacramento, Los Angeles, and San Diego for over 1,100 officers; over 100 dock officers in California and Washington chose SPFPA, and you lost numerous, fruitless attacks on our 9(b)(3) status throughout the country. It is the SEIU that is wasting its members dues

money on these unnecessary and unsuccessful attacks, not the SPFPA who is only protecting its jurisdiction of over 54 years. You use "terminated for cause" employees, SPFPA ex-local officers voted out of office by their membership, full-time SEIU employees claiming to be former SPFPA members, and names of people who were never part of the SPFPA to discredit this organization in your anti-union literature and videos. This certainly is not in keeping with the fake principles of your non-existent federation.

In Seattle, when over 450 security officers rejected the SEIU, your Union engaged in a campaign of threats and intimidation to force the employer out of business. Unions should fight to preserve and improve jobs and not actively campaign to throw members out of work. On the basis of charges filed by the SPFPA, an NLRB Administrative Law Judge has found that the SEIU engaged in unlawful activity and interfered with the rights of security officers. And you claim that the SEIU seeks to raise standards for security officers.

For the record, the SPFPA is growing in membership and strength daily. Our NLRB elections have increased by major proportions and our success rate cannot be denied. With future campaigns in several major cities (including Chicago) and the finalization of several active mergers, the SPFPA will represent well over the 20,000 officers we currently are proud to service.

The SPFPA has for over half a century worked with and supported all Unions. We do not raid unless raided. (Remember, as you admitted in our conversation, SEIU Local 73 Chicago raided SPFPA at Nuclear facilities in Illinois). We do, however, dedicate ourselves to assisting security professionals who call us for help. That is our promise and our mission, and we will not be detoured from it. If the SEIU fails to "recognize the integrity" of the SPFPA, we will continue to fight and we will continue to *WIN*! I am calling on all independent, legitimate security unions to do the same.

As I stated to Mark Gaffney, AFL-CIO Michigan President, if you, as an SEIU representative wish to discuss this further, the line is always open. If not, make no mistake the SPFPA will continue to do whatever is necessary to protect our members, their families, other security unions, and security professionals nationwide.                * * *

## "The Spirit of America" Award

*by Cynthia*

The original picture of the flag was taken Oct. 6, 2001 at Marshall Independent School District Administration Building in Marshall, Texas. I stood directly under the flagpole on a windy, fall day. Although I know the flag looked especially beautiful against the East Texas sky, little did I know that I would capture such an interesting formation. The "fighter jet" formation has completely thrilled the hearts and imaginations of so many Americans. I do not believe that the picture was captured merely out of coincidence, but that it is to be used as a gift from our Father in Heaven. It's my hope that it encourages the people of the United States to continue to pursue freedom though we are in the midst of such tragic and trying times that, if allowed, can weaken our faith in humanity. Therefore, I found it appropriate to name this picture "The Spirit of America."




*Carl Prince, President Local 706 presents "The Spirit of America" award to President Hickey*

My friends, family and I proudly dedicate "The Spirit of America" to our American heros including: Firemen, law enforcement personnel, medical staffs, military personnel, as well as the untold heroes of the World Trade Center and Pentagon destruction. May God Bless and Protect Our Great Nation.

*Cynthia is the daughter of SPFPA Member Carolyn Lenart, Chief Steward, Local 706 who took this photo. She has developed a product line of "The Spirit of America" items. If you would like to place an order, please contact Carl Prince, President, Local 706 at (318) 869-0247.*

### The AFL-CIO for Security is Born:

# National Alliance Police, Security and Corrections Organizations (NAPSCO)





*Howard Johannsen, President of Federation of Police, Security and Corrections Officers (FOPSCO) agrees that "one union - one voice" is the future for the security industry as a whole.*



*The vision is real among Security Leaders across the country. President Hickey and newly merged President Caleb Gray-Burriss NASPSO agree that the future for security is to become united!*



*Dan Payne, President American Federation Security Officers (AFSO) and President Hickey merged together to form "one union - one voice"!*



*President Hickey and Secretary Treasurer Eck shake hands with former USCSO President Thomas Massone and Secretary Treasurer Don S. Hauschild at the merger agreement signing.*



*Howard, Dave and Caleb are all smiles after another successful merger at meetings held at SPFPA International Headquarters.*



*UGSOA President Vissar met with President Hickey in Las Vegas to discuss the NAPSCO vision. Unfortunately for his members, Vissar continues to fail to recognize the power of "One Union - One Strong Voice" for security professionals.*

## For more information on NAPSCO
## Call (866) NAPSCO + 1

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# *The Vision is Real!*



"*The vision "One Union - One Strong Voice" is shared by true security leaders across the country. These mergers have opened many doors for security unions and the security industry as a whole. We now have the opportunity to learn from each other and expand like never before. The unified talent and expertise we share will help us achieve great improvements for our members and revolutionize the industry for security professionals nationwide.*"

David L. Hickey
2003

*David L. Hickey, International President*

# "One Union - One Strong Voice"



President Hickey shares his vision with the U.S. Court Security Officers nationwide. Recently CSO's in New York City, Atlanta and Brooklyn voted overwhelmingly for SPFPA. "One Union - One Voice"





*Creative planning sessions are held to develop communication strategies for the purpose of improving the security industry through legislation, training, and mutual support of security unions.*

*Team building approach is reinforced in language developed by General Counsel Gordon Gregory and President Hickey for future contracts and By-Laws.*



Daniel Payne, President American Federation of Security Officers (AFSO) and the entire Executive Board and membership voted overwhelmingly to merge with SPFPA. Great job and welcome to our family!



*International Secretary-Treasurer Dennis Rok gives oath of office to new Regional Vice-President Daniel Payne.*

# *America's Union for Security Professionals!*



*Dennis Eck*

# International Secretary-Treasurer

## *Focus on Finance*

If you haven't thought about the local unions or your personal liability to checking account fraud, maybe you should. Over the past 10 years or so, check fraud has become a major threat to individuals and businesses, costing an estimated $16 billion dollars a year.

Several factors have precipitated the rise in check fraud. One is a banking regulation requiring banks to speed up the availability of customer funds. As a result, check funds are sometimes made available before checks have even cleared.

Also, the low-cost, high-tech copying/scanning equipment available today makes it easier to produce forged and duplicate checks and alter dollar amounts.

These and other factors have combined to make check fraud one of the leading white-collar crimes of the decade. It is a relatively low-risk criminal activity with high stakes and high odds of success. There are estimates that one million "bad" checks are issued every day, and only about 10 percent of the financial loss is ever recovered.

Check fraud can take on many different forms. The most common types are theft and forgery, duplicating or counterfeiting, and alteration. Amounts are usually for only a few hundred dollars per issued check to avoid drawing undue attention.

You may be liable for losses due to check fraud in certain situations; therefore, consider the following suggestions to reduce your exposure:

Purchase a good quality check. This is the easiest fraud-deterrent approach. Discount checks may not be the bargain you hoped for. Better quality checks may contain one or several security features; such as, treated inks, tamper resistant paper, watermarks, etc.

Reconcile your bank statements and report any losses promptly. This is not only the best way to track the accuracy of deposits and payables in order to catch fraudulent activity quickly, but it also helps demonstrate due diligence on your part should liability for losses become an issue.

Maintain tight security over your checks and check book. Store your checks securely and monitor your supply regularly. Be careful with your check book. Old bank statements, voided checks, billing information regarding credit card accounts, etc. should be shred, **not just thrown away.**

In addition to implementing these suggestions, you can also take advantage of a variety of technology-based products and services from your bank that can help curb check fraud. These include account and deposit reconciliation, paid check imaging, electronic funds transfer, payroll direct deposit and other cash management services.

To learn more about fraud-prevention measures you can take and services that might be available to you, speak with a bank representative in your home area.

# Governor Granholm addresses Homeland Security

Dennis Eck met with Governor Granholm and discusses the need for improved training programs. SPFPA members and their families deserve to be safe and properly equipped in Michigan and



nationwide. Future discussions are planned with the Homeland Security Department in Michigan. We need to continue to develop programs that will ensure safety and security to our Country and the security members of this Great Union!

# Training survey results not suprising

Members overwhelming responded to the SPFPA Training Survey that was distributed to all SPFPA Locals. A majority of the feedback included concerns regarding the overall lack of proper equipment, training, licensing and level of staffing necessary to be prepared for duty.

The results of your survey are being reviewed by SPFPA legal counsel and will be utilized to formulate plans to further address your concerns. Keeping our SPFPA family safe and secure, improving the level of dignity and respect, and achieving a higher standard of living is our common goal.

<u>Thank you</u> to those who participated. Together, we can make a difference!

---

**Have you moved recently?  Please notify the International Headquarters**
**25510 Kelly Road, Roseville, MI 48066**

***Communication is important to our members!***

# SPFPA International Holds Regional Conferences to Educate Members and Local Union Leadership

**Topics: Negotiations; Federal Mediation; Grievance Handling; Representation & Service; State-Wide Organizing**



SPFPA has been on the forefront of strengthening our Local Union Leadership by conducting Regional Conferences throughout the United States. These conferences led by SPFPA International President, David L. Hickey, and SPFPA International Secretary-Treasurer, Dennis T. Eck, gave each member a more in-depth knowledge of how our organization is better prepared to handle the issues facing our members and their families. Keynote speakers included C. Richard Barnes, Federal Mediation and Conciliation Services (FMCS); SPFPA General Counsel Gordon A. Gregory and SPFPA Attorney James Moore; SPFPA Insurance Benefit Representative Gary Hasenbank; Regional Vice Presidents Terry J. Fowler, Gerry E. Hartlage, Bobby R. Jenkins, Kerry C. Lacey, Daniel Payne and SPFPA Organizing Director, Steve Maritas.



Topics of discussion included contract negotiations, federal mediation process, grievance handling, finance, health and welfare programs, service to our members, arbitration, and organizing on a national scale. President Hickey discussed recent and future mergers and the SPFPA's vision "one union - one voice". President Hickey also announced the ongoing development of the Members Benefits Programs to include the *"all new"* SPFPA Health and Welfare Program, SPFPA 401K Pension and Annuity Fund and disability benefits which will



be implemented in the very near future.

Feedback from these very successful conferences have been overwhelmingly positive. Future conferences including the SPFPA's new Educational Program are already being planned. For more information, contact the International Headquarters.





















# Security Officers Nationwide choose *"America's Union for Security Professionals"* . . . the International Union, SPFPA!

## SPFPA Launches Aggressive Organizing Campaigns, Achieving Record-Breaking Success!

A new program was launched to assist Security Professionals nationwide. SPFPA International Headquarters receives numerous distress calls daily from around the country from security professionals seeking the professional representation of SPFPA.

SPFPA Organizing Team

*Security Officers in Washington, DC support SPFPA!*

*Los Angeles Security Officers are signing up for SPFPA!*

May 6, 2003

Mr. Joseph A. Hendricks, President

Mr. Dave Hickey, President
SPFPA International Union
25510 Kelly Road
Roseville, MI 48066

RE: UGSOA Local 62

Dear Mr. Hickey:

Our union brothers and sisters were very pleased that you accepted our request and solicitation and agreed to come to Atlanta and address our local membership on April 24, 2003.

We all are very positive about the SPFPA Union. We have been enlightened from your comprehensive explanations and benefits discussion that you and your team shared with us about SPFPA's vision, goal, mission and values.

The questions and answers about the above subject's were very productive and received positive responses. On April 25, 2003 more than 88% of our members signed the SPFPA cards, unanimously selecting SPFPA as our exclusive representative in collective bargaining.

We look forward to the integrity, honesty, dedication, and trusting representation from our soon-to-be new union.

Sincerely,

Joseph A. Hendricks, President
UGSOA Local 62

*New York Security Officers vote overwhelmingly for SPFPA representation.*

**For more information call (800) 228-7492**

**SPFPA Organizers are Ready to Go!**





# SPFPA continues to *Win* Elections

## Recent SPFPA Wins:

Northwest Protective Services
Basic Contracting
Holiday International
St. Joseph's Hospital
St. Vincent's Hospital
Nevada Security Innovations
Quest
Detroit Diesel
Black Hawk
Deco
Startech
Deleware North
Wackenhut
Securitas
Akal
MVM
Argus
AKAL-CSO's Brooklyn
Management Training Corp.
ISI
Inter-Con

## SPFPA Campaigns:

Securitas
AT Systems
Eagle
Loomis, Fargo
St. John's Hospital
Allied Security
HWA

## City-Wide Campaigns:

Los Angeles, CA
St. Louis, MO
New Jersey
Washington, D.C.
Seattle, WA
New York
Chicago, IL



## *Organizing*

### SPFPA Members Organizing Security Officers

**S.O.S.**



*Steve Maritas, Director Organizing*

The terrorist attacks of September 11 struck at the very heart of the American homeland. It was a new form of total war in the age of terrorism, and it put all Americans on notice that the United States is dangerously vulnerable and that new means are urgently needed to strengthen the security of our homeland. The nation's overall level of alert continues to be elevated consistently, indicating a significant risk of terrorist attacks. While this threat remains high, the question on every American's mind is not if another attack could happen again, but when. If in fact we are subject to such an attack, on the front lines of such a terrorist attack would be America's security officer professionals.

While the International Union, Security, Police and Fire Professionals of America (SPFPA) represents many security police professionals working in many locations likely subject to attack, such as nuclear facilities, governmental buildings, NASA, airports, seaports and many other high profile locations, many of these locations are still unorganized, giving way to a greater vulnerability of attack.

When we compare a unionized professional security force under the SPFPA banner versus a non-union security force, governmental statistics have clearly shown that a unionized professional security force is more likely to have higher wages, better benefits, better working conditions, job security, a voice on the job and better training with less turnover giving the front line unionized security officer a sense of pride, motivation and awareness in protecting our nation, while limiting the vulnerability of attack with an immediate response. This is why SPFPA continues to pride itself as "America's Union for Security Professionals", and still remains the leader of choice among security professionals looking to unionize. To date, since the September 11

attack, security professionals from around the United States are continually sending a distress call for help to our union. Organizing these new members is now at an all time high. Campaigns are currently underway in California, New York, Washington, Kentucky, District of Columbia and many other states adding the potential of thousands of new members to the SPFPA family.

As the Organizing Director, I have been given the opportunity to listen to the concerns of many unorganized security professionals who seek the necessary training, representation, wages and benefits SPFPA members now enjoy. As part of this International's vision of a new direction and the continuing effort to strengthen the security of our homeland, our union has now embarked in a new program called S.O.S., which stands for Security Officers Organizing Security Officers. Commencing August 2003, this new International organizing training program SOS will be in place for every SPFPA member to participate in. By the year 2004, our goal is to have trained over 1,000 new member organizers to help assist in organizing the unorganized who seek our help. Only through membership participation can we begin to educate unorganized security officers on the many benefits of belonging to our union. SPFPA is strengthening the security industry daily.

**Security, Police and Fire Professionals of America (SPFPA) is America's Union for Security Professionals!**

## For more information call (800) 228-7492 or Cell (646) 567-6454

### www.SPFPA.org

# Outstanding turnout at National Security Summit



*President Hickey discusses the important leadership role SPFPA must take in the representation of security, police and corrections organizations nationwide.*



*Ideas were shared to develop effective liaison on matters of common concern to the health, safety and welfare of the security industry.*

















SPFPA National Security Summit was a great success. A standing room only crowd of SPFPA members and union leaders from across the country joined together in solidarity. A dynamic agenda was planned which included a panel discussion with Security Union Leaders and addressed the various challenges being faced in the security industry. A panel discussion of employers and contractors discussed the "9/11 Challenge into Private Security". Special Guest speakers included Gordon A. Gregory, General Counsel, James Moore SPFPA Attorney, and Steve Babson, Wayne State University. President Hickey announced the historic formation of NAPSCO and shared his vision of "One Union - One Voice".

**Special guest speakers included:**







*Steve Babson,*
*Professor*
*Wayne State*
*University*

*James Moore*
*SPFPA*
*Attorney*

*Gordon A. Gregory*
*General Counsel*

# Washington, DC District News



*Caleb Gray-Burriss.*
*International Representative*

For the last 12 years, I have been representing Washington Area Security Personnel. I have never been as proud as I am now in our membership. We have had our share of growing pains but with the dedication and commitment of our membership we continue to grow in numbers and strength. The Washington Region is comprised of Security Police Fire Professionals of America (SPFPA) Locals 285, 286, 287, 288, 289, 290 and 450 and growing. Each local has Officers who have assumed their positions with enthusiasm.

To the Washington Local Officers and their Members, I Salute YOU!!

Our membership is a unique addition to the SPFPA Family. For the most part, because we are located in the Washington, D.C. area, our membership is responsible for providing security for Federal facilities. In addition, there are more law enforcement agencies, DC Metropolitan Police, Capitol Hill Police, US Park Police, and GSA Special Police, to name a few. Unfortunately, historically private/contract Security Personnel have been given little or no respect, being referred to as "rent-a-cops". Enhancing the professionalism and improving the perceptions regarding Security Personnel has been high on my priority list since I began organizing Security personnel.

Being a part of SPFPA, having representation, receiving increased wages and improved benefits are major steps toward heightening the status of our members, as professional Security Officers.

Today, Security is of global, national, local and personal concern. Those who provide security services are in demand and deserve to be acknowledged. The unification and representation of Security Personnel is imperative. In this regard, there is a Dream and a Vision that I share with David Hickey, International President, SPFPA. We are moving forward to establish an organization to bring together unions throughout the nation representing Security Personnel. An organization with common goals and shared resources focused on the betterment of Security Personnel. We envision an organization with tremendous potential to influence and expose the issues and concerns of Security Personnel. The Washington Region membership supports this organization and anticipates a bright and lucrative future as members of SPFPA.

## Vice President Region 4



*James L. Allen*

### Securitas National Negotiations Resume

The Securitas Security Officers (Pinkerton) will not let anything stand in their way. They have defeated the NUSP/SEIU and now are on their way to economic and social justice with their employer. The Union National Contract Negotiating Committee is prepared for National Negotiations at the International Union, SPFPA Headquarters and will continue until victory is ours.



The following Union Representatives are dedicated to getting the type of contract that their members deserve: Chief Negotiator, International President David Hickey; assisted by Region 4 Vice President Jim Allen, National Securitas Director Harold Trigg; Local 4 Executive Board Member, Harry Wagoner; Local 20 President, Cassie Smith; Local 64 Vice President, Tom Len; Local 114 Chief Stewards Lawrence DeVito and Devon Madray; Local 116 second Vice President Tony Johnson and Chief Steward, Marva Jones; Local 117 President, Freddie Miller and Vice President; Gene Beals; Local 145 Shift Steward, Pat Roach; Local 149 Co-Director and Local President, Penny Warner; Local 166 Representative; Patricia Landess and Guide, Jay McNeely; Local 168 Chief Steward; Tony Seefeld and Recording Secretary, Valerie Durance; Local 506 Chief Steward, Rich Domyan, Jr.; Local 555 Chief Steward, Milton Brown; Local 706 President, Carl Prince and Local 712 President, Ann Baxter. With a team like this, we will succeed!

The 60-day notice has been exchanged between the International SPFPA and the DaimlerChrysler Corporation for our upcoming negotiations. Region 4 will also be negotiating with Loomis, Fargo Company; Securitas Guide Unit and the Wackenhut Corporation at several locations.

We will keep the membership advised as we move forward in all negotiations.

**It's going to be one hot summer!**

*America's Union for Security Professionals*

### MEMBERSHIP BENEFITS
# Scholarship Award Winners

    

*Cara Nichole Henry*
*Local 65*
*Hannibal, OH*

*Ashley Landry*
*Local 542*
*Bedford, MA*

*Nicholas L. Jendrejeski*
*Local 502*
*Pittsburgh, PA*

*Krystal Ras*
*Local 529*
*West Valley, NY*

*Terry Benton*
*Local 330*
*Aiken, SC*

I cannot express what a great surprise it was to receive this scholarship. This, by far is one of the greatest honors that I have ever received! I would like to thank the members of the International Union, SPFPA, for this generous award. Both of my parents work very hard to provide for my sister and me. This scholarship lessens the heavy burden of college expenses for my family.

I am thankful that my father belongs to a union dedicated to the welfare and support of its members and their families. This financial gift will be applied toward my educational expenses at Bethany College, where I am majoring in Education and Biology. Once more, on behalf of my family and myself, I would like to extend my sincere thanks to the International Union, SPFPA!

This is just a short but sincere thank you to show my great appreciation for your choosing me to be a recipient of the SPFPA Affinity Scholarship. This generous scholarship will be a great help to me in accomplishing my future goals while attending the University of Massachusetts at Amherst. Once again, I would like to say thanks.

**Membership benefits that count!**

**It's easy to apply! Just contact the International Office and ask for your application!**

**For more information call (586) 772-7250**

I am writing to inform you that I have received the International Union Scholarship check in the amount of $1,000.00.

I would also at this time like to thank you and your organization for this scholarship.

Thank you to the International Union, Security, Police and Fire Professionals of America for the $1,000.00 scholarship that I received. It will help out a great deal with all the school items I need to pay for. The scholarship is greatly appreciated.



**SPFPA SCHOLARSHIP PROGRAM**

SPFPA members and their families are eligible to receive...

**$1,000.00**

for education

For more information contact International Headquarters (586) 772-7250

I would like to say thank you very much for the scholarship that you have chosen me to receive. I have received your scholarship, and it has been put to good use. My school has a student computer ownership initiative, and I have used your money to purchase a computer. Your organization has been a great help to me. A few weeks ago, I was about to depart for school and I had no way of purchasing a computer, but the day before I left, I received your letter in the mail. You don't know how much of a blessing your organization has been to me.

Once again, I would like to say thank you for your generous contribution.



The International Union, SPFPA, is proud to support the SPFPA Scholarship Program. Education is a benefit that our members and their families deserve! Congratulations to the Scholarship Winners!

# SPFPA Charity Golf Day/Luncheon

## *Record turnout for a wonderful cause!*

The International Union, Security, Police and Fire Professionals of America (SPFPA) hosted it's 12th Annual Charity Golf Outing. A very special "Thank You" to our many members and friends who attended and supported this most worthy cause!



*(L-R) Daniel Payne, Vice President, Region 7; David Hickey, International President, SPFPA; Caleb Gray-Burriss, International Representative; Howard Johannssen, President, FOPSCO*



*Dave Clancy wins set of deluxe Golf Clubs. Congratulations!*



*Kerry and Evan Lacey enjoy a great day!*



*Brian Gibbons is happy to support SPFPA Charity Golfday!*



*Ulysses Hampton enjoys sharing some time with friends*

**Closest to the Pin**
Guy Wegener
Kerry Lacey
Fred Kriebel

**Longest Drive**
Tim Link

**Straightest Drive**
Dave Clancy

**Putting Contest**
1st Place  - Brian Bruster
2nd Place  - Brian Carter
3rd  Place - Gary Hasenbank



*1st Place Winners - Tony Cardamone, Brian Brzustewics, Mike Mellado and Tim Lindquist*





*2nd Place Winners - Fred Kriebel, Paul Timm, Dave Roberts, Steve Lynch*



*"Last Place" Champs - Joe Otmanowski, Dorreen Burns, Mark Heinen, Rachael Helton*

## Sponsors and Contributors

Local 5
Local 120
Local 64
Local 110
Local 114
Local 117
Local 122
Local 141
Local 145
Local 149
Local 159
Local 213
Local 238
Local 749

Standard Federal Bank
Pension Trend
ACME Packaging Corporation
End User Consultants
Bob Carroll
Charlie Bradshaw
C.E.O. Optical
St. Joseph's University
UBS Paine Webber
Loomis Fargo & Company

Local 256
Local 263
Local 430
Local 332
Local 349
Local 410
Local 502
Local 536
Local 560
Local 801
Local 803
Local 890
Local 794
Local 1991

Total Armored Car Services, Inc.
Miller Brewing Company
AFL-CIO, Detroit Council
Fine State
Mundet Capital
Blue Cross/Blue Shield
The Wackenhut Corporation
Craber and Associates
Gregory/Morris, Yeakle, Pienta & Brooks
Security
Bruce E. Goodman
First Union Complex
Day & Zimmerman
FOPSCO
Homaphones
Struico Chemicals
AFS
Complete Travel Services Inc.
Daimler Chrysler
American Plan Administrators

**Thank you very much for your participation and continued support!**

*America's Union for Security Professionals*





*Gordon A. Gregory, General Counsel*

Since its founding 55 years ago, our Union has been involved in numerous struggles to preserve its independence as the country's largest Union devoted exclusively to the representation of security personnel. In those struggles anti-union employers, hired consultants and hostile agencies have tested our endurance, skills and dedication. We have always prevailed, and becoming wiser, have continued to grow and move forward in the interests of security officers and their families.

Throughout the years we have enjoyed a strong fraternal relationship with the entire labor movement even though federal labor law prevents us from affiliating directly or indirectly with a non-guard union or with the AFL-CIO.

We have contributed to the labor movement through our efforts in support of the Service Contract Act, the landmark U.S. Supreme Court decision in *Burns Security*, and our full support of organized labors political and legislative initiatives. Our jurisdiction was respected by other unions, and we respected theirs. The UPGWA and SPFPA did not raid other unions. We have always remained within our statutory jurisdiction of representing "guards."

The SPFPA is now engaged in the most vicious struggle in its entire history. Ironically, that struggle is with a "union" which seeks to discredit, diminish and destroy our Union. That union is the Service Employees International Union (SEIU) with traditional jurisdiction over janitors and other building service employees.

Since the NLRB will not certify the SEIU to represent security officers, it must obtain recognition and employees dues through means such as organizing from the top down, affiliating with a guard union or the force of picketing, threats and political pressure.

SEIU tactics came to light recently in Seattle where security officers of Northwest Protective Services contacted the SPFPA for representation. They had

been forced into an SEIU Local through a questionable affiliation. In accordance with its employees wishes, Northwest recognized the SPFPA and entered into a recognition agreement. Now the SEIU dirty tricks begin. It caused politicians, including the Mayor of Seattle, to write letters to Northwest threatening it with loss of customers. It threatened to picket Northwest and cause loss of business. Northwest bowed to the pressure and threats and recognized the SEIU. We filed unfair labor practice charges against SEIU and Northwest and NLRB issued a complaint. On June 10, 2003, an Administrative Law Judge issued his decision finding that SEIU had violated the law, and ordered a remedy including the refund of dues.

The Northwest case provoked the SEIU to seek a meeting with SPFPA representatives. Three meetings were held, and at each, SEIU representatives insisted upon a "jurisdictional agreement" in contrast to a traditional "no-raid agreement." We were asked to give up our right to organize and represent security officers in certain geographical areas, businesses and industries. The price was too high. The SPFPA would not forsake security officers and their right to select a security officer union.

Despite the SPFPA's pledge not to raid any SEIU units or active organizing drives, the SEIU refused to play on level field. It pledged to destroy our Union which would, of course, destroy our members' jobs.

SEIU retained a "labor consultant" firm in Washington, D.C. which operated through transparent entities called Front Line Project, Pruitt Organizing Group and others. These groups are controlled by an operative named Duane Stillwell. From the shadows he also created a fictional organization called National Union of Security Professionals which has no constitution, no staff, no office and no members.

The SEIU and its Stillwell fronts has attempted to interfere with our organizing efforts or established units at a number of locations. In each instance the SPFPA has emerged victorious.

Northwest Security has been discussed. Also in Seattle we defeated SEIU efforts at Eagle Guard Services to

claim that the SEIU is not a qualified Section 9(b)(3) union.

At Pinkerton and DaimlerChrysler the darling NUSP has been soundly defeated in both its legal and organizing efforts to replace the SPFPA.

At Inter-Con in California our Union overcame the scurrilous tactics of the NUSP and received overwhelming support from security officers.

The SEIU's use of a "labor consultant" is, of course, an employer tactic. It is a coward's tactic and does not relieve it of responsibility for the notorious conduct of its agent.

The Stillwell enterprises, with SEIU blessing, have conducted the most vicious, scurrilous, rotten and dirty campaign in contemporary labor history. They make extreme anti-union employers blush.

The SEIU has sanctioned and supported blatant lies, misrepresentations, and underground tactics which are a detriment to the entire labor movement.

If the SEIU really cared about the welfare of security officers it would assist the SPFPA in organizing them, and in exchange the SPFPA would assist the SEIU in organizing janitors. SEIU knows that it cannot be certified by the NLRB, but it has set out to remove the SPFPA as an impediment to its efforts to force recognition from employers. And the SEIU continues to reject SPFPA's offer to enter into a traditional no-raid agreement.

In the years I have been privileged to serve as our Union's General Counsel, I have never been prouder of our International Officers, Local Officers and members. You stand in solidarity against the SEIU menace, and see through the phony claims and vicious lies. You understand that SEIU's program is simply to enhance numbers, collect dues, and increase political clout. It is the SEIU way or no way. Like a vengeful child it will attempt to destroy a security union and with it the livelihood of security officers. It will not happen to the SPFPA. We will continue to fight in a fight that we did not start, and, with the full support of our members and new members, we will continue to win. • • •

## Research and Communication



*Rick Mallory, Director*
*Research and Communication*

### Democracy in the SPFPA

From the earliest inceptions of the labor movement, democratic principles have been at the core. The belief of individuals collectively forming a consensus in order to benefit the group as a whole is fundamental to the success of the SPFPA. To this end, International By-Laws require that locals perform elections of officers annually, unlike pseudo unions that have appointed delegates that elect only select individuals that may not even be members of the union to serve as officers controlling the membership money and future. In the SPFPA, the membership selects the leadership of the local and the leaders selected by the membership select the international officers, all of which are required to be dues paying members of the union. In order for this system to work, the membership needs to participate in the election process by voting in an annual election and making sure they elect candidates who will maintain their best interests.

To maintain this process, members should also consider running for office or serving on election committees. Active participation by members in the operation of the local is vital to protect the interests of the membership. While some offices, such as president, steward, and financial secretary/treasurer, do require significant personal investment, many other positions require minimal effort and are just as vital. Filling these positions also provide members with an opportunity to become involved and learn the ropes. So please remember, that for your union to succeed, you need to participate in your next local election process.

For more detailed information on conducting local elections, check the following websites:
http://www.spfpa.org/docs/ elections.html - Contains information on SPFPA by-laws governing local elections.
http://www.dol.gov/esa/regs/compli-ance/olms/complpubs.htm - Contains compliance assistance information to meet federal law regarding union elections.



*Bobby R. Jenkins*

# Vice President Region 10

As the year progresses, it made me realize how many good, positive and exciting things have taken place in organizing and mergers with many new groups who chose to join ranks with the SPFPA. I want to personally welcome Howard Johannssen and his group (FOPSCO), Dan Payne and AFSO from California, Caleb Gray-Burriss and his group in Washington, D.C., and new Organizing Director, Steve Maritas from New York.

I would like to also welcome on board new Local 724 from El Paso, Texas. A new 3-year agreement that included a wage increase of $3.92 per hour and other benefits were negotiated and ratified for this group with Deco Security. A special thanks to Jose Carrillo for being instrumental in organizing this group and for all your help!

A big Alabama welcome "y'all" to our SPFPA family goes out to all of the above mentioned!

Reflecting back, I would be remiss if I did not mention the superb job Gordon Gregory and his firm (Jim, Mark, Scott and Rachel) have done this past year. Special thanks from Region 10 for the legal expertise and arbitration cases handled. Congratulations are in store to Rachel Helton for her big arbitration win for Local 250 in St. Louis. Two Alton Belle employees were reinstated and made whole for lost time wages and benefits.

I could not close without sending a big thanks to our staff at International Headquarters in Detroit: Elaine, Carol, Kim, Gloria, Keri, Joanne and Mary. We couldn't operate without you.

I will leave you with this thought. Gratitude to God should be as regular as our heartbeat.

## Locals join together at Annual Picnic



*[photo caption text partially illegible]*

## Successful Labor/ Management Conference



*Members of Local 77 are pleased with the labor/management conference held with Scott Mandel, President of Asset Protection & Security Services.*

**We support the SPFPA!**



Robert A. Inman, Director
Correctional Officer
Professionals (COP)

## Correctional Officer Professionals (COP)



The Arizona State AFL-CIO invited our Union to many of the functions in Arizona since being registered with the Arizona Labor Council. I received a call from one of the organizers from another Union wanting to know if he could give out our local address and phone number. I asked him why and he told me that there was a group of Security Officers that had been inquiring about a Security Union in Arizona. Upon hearing that we hurriedly got some of our Union members together, and we participated in the Labor Day Parade, where we were able to speak with security officers interested in becoming organized and gain additional leads.









## DOE/NRC Report

Harvey Key, Director
DOE/NRC

## NRC News

I am sure by now that all of you have had a chance to read the Nuclear Power Plant Security Report 2002 provided by Project on Government Oversite (POGO). I was deeply disturbed but not surprised by what I read. These issues have been ongoing for years, however, now they are in the spotlight of national security.

Will any changes be made? I do not know. What I do know is that, I have been assured that the NRC is seriously considering the POGO Report. NRC Commissioners have met with representatives of POGO to discuss the conclusions of the report. Additionally, hearings have been held with the Senate Environment and Public Works Committee. The NRC is carefully monitoring these concerns and responding to issues raised to their attention. I was also advised that the NRC is deeply concerned about the reports of excessive overtime and fatigue effects on security force personnel.

If you are experiencing excessive overtime at your facility, have your Local Union representative contact me as soon as possible with supporting data.

## DOE News

The Department of Energy (DOE) held Public Hearings and a Comment Period, on the Proposed Rule to establish a Human Reliability Program (HRP) that would consolidate its Personnel Security Assurance Program (PSAP) and Personnel Assurance Program (PAP).

The **proposed** rule includes:
1. Random Alcohol Testing
2. Eight-Hour Abstinence rule for alcohol
3. Annual Submission of Questionnaire for National Security Positions (QNSP)

4. Psychological Evaluations
5. Counterintelligence Polygraph Examinations

SPFPA representatives attended these hearings and made the necessary comments to ensure that the concerns of the bargaining units were conveyed to the DOE.

The (SPO)-I/II Quality Panel Agenda Items included:

- Status of On-Site Protective Force (PF) Programs.
- Status of PF Related Directives.
- Status of Basic SPO Training Course.
- Status of SPO-I/II Job Analysis.
- Status of Development of Basic SO Training Course.
- Discussion/Review of the Draft Protective Force Physical Fitness Qualification Course.
- Status of Revision of 10 CFR 1046.

The major emphasis of the meeting will be discussion/review of the Draft PF Physical Fitness Qualification Courses for comment and input. Quality Panel Members will have a "hands-on" opportunity to walk through the draft courses at the NNSI Range Complex.

SPFPA representatives will be attending this event to ensure bargaining unit concerns are conveyed to the DOE.

### *Personal Message*

During this dangerous time in our nation's history, I would like to wish you and your families a safe, and happy holiday season. Although fear and death are all around us, we have these words from our Lord to help us.

He shall cover thee with his feathers, and under his wings shalt thou trust: his trust shall be thy shield and buckler.

Thou shalt not be afraid for the terror by night; nor for the arrow that flieth by day;

Nor for the pestilence that walketh in darkness; nor for the destruction that wasteth at noonday.

A thousand shall fall at thy side, and ten thousand at thy right hand; but it shall not come nigh thee.

*Psalm 91:4-7*



## SPFPA is Organizing Private Airport Security Officers all across the Country!



*Security professionals are organizing their fellow officers at airports nationwide under the SPFPA's SOAR banner.*



*Presently SPFPA is running extensive campaigns at airports throughout the United States.*



# Vice President Region 11



*Terry J. Fowler*

Thank you for your hard work. Many of you have been involved in our organizing drives recently with great success. I see more and more of our locals getting involved with tremendous results. Some examples are Holiday Security in Calexico, California; Loomis Fargo in Spokane, Washington; Securitas Security in Los Angeles, California and we have more than ten additional organizing drives within the Region right now.

Our great success is you. The Locals are getting involved and meeting with Security Officers interested in joining the SPFPA and that is what makes the difference. The International Officers will always be involved in drives, but the Officers in your locations are looking for local contacts. That's where your help is invaluable. Meet with officers in your area, tell them what a great organization we have, and they will become as excited as we are.

As we continue this rapid growth, the Locals will see more International Representatives working in the Region. That is the exciting part of expansion. You will also see more service related benefits for your locals as well. The International Union has been involved in trying to secure more benefits for the members, which you should see as a result of our expansion.

I also ask that each Local Executive Board remain mindful of your memberships. In these trying times and financial chaos, it is becoming increasingly difficult to keep our heads above water and stress levels are at an all time high. Often times this stress will spill over into the work place. This causes my greatest concern. If you see problems beginning, don't wait too long in finding them help. Many of our employers offer Employee Assistance Program (EAP) which are more than for drugs or alcohol problems; many offer financial, marital and family counseling as well.

Let's not have the attitude that we are butting into their personal lives. We should also not be pushy either. If there is a problem it may spill over into the work place, then it will affect all of us. We also realize how busy everyone's personal schedules are, but it is imperative we all get involved. We can all succeed together!



*by David L. Hickey,*
*International President*

The International Union is proud of the many people who dedicate themselves and make the personal commitments to assist us in the service of our members. They are the *"best of the best"*. I am proud to appoint the following members to these most important positions, and wish them great success as they begin their duties. Congratulations to each of you and my personal thanks for a future job well done.

You have my full commitment and support with regards to your positions and responsibilities, and rest assured as we continue to grow, future positions will be filled by officers who, much like yourselves, will pledge to commit the time and energy necessary to keep SPFPA as the #1 Security Union in the Country! * * *

**Great job everyone!**

**S E R V I C E ▪ R E P R E S E T A T I O N ▪ C O M M I T T M E N T**










# Newly Appointed Representatives


**Securitas Directors**



Harold Trigg, Local 166, National Securitas Director.



Anthony Neloms, Local 168, Securitas Co-Director.



Penny Warner, Local 149, Securitas Co-Director.



Matt Sandlin, Local 117, Securitas Co-Director.

A special "thank you" to Harold Trigg, Anthony Neloms, Penny Warner, and Matt Sandlin for their hard work in assisting their fellow Securitas security members.

**Region 3 Vice-President**



Mike Swartz has recently been appointed Vice-President for Region 3 and assumed all-duties and responsibilities. We welcome Brother Swartz to our Team!

**Region 7 Vice-President**



Daniel Payne has been appointed Vice President of the new "Region 7." Congratulations Brother Dan!

**Homeland Security Director**



Dean Hess is newly-appointed as the SPFPA Homeland Security Director and will work directly with President Hickey.

*The achievements of an organization are the result of the combined efforts of each individual.*

*Vince Lombardi*



## Union-Made Products for SPFPA Locals

*Peggy Osgood*
*SPFPA Products Designer*

SPFPA offers a wide variety of union-made products and services for your local officers and members. To order your SPFPA products, just contact your Local President or Financial Secretary. An order can be placed on the website (www.SPFPA.org), or by sending an order form to the International Headquarters.

The International Office also welcomes SPFPA local unions to utilize the services of our union printing companies for stationery and office supplies. You may contact them directly.

**Goodwill Printing Company**
**2000 West Eight Mile Road**
**Ferndale, MI 48220**
**(248) 547-7500**

**Heitman Garand Printing Company**
**1627 West Lafayette**
**Detroit, MI 48216**
**(313) 962-3258**



## SPFPA SCHOLARSHIP PROGRAM

SPFPA members and their families are eligible to receive

### $1,000.00

for education.

For more information call (800) 228-7492 today.



# Vice President Region 7

## Strength in Numbers

*Daniel Payne*

I would like to take this opportunity to introduce myself to you, my fellow brothers and sisters of SPFPA. Nine years ago, I was elected Secretary, Treasurer and Business Manager of American Federation of Security Officers (AFSO), Local 1 in Los Angeles. Local 1's resources and membership were in decline and I saw a great challenge to turn things around. I am proud to say that we succeeded by cutting expenses and organizing more members. "Strength in numbers" was a concept that I often discussed with Local 1's Executive Board. There is a huge potential in California, but being an independent Security Officer local in Los Angeles, we believed that in order to become more effective in representing our members, we had to become stronger.

Approximately one year ago, I received a phone call from SPFPA International President David Hickey. In that first phone call, I told Dave AFSO, Local 1 had approximately 1,000 members in all types of industry, such as motion picture studios, hospitals, aerospace, bottling, cannery and a large group of officers on the docks in Los Angeles and Long Beach harbors. I learned that SPFPA was the largest independent security officer union and that SPFPA represented thousands of members all across the United States, Canada and Puerto Rico.

Shortly after that phone call, Dave flew to Los Angeles for a meeting, and shared his vision of organizing and creating "strength in numbers". "Strength in numbers", he took the words right out of my mouth. We share exactly the same vision for the future of Security Officers "One Union – One Voice" and with that, merger talks ensued.

AFSO, Local 1's Executive Board, met many times, debating a merger with the assistance of Lewis Levy, our legal counsel. I believed very strongly that affiliation and merger was the absolute right thing to do for the future of Local 1 Security Officers and ultimately for all the Security Officers. The Executive Board voted to let membership decide, and in December of last year, a referendum was held and an overwhelming majority voted in favor of the merger. Local 1 is now a local within SPFPA and at the same time, Region 7 was created.

California is now Region 7 with 180,000 Security Officers in the state. If I could speak to each one of those officers, I would convince them to sign a pledge card now. With those numbers, can you imagine the strength we would have?

Last June, Region 11 and Region 7 held a joint Conference at the Universal Sheraton Hotel. I would like to thank a lot of people for making it happen, starting with President Hickey, Secretary-Treasurer, Dennis Eck, and Director of Organizing, Steve Maritas for sharing their thoughts on what is happening in SPFPA. I would like to thank Linda Gonzales and Joe Medine of the FMCS for their educational seminar. A big thank you to Lewis Levy, Adam Stern and David Myers of Levy, Stern & Ford, for their valuable class on grievance and arbitration skills. In addition, for helping a first-timer set up such a conference, thanks again Terry Fowler.

These are exciting times and I am excited about the future and what SPFPA is doing for Security Officers from coast to coast and beyond. I look forward with great pleasure to working with President David Hickey and the SPFPA Executive Board, and the truly wonderful staff in the SPFPA office. As the new Vice President of Region 7, I have had the opportunity to observe SPFPA up close. I have discovered a union with vision and leadership dedicated to organize, organize, organize, and bring other independent Security Officer unions together for the betterment of Security Officers and their families, and create "strength in numbers" and "One Union – One Voice".

* * *

International Union,
Security, Police and Fire Professionals of
America (SPFPA)
25510 Kelly Road
Roseville, MI 48066

*Address Service Requested*

NON-PROFIT ORG
U.S. POSTAGE PAID
FENTON MI
PERMIT NO. 1776

# *One Union - One Strong Voice!*



**Stands for:**

- Professionalism
- Leadership
- Respect
- Dignity
- A Voice
- Honesty
- Brotherhood & Sisterhood
- Solidarity
- Unity
- Job Security
- Higher Wages
- Scholarship Program
- Family Health Benefits
- Retirement Benefits
- Shift Differential Pay
- Seniority Rights
- Bereavement Days
- Sick Days
- Holidays
- Vacation Days
- Comprehensive Training
- Member Participation
- Member Organizing
- Servicing our Members
- Strong Contracts










*THE VISION IS REAL!*

**Become part of**
*America's Union
for Security Professionals,*
**SPFPA!**

# (800) 228-7492

# Visit our Website
# www.SPFPA.org





E
X
H
I
B
I
T

B

**EXHIBIT "B"**



Click here to return to the browser-optimized version of this page.

This article can be found on the web at
**http://www.thenation.com/doc/20050829/wypijweski**

# States of Disunion

by JOANN WYPIJEWSKI

[from the August 29, 2005 issue]

The best that can be said about the split in organized labor, which occurred on July 25, opening day of
the AFL-CIO's fiftieth-anniversary convention in Chicago, is that perhaps the principles of chaos theory
will play out in interesting ways. By that theory, the slightest variation in conditions can drastically
change the long-term behavior of a system. Or, as chaos pioneer Edward Lorenz put it, "One flap of a
seagull's wings would be enough to alter the course of the weather forever."

The defection of first the Teamsters and Service Employees (SEIU) and a few days later the Food and
Commercial Workers (UFCW) is a bit more momentous than the flap of a bird's wings, costing the labor
federation some 4 million members and $30 million in annual dues and establishing the basis for a rival
federation, the Change to Win Coalition. But in every way beyond the material it is, so far, insubstantial.
No political vibrancy or meaningful debate, no fundamental power shift or even analysis, no movement
mojo, nothing revolutionary or even progressive is discernible in the schism. Except as props or fodder
for rhetoric, workers have been left out. They may yet demand in, but how and by what mechanism no
one can say.

In Chicago on the day of the split, each side fulfilled the other's caricature of it. At Navy Pier the
convention came to order in a vast, darkened hall, with prayer, color guard and solemn praise for "the
greatest labor federation on earth." "Unity" was proclaimed from the dais, from the slogan on vest-backs
of convention staff, from screen projections as if nothing were amiss; as if four major unions (the three
that ultimately split and UNITE HERE) had not ceased paying dues some months before and were not
now boycotting the convention, as if people in the hall were not seething and insulted, and crisis were
not all around.

"This is surreal," a building trades activist kept repeating. In the visitors' section, international trade
unionists were mystified. Business unfolded as usual. Politicians paraded on to extend their greetings
and score their points, and silence or veiled reference addressed the issue foremost in everyone's mind.

In the bright, cramped offices of SEIU Local 1, where the Teamsters' James Hoffa kicked off the
lunchtime press conference announcing the split, "Change to Win" was as contentless as "Unity" had
been at Navy Pier. The day before, Joe Hansen of UFCW had told reporters that the coalition's
differences with the AFL were "principled and fundamental" but couldn't explain them. Now Hoffa
seemed to settle the matter by emphasizing the $10 million a year that the Teamsters would save by not

paying into the federation. On organizing in core union sectors, one of the stated missions uniting the coalition partners, he mentioned trucking but referred more often to opportunities for the Teamsters to organize casino workers--gesturing fraternally toward UNITE HERE, which elsewhere is suing another union for encroaching on its claimed casino sector.

For his part, SEIU's Andy Stern seemed focused on history. The split, he said, was intended "not to divide the labor movement but to rebuild it." He said SEIU has no interest in raiding, the age-old practice of hitting on another union's members to get them to switch affiliations. Yet as he spoke, his operatives in California were in the midst of raiding an AFSCME local for 10,000 home-care workers under contract with Riverside County.

In the question period, Stern welcomed comparisons with the CIO, which emerged from a split within the American Federation of Labor in 1935, though unlike the current fissure, not before decades of mass rank-and-file industrial organizing. He spoke of bold, fundamental change, change that doesn't dilly-dally with consensus. Days later, in an interview with CNBC-TV, he sounded like a throwback to labor dinosaurs of the 1980s: "Well, our labor movement was built around an industrial economy back in the 1930s. It was sort of a class struggle kind of unionism, but workers in today's economy are not looking for unions to cause problems; they're looking for them to solve them, and this means just like Ireland where business and labor and government all began to work together, we need team America to really work together."

Team America? When a government-corporate combine is striking against union rights, civil rights, social rights, and in some parts the only sure job is in prison? Back at Navy Pier, the president of a Massachusetts electrical workers local said, "There's got to be something between pork chops and Kool-Aid," shorthand for, in the first case, bureaucrats who simply want to manage decline and who exist in every AFL and Change to Win union, and, in the second case, bureaucrats or their acolytes who have an inflated sense of their own superiority. That other "something" has yet to be named, but a move toward it is the only wing-flapping that might alter the course of labor's heavy weather for the good.

In the convention's aftermath there are at least interesting questions. Will anything emerge to fill the void left by two unsatisfactory forces, to develop a strategy helpful to union workers and the working class? Will local unionists, who had no real say in the split, find ways to exercise solidarity and coordinate political action? Will blacks, Latinos, women, gays, all the people who for years have been pressuring national unions and the AFL to go beyond window-dressing inclusion, be able to use the federation's just-passed diversity resolutions to shake up labor leadership, vision, decision-making? Will anything be made organizationally of the historic antiwar resolution? How will Change to Win function once it institutionalizes itself on September 27 and SEIU has to maintain operational unity and political cohesion with the conservative Carpenters, Teamsters and UFCW? Will other unions disaffiliate from the AFL? Will locals disaffiliate from the Change to Win unions? Will the AFL directly affiliate locals? Will Government Employees' president John Gage press on with a proposal for a serious top-to-bottom debate within the AFL on the nature of work, the economy and organizational strategies needed to meet them? Will anyone develop an independent, inside-outside people's political agenda, as Jesse Jackson passionately urged at the convention, or will disappointment with the Democrats and organizational disarray mean what it has so far among Change to Win and some AFL unions: money and support for Republicans?

Perhaps, as a North Carolina unionist wrote to me, "Pain is the only motivator for action," and we're in for exciting days. Just as likely, we're in for bloodletting and fragmentation. Either way, it's no time for romantics.

E
X
H
I
B
I
T

C

# EXHIBIT "C"

# Resignation Letter of UHW President Sal Rosselli from the SEIU Executive Committee

February 9, 2008

Andrew L. Stern, President
SEIU
1800 Massachusetts Ave., N.W.
Washington DC 20036

Dear Brother Stern:

Like you, I take great pride in the recent growth of SEIU and the prominent position our union holds in the labor movement and in public policy debates of critical importance to working families. I was honored four years ago when you appointed me to your executive committee. During the previous eight years, we had worked together constructively to help hundreds of thousands of health care workers in California and beyond join our union and change their lives.

In United Healthcare Workers West (UHW), we have always believed that our international union should be about more than numbers and headlines. Over the past two years, a stark difference has evolved between SEIU's projected image and its real world practices. An overly zealous focus on growth – growth at any cost, apparently – has eclipsed SEIU's commitment to its members. As labor leaders, we are obligated to place the needs of our members first and to uphold democratic principles not only in the workplace, but also in our union. That is increasingly being blocked, circumvented and manipulated.

It is said that "democracy dies in the darkness." It is with deep disappointment and great concern that I have watched dark shadows fall upon SEIU, diminishing our hope for revitalizing the labor movement. Let me shed some light on the undemocratic practices we in UHW have experienced firsthand:

• You unilaterally decided to eliminate the Catholic Healthcare West (CHW) Unity Council and appointed an International Union consultant to manage our collective bargaining relationship, even though the Council's creation was adopted by CHW rank-and-file leaders and approved by the International Executive Board. By all accounts, our relationship with CHW had been enormously successful and had led to significant growth and dramatic improvement in the lives of SEIU members who work at CHW. Your decision potentially weakens us just as we are about to enter negotiations for 16,000 CHW employees, jeopardizing the lead contract of our 2008 contract campaign that has lined up the expiration dates of nearly 100 acute care hospitals covering approximately 100,000 caregivers.

• Similarly, you silenced workers' voices in bargaining with the California Nursing Home Alliance by directing International Union representatives to meet with our employers behind our backs and then abused your power by barring UHW members and staff from participating in direct negotiations with our employers, despite the fact that UHW represents 75 percent of the nursing home members in bargaining. Based on our recent meetings with representatives of the nursing home industry, it is obvious that the International Union's secret discussions with our employers are continuing.

• You recently decided to intensify the divisive debate about separating long-term care workers from hospital workers in California which will further undermine our unity just as negotiations commence for contracts at more than 100 nursing homes – contracts we fought for years to align on a common expiration date of June 2008 -- in order to win major improvements for caregivers and residents and secure organizing rights for workers in as many as 98 additional facilities, including 17 where organizing drives are already under way.

• Despite our representation of the largest number of workers in Catholic health care of any SEIU local and the direct involvement of two employers with whom we are engaged in active campaigns, you exclude UHW from participation in discussions with the United States Conference of Catholic Bishops. In response to our request for review of your decision, you have now scheduled a hearing in Chicago for February 12, with only 8 days' notice, whose scope is far broader than anything approved by the International Executive Board, on the alleged ground that it is necessary to review all aspects of our Catholic health care employer relations and representation, raising the specter that these matters will be placed entirely under control of the International Union and its bureaucracy where rank and file members will have no say, and no ability to affect their workplace destiny.

• In a deliberate attempt to create instability in important ongoing organizing campaigns by fomenting mass resignations among our Southern California organizing staff, your officers and staff helped orchestrate the recent resignation of Southern California Organizing Director, Amado David, whose letter of resignation appeared to have been created on SEIU equipment weeks before his resigning and is now being circulated by you to other SEIU leaders, all as a pretext for taking further action against UHW's leaders and members. Despite this attempt, our UHW Southern California organizing program remains fully staffed and staff remain committed to UHW's organizing program.

• You and other International officers interfered in the affairs of the SEIU California State Council – our collective vehicle for state legislative and electoral action – using the imposition of a revised constitution and bylaws to prompt a presidential

election when none had been anticipated, then manipulating the per capita voting formula and procedures in order to produce the outcome you desired. Ultimately, you permitted provisional locals with no members (and locals that have never paid per capita) and locals that were months behind in per capita payments (owing the State Council nearly $2 million) to vote in the election so that you could control the outcome of the election and seat the leader of your choice.

• Your secret meetings with Governor Schwarzenegger and other elected officials, without the participation of SEIU California leaders, fatally weakened our many years of disciplined work to bring about true health care reform. Those secret discussions with the governor and his staff led them to believe that SEIU – and the labor movement along with us – would settle for far less than was necessary to protect the interests of working families or to win the support of California's voters. The final deal that was struck, while far better than the settlement you had recommended, was flawed and tainted as a result of your actions and was politically doomed.

• Just last week you attempted secretly, although unsuccessfully, to squelch the SEIU California State Council's endorsement of Barack Obama for President.

• You removed a UHW administrative vice president from the Executive Board of the California United Homecare Workers Union (CUHW) for asking questions about "budget and allocation of funds." Your actions like this have created a culture of fear throughout SEIU, making local officers, members and staff afraid to speak up for fear of reprisal.

• Your international officers and staff manipulated voting procedures in Unity Council bargaining with Tenet Healthcare in order to thwart the will of the members and achieve your desired outcome. Specifically, international officers tried to cast "per capita" votes on behalf of unorganized workers who had no knowledge of the negotiations, paid no dues to SEIU, and were not even in the process of forming a union. Your failed effort would have given away our members' right to strike for seven years and would have forced them to accept lower standards.

As you know, UHW (formerly Locals 250 and 399) is the oldest health care union in the country, with 75 years of proud and historic accomplishments. We stand for the principle of one member, one vote and the basic belief that members must have a seat at the bargaining table and the right to vote on all agreements that affect them. We believe that involving members at all levels of our union, providing rank-and-file workers with the support they need to decide our direction and lead our struggles, while winning good contracts that improve caregivers' lives and the quality of the care we provide. These are the best examples we can use to organize the unorganized. Consistent with this, we believe that the deterioration of democracy in our union will have disastrous consequences.

The Nursing Home Alliance agreements and others negotiated by the International Union appear to relegate entire categories of workers to permanent second-tier status, without basic rights and standards to be expected in a union contract or any reasonable hope of achieving them. This transactional exchange of members' rights and standards for greater numbers contradicts the core mission of SEIU. We must be committed to fight for higher standards so that workers who perform the same work will ultimately earn the same pay and benefits, regardless of the identity of their employer.

Let me be clear. We fully support a culture of organizing and strongly approve the goal of organizing our core industries. We also understand the obligation that union strongholds like California and New York have to help organize health care workers outside those two states. Our own organizing record, our leadership in developing and supporting the organizing recommendations of the President's Committee 2000 and the establishment of the Unity Funds, our successful bargaining-to-organize fights in CHW, Tenet and HCA that led to growth opportunities outside of California, and our direct assistance to local and international organizing efforts throughout the country leave no doubt regarding our commitment.

Each year UHW provides $23 million in per capita payments and Unity Fund contributions to the International Union. We do so, even though this is the fourth straight year in which not a dime is spent in California. However, we cannot support, as you propose, sending even more of our organizing dollars to Washington and giving the International Union even greater control of their use when so many of SEIU's organizing ventures have not and will not build power in our core industries, which was the purpose of the dues increase. Furthermore, we see an ever diminishing International Union commitment to improve workers' lives now or in the future.

Much of what I have outlined here I have said to you directly and in Executive Committee meetings. I have abided by the code of conduct for Executive Committee members that requires what is said in the committee to stay in the committee and that positions adopted by majority vote of the committee should determine the position of all its members.

In good conscience, I can no longer allow simple majorities of the Executive Committee to outweigh my responsibility to our members to act out of principle on these critically important matters. I say this with no ill will, but with a deep sense of conviction.

As an elected leader of UHW and an elected international union vice president, I believe that maintaining my silence about the sacrifice of our principles and our failing to give voice to a clear and honest disagreement about the road we are on and the future direction of our International Union is too high of a price to pay. Therefore, my conscience leaves me no option but to resign my position as a member of the Executive Committee, effective immediately.

I believe that workers must have a voice. Indeed, that is the central reason I believe in our union. I believe that for workers to have a representative and effective voice, capable of changing their lives and the direction of our nation, many voices

must be heard, not just those from Washington. I resign not to walk away, but to stay involved and to be able to speak freely.

In Unity,

Sal Rosselli
President

E
X
H
I
B
I
T

D

# EXHIBIT "D"

2/20/08 SFWEEKLY (No Page)

2/20/08 S.F. Wkly. (Pg. Unavail. Online)
2008 WLNR 3504891

S.F. Weekly
Copyright 2008 NT Media, LLC

February 20, 2008

### Local Union Leader Rosselli Blasts SEIU Boss Andy Stern

Smith, Matt

Somewhere in California there's a woman alone in a nursing home with bedsores that grow more painful and life-threatening by the day. And down the hall there's an orderly who would like to do something about her but can't, because during some shifts he's one of just two care-givers on a ward with dozens of patients.

"California nursing homes are sweatshops, [and] a terrible place to live," said Sal Rosselli, president of California's largest healthcare workers' union local, Oakland-based United Healthcare Workers-West, during an online interview last week with the magazine Labor Notes.

While Rosselli's statement might sound like ordinary pre-strike cant, his words are actually much more radical than that.

Rosselli's criticisms are directed at America's most famous labor leader, Andy Stern, the celebrity president of the two-million-member Service Employees International Union (SEIU). According to Rosselli, Stern's expansion of the union has cost workers the ability to complain or fight to improve conditions.

"People join unions because they want to change their lives," Rosselli told Labor Notes. "Workers in struggle create real moral authority, and other people see it and it makes them want to join unions, too. The same is not true with these top-down deals ... where the union agrees to prenegotiated contracts that severely limit workers' bargaining rights and voice."

I've written before about these SEIU deals (see "Partners in Slime," June 30, 2004, and "Union Disunity," April 11, 2007), where the union agrees to prohibit workers from complaining about conditions in exchange for being able to recruit more members in nursing-home chains. I've also described how this strategy privately angered workers and organizers in California, the union's greatest stronghold.

But last week Rosselli turned this once-secret dispute into an open rebellion. This is no minor quarrel. Until recently, he was the head of the 600,000-member SEIU California state council; he resigned earlier this month as a member of the policy-setting national SEIU executive committee, while retaining his post as president of United Healthcare Workers-West, the 150,000-member SEIU branch representing California hospital, nursing home, and home-care workers.

Rosselli's new dissident movement has the potential to derail Stern's ambitious plans to expand into home daycare, alliances with overseas unions in countries such as China, and collaborative agreements with companies such as Wal-Mart, which joined with SEIU last year to push for broadened healthcare coverage. By painting SEIU's national leadership as bent on undermining workers' rights, Rosselli's renegade battle could harm efforts by SEIU to present a united front during a crucial presidential campaign. Last week, SEIU endorsed Barack Obama, and is mobilizing members to work on his primary and general election campaigns.

Rosselli announced his resignation in an open letter claiming that Stern has focused on growth at any

cost. Rosselli's local has also launched a new Web site, www.seiuvoice.com, accusing Stern of expanding union power at workers' expense. Rosselli also issued a series of statements in response to inquiries from SF Weekly in which he made public for the first time his accusations of a Stern power grab. SEIU's national press office did not respond by press time to my request for an interview with Stern or his representatives.

Stern's supporters may protest that this is a bad time to open a national discussion about whether the key Democratic Party ally has been instrumental in curtailing workers' rights. But after a decade in which the poor have gotten poorer, the sick have received less care, and organized labor has made few inroads into making things better, I can think of no better moment for a long-delayed debate over whether Stern's vision of expansion at any cost is truly in the best interest of workers.

During an election year filled with calls for "change," it may seem ironic that an anachronism within an anachronism might be a source for change within the Democratic Party.

To the extent organized labor appears in the press as something other than a component of a political or business story, it's portrayed as outdated and irrelevant -- unless the story happens to mention Stern. He is known for pursuing a "collaborative" rather than adversarial relationship with employers. As Stern's fame has grown, his supposed modernization campaign has become the most-covered story in the labor movement.

Rosselli, meanwhile, is a longtime activist little known outside the old-line labor city of San Francisco, despite leading a behemoth California healthcare union. He is a former nursing home worker who was president of the Alice B. Toklas Lesbian Gay Bisexual and Transgender Democratic Club in the early days of the AIDS crisis. In 1988, he led a dissident faction in the local healthcare workers' union that blamed decline in membership on "30 years of international control," referring to the union's top leadership. Rosselli defeated a slate of candidates who had been handpicked by the national SEIU and has been one of California's top labor leaders ever since.

In the storyline of the current U.S. labor movement -- as depicted in piles of Stern magazine profiles -- Rosselli is the kind of old-fashioned leader that history might forget. But it's Stern's cheap-trick "modernization" that should be left in the dust.

This view has been challenged by the specific details of Stern's supposed "modernizing" labor deals. A nursing home pact (first described in SF Weekly's 2004 story) between the union and home operators took away the right of patients and their families to sue those operators in cases where patients are injured, raped, or killed. Subsequent contracts obtained by SF Weekly showed these deals stifled workers' free speech rights while also curbing their ability to earn decent pay. Rosselli had previously privately criticized these agreements within the union while giving them tacit public support. Last week he made his criticisms public, creating the first credible rebellion against Stern's leadership.

In his letter to Stern, Rosselli lists a series of grievances suggesting that SEIU's sellout model of union organizing stretches beyond the wards of nursing homes.

Rosselli described secret negotiations last fall between Stern and Governor Arnold Schwarzenegger. In these meetings, Stern allegedly agreed to support a watered-down healthcare package in exchange for measures that would help expand SEIU's membership. Some union leaders had urged California Democrats to support a single-payer plan that would eliminate private insurers. An eventual compromise bill between the Democrats and Schwarzenegger was based on requiring more Californians to have insurance. The bill is now considered dead.

"Your secret meetings with Governor Schwarzenegger and other elected officials, without the participation of SEIU California leaders, fatally weakened our many years of disciplined work to bring about true healthcare reform," Rosselli wrote to Stern.

While the healthcare bill may now be dead, the Schwarzenegger-Stern negotiations appear to be the legislative equivalent of a ghost. According to Sacramento insiders, Senate Bill 867 was the quid pro quo SEIU demanded in order to back the doomed healthcare plan. If passed, it would help SEIU

absorb into its union ranks people who provide state-subsidized day care in their homes. Though healthcare reform has died, this apparent sop to SEIU lives on. The bill was sent to committee last week.

Rosselli alleged that Stern grabbed for power elsewhere, too, claiming that Stern is poised to weaken Rosselli's local union's influence by attempting to separate 65,000 home care workers out of Rosselli's UHW, essentially cutting Roselli's union in half. Rosselli also accused Stern of sabotaging his local unions' efforts to participate in negotiations on new contracts with healthcare systems affiliated with the Catholic Church.

"We are concerned that SEIU's international leadership has charted a course that values growth above all other principles," Rosselli said in a statement responding to questions from SF Weekly.

"Our folks are enraged," Rosselli told Labor Notes. "We had been working for 20 years toward similar working conditions and standards for nursing home workers and hospital workers. They are different now, and very different in terms of conditions for patients."

Rosselli's bid to incite open revolt inside what is America's fastest-growing union seems a long shot. Stern enjoys firm control over SEIU's national executive committee. During the past year, Rosselli's complaints have been brushed off by national leadership.

But despite Stern's status as American labor's biggest celebrity, some union members -- many of them outside Rosselli's dissident healthcare union -- are furious about the way he has wielded power during the past few years. In California and elsewhere, the SEIU has consolidated what used to be dozens of small local unions into large industry-based locals. In the process, union staff have been laid off or moved into different jobs with worse benefits. This has created a bizarre situation where the AFL-CIO-affiliated union that represents SEIU organizers, secretaries, and other union office staff has filed complaints with the National Labor Relations Board alleging that SEIU itself has behaved as an abusive employer. Rank-and-file workers, meanwhile, feel that in some cases their ability to select their own leadership has been either diluted or abridged.

And there's the issue of the downright nastiness of Stern-led deals that trade away the legal rights of people as helpless as the elderly and the disabled. SF Weekly's stories about SEIU's nursing-home deals have been widely read within organized labor, the evidence that Stern's "collaborative" arrangements with employers aren't modernization at all. Instead they hark back to the bad old days of company-union sweetheart deals that have given organized labor a reputation for corruption.

Rosselli's open rebellion is premised on the hope that somewhere in America, there are SEIU workers growing tired of Stern's ruse who will begin to advocate for real workers' rights.

EXHIBIT E

# EXHIBIT "E"



# When's the last time Allied International Union helped you get a raise? Sick days? Vacation?

## Most likely your answer is <u>NEVER!</u>

That's because the current union leadership and people like Mary Beth Stafford are only interested in taking your dues money.

---

**Jesus Govea** has been a working member of Allied International Union for over four years at LAX airport, **<u>leading the fight to win better wages, sick days, healthcare and more.</u>** Allied International Union has done nothing to help Jesus and his co-workers in that fight.

**Jesus Govea** and the thousands of workers who support him believe that **<u>real union leadership</u>** is about helping workers win better wages and better working conditions. That's the experience and commitment Jesus Govea will bring to Allied International Union.

---

## Vote for Change.

## <u>Vote for Jesus Govea for Vice President</u>

You should have recently received a ballot in the mail from Allied International Union. Follow all the instructions carefully, and exactly. Mail the ballot back right away. **If you need more information about the election, or do not have a ballot, contact Andy Friedman at 412-519-0966.**

DEFENDANTS
EXHIBIT NO. 20
FOR IDENTIFICATION
7/1/07
DATE: RPTR

# Are you disappointed with Allied International Union?

## Vote for Change.
## Vote for Jesus Govea.

**Jesus Govea** has been a working member of Allied International Union for over four years as LAX airport, **leading the fight to win better wages, sick days, healthcare and more**.

**Jesus Govea** believes that **real union leadership** is about helping workers win better wages and better working conditions.

---

The current **Allied International Union leaders**, including Mary Beth Stafford, continue to sign substandard contracts for workers with:

➢ little or no raises

➢ little or no health insurance

➢ little or no sick days or vacation

Now, they want you to vote for Mary Beth Stafford. **A vote for her is a vote to keep Allied International Union weak and ineffective.** Vote for her if you think your wages, health insurance, vacation, personal and sick time are good enough.

---

## Vote for Change.

## Vote for Jesus Govea for Vice-President.

You should have recently received a ballot in the mail from Allied International Union. Follow all the instructions carefully, and exactly. Mail the ballot back right away. **If you need more information about the election, or do not have a ballot, contact Andy Friedman at 412-519-0966.**

# EXHIBIT "F"

# KENNEDY, JENNIK & MURRAY, P.C.

### ATTORNEYS AT LAW

**113 UNIVERSITY PLACE**
**NEW YORK, NEW YORK 10003**
**(212) 358-1500**

• • •

**FACSIMILE (212) 358-0207**

THOMAS M. KENNEDY
SAN M. JENNIK
THOMAS M. MURRAY
OF COUNSEL:
LARRY MAGARIK

ELIZABETH M. PILECKI (NJ, MA)
RACHEL A. KIRTNER (OR)
OMAR A. JOSEPH (MA, D.C.)
CHRISTOPHER G. GANT (NJ ONLY)
WILLIAM G. SCHIMMEL (IL, MI, NJ)
BERNHARD W. ROHRBACHER (CA ONLY)

July 12, 2007

**By Fax and Regular Mail**
Mark Steven Soroka
Taubman Kimelman & Soroka, LLP
30 Vesey Street, 6th floor
New York, NY 10007

Re: **Allied International Union**

Dear Mr. Soroka:

I write as counsel to Melvin Garland, Demarri Campbell, William Watson, Larry Binyard and Jesus Govea regarding the election of officers in the Allied International Union.

In response to your letter to Mr. Garland, dated July 6, 2007, I have enclosed copies of the Affidavits of Mr. Garland and Demarri Campbell, dated May 3, 2007. I have also enclosed a copy of the Nomination and Election Notice and the Rules for Nominations and the Election.

To arrange for interviews of Messrs. Garland, Campbell and Watson, please contact Omar Joseph, Esq. in this office.

I understand that you also sent a similar letter to Jesus Govea. I have not seen that letter and therefore will not be able to respond to it by July 13, 2007. Please send me a copy. I will contact you again after I review the letter.

Very truly yours,

Susan M. Jennik

Encls.

EXHIBIT
M M
7-18-07
FED    EL

## AFFIDAVIT

Damarri Campbell, being duly sworn, deposes and says as follows:

1.     I submit this affidavit in support of my protest of the election of officers of the Allied International Union, (herein, the "Union").

2.     I am currently a member in good standing of the Union and have been for approximately ten months.

3.     Pursuant to a Nomination and Election Notice issued by the Union, I attended a special nomination meeting on April 30, 2007, with the intention of nominating or seconding the nomination of Larry Binyard for Secretary Treasurer Melvin Garland for President of the Union.

4.     The notice said that the Special Nomination Meeting would be held on April 30th from 10 a.m. to 12 p.m. and from 6 p.m. to 8 p.m. The meeting was to held at the Bedford Stuyvesant Multi-Service Center.

5.     I arrived at the meeting at around 6:20 p.m. There were approximately 11 or 12 people present, including the Union's officers. Also in attendance at the special nominations meeting were members in good standing Larry Binyard, Dwayne Hilton, and William Watson. We had planned that the four of us would nominate and second the nominations of Garland for President and Binyard for Secretary Treasurer.

6.     When I arrived, President Peggy Vanson was answering questions that Watson and Binyard were asking them. I asked Binyard and Watson in front of Vanson, who was standing approximately two feet from me, if they had a chance to vote. Binyard said, "we did not get a chance to vote." Watson said the same thing, that he did not get the chance to vote. Vanson then said that the ballots were closed. Vanson went over to the head table to speak to the people at the head table, then came back and confirmed that the ballots were closed. I was upset.

I did not say anything further to Vanson. I was at the meeting for only approximately 15

minutes.

      7.      Although the Union had announced that the special nominations meeting would

be held between 6:00 p.m. and 8:00 p.m., I had no opportunity to nominate anyone.

Dated: New York, New York
       May 3, 2007

                                     Damarri Campbell

Subscribed and sworn to before me
this 3rd day of May, 2007

**THOMAS M. MURRAY**
NOTARY PUBLIC, STATE OF NEW YORK
No. 02MU6058040
QUALIFIED IN NEW YORK COUNTY
CERTIFICATE FILED IN NEW YORK COUNTY
COMMISSION EXPIRES APRIL 30, 2007

2

## AFFIDAVIT

Melvin Garland, being duly sworn, deposes and says as follows:

1.     I submit this affidavit in support of my protest of the election of officers of the
Allied International Union ("the Union") conducted in April and May, 2007.

2.     I am a member in good standing of the Union.

3.     Pursuant to a Nomination and Election Notice issued by the Union, I attended a
special nomination meeting on April 30, 2007, with the intention of nominating Larry Binyard
for Secretary Treasurer of the Union for the upcoming officer election, and to be nominated for
President of the Union. A copy of the notice is attached hereto as Exhibit A.

4.     The Union's Constitution and By-Laws provides that nominations take place at a
special membership meeting in April, that nominations be made by any member in good
standing, and be seconded by two members in good standing. The Constitution further provides
that "nominations shall not be closed until a reasonable opportunity has been afforded for all
nominations." A copy of the Constitution is attached hereto as Exhibit B.

5.     Also in attendance at the special nominations meeting were members in good
standing Larry Binyard, Demarri Campbell, and William Watson. We had planned that the four
of us would nominate and second my nomination for President and Binyard's nomination for
Secretary Treasurer. Binyard and myself were opponents of the incumbent officers and known to
be so by the Union.

6.     Although the Union had announced that the special nominations meeting would
be held between 6:00 p.m. and 8:00 p.m., the Union closed nominations three (3) minutes after
nominations were opened. This was insufficient time for members to nominate anyone other
than the incumbents, much less follow what was going on.

Jul-12-07    04:00pm    From-Kennedy, Jennik & Murray, P.C.    12123580207    T-837    P.006/007    F-966

Apr-25-07    01:33pm    From-Kennedy, Jennik & Murray, P C    12123580207    T-008    P 002    F-290

Tel (516) 742-6320                                                    1-800-577-5464
Fax (516) 742-0204

# ALLIED INTERNATIONAL UNION
## 332 WILLIS AVENUE • MINEOLA, NEW YORK 11501

### NOMINATION AND ELECTION NOTICE

#### Special Nomination Meeting

Officers positions to be filled:            President
                                            Vice President
                                            Secretary-Treasurer

#### Schedule of Nomination Meeting

Dates:   April 25th  –  Members who live and work in the Los Angeles, CA area

#### Location and Times of Nomination Meeting

Place:  Renaissance Los Angeles Hotel        Time:  1 p.m. – 5 p.m.
        9620 Airport Boulevard
        Los Angeles, CA 90045
        (Room # will be posted in lobby)

Jul-12-07   04:01pm   From-Kennedy, Jennik & Murray, P.C.          12123580207          T-837   P.007/007   F-956

Apr-26-07   01:33pm   From-Kennedy, Jennik & Murray, P C           12123580207          T-008   P 003   F-280

Total P.03

### Rules for Nominations and the Election

To be eligible to run for office, a candidate must be a member in good standing continuously for a period of at least one (1) year immediately preceeding the nomination meeting; a candidate cannot be three (3) months or more in arrears in dues on the date of the nomination meeting; and a candidate must be employed in the industry as a guard, security officer, watchman, captain, lieutenant, sergeant, investigator or policeman, or be a full-time officer or paid employee of the Union.

To run for office, a candidate must be nominated and then seconded by two (2) members in good standing. No member can become a candidate unless he or she is nominated and seconded at the nomination meeting. A member who cannot attend the meeting may state his or her intention to accept a nomination for office if nominated and seconded at the meeting by filing written notice with the Chair of the Election Committee at Allied International Union, 332 Willis Avenue, Mineola, NY 11501 prior to such nomination or within five (5) days of the nomination.

Each member must present identification at the meeting and sign the attendance sheet. If there is no contest for any office and the candidates are found to be properly qualified, the nominees shall be declared elected.

If there is a contest for one (1) or more positions, an election will be held by mail ballot. Ballots will be mailed with instructions to all members in good standing on May 7th, 2007. If a member does not receive a ballot, a duplicate can be requested by calling the Chair of the Election Committee at (516) 742-6320.

To be eligible to vote, a member must be in good standing. No write-in votes will be permitted. The ballots must be received by the Post Office no later than 9:00 a.m. on May 29th, 2007. The tally will be conducted at the Union office on May 30th, 2007 at 10:00a.m.

213 488 8358   P.03            LOCAL 187/ AIU   11:85   MAR-19-2007

E
X
H
I
B
I
T

G

# EXHIBIT "G"

# Make Fordham Accountable

# Make Fordham Accountable

 Subject: _____

Fordham's Expansion Is Unjust

Dear President McShane,

(Edit Letter Below)

I am extremely concerned about the proposed expansion of Fordham University's Lincoln Center campus. I believe that this project may negatively impact our community in many ways. The project will bring up to 5,000 additional people to Fordham's superblock, which could lead to the overcrowding of our already busy streets and trains. The construction, projected to last 25 years, could increase the levels of noise and air pollution, affecting the quality of life for residents. The addition of yet another luxury condominium tower only intensifies our neighborhood's affordable housing crisis. Finally, the design of the new campus will be out of scale with its surroundings, and will exaggerate the fortress-like layout of the Lincoln Center campus. Please take community's concerns seriously as you plan this major development.

Sincerely,
[Your name]
[Your address]

**Take Action on this Issue**
Fordham University President
Joseph McShane

- President Joseph McShane
- cc: President's Office

Send This Message

Complete the following to send this message. If you have participated before, just type in your email address then submit the form.

Email:*
_____

First Name:*
_____

Last Name:*
_____

☑ Check this box if you would like to receive periodic updates or action alerts

* Required Field

Send This Message

Maintainer: Stand for Fordham Summit Security Officers
(info@standforfordhamsummitsecurityofficers.org)



EXHIBIT H

# EXHIBIT "H"

Come live at The Arbors.

**newsday.com**

Search [_____] | ⊙ Newsday.com ⊙ Web enhanced by Google

Home | News | Sports | High School Sports | Entertainment | Explore Long Island | Blogs | Business | Travel | Classifieds | Jobs | Cars | Real Estate | Shop | Place on Ad

**BLOGGERS**



Noel Rubinton



Carrie Mason-Draffen



Jim Bernstein

Valerie Kellogg

**BLOGROLL**

**WEB SITES**

Long Island Press
LI Business News
Long Island
Neighborhood Network
Pine Barrens
Association
Long Island Regional
Planning Board
New York State
Department Of
Transportation, LI Office
The Long Island
Association
The State Department
Of Labor
The Long Island
Convention And Visitors
Bureau
The Long Island Board
Of Realtors
The Long Island Wine
Council
Huntington Chamber Of
Commerce
Nassau Council of
Chambers of
Commerce

# Business Beat

People on the move

« National mortgage crisis hurts renters too | Main | More information on unclaimed refunds »

## Unions struggle over JetBlue security guards

Two union locals are fighting for the right to represent security guards in the metropolitan area, and the latest battleground is JetBlue Airways Corp., the discount carrier based in Forest Hills.

Local 32BJ of the giant Service Employees International Union is going head to head with Allied International Union of Garden City to represent security guards at JetBlue's Kennedy Airport operation

Allied International already represents the JetBlue guards, but Local 32BJ is pushing to replace Allied.

The guards are employed by Summit Security Services Inc., and Local 32BJ said they "earn low wages" and have "crummy benefits." Local 32BJ says it can do better.

Kevin Doyle, Local 32BJ's executive director, sent a letter in late October to David Barger, JetBlue's chief executive officer, complaining about Summit, charging the company has "a poor record" representing employees. "JetBlue uses a security contractor we are not enamored with," said Matt Nerzin, a Local 32BJ spokesman.

Local 32BJ attempted last week to have billboards criticizing Summit placed at the Midtown tunnel in Queens and at JFK, but was rebuffed by two construction companies.

One of them, City Outdoor, said in a letter last week to Local 32BJ that it is "company policy not to display and type of advertising that bashes, is derogatory to a group or competitor, demeans or draws attention to faults of another party."

Allied International has defended itself in a letter on its website that was initially sent to the student newspaper at Fordham University, where Allied represents security guards. Allied said a story that appeared in the student paper about Allied was "a propaganda piece" with information provided "from a 32BJ brochure."

"Most of the security officers working at Fordham University have withdrawn support of 32BJ, and have declared their continued support" of Allied, the letter says.

For its part, Summit said Local 32BJ's "campaign" is "an effort to discredit our company and coerce our already unionized employees" to join Local 32BJ.

JetBlue appeared to want to distance itself from the dispute.

"JetBlue's business relationship with Summit Security is professional in nature and it would be inappropriate to comment upon any internal labor issues that may exist between Local 32BJ and Summit management," JetBlue said in a statement.

—Jim Bernstein

Posted by Noel Rubinton on November 19, 2007 10:13 AM | Permalink

## TrackBack

TrackBack URL for this entry:
http://blogs.trb.com/cgi-bin/ml/mt-Lcgi/37444

Post a comment

EXHIBIT I

# EXHIBIT "I"



## Wall Street Journal Article on JetBlue Delays

An article in Tuesday's Wall Street Journal analyzed data on "extreme delays" and came to the conclusion that "certain airlines and certain airports were more prone than others to long delays before takeoff and very late arrivals." Not surprising is that one of these "certain airlines" is JetBlue. The analysis found in part that:

- JetBlue Airways customers were the most likely to suffer taxi-out delays of more than three hours. (Taxi-out delays are where planes are delayed after leaving the gate)
- JetBlue had the longest average delay last year, averaging 67 minutes past its scheduled arrival time at the gate.
- JetBlue had the second highest percentage of flights in 2007 that were delayed 45 minutes or more, at 13.8%.

Our advice for those of you flying JetBlue: bring a good book. You might be there for a while.

Read the whole article here.

Posted on Thursday, January 24, 2008 at 09:49AM by ss26 WebMaster | Post a Comment

## The Mystery of the Disappearing Billboards

An interesting new twist on our Jet Blue ad campaign -- which was announced today -- has developed: No sooner did the billboards go up than it suddenly came right back down.

Attached images show they were up one day, but gone the next. The billboard company claims that the billboards go against their company policy " not to display any type of advertising that bashes, is derogatory to a group or competitor, demeans or draws attention to faults of another party." This comes after the company already accepted the billboards. Seems to us that the company's policy would eliminate most of the ads on TV these days.



Posted on Tuesday, November 20, 2007 at 10:50AM by ss26 WebMaster | Comments Off

## Watch Our YouTube Videos!

Watch our video ads on YouTube!





Posted on Friday, November 16, 2007 at 09:48AM by ss26 WebMaster | Comments Off

## Delay Of The Day

**Delay of the Day** for March 17, 2008: JetBlue Airways Flight #21 From JFK International Airport to Tampa International Airport.

Scheduled Departure: 5:20 PM

Actual Departure: 6:52 PM

Departed Gate 92 minutes later than scheduled.

Scheduled Arrival: 8:30 PM

Actual Arrival: 9:59 PM

Arrived at gate 89 minutes later than scheduled.

**Have you flown JetBlue lately? Tell us your story!**

Posted on Thursday, November 8, 2007 at 03:25PM by ss26 WebMaster | Comments Off

## JetBlue Delay Facts

**FACT:** JetBlue had a 72.9% on-time performance in 2006, lower than all but one major U.S. airline.

**FACT:** In the first quarter of 2007, JetBlue had a 63.4% on time performance.

**FACT:** After a February 2007 ice storm, 1,000 JetBlue flights were unable to get off the ground over a six day period. The storm stranding thousands of passengers on the tarmac, some for as long as 10 hours or more, as customers could not leave

the grounded planes.

**FACT:** While these planes were stuck on the tarmac, some passengers were left on planes without water, food service or working toilets. In response, JetBlue created its "Passengers Bill of Rights" that assures, in part, that passengers will be able to leave flights that have been grounded for more than five hours.
Posted on Thursday, November 8, 2007 at 03:22PM by ss26 WebMaster | Comments Off

This website is presented by the Service Employees International Union for the sake of JetBlue customers and workers and is not affiliated with JetBlue Airways Corporation or any of its subsidiaries. Copyright © 2007, 2008 ItsNotEasy WebMaster. All rights reserved. | PRIVACY POLICY

E
X
H
I
B
I
T

J

# EXHIBIT "J"

# SECURITY OFFICERS CALL FOR CHANGE!

## 299 YES          67 NO

We have sent a strong signal to Allied International Union that we demand change! But over the course of this election, Allied broke the law and behaved unfairly.



Allied International Union's conduct may have hindered FJC workers' ability to vote in this election. Their actions will be reviewed by the National Labor Relations Board, which is currently investigating charges that Allied made illegal threats to workers regarding their votes.

As a majority of voters indicated, we are tired of Allied's games. We demand accountability and respect from Allied International Union!

**32BJ**
**SEIU**

## -FJC HRA Organizing Committee

EXHIBIT K

EXHIBIT "K"

# HAS ALLIED INTERNATIONAL UNION
# BEEN TAKING YOUR DUES
# ILLEGALLY?

When you started work, you were probably given an Allied International Union card that required you to have dues deducted out of your paycheck and sent directly to Allied International Union.

You have **no** legal obligation to have dues deducted from your paycheck.

Allied International Union will be coming around desperately trying to sign you up on a new card so that they can continue to take your money while they do nothing to represent you.

## Don't sign a new Allied Card!
## Don't be intimidated!

It's against the law for Allied International Union to threaten that you will lose your job or benefits or to threaten you in other ways if you don't sign the check-off card.

*Call 212-388-3601 to report any threats that Allied International Union has made to you.*

*No Taxation Without Representation! Don't Sign for Allied!*

 

SEIU Local 32BJ – 101 Avenue of the Americas, New York, NY 10013, 212-388-3800

04/02/2008  13:51    516-742-0204          ALLIED INT UNION                    PAGE  02/07
              EVR BKLYN FIELD OPS    Fax:718-473-8059       Apr  2 2008 15:21    P.02



101 Avenue of the Americas
New York, NY 10013

NAME REDACTED

02 TM      $ 00.41⁰
00042311Φ5   MAR 29 2008
MAILED FROM ZIP CODE 10013

11213/2765 CO19    [barcode]

# STOP ALLIED INTERNATIONAL UNION FROM **ILLEGALLY** TAKING DUES FROM YOUR PAYCHECK!

## *!Don't Sign A New Allied Card!*

**Dear Allied International Union Member:**

When you started work, you were probably given
an Allied International Union card that re-
quired you to have dues deducted out of your
paycheck and sent directly to Allied Interna-
tional Union. This was **illegal** because you
have **no legal obligation** to have dues deducted
from your paycheck. As a result, Allied has
been taking your money every month and doing
nothing to represent you.

Now, Allied International Union is desperately
trying to sign you up on a new card so that
they can continue to take your money. They
have sent out a letter claiming that they are
"updating their computer files" and warning
that you "must" fill out a new membership ap-
plication and check-off card if you want to
keep your job. **Don't sign these new Allied
forms. This is just another one of Allied In-
ternational Union's illegal tricks to get your
money. Allied cannot threaten your job if you
do not sign these cards.**

Don't be intimidated. Demand that Allied re-
fund you all the dues which it took from you
as a result of its unlawful card.

Please call 212-388-3601 to report any threats
you have received by Allied International Un-
ion or to get more information about your
rights.

*No Taxation Without Representation!
Don't Sign for Allied!*

E
X
H
I
B
I
T

L

# EXHIBIT "L"

Pinpoint References to the Allied International Union Report to the Executive Board by the Committee to Investigate and Report, dated September, 2007, attached to this Exhibit.

(Key – Notation: Page #, Paragraph #)

Specific instances of Wire Fraud committed in connection with and in furtherance of the Defendants' scheme to defraud:

Page 8 @ P. 2
Page 37 @ P. 2 & 3
Page 39 @ P. 2 & 3
Page 64 @ P. 1 & 2
Page 65 @ P. 1
Page 67 @ P. 5
Page 68 @ P. 1, 2 & 3
Page 69 @ P. 2
Page 71 @ P. 2
Page 74 @ P. 2
Page 73 @ P. 2 & 3
Page 76 @ P. 3 & 4
Page 79 @ P. 2
Page 80 @ P. 2


Specific instances of Mail Fraud committed in connection with and in furtherance of the Defendants' scheme to defraud:

Page 18 @ P. 2
Page 38 @ P. 3
Page 39 @ P. 1, 2 & 3
Page 40 @ P. 2
Pages 63-65
Page 77 @ P. 3

H:DOCS\7002\001\921DOCB2975:.DOC

# ALLIED INTERNATIONAL UNION

## Report to the Executive Board

## by the

## Committee to Investigate and Report

## on the

## Protests to the April 25, 2007 and

## April 30, 2007 Nomination of Officers and

## to the May 2007 Campaigning For Office

## and Election of Officers

## September, 2007

Members of the Committee:
Miriam Carona
Richard Puccio
James Lee

Counsel to the Committee:
*Taubman Kimelman & Soroka, LLP.*

1

**Preliminary Statement**

On May 4, 2007, Melvin Garland ("Garland") filed a protest to the April 30, 2007 6:00 p.m. to 8:00 p.m. nominating meeting held at Brooklyn, New York for the election of officers of Allied International Union on behalf of himself relating to nominations for the Office of President and on behalf of Larry Binyard("Binyard") relating to the nomination for the office of Secretary-Treasurer. (A copy of the Garland letter verified May 4, 2007 to the Allied International Union Executive Board is attached and marked Exhibit B)

On May 31, 2007, Garland filed a second protest to the April 30, 2007 nominating meeting for the election of officers of Allied International Union and further protesting the campaign for and election of officers on behalf of Jesus Govea ("Govea") relating to the campaign for and election for the office of Vice President of Allied International Union (A copy of the second Garland letter verified May 31, 2007 to the Allied International Union Executive Board is attached and marked Exhibit C)

On May 30, 2007 MaryBeth Stafford ("Stafford") filed a protest to the April 25, 2007, 1:00 p.m. to 5:00 p.m. nominating meeting held at Los Angeles, California for the election of officers of Allied International Union on behalf of herself relating to nomination for the office of Vice President. Stafford further protested the campaign for and election for the office of Vice President of Allied International Union (A copy of the Stafford letter verified May 30, 2007 to the Allied International Union Executive Board is attached and marked Exhibit D)

**Appointment of the Committee**

This Committee was appointed by the Executive Board of Allied International Union pursuant to Article VI, Section 2 of the Constitution and By-Laws of the Allied International Union to investigate objections to the conduct of the election or conduct effecting the results of the election and report to the Executive Board.

[1] The following members in good standing of the Allied International Union were appointed to the Committee: Miriam Cerone, Richard Puccio and James Lee. The law firm of Taubman Kimelman & Soroka, LLP was retained to serve as legal counsel to the Committee.

## The Objections or Protests

The Objections or Protests were timely and properly filed within the limitations required by the Constitution and By-Laws of the Allied International Union, Article VI, Section 2. [2] (a copy of the Constitution and By-Laws of the Allied International Union is attached and marked as Exhibit A)

The allegations of the Objections or Protests are set forth below:

### The Garland Protest dated 5/4/07

Allegation 1. No Reasonable Opportunity to Nominate for the Offices of President and Secretary – Treasurer

One of the nominating meetings was scheduled for April 30, 2007 from 6:00 p.m. to 8:00 p.m. in Brooklyn, New York. Mr. Garland claims that when he arrived at the meeting at 6:40 p.m., nominations had already closed.

From 6:40 p.m. until 8:00 p.m. Mr. Garland claims in his protest that he was present and there was no further opportunity for members to nominate candidates. As a result Mr. Garland claims that he was not able to be nominated for President and Mr. Binyard was not able to be nominated for Secretary/ Treasurer. Thus the nominations were conducted

---

[1] a stenographic record of the proceedings of the Committee are delivered to the Executive Board with this report along with the exhibits to that record. References to the transcript of the proceedings of the Committee are noted as R followed by the last name of the person interviewed and page number of the transcript. Exhibits referred to herein are to exhibits to proceedings of the Committee.

[2] within five (5) days after the holding of an election a member in good standing may file with the Executive Board of this Union objections to the conduct of the election or conduct effecting the results of the election. Unless objections are made and filed with the Executive Board as herein specified, all objections shall be deemed waived. Objections must be written and filed in quadruplicate,

3

in violation of the Union Constitution and By-Laws, Article VI Section 1 and Section 401(e), of the Labor Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. §481(e) which state:

Constitution and By-Laws Article VI, Section 1

".  .  . Nominations shall not be closed until a reasonable opportunity has been afforded for all nominations."

LMRDA § 401(e), 29 USC § 481(e)

"In any election required by this section which is to be held by secret ballot a reasonable opportunity shall be given for the nomination of candidates .  .  ."

Allegation 2. Nomination Notices were Not Properly Mailed to the Members
Mr. Garland claims that nomination notices were not mailed at least 15 days prior to the nomination meetings. Mr. Garland further claims that nomination notices were not mailed to each member at the last known address appearing in Union records and claims that he and unnamed others at his worksite did not receive nomination notices. Thus the nominations were conducted in violation of the Union Constitution and By-Laws, Article VI, Section 1 which states
".  .  . At least fifteen (15) days prior to the date of the nomination meeting, notice thereof shall be mailed by the union to each member at his last known address as it appears in the Union's records.  .  .  ."

---

signed by the member, his signature verified before a notary public and shall contain a complete statement of the facts constituting the grounds of objections

4

**The Garland Protests dated 5/31/07**

Allegation 1. Mr. Garland claims Mr. Govea was denied a right to do a mailing to the membership list

The claim is that the Union imposed certain conditions on Mr. Govea (unspecified in this protest) that were not imposed on his opponent.

Allegation 2. Mr. Garland claims Mr. Govea was denied member worksite information

The claim is that the Union denied Mr. Govea information about the worksite where the members work although his opponent was able to use such information in her campaign.

Allegation 3. Mr. Garland claims Mr. Govea was denied an observer at the printing, preparation and mailing of ballots.

The claim is that Mr. Govea's request for the information about when and where the ballots would be printed, prepared and mailed were denied.

Allegation 4. Mr. Garland claims Employer resources were used to support the candidacy of Ms. Stafford for Vice President

The claim on unspecified dates and on May 11 & 12, 2007, Ms. Stafford was allowed to campaign at Aviation Security in Los Angeles by speaking to employees during their work time. The claim is further that the on those dates, Ms. Stafford was accompanied

5

by Oscar Antonio, a Union representative, who was on paid company time while he did this campaigning.

Allegation 5.  Mr. Garland claims Union resources were used to support the candidacy of Ms. Stafford for Vice President

The claim is unspecified resources and information about unspecified Union Member work locations and unspecified membership contact information, were used by Ms. Stafford in her campaign.

Allegation 6.  Mr. Garland claims ballots were not mailed to unspecified members

The claim is unspecified, but alleges a significant number of members did not have ballots mailed to them and were thus denied the right to vote.

Allegation 7.  Mr. Garland claims the Union interfered with Member requests for replacements of unreceived ballots

The claim does not name any member whose request for a replacement ballot was interfered with, but claims that this was done in general by not answering the Union telephone (516) 742-6320 during business hours; by leaving the union telephone off the hook during business hours; by intimidating and interrogating Union Members who were able to get through on the telephone; by not sending replacement ballots to Union Members who called to request them.

Allegation 8.  Mr. Garland claims the Union denied Mr. Govea's request to inspect the membership list

The claim is that Mr. Govea made a request to inspect the membership list prior to the counting of ballots and it was denied.

Allegation 9.  This is a repeat of Allegation 1. of the Garland Protest dated 5/4/07

Allegation 10.  Mr. Garland claims the Union denied Mr. Govea 's claim to inspect Collective Bargaining Agreements.

The claim is that Ms. Stafford was given access to Collective Bargaining Agreements between the Union and Employers which she used to support her campaign and Mr. Govea was refused the opportunity to inspect Collective Bargaining Agreements.

Allegation 11.  Mr. Garland claims the Union's counsel, Weissmann and Mintz assisted Ms. Stafford.

The claim is that in unspecified ways, Union counsel acted on behalf of Ms. Stafford.

**The Stafford Protest dated 5/30/07**

Allegation 1.  Ms. Stafford claims Mr. Govea's nomination was not seconded by two Members in good standing as required and his nomination and his candidacy for the office of Vice President must be nullified.

The claim is that on 4/25/07 Mr. Govea was nominated for the office of Vice President by one member in good standing and seconded by only one member in good standing. The election rules for nomination and election require the seconding of a nomination for office by two members in good standing, not one.

7

Allegation 2. Ms. Stafford claims Mr. Govea received aid, both financial and otherwise, from labor unions SEIU and/or their agents who prepared, copied and distributed flyers for Mr. Govea, had their union paid staff campaign for him and make phone calls promoting the candidacy of Mr. Govea, which she claims were paid for by the unions and not by Mr. Govea.

The claim is that on 5/14/07, 5/15/07, 5/17/07, 5/18/07, 5/21/07, 5/22/07, 5/23/07 & 5/24/07 and on other dates in May, at various work locations in New York City and Los Angeles where members of Allied International Union are employed, paid employees and other persons, paid by Local 32BJ, SEIU and its agents and paid by a California local of SEIU and its agents, supported the candidacy of Mr. Govea for Vice President of Allied by holding rallys of members, giving out flyers to members, speaking to members and phoning members, urging them to vote for Mr. Govea and further telling members not to vote for Ms. Stafford because she is a corrupt lawyer and a fake lawyer. Thus the election campaign was conducted in violation of Title IV, Section 401(g) of the LMRDA 29 USC. 481(g) which states:

"(g) No moneys received by any labor organization by way of dues, assessment, or similar levy, and no moneys of an employer shall be contributed or applied to promote the candidacy of any person in an election subject to the provisions of this title. Such moneys of a labor organization may be utilized for notices, factual statements of issues not involving candidates, and other expenses necessary for the holding of an election."

8

**The Investigation Process**

Consistent with the guidelines issued by the U.S. Department of Labor, Office of Labor Management Standards [*], the Committee utilized the following steps in resolving each of the allegations of those protests:

1. The Committee thoroughly reviewed each of the allegations of the Protests and established the information that would be necessary to resolve the Protests.

2. Interviewed and obtained information from the protesting partys' needed to resolve the Protests.

3. Reviewed the Constitution and Bylaws of the Allied International Union and the Nomination and Election Rules adopted for the Nomination of Officers and the conduct of the Officers Election.

4. Reviewed the Nomination and Election Records and other documentary or written evidence relevant to the Protests.

5. Interviewed Union Members and accepted affidavits of persons having information relevant to the Protests.

6. Each allegation of each Protest was investigated and analyzed to determine if it had merit, and if it had merit whether it had an impact on the nominations and/or on the result of the election. If so, the Committee would propose the appropriate action to be taken.

7. The Committee would dismiss allegations found to have no merit.

---

[*] See Conducting Local Union Officer Elections, a Guide for Election Officials, U.S. Department of Labor, Office of Labor Management Standards (printed off the Dept. of Labor website in July of 2007). Each member of the Committee was provided with a copy of the Guide to assist them in the performance of the within Election Investigation.

**Participation in the Investigation by the Members who protested or on whose behalf protests were filed.**

At the onset of the investigation, the Committee by letters dated July 6, 2007, through their counsel to Mr. Garland, Ms. Stafford, Mr. Govea and Mr. Binyard, asked for dates when they would appear to be interviewed by the Committee and what other witnesses they would present that had information relative to any Protests. By those same letters, the Committee asked for any relevant documentary evidence and affidavits relating to the protests to be produced by July 13, 2007. ( See Ex. I, J, K & L.) Ms. Stafford responded, scheduling her interview with the Committee for 7/13/07 and providing names of members she wanted interviewed which were scheduled for 7/11/07, 7/13/07 and 7/18/07. (All interviews were to be transcribed by a court reporter.) The testimony of those members interviewed will be addressed in the report when addressing the allegations of the protests that testimony relates to. Mr. Garland, Mr. Govea and Mr. Binyard responded by letter of their counsel Kennedy, Jennik & Murray, P.C. dated July 12, 2007 with certain attached documents ( see Ex. MM ). The letter further asked the Committee counsel to contact Omar Joseph, Esq. of Kennedy, Jennik & Murray, P.C to schedule interviews of Mr. Garland and two Member witnesses, Mr. Campbell and Mr. Watson. Committee counsel contacted Mr. Joseph and scheduled interviews of Mr. Garland, Mr. Binyard, Mr. Campbell, Mr. Watson in person, and Mr. Govea, by phone from California, for July 18, 2007. To accommodate their daytime work schedules, and the time difference in California, interviews were scheduled to start at 5:00 p.m.

On July 18, 2007, Mr. Joseph appeared, but neither Mr. Garland, Mr. Binyard, Mr. Campbell or Mr. Watson appeared to be interviewed or called. With no other witnesses at approximately 6:30 p.m., Mr. Govea was called to be interviewed by speaker phone. At approximately 8:00 p.m. the interview of Mr. Govea was completed and Mr. Joseph left. The Committee remained until 9:30 p.m., interviewing another California witness by telephone. By that time neither Mr. Garland, Mr. Binyard, Mr. Campbell or Mr. Watson appeared or called.

After discussions between Committee counsel and Mr. Joseph, interviews of Mr. Garland, Mr. Binyard, Mr. Campbell, Mr. Watson and a new witness, Mr. McFarland were rescheduled for August 3, 2007 at 10 a.m. By letters dated July 31, 2007 from Committee counsel to Mr. Garland, Ms. Stafford, Mr. Govoa and Mr. Binyard, they were advised that any remaining witnesses would be interviewed on August 3, 2007 and asked for the submission of any additional exhibits. (See Ex. TT, UU, VV & WW). On August 3, 2007 at 10 a.m., Mr. Joseph appeared before the Committee, but with no witnesses. The Committee waited until 11:30 a.m., and when no witnesses appeared, Mr. Joseph asked if the Committee would interview witnesses by telephone. After discussion, the Committee agreed to interview by telephone those Member witnesses who had not actually filed objections.

Mr. Watson was called and after a few questions, Mr. Watson, who was at work said he would call back during a meal break. Mr. Campbell was called and interviewed by telephone. Attempts were made to telephone Mr. Binyard, but he was unavailable. Mr. Watson was called and completed his interview. Mr. Garland called at about 1:30 p.m., claiming he was stopped by police near Co-op City in the Bronx at 11:50 a.m. and the police seized his vehicle. The Committee did not understand why Mr. Garland was in the Bronx at 11:30 a.m., when he was scheduled to be interviewed by the Committee at 10 a.m., but the Committee members advised Mr. Garland how to get to the interview from Co-op City by public transportation. Attempts were again made to telephone Mr. Binyard. The Committee was told that Mr. Binyard was in a prayer meeting and would call back shortly after the meeting was done. Mr. Binyard never called back the Committee and further telephone calls to Mr. Binyard went to voicemail, and messages left by the Committee went unreturned. Due to his failure to appear and his refusal to speak to the Committee by telephone, Mr. Binyard could not be interviewed. Mr. McFarland was called and was interviewed by telephone by the Committee. After a few minutes of questioning, Mr. McFarland's phone began disconnecting. Then Mr. McFarland began refusing to answer certain questions. Then she disconnected and the

11

Committee could not get her back on the telephone. The Committee's messages to Mr. McFarland to call back went unanswered.

At approximately 3 p.m., Mr. Garland called and said he was not coming by public transportation and asked to be interviewed by telephone. The Committee, due to the problems with the telephone interview with Mr. McFarland, did not wish to interview Mr. Garland by telephone. Mr. Garland complained about the questions asked of Mr. McFarland, but was advised by the Committee that Mr. McFarland was represented by counsel, and all questions she was asked directly related to the protests the Committee was directed to investigate. The Committee caucused and advised Mr. Garland that since he filed objections and since objections per the Union Constitution and Bylaws (Ex. A) are required to contain a complete statement of facts constituting the grounds of objections and must be verified, Mr. Garland's interview would have to be in person and under Oath. The Committee again advised Mr. Garland that they would wait until 5 p.m. and hoped he would come to be interviewed. The Committee waited until 5 p.m., but Mr. Garland did not attend his interview.

The Committee contacted the Executive Board of the Union to ask how they wanted the Committee to proceed with the interview of Mr. Garland. The Executive Board agreed with the Committee that due to the provisions of the Union Constitution and Bylaws, Mr. Garland having filed objections had to be interviewed in person and under Oath. The Executive Board directed the Committee to schedule another in person interview of Mr. Garland. An interview of Mr. Garland was scheduled for 8/14/07 at 11 a.m. and that date was final for the submission of documents. (Ex. XX). Mr. Joseph arrived on time and Mr. Garland arrived at 11:45 a.m. and was interviewed. Later that day, Ms. Stafford submitted three additional affidavits as Exhibits and the two letters between Mr. Gover's counsel and Union counsel were also submitted as Exhibits. At the close of business on August 14, 2007 the record of the Committee was closed.

**The Interview of the Election Chair**

Tara Pamulo, the duly appointed Election Chair and her assistant, Jennifer Chan, were interviewed by the Committee on July 11, 2007. Ms. Pamulo explained to the Committee how the Union updated its membership lists before mailing out nomination and election notifications. The Union did a comparison of the members listed in the monthly dues reports submitted by all employers to the computerized membership list kept by the Union. Any inconsistency found and Ms. Pamulo would contact the employer directly to get current names and addresses of all members and update them in the computer system. (R-Pamulo, p. 4, 5).

The Election Chair then made arrangements for a location, place and time to hold nomination meetings for the Officer positions of President, Vice President and Secretary Treasurer in the Los Angeles, California area, the Washington D.C area and the New York metropolitan area. The first nomination meeting was scheduled for April 25, 2007 from 1 p.m. to 5 p.m. for the approximately 500 Union Members in the Los Angeles, California area and to be held at the Renaissance Los Angeles Hotel, 9620 Airport Boulevard, Los Angeles, CA 90045 with the room number to be posted in the lobby. (Ex. T). The second nomination meeting was scheduled for April 27, 2007 from 1 p.m. to 4 p.m. for the approximately 100 Union Members in the Washington D.C. area and to be held at the Key Bridge Marriot, 1401 Lee Highway, Arlington, VA 22209 with the room number to be posted in the lobby. (Ex. S). The third nomination meeting was scheduled for April 30, 2007 for 10 a.m. to 12 p.m. and 6 p.m. to 8 p.m. for the approximately 4900 Union Members in the New York metropolitan area and to be held at the Bedford Stuyvesant Multi-Service Center, 1958 Fulton Street, Brooklyn, New York 11233 (Ex. N). (R-Pamulo, p.5-8)

Notices of the above nomination meetings were prepared, copied and mailed to the Union Members in the respective areas. In addition to the notices (Ex. W, S & T) rules for the Nominations and the Election were prepared, copied and mailed to all Union Members (Ex. M) (R-Pamulo, p.8, 9) and provided as follows:

"To be eligible to run for office, a candidate must be a member in good standing continuously for a period of at least one (1) year immediately preceding the nomination meeting; a candidate cannot be three (3) months or more in arrears in dues on the date of the nomination meeting; and a candidate must be employed in the industry as a guard, security officer, watchman, captain, lieutenant, sergeant, investigator or policeman, or be a full-time officer or paid employee of the Union.

To run for office, a candidate must be nominated and then seconded by two (2) members in good standing. No member can become a candidate unless he or she is nominated and seconded at the nomination meeting. A member who cannot attend the meeting may state his or her intention to accept a nomination for office if nominated and seconded at the meeting by filing written notice with the Chair of the Election Committee at Allied International Union, 332 Willis Avenue, Mineola, NY 11501 prior to such nomination or within five (5) days of the nomination.

Each member must present identification at the meeting and sign the attendance sheet. If there is no contest for any office and the candidates are found to be properly qualified, the nominees shall be declared elected.

If there is a contest for one (1) or more positions, an election will be held by mail ballot. Ballots will be mailed with instructions to all members in good standing on May 7th, 2007. If a member does not receive a ballot, a duplicate can be requested by calling the Chair of the Election Committee at (516) 742-6320.

To be eligible to vote, a member must be in good standing. No write-in votes will be permitted. The ballots must be received by the Post Office no later than 9:00 a.m. on May 29th, 2007. The tally will be conducted at the Union office on May 30th, 2007 at 10 a.m."

14

The approximate 100 notices for the Washington D.C. Members and the approximately 500 notices for the Los Angeles, CA Members all with nomination and election rules and updated member labels were delivered by Ms. Pamulo to Garden City Printers who stuffed, labeled and verified mailing the California notices by April 10, 2007 and the Washington D.C. notices by April 11, 2007. The approximately 4900 notices for the New York City metropolitan area members with nomination and election rules and updated member labels were delivered by Ms. Pamulo to Garden City Printers who stuffed, labeled and verified mailing them by April 12[t2], 2007. For any nomination notices that were returned as incorrectly addressed, the Election Chair contacted the employer to update the address information in the Union's computer records and re-sent the notices. (R-Pamulo, p. 9-13).

Joseph Glennan, an Executive Board Member of the Union was assigned by the Executive Board to Chair the Nomination meeting scheduled in California on April 25th, 2007 from 1 p.m. to 5 p.m.  Mr. Glennan was interviewed by the Committee on July 13, 2007. In his interview, he stated that the only member who attempted to be nominated for office at that meeting was Jesus Govea who was nominated for the Office of Vice President by a fellow member, Carolina Franco, but was only seconded by one other fellow member, Saul Hernandez. Mr. Govea was not seconded by two other fellow members as required in the Rules of Nomination and Election. No other Members were attempted to be nominated for Union Office at the Los Angeles, CA Nomination Meeting. Joseph Glennan was also assigned by the Executive Board to Chair the Washington D.C. Meeting scheduled in Arlington, VA on April 27th, 2007 from 1 p.m. to 4 p.m. No member was attempted to be nominated for Union Office at the Washington D.C. Nomination Meeting. (R-Glennan, p. 5-8).

Iara Pamulo, the Election Chair, chaired the Nomination Meeting scheduled in Brooklyn, New York on April 30th, 2007 from 10 a.m. to 12 p.m. and 6 p.m. to 8 p.m. The 6 p.m.-8 p.m. meeting is the one relevant to the Protests and the only Members attempted to be nominated for office at that meeting were Peggy Vanson who was nominated for the Office of President by a fellow member, Owen Williams, and seconded

by four other fellow members, Terri Simmons, Delores Selby, Kim Stevenson and Otha Tanks; MaryBeth Stafford who was nominated for the Office of Vice President by a fellow member, Terri Simmons and seconded by three other fellow members, Owen Williams, Delores Selby, and Kim Stevenson; Joseph Glennan who was nominated for the Office of Secretary Treasurer by a fellow member, Owen Williams and seconded by four other members, Terri Simmons, Delores Selby, Kim Stevenson and Otha Tanks. No other members were attempted to be nominated for Union Office at the Brooklyn, New York Nomination Meetings. An attendance sheet was kept of the New York Nomination Meetings and in addition to Officers and the Election Chair, twenty members were in attendance. ( See Ex. W). Minutes were taken of this Nomination Meeting by the Election Chair, Tara Pamulo (See Exhibit X). Since there was no opposition to Peggy Vinson's nomination, she was declared the President. Since there was no opposition to Joseph Glennan's nomination, he was declared the Secretary Treasurer. (R-Pamulo, p. 15-19, 29, 31.)

Although Jesus Govea did not receive the two seconds required by the Nomination Rules, an election proceeded between MaryBeth Stafford and Jesus Govea for the Union Office of Vice President. (R-Pamulo, p. 30, 31). Prior to the start of the election process, the Election Chair determined that a separate telephone line, other than the heavily used main Union phone line was needed to handle the expected number of election related telephone calls. The Election Chair set aside a little used Union telephone line, (516) 742-3121, for election related issues. This telephone number was communicated to the candidates (See Ex. Y) so they could provide it to all their Member supporters and was included in all the approximately 5500 ballots sent out to all Members in good standing on May 7, 2007.(See Ex. Z-1) (R-Pamulo, p.37-39). Jennifer Chan was enlisted to assist Ms. Pamulo in answering the election telephone line and responding to election related issues. Procedures were established for addressing calls requesting replacement ballots, due to spoilt ballots or the failure to receive a ballot. The request had to come directly from the Member. The Election Chair had to confirm membership, get

the corrected address and employer information and if membership was confirmed, a replacement ballot was sent out. (R-Pamulo, p. 44-46).

The Election Chair, Tara Pamulo, contacted Mr. Govea and Ms. Stafford and advised them of a meeting at the Union Headquarters in Mineola, N.Y. for May 3, 2007 at 1 p.m. At the meeting, the Election Committee was going to review the procedures to be followed in the election and to discuss campaign rules (See Ex. Y). Mr. Govea did not attend the meeting and did not personally communicate by letter or telephone with the Election Chair. Mr. Govea did not provide authorization to the Election Chair by letter or telephone for any other person or member to act on his behalf regarding election issues. The ballots and several election issues were discussed between Ms. Pamulo and Ms. Stafford and it was left to Ms. Pamulo to draft the ballots and cover letter. (R-Pamulo, p. 31-34).

The corrected Membership lists after the Nomination Notice mailing were used for purposes of mailing out the Election ballot package. The package included an Election Notice (See Ex. Z-1) which provides the contact name of Tara Pamulo and the separate election telephone number of (516) 742-3121 in case a replacement ballot was needed and further provides instructions for voting and returning the ballot to be received by May 29, 2007. Also enclosed was the Official Ballot (See Ex. Z-2) with instructions to put an "X" in the box next to the candidate of choice. Finally there was a pre-addressed, pre-stamped envelope for the return of the ballot to the Election Committee. The ballot packages of approximately 100 for the Washington DC area Members, of approximately 500 for the Los Angeles, California area Members and of approximately 4900 for the New York City area Members were delivered by Ms. Pamulo to Garden City Printers who stuffed, labeled and verified mailing them on May 7, 2007. At that point, no candidate had requested an observer for the printing preparation and mailing of the ballots and no candidates sent an observer. The only one who oversaw the process was Ms. Pamulo, the Election Chair. (R-Pamulo, p. 34, 35, 60).

Thereafter, a letter dated May 4, 2007 was received by the Election Chair on May 7, 2007 from Kennedy, Jennik & Murray, P.C. claiming to represent Mr. Govea in the

upcoming Union Election. (See Ex. NN). No authorization from Mr. Govea was included. Kennedy, Jennik & Murray, P.C. sought the Union to distribute Mr. Govea's campaign literature on May 7, 2007, sought the inspection by Mr. Govea of membership lists with the names and addresses of Union Members on May 7, 2007, sought a list of work sites where Union Members work and sought ballot information on Mr. Govea's right to have observers present. Ms. Pamulo, Election Chair, not having received authorization from Mr. Govea, and the letter being from an attorney, forwarded the letter to Union counsel, Weissman & Mintz, LLC for review. (R-Pamulo, p. 39-43).

By letter dated May 10, 2007, Weissman & Mintz, LLC responded to Kennedy, Jennik & Murray, P.C.'s request (See Ex. OO). In their response to the request to distribute campaign literature, it was stated that Allied has a good faith belief that the $2,067.00 in postage and other costs of the mailing and fees for Mr. Govea's legal representation were being paid by SEIU 32BJ, their agents or at their direction in violation of Section 401 (g) of Title IV of the LMRDA. Allied would therefore deny the request on behalf of Mr. Govea to distribute the campaign literature, unless Mr. Govea and his counsel certify the funds to distribute campaign literature and retain election counsel are not from SEIU or SEIU 32BJ, or their agents or at their direction, and state the source of his campaign funds to assure that they are from lawful sources, with the names of Union Members supporting his candidacy being redacted. If certifications were provided, procedures for campaign mailing were enclosed with the letter (See Ex. OO) In response to the request for Mr. Govea to inspect the Membership lists, it was stated that the time to inspect was limited to the 30 day period prior to the mailing of the ballots, which would be April 7, 2007-May 7, 2007 and if requested, Mr. Govea would have been allowed to personally inspect mailing lists during that period at the Union Headquarters in Mineola, N.Y. In response to the request for a list of work sites where Allied Members work, the Union does not have such a list of sites. Finally, in response to ballot information it was stated that the ballots were prepared and mailed on May 7, 2007 by an independent mailing house, that ballots would be opened and counted at 10 a.m. on May

30, 2007 at Allied's offices in Mineola, N.Y. and advise if Mr. Govea wants an observer present so accommodations can be made.

By letter dated May 15, 2007, Kennedy, Jennik & Murray, P.C. responded to the May 10, 2007 letter of Weissman & Mintz, LLC. (Ex. PP). In response to the certification request that the source of funds for the mailing were not from a Union in violation of 401(g) of the LMRDA, and for the source of the funds with a redaction of the names of Union Members, it was stated requesting Mr. Govea only to identify his financial support is retaliatory and coercive. On this issue it was further alleged that Ms. Stafford was using union or employer resources for her campaign and she should be investigated by Allied. In response to the issue of inspecting the membership list, the letter objects to the time frame of when the inspection must be completed and limiting the right of inspection to the Union headquarters in Mineola, N.Y., when the Union has Members throughout the country. In response to the claim that the Union has no records of Member's worksites, the letter claims Ms. Stafford has access to this information and then further requests Mr. Govea be allowed to review Collective Bargaining Agreements. Finally, the letter requests the time and place of printing and mailing of ballots, seeks the right to an observer when ballots are picked up and advises Mr. Govea will have an observer present for the ballot count.

By letter dated May 18, 2007, Weissman & Mintz, LLC responded to the May 15, 2007 letter of Kennedy, Jennik & Murray, P.C. (See Ex. RR). In response to the request to mail campaign literature, the letter reaffirmed the prior position on that issue, and further stated that the Union will advise Ms. Stafford of your concerns and remind her that no union or employer funds can be utilized to support her campaign for office. In response to examining the Union Membership list the letter reaffirmed the prior position. In response to Member worksite information the letter reaffirmed the prior position and on the production of Collective Bargaining Agreements, stated the Union will compile its current Agreements for Mr. Govea's review. In response to ballot information requests, the ballots will be picked up at Williston Park Post Office at 9:30 a.m. on May 30, 2007, and finally requested the name of the observer designated by Mr. Govea.

Apparently a follow-up letter that crossed in the mail dated May 18, 2007 was sent by Kennedy, Jennik & Murray, P.C. (See Ex. AAA.) It requested the status of the response to their prior letter, sought a ballot tally if one was taken and finally requests replacement ballots on behalf of some twenty persons who they claimed had not received them. The request for replacement ballots was sent to Ms. Pamulo who confirmed membership, confirmed addresses and sent replacement ballots to those Members on the list who hadn't received them. Mr. Govea never provided a confirmation that the source of his funds for a member mailing was not in violation of LMRDA 401 (g). Mr. Govea never made a request to the Election Chair for such a member mailing. Mr. Govea never made an appointment with the Election Chair to view membership lists or current collective bargaining agreements at the Union headquarters in Mineola, N.Y. (R-Pamulo, p. 41, 42.)

During this period, requests for replacement ballots were made to the Election Chair on the election telephone line. None of the callers complained about having any difficulty getting through. Almost all callers during this period had been referred by Raul, Neil Diaz or Andy Friedman of Local 32B-J, SEIU who instructed the caller to call Tara, ask for a replacement ballot and vote for Mr. Govea. Most of the callers were not Members of Allied, and were not even in guard titles. Only those callers that would confirm Membership in Allied were sent replacement ballots.(R-Pamulo, p. 43-54) (R-Chan, p. 5-9).

By letter dated May 29, 2007, Kennedy, Jennik & Murray, P.C. advised Weissman & Mintz, LLC that Mr. Govea's observers would be Melvin Garland and Anthony Sessions, with Ramona McFarland as an alternate. (See Ex. BBB.) On May 30, 2007 the observers for Mr. Govea came to Allied's headquarters in Mineola, N.Y. Accompanying Mr. Govea's observers and attempting to gain access to Allied's headquarters was Andy Friedman, a paid organizer for Local 32 B-J, SEIU. (See Ex. LL). It is public record that Allied has challenged before the National Labor Relations Board, Local 32 B-J, SEIU's illegal attempts to raid Allied's Members. The attempts of a 32 B-J organizer on behalf of Mr. Govea to enter Allied headquarters to try and insert himself in

20

Allied's Officers election ballot count, together with allegations of Local 32 B-J openly seeking membership cards from Allied Members and at the same time campaigning on behalf of Mr. Govea for Vice President of Allied, became a contentious issue. The results were Member charges that Locals of SEIU and their affiliates were interfering in Allied internal officers election on behalf of Mr. Govea in violation of the LMRDA and Allied's Constitution and Bylaws. Under the circumstances, Allied's general counsel, Weissman & Mintz, LLC impounded the ballots and took them for safeguarding pending an investigation of all aspects of the nomination and election process. (R-Pantulo, p. 56 & 57). Protests as previously identified herein were filed. (See Ex. B, C & D). The Union Executive Board appointed this Committee and retained Committee counsel to investigate and make recommendations to the Executive Board. The Committee will now review each of the Protests filed commencing with the notifications of nomination meetings through the nomination process, the preparation and mailing of ballots, the campaign, the ballot count and the impounding of the ballots.

### Findings and Recommendations of the Committee

#### A. The Late Mailing or Failure to Mail Meeting Notices for the Nomination of Members for Union Office.

#### Finding:

There is no evidence that nomination meeting notices were mailed late, or not mailed to Union Members at their last known addresses appearing in the Union records. This protest is found to be without merit and unsubstantiated and therefore, did not affect the nomination process or the election.

<u>Statement of Relevant Constitutional Provisions</u>

### Article VI, Section 1 as relevant provides:

"....at least fifteen (15) days prior to the date of the nomination meeting, notice thereof shall be mailed by this union to each member at his last known address as it appears in the Union's records."

**Facts Supporting the Findings:**

Tara Pamulo, the Election Chair, was interviewed extensively about the mailing of nomination notices to the membership. (R-Pamulo-p.4, 5). Ms. Pamulo updated the membership lists by comparing them to employer submitted monthly dues statements. (R-Pamulo-p. 4, 5). Ms. Pamulo then prepared notices for the Los Angeles, California meeting for April 25, 2007 from 1 p.m. to 5 p.m.(R-Pamulo-p. 7) (Ex. T. ), for the Washington D.C. meeting for April 27, 2007 from 1 p.m. to 4 p.m. (R-Pamulo-p. 7) (Ex. S ) and for the New York meeting for April 30, 2007 from 10 a.m. to 12 p.m. and 6 p.m. to 8 p.m. (R-Pamulo-p. 6) (Ex. N). Each notice had the above information as well as the location of the meeting, the offices for which nominations would be accepted and rules of nominations and election (Ex. M).

Ms. Pamulo stated that Garden City Printers was retained by the Union to mail its nomination notices (R-Pamulo-p. 9). She dropped off Member labels from the updated mailing list, with instructions to mail the approximately 500 notices to the Los Angeles, California Members by April 10, 2007, the approximately 100 notices to Washington D.C. Members by April 11, 2007 and approximately 4900 notices to the New York Members by April 12, 2007 (R-Pamulo-p. 10). Garden City Printers provided confirmation that the notices were mailed by the due dates (R-Pamulo-p. 9). Ms. Pamulo received no calls from any members that they did not receive notice. (R-Pamulo-p. 12). Any notice returned had the address updated and was re-mailed (R-Pamulo-p. 13), but

22

Ms. Pannulo has no recollection of Mr. Govea, Mr. Garland or Mr. Binyard's notice being returned to the Union.

Mr. Govea in his interview stated he did not receive the actual notice of the California nomination meeting, but he did learn of it from a fellow Member and he appeared at that meeting. (R-Govea, p.6, 7). In spite of this claim, Mr. Govea appeared to have received actual notice of the meeting and rules which is confirmed by pages 5 & 6 of Ex. MM which was submitted to the Committee by Mr. Govea's counsel, Kennedy, Jennik & Murray, P.C. These two pages are the nomination notices for the California meeting and nomination rules (Ex. T & M) with a fax notation showing both pages were faxed from Local 1877, SEIU on April 19, 2007 at 11:05 to Mr. Govea's counsel, Kennedy, Jennik & Murray, P.C. Mr. Campbell, in his interview stated he received notice of the New York nomination meeting held on April 30, 2007 and he appeared at that meeting. (R-Campbell, p. 5 & 6).Mr. Watson, in his interview, stated he received notice of the New York nomination meeting held on April 30, 2007 and he appeared at that meeting (R-Watson, p. 5, 6). Ms. Stevenson, in her interview, stated she received notice of the New York nomination meeting held on April 30, 2007 and she attended that meeting. (R-Stevenson, p.13). Mr. Glennan in his interview stated that he was an Executive Board Member who chaired the California meeting on April 25, 2007 and attended the New York meeting on April 30, 2007 and no Member complained to him about not receiving notice of the nomination meeting (R-Glennan, p. 9). Mr. Garland who verified this Protest was interviewed. In the Protest, Mr. Garland swears " I did not receive a copy of the nomination notice although I had received a copy of the Christmas party mailing and I have not moved since. At my worksite, 20 of 22 Members advised me that they did not receive a copy of the nominations notice in the mail". (Ex. B). In his interview, Mr. Garland states that he attended the April 30, 2007 nomination meeting in New York, and since he was there he had actual notice of the meeting. (R-Garland, p.6, 7). When asked to identify any of the 20 Members at his worksite who did not receive notice of the New York nomination meeting as verified in his Protest, he was unable to identify even one Member's name. (R-Garland, p.5.) Mr. Garland then corrected that the

Members at his location who did not receive the nomination meeting notices were only 5 Members (R-Garland, p.5.) He did not remember all their names, but confirmed that those 5 Members who did not receive notice were provided actual notice by him (R-Garland, p.6, 7).

Discussion

Ms. Pamulo testified that the notices for the California nomination meeting were verified as being sent on April 10, 2007. This is 15 days prior to the date of the California nomination meeting and in compliance with the 15 day requirement in the Union Constitution. Ms. Pamulo further testified that the notices for the Washington D.C. nomination meeting were verified as being sent on April 11, 2007. This is 16 days prior to the date of the Washington D.C. nomination meeting and in compliance with the 15 day requirement in the Union Constitution. Ms. Pamulo further testified was that the notices for the New York nomination meetings were verified as being sent on April 12, 2007. This is 18 days prior to the date of the New York nomination meetings and in compliance with the 15 day requirement in the Union Constitution. This testimony went undisputed.

Mr. Garland produced no witnesses or documents to dispute Ms. Pamulo's testimony that all notices of nomination meetings were mailed to Members at least 15 days prior to the meeting date. Mr. Garland produced not one meeting notice that was postmarked less than 15 days prior to the meeting. No Member complained at any of the nomination meetings about receiving late notices of the meeting. No Member complained that they were adversely impacted in the nomination process based on the date they received notice of the nomination meeting. All six Members who claimed to have a desire to run for Union office; Ms Vauson, Mr. Garland, Ms. Stafford, Mr. Govea, Mr. Glennan and Mr. Binyard, all knew about the nomination meetings and were able to attend at least one. Based on the above, it is the opinion of the Committee that Mr. Garland's claim that nomination meeting notices were not mailed at least 15 days prior to

the meeting date is unsubstantiated and had no impact on the nomination process or election.

Ms. Pamulo further testified to updating the Union Membership List addresses by comparing them to the Employer's monthly Member dues submissions. These updated Member addresses were printed onto labels and given to Garden City Printing for mailing of nomination meeting notices. Ms. Pamulo testified that these labels represented the last known addresses of all current Allied Members. With the exception of the Protest of Mr. Garland that he and twenty Members at his worksite did not receive notices of the nomination meetings, no Member complained to the Union of not receiving notice of the nomination meeting and no Member complained at any of the nomination meetings of not receiving notice.

Not one witness who appeared before the Committee, including Mr. Garland, was able to substantiate that even one Member did not receive notice of the nomination meetings. When interviewed, Mr. Garland could not provide the names of even the five Members who he was now claiming did not receive notice. Again as previously stated, in spite of the Protest, all six Members who claimed to have a desire to run for Union office all heard about the nomination meetings and were able to attend at least one. Based on the above, it is the opinion of the Committee that Mr. Garland's claim that nomination notices were not mailed to each Member at his last known address as it appears on the Union's record is unsubstantiated and therefore had no impact on the nomination process or election.

**B. The Failure of Jesus Govea to be Properly Nominated as a Candidate for Vice President of the Union, Mr. Govea was only seconded by One Member in Good Standing, Not the Required Two Members.**

**Finding:**

Mr. Glennan, Mr. Antonio and even Mr. Govea in their interview all stated that Mr. Govea was nominated by one Member in good standing, Ms. Franco and seconded

by only one Member in good standing, Mr. Hernandez, not the two Members in good standing required. The Constitution and Bylaws of the Allied International Union provides and the Nominations and Election Rules require that for the nomination to Union office the proposed candidate be seconded by two Union Members in good standing. Mr. Govea was not properly nominated as a Candidate for Vice President of Allied in that he was not seconded by two Members in good standing. The Protest is found to have merit and is found to be substantiated and was found to affect both the nomination process and the election, since Mr. Govea, although not properly nominated was allowed to run for the office of Vice President against Ms. Stafford who was properly nominated. Under these circumstances, where there is only one properly nominated Candidate for the Office of Vice President, the Union Constitution and Bylaws provides that "the nominee shall be deemed and declared elected to such office". As a remedy for this meritorious Protest, the Committee recommends to the Union that the nomination and candidacy of Jesus Govea for the Union Office of Vice President be rescinded and that MaryBeth Stafford as the only nominee, in accordance with the Union Constitution and Bylaws, be deemed and declared elected Vice President of Allied International Union.

## Statement of Relevant Constitutional Provisions

### Article VI, Section 1 as relevant provides:

"...Nominations for officers may be made at the nomination meeting by any member in good standing (unless otherwise restricted or limited by this Constitution) and seconded by two members in good standing eligible to offer a second." (See Ex. A.)

### Article VI, Section 2 as relevant provides:

26

"...Where there is only one candidate for an office and there are no contestants for such office or offices, in that event the nominee shall be deemed and declared elected to such office." (See Ex. A.)

"...No member shall write or be permitted to write in the names of persons who were not duly nominated at the nomination meeting." (See Ex. A.)

## Statement of Relevant Provisions of the Union's Rules for Nominations and the Election.

"To run for office, a candidate must be nominated and then seconded by two (2) members in good standing. No member can become a candidate unless he or she is nominated and seconded at the nomination meeting." (See Ex. M.)

## Facts Supporting the Findings:

Joseph Glennan chaired the California nomination meeting. The meeting was scheduled for April 25, 2007 from 1 p.m. to 5 p.m. at the Renaissance Hotel in Los Angeles, California. Mr. Glennan arrived shortly before 1 p.m. Oscar Antonio, who is a Member employed at Aviation Safeguards and the Union's California Shop Steward, arrived at the meeting around 1:30 p.m. and remained until the meeting closed at 5 p.m. At about 2 p.m., a Union Member who thought it was a Union meeting came in, asked some Union questions and then left shortly thereafter. No one else came until 4:15 p.m., when Mr. Govea came with two others, a Carolina Franco and a Saul Hernandez. After a few minutes, Mr. Govea said "let's get to it" and Ms. Franco nominated Mr. Govea for Vice President and Mr. Hernandez seconded the nomination. Within 5 or 10 minutes, Mr. Govea, Ms. Franco and Mr. Hernandez were gone. Mr. Glennan and Mr. Antonio stayed until 5 p.m., but no other Member came to the meeting to second Mr. Govea's nomination. (R-Glennan, p. 5-8). Mr. Antonio was interviewed and confirmed that he

27

was at the meeting and that around 4 p.m. Ms. Franco nominated Mr. Govea for Vice President and Mr. Hernandez seconded the nomination. There was no other second for Mr. Govea's nomination (R-Antonio, p. 54-57).Mr. Govea was also interviewed and confirmed that he arrived at the nomination meeting around 4 p.m.. After a few minutes, Mr. Govea was nominated by Ms. Franco for Vice President and Mr. Hernandez seconded the nomination. There was no other second. (R-Govea, p.9). Mr. Govea was a little confused in testimony about when he received notice of the nomination meetings, but he did receive it from a co-worker. (R-Govea, p. 6, 7.) This however was cleared up by the submission by Mr. Govea's counsel, showing that a meeting notice and a copy of the Rules was faxed on May 19, 2007, six days before the meeting, from Local 1877, SEIU to Mr. Govea's election attorney Kennedy, Jennik & Murray, P.C. ( See Ex. MM at p. 5 & 6).

All other candidates or proposed candidates either through testimony or exhibits demonstrated their awareness of the requirements of the Rules that to be properly nominated For Union office , a candidate required the nomination by one Member and the second by two more Members. Ms. Stafford testified to this awareness, and that Ms. Vanson for President, she for Vice President and Mr. Glennan for Secretary Treasurer were each nominated and then seconded by two or more Members (R-Stafford, p. 10) (See also minutes of April 30, 2007, 6 p.m. to 8 p.m. Nomination Meeting-Ex. X). In his April 4, 2007 Protest, Mr. Gatland also shows his awareness of this requirement on behalf of himself and Mr. Binyard by identifying three Members, one prepared to nominate and two to second his and Mr. Binyard's nomination. (See Ex. B).

## Discussion

After review of the Rules of Nominations and Elections and the Union Constitution; it is the Opinion of the Committee that in order to be nominated for Union Office a Member must be nominated by one Member in good standing and seconded by two others, that three Members stand up for the Candidate at the meeting for the

28

Candidate to be nominated. By its term seconding means in addition to the first nomination.

So allowing a nominator to also be a second goes against the clear meaning of the language. Nor is there any history in this Union of allowing a candidate to nominate himself. This would further go against what actually occurred at the California nomination meeting. Mr. Glennan, Mr. Antonio and Mr. Govea all testified that Ms. Franco nominated Mr. Govea, not that Mr. Govea nominated himself.

Further, Mr. Govea cannot claim he did not have notice of this requirement. Mr. Govea's own election counsel was faxed the Rules of Nomination and Election on April 19, 2007, six days before the meeting, by Local 1877, SEIU, and submitted them to the Committee (See Ex. MM). Even if Mr. Govea only received notice on this date, six days is more than enough time for him to bring three fellow Members to stand up for him at a nomination meeting for Vice President. Considering there are some 5500 Members of the Union, with 500 Members in California working for one employer at the airports, getting three of those fellow Members to nominate him at a meeting near the airport, is not unreasonable or burdensome. Nor can Mr. Govea claim the language to be confusing, since all other candidates or proposed candidates were nominated or proposed to be nominated by at least three fellow Members. ( See Ex. B & X.) The testimony of Mr. Govea, Mr. Antonio and Mr. Glennan, all who were present in California, is consistent in that Mr. Govea was nominated by only two fellow Members, not the three required. Based on the above, the Committee finds that Mr. Govea was not duly nominated for the Office of Vice President with Allied International Union and as such had impact on the nomination and election process.

In determining an appropriate remedy for the violation of the nomination rules, the Committee reviewed the Union Constitution to see if a Member who was not duly nominated could still run in an election for Union Office. Telling on this issue is the Constitutional prohibition against write-in ballots on behalf of a Member who was not duly nominated. Considering the Constitutional prohibition, it was error to allow Mr.

Govea who was not properly nominated, to run in the Union election for Vice President, and his nomination and the election must be rescinded.

In determining whether the nomination process should be redone or whether the sole remaining nominee for Vice President, MaryBeth Stafford, who was properly nominated, shall be deemed and declared elected to such office, the Committee again went to the Union Constitution for guidance. The Constitution clearly provides that when there is only one properly nominated remaining candidate, the nominee shall be deemed and declared to such office. In the case of Ms. Vanson, who was the only nominated candidate for President, and Mr. Glennen, who was the only nominated candidate for Secretary Treasurer, they were deemed and declared elected to such respective offices. It is therefore the recommendation of this Committee that the only appropriate remedy to this substantiated Protest is for the Union to deem and declare MaryBeth Stafford the Vice President of Allied International Union, for the term commencing July 1, 2007.

### C. The Failure of the Union to Provide a Reasonable Opportunity for the Nomination of Melvin Garland as a Candidate for Union President and the Nomination of Larry Binyard as a Candidate for Union Secretary Treasurer.

**Finding:**

This Protest relates to the April 30, 2007, 6 p.m. to 8 p.m. New York nomination meeting. Both Mr. Garland and Mr. Binyard attended the meeting at different times. The Committee found there was a call for nomination by the Election Chair at the meeting at 6:30 p.m., again at 7:00 p.m. and again at 7:40 p.m. Ms. Vanson was nominated for Union President, Ms. Stafford was nominated for Union Vice President and Mr. Glennen was nominated for Union Secretary Treasurer all at the 6:30 p.m. call for nominations. Mr. Garland was present at the meeting for the 7:40 p.m. call for nominations, but he was not nominated for President at the 6:30 p.m., 7 p.m. or 7:40 p.m. call for nominations.

Mr. Binyard was present at the meeting for the 6:30 p.m. call for nominations, but he was not nominated for Secretary Treasurer at the 6:30 p.m., 7 p.m. or 7:40 p.m. call for nominations. There is no evidence that Melvin Garland and/or Larry Binyard were not provided a reasonable opportunity to be nominated for Union Office. This protest is found to be without merit and unsubstantiated and therefore did not affect the nomination process or the election.

## Statement of Relevant Constitutional Provisions

**Article VI, Section 1 as relevant provides:**

"...Nominations shall not be closed until a reasonable opportunity has been afforded for all nominations."

**Facts Supporting the Findings:**

Tara Pamulo, the Election Chair, was interviewed extensively about the April 30, 2007, 6 p.m. to 8 p.m. New York nomination meeting which she chaired and for which she took minutes. (See Ex. X) (R-Pamulo, p. 15, 17). There was a total of 23 Members at this meeting at varying times. The Committee interviewed 11 of those Members and received affidavits from 2 more.

At 6 p.m., present at the meeting were Peggy Vanson, President of the Union, Joseph Glennan, the Secretary Treasurer of the Union, MaryBeth Stafford, the Union Business Agent, Tara Pamulo, the Election Chair, Otha Tanks, a Member assigned to take attendance (See Ex. W), William Watson, who claims he wasn't allowed to nominate Mr. Garland for President and Mr. Binyard for Secretary Treasurer, and Larry Binyard, who claims he wasn't allowed to nominate Mr. Garland and be nominated himself. (All the above Members were interviewed by the Committee except Mr. Binyard, who refused.) Since there were so few Members present, the call for

nominations was delayed to 6:30 p.m. to give more Members a chance to get to the meeting.

At 6:30 p.m., Ms. Pumulo called the nomination meeting to Order and asked for nominations for the Office of President. Ms. Vanson was nominated and seconded by 4 Members. (See Ex. X). Mr. Watson and Mr. Binyard were present at the time, but no Member nominated Mr. Garland for President. (R-Pumulo, p. 21, 22) (R-Vanson, p. 6, 7) (R-Glennan, p. 13, 14) (R-Stafford, p. 10, 11) (R-Tanks, p. 6, 7) (R-Simmons, p. 5, 6, 7, 8) (R-Williams, p. 5, 6, 7, 8, 9) (R-Stevenson, p. 15) (R-Watson, p. 11, 12, 13, 14). No one else was nominated for President. The Election Chair asked for nominations for Vice President. Ms. Stafford was nominated and seconded by 3 Members. (See Ex. X). No one else was nominated for Vice President. The Election Chair asked for nominations for Secretary Treasurer. Mr. Glennan was nominated and seconded by 4 Members (See Ex. X). Mr. Watson and Mr. Binyard were present at the time, but no Member nominated Mr. Binyard for Secretary Treasurer. (See all prior citations to record after "No Member nominated Mr. Garland for President".) No one else was nominated for Secretary Treasurer.

Damarri Campbell, a Member who claims he wanted to nominate Mr. Garland and Mr. Binyard, arrived at the meeting after the 6:30 p.m. call for nominations, but before the 7 p.m. call for nominations. Mr. Campbell claims he asked Ms. Vanson if he could still nominate anyone and she said no. (R-Campbell, p.7). Mr. Campbell claims to have asked five other gentlemen at the meeting who also said the ballots were closed. (R-Campbell, p.13, 14). Ms. Vanson denied talking to Mr. Campbell about nominations. (R-Vanson, p.7). Mr. Glennan stated he was sitting by the dais and Ms. Vanson never told Watson or Campbell or anyone else that ballots or nominations were closed. The only conversation involved medical benefits. (R-Glennan, p14, 19, 20.) No other Member interviewed heard Ms. Vanson or any other gentlemen tell Mr. Campbell or anyone else after the 6:30 p.m. call for nominations, that ballots or nominations were closed. (R-Simmons, p. 6, 7, 8) (R-Stevenson, p. 16) (R-Williams, p. 7, 8, 9) (R-Tanks, p. 8 & 9) (R-Stafford, p. 11) (R-Pumulo, p. 21, 23, 24). Mr. Watson, Mr. Binyard, and Mr. Campbell

32

left at approximately 6:45 p.m., before the 7 p.m. call for nominations and never returned to the meeting. Mr. Watson, Mr. Binyard and Mr. Campbell did not nominate anyone for Union Office and did not try to nominate anyone for Union Office. (R-Pamulo, p.21, 22, 23, 24.)

At 7 p.m., Ms. Pamulo called for nominations (See also McFarland Affidavit, Ex. YY und Gerst Affidavit, Ex. ZZ) and no nominations were made. (See Ex. X). At about 7:15 p.m, Melvin Garland, a Member who claims he wanted to be nominated to run for Union President and wanted to nominate Mr. Binyard, arrived at the meeting. Mr. Watson, Mr. Binyard and Mr. Campbell had already left the meeting. (R-Pamulo, p.24) (R-Glennan, p. 16). Mr. Garland remained at the meeting until 8 p.m. At 7:40 p.m., Ms. Pamulo called for nominations. Mr. Garland was at the meeting but he didn't nominate any fellow Members and no fellow Members nominated Mr. Garland. He also didn't complain that he wanted to nominate a Member or be nominated for Office and was denied the opportunity. (R-Pamulo, p. 25, 26, 27, 28) (R-Glennan, p. 16, 17 , 18) (R-Stafford, p. 12, 13, 14, 15) (R-Vanson, p. 8) (See also Ex. YY & ZZ). Mr. Garland remained at the meeting until 8 p.m., but only discussed Union issues involving medical benefits and grievances. Mr. Garland claims he arrived at the meeting at 6:40 p.m. (R-Garland, p.8.) Mr. Garland claims he was present at the meeting at 7 p.m. and 7:40 p.m. and there was no call for nominations (R-Garland, p.8-10.) Mr. Garland's claim about his arrival time and the failure to call for nominations when he was there is disputed as above.

## Discussion

The Committee finds it to be undisputed that Tara Pamulo, the Election Chair, chaired the Nomination Meeting in Brooklyn, N.Y. held on April 30, 2007 between 6 p.m. and 8 p.m. and was present during that entire period. The Committee further finds it to be undisputed that Ms. Pamulo at around 6:30 p.m. called for nominations, that Ms. Vanson was nominated for President, and that Ms. Stafford was nominated for Vice

President, that Mr. Glennan was nominated for Secretary Treasurer, that Mr. Binyard was present at the meeting at that time but was not nominated for Office; and that no other Members were nominated for Union Office at that time. The Committee further finds it to be undisputed that at around 7 p.m., Ms. Pamulo again called for nominations and no Member was nominated at that time for Union Office. The Committee finally finds it to be undisputed that at around 7:40 p.m., Ms. Pamulo again called for nominations, that Mr. Garland was present at the meeting at that time but was not nominated for Union Office and no Member was nominated at that time for Union Office. Based on the above, the Committee finds a reasonable opportunity to be nominated was provided to Mr. Garland and Mr. Binyard.

Mr. Watson claims that the 6:30 p.m. call for nominations lasted 5 minutes and did not give him an opportunity to nominate. It only takes a few seconds to stand up and say I nominate Melvin Garland or I nominate Larry Binyard. This claim is further unsupported and disputed by numerous other Members at the meeting interviewed by the Committee. Mr. Binyard, although invited, refused to be interviewed by the Committee.

Mr. Campbell's claim is that when he arrived at the meeting after the 6:30 p.m. call for nominations that Ms. Vanson and five other unidentified persons told him that ballots for nominations were closed. He claims that he therefore left with Mr. Watson and Mr. Binyard after 15 or 20 minutes. Ms. Vanson denies this as does Mr. Glennan. No other Members heard Ms. Vanson or anyone else make these alleged statements. Further, Mr. Campbell's alleged belief that nominations were closed and the meeting was over doesn't make sense to the Committee considering that no Members besides Watson, Campbell and Binyard were leaving the meeting at the time and more Members continued to arrive at the meeting including Mr. Gertz, Mr. McFarland and Mr. Garland. Finally, Mr. Garland was present at 7:40 p.m. when there was a call for nominations. Mr. Garland disputes this, but considering all the other witnesses who support it, Mr. Garland's testimony on the issue is not believable.

There is no allegation that anyone interfered with Mr. Garland nominating a Member or being nominated at the time. Nor is there any claim that Mr. Binyard, Mr. Watson or Mr.

Campbell were denied entry back into the meeting after Mr. Garland finally arrived to nominate a Member or to be nominated themselves. Based on the above, it is the opinion of the Committee that Mr. Garland's claim that he and Mr. Binyard were denied a reasonable opportunity to be nominated for Union Office is unsubstantiated and therefore had no impact on the nomination process or election.

### D. The Denial by the Union to Mr. Govea to do a Mailing to the Membership List by Imposing Conditions on Him Not Imposed on Ms. Stafford.

**Finding:**

This Protest relates to a series of letters between the law firm of Kennedy, Jennik & Murray, P.C. and the Union counsel, Weissman & Mintz, LLC. Due to complaints of flagrant campaign abuses by a labor union, Local 32 B-J SEIU, on behalf of Mr. Govea, Union counsel sought assurances that the cost of the mailing to the membership list by Mr. Govea was not being illegally paid for or funded by a labor union. The assurances were being sought through a certification that no labor union funds were being used and a statement as to who was providing the funding with member information redacted. Mr. Govea was provided with Union campaign mailing procedures. Mr. Govea did not provide the certification and did not provide stamped campaign literature with payment for labeling to the Union. The Committee requested information from Mr. Govea showing campaign expenditures made, but he has refused to provide any such information or documents.

After allegations that Ms. Stafford used union and employer funds in her campaign, she verified to both the Union and the Committee that she paid all campaign expenditures, including all costs of a campaign mailing to the membership list, with her own personal funds providing paid receipts, credit card bills, affidavits and testimony of witnesses. The Committee finds that the requirements asked of both candidates were specifically limited to address the alleged campaign abuses, in Mr. Govea's case, illegal

35

union funding of his campaign, and did not present a burden or unequal treatment. If Mr.
Govea was not receiving illegal campaign funding, the redactions of the names of
Member supporters would have protected the identities of his supporters. Although it will
be addressed more fully in response to a later Protest, the Committee has found flagrant
and serious violation by Mr. Govea in accepting sizable campaign services from Local 32
B-J, SEIU in New York and Local 1877, SEIU in California. Based on the above, it is the
opinion of the Committee that the requirement of a certification by Mr. Govea that his
campaign mailing to the membership list was not being illegally funded by a union and a
list of who provided funding with a redaction of Union Members was not unlawful and
this protest is unsubstantiated and therefore had no impact on the election.

## Statement of Relevant Statute

### Section 401 (c) LMRDA as relevant provides:

"...every national or international labor organization and its officers, shall be
under a duty, enforceable at the suit of any bonafide candidate for office in such labor
organization... to comply with all reasonable requests of any candidate to distribute by
mail or otherwise at the candidate's expense campaign literature in aid of such person's
candidacy to all Members in good standing of such labor organization....with equal
treatment as to the expense of such distribution".

### Facts Supporting the Findings:

Mr. Govea admitted in his interview to never personally contacting the Election
Chair to request a campaign mailing under the membership list. (R-Govea, p.28). Mr.
Govea admitted in his interview that he never provided the Union with his campaign
literature in stamped envelopes to be labeled by the Union. (R-Govea, p. 27, 28, 30). He

claims to have left those tasks to the law firm of Kennedy, Jennik & Murray, P.C., (R-Govea, p. 27, 28) who he has not paid any monies to. (R-Govea, p. 15).

In interviewing Members, the Committee has accumulated extensive testimony and documents, showing rampant Union funded campaigning on behalf of Mr. Govea by Local 32 B-J, SEIU in New York and by Local 1877, SEIU in California. Both these Unions campaigned for Mr. Govea by holding rallys, using their paid employees to phone Members, using their paid employees to design, copy and hand out flyers to Members at their worksites. While they campaigned for Mr. Govea for Allied Union office, they were asking Allied Members to sign cards to be represented by Local 32 B-J SEIU in New York or Local 1877, SEIU in California. (R-Pantulo, p. 45-54) (R-Chan, p. 5-9) (R-Stafford, p. 30-57, 67-70) (R-Glennan, p. 21-25) (R-Vanson, p. 10-11) (R-Simmons, p. 9-11) (R-Dixon, p. 4-11) (R-Evans, p. 4-16) (R-Rodriguez, p. 9-13) (R-Peters, p. 4-8) (Ex. P, Q, R, GG, HH, II, JJ, KK, LL, MM).

Mr. Govea did not pay for the above services provided to him by Local 32 B-J or Local 1877 (R-Govea, p. 18, 19, 22, 23, 25, 26, 45.) He claims these were monies raised by New York Members to give out campaign literature (R-Govea, p. 21, 22) Mr. Campbell, Mr. Garland and Ms. McFarland all testified that they did not contribute money to Mr. Govea's campaign (R-Campbell, p.20) (R-Garland, p.23) (R-McFarland, p. 7, 8.) Mr. Govea claims to have paid some costs for 100 copies and telephone calls but has not supplied documentary evidence or any other proof. (R-Govea, p. 23, 43, 44.)

Mr. Watson testified that he had no involvement in Mr. Govea's campaign; only that he voted for him (R-Watson, p. 22, 23.) Ms. Stafford on the other hand has provided the Union and the Committee with proof that she personally paid all her own campaign costs for Union office, including all costs for doing a Membership mailing through the Membership list. (See Ex. AA, BB, CC, DD, EE, FF, SS).

The request to the Union to distribute Mr. Govea's campaign literature came by letter dated May 4, 2007 from the law firm of Kennedy, Jennik & Murray, P.C. The letter as relevant provides:

"That on Monday, May 7, 2006 the Union distribute his campaign literature to the Membership at his expense. Mr. Govea further requests that the Union inform him immediately, through his undersigned counsel, of the procedure for submission and distribution of his literature to enable him to submit his literature for distribution by Monday, May 7, 2007." (Ex. NN)

By letter dated May 10, 2007, the Union's counsel, Weissman & Mintz, LLC responded to the request.

"With respect to Mr. Govea's request, Allied has a good faith belief that the $2,067.00 in postage and the other costs associated with Mr. Govea's proposed mailing and the fees associated with your law firm's representation of Mr. Govea have been paid or will be paid by SEIU 32 B-J and at SEIU 32 B-J's direction. Allied also believes that Mr. Govea's campaign, his proposed mailing, your coordinated representation of Mr. Govea (in Los Angeles) and Messrs. Gurland and Binyard (in New York) all under the direction of SEIU 32 B-J, constitutes an interstate conspiracy to violate Section 401 (g) of Title IV. For this reason, Allied is compelled to deny your request on behalf of Mr. Govea to distribute his campaign literature. Allied does not discriminate against Mr. Govea, but applies Title IV consistently to all bona fide candidates. Allied is also confident that any finder of facts would easily pierce this "corporate" veil and connect the dots between SEIU 32 BJ and these campaign expenditures should your clients seek intervention by a district court or the Secretary of Labor.

As we discussed on May 8, and notwithstanding the evidence of SEIU 32 B-J's unlawful interference in Allied's election, Allied would review its decision regarding Mr. Govea's request to mail his campaign material if you and Mr. Govea would certify that Mr. Govea's mailing and your legal representation of Mr. Govea and his colleagues during this election were funded solely at Mr. Govea's expense and in compliance with Title IV, or if you could provide evidence of any other sources of lawful funds supporting Mr. Govea's candidacy."

No certification from Mr. Govea or counsel that the mailing and counsel's representation were funded in compliance with Title IV was provided.

**Discussion**

In proceeding with the election, the Union determined that each candidate would have to pay the cost of any mailing to the Membership. The procedure to be followed involved the candidate at their cost, preparing the flyer or enclosure, stuffing and sealing the envelopes and placing a stamp on the envelope. To do a mailing to the entire membership involved approximately 5500 pieces. The mailing would be brought to the Union headquarters where a clerical would be hired and paid by the candidate to place Member labels on the envelopes and bring them to the post office.

Under LMRDA 401(c) if the Union is not paying for all candidate mailings, the above costs are at the candidates expense. Under LMRDA 401(g), it is illegal for a candidate to accept money or services from a Union or employer to fund a campaign for Union office. Allied received Mr. Govea's request to do a mailing from Kennedy, Jennik & Murray, P.C. on May 7, 2007. At that time Mr. Govea's campaign was in full swing. Phone calls were being made to Allied Members from paid employees of Local 32 B-J SEIU. Leaflets for Mr. Govea were being prepared, copied and distributed at Allied Member worksites by paid employees of Local 32 B-J SEIU. The bottom of Mr. Govea's flyers had a contact name Andy Friedman and a phone number to call him if you need more information about the election or do not have a ballot. Andy Friedman was and is a paid organizer for Local 32 B-J SEIU. Since Local 32 B-J SEIU was trying to raid Members from Allied organized jobs, the Union was receiving complaints from its Members who didn't know if this was an election between Allied and Local 32 B-J, or an Officer election between Mr. Govea and Ms. Stafford.

When the Committee interviewed Mr. Govea, he appeared to be unaware. He claimed not to have seen copies of the flyers being handed out by 32 B-J. He claimed to be unaware that Andy Friedman's name and telephone number, a paid organizer of 32 B-J, was on his flyer. He further stated that he contributed none of his personal monies to his campaign for Union office of Allied in New York. Allied has some 90% of its Membership in New York. When asked how his New York campaign was being funded,

he said by friends in New York. When asked to name these friends, he couldn't. When Mr. Garland, Mr. Watson, Mr. Campbell and Mr. McFarland who appeared to be his supporters, were interviewed they claimed not to have contributed any monies to Mr. Govea's campaign and minimal services. Mr. Garland said he handed out 30 flyers at his worksite and Mr. McFarland said she handed out 12 flyers at her worksite.

The Union had received complaints from Members about 32 B-J campaigning for Mr. Govea and had a legitimate concern about illegal Union campaign contributions from another Union being spent to send a Member campaign mailing through an Allied Membership list. A Union Election Chair does have an obligation to police the election and make sure that illegal campaign contributions are not to be used by a candidate. Since the problem was with Mr. Govea's campaign, the Union asked Mr. Govea to certify that the more than $2,000.00 in postage costs for the mailing, plus envelopes, envelope stuffing, copying and labeling costs are not being paid by Local 32 B-J, and to certify that either Mr. Govea is personally paying the costs or if not, state the legal source, before a campaign mailing through the Membership list would be allowed.
If the legal source of these campaign funds were fellow Members of Allied, Mr. Govea could redact those names to protect their privacy. This appears to ensure that illegal sources are not used, but at the same time Member privacy is protected. Mr. Govea did not provide the Union the source of his campaign funds or sources. Although there is a Protest to Mr. Govea using SEIU funds in New York and California in his campaign, Mr. Govea has also refused to provide the source of his campaign funds although requested by the Committee.

In this protest, Mr. Govea objects to Ms. Stafford not also being required to account for the source of her campaign funds before being allowed to do a Union Membership list mailing. However, at this time, there were no complaints that Ms. Stafford's campaign was using illegal sources of funding. Ms. Stafford testified to the Committee that as of this point, she had not started campaigning yet. She had recently given birth and was spending a few days home with her newborn baby. And her trip to California on May 11, 2007 was the start of her campaign. There were no complaints and

40

no reason to have Ms. Stafford certify the nature of her funds. Later in the campaign
there were complaints about the source of Ms. Stafford's funds for her California trip.
She had to account to the Union and to the Committee. Unlike Mr. Govea, Ms. Stafford
accounted to both the Union and the Committee, providing paid receipts and credit card
bills showing use of her personal funds, not only for the California trip, but also for her
source of funds for the Membership list mailing. Based on the above, it is the opinion of
the Committee that the claim that Mr. Govea was unlawfully denied the right to do a
mailing to the Membership list is unsubstantiated and therefore had no impact on the
election.

**E. The denial by the Union to Mr. Govea of information about worksites
where the Union represents Members although Ms. Stafford was able to use such
information in her campaign.**

**Finding:**

The Committee finds that the Union did not have a list of worksites as requested
by Mr. Govea's counsel. Ms. Stafford stated that she had no access to worksite
information, and the Committee has been provided with no information to be able to
dispute this. Based upon the testimony that basically every worksite campaigned at by
Ms. Stafford or her campaigner had already been visited and campaigned at by Mr.
Govea's numerous campaigners in New York, the Committee finds that both candidates
Mr. Govea and Ms. Stafford had equivalent worksite information and therefore, the
protest is found to be unsubstantiated and is found to have had no impact on the election.

**Facts Supporting the Findings:**

Mr. Govea did not personally request worksite information and Mr. Govea is not
aware of any worksite information that was provided to Ms. Stafford (R-Govea, P. 28,

41

35). The only request for worksite information was made by Jennik & Murray, P.C. (See
Ex. NN) Union counsel Weissman & Mintz, LLC responded that Allied does not have a
list of worksites (Ex. OO) Ms. Stafford testified that she did not seek or receive worksite
information from Allied (R-Stafford, p. 59). Ms. Stafford further testified that every
worksite of Allied Members she went to campaign, employees of Local 32 B-J had
already been at that site campaigning for Mr. Govea and left vote for Mr. Govea flyers
(R-Stafford, p. 34,36, 40, 41, 49, 51, 53, 56). Ms. Stafford referenced more than 25
worksites that she had visited where Local 32 B-J had already been there campaigning for
Mr. Govea and left flyers. (R-Stafford, p. 30-54). Mr. Rodriguez, who Ms. Stafford paid
to campaign for her on two days in New York also testified that all worksites he visited,
referencing about 8 worksites where Local 32 B-J had already been there campaigning
for Mr. Govea and left flyers. (R-Rodriguez, p. 9-12).

## Discussion

Ms. Stafford states she received no worksite information from Allied. However,
even if she did get any worksite information from her years of employment at Allied, it
did not provide her with any advantage in campaigning for Union office. Every worksite
Ms. Stafford or Mr. Rodriguez, on her behalf, visited to campaign, had already been
visited by Local 32 B-J campaigning for Mr. Govea. It appears to the Committee from
interviewing Members that Mr. Govea had better worksite information than Ms. Stafford.
Based on the above, it is the opinion of the Committee that the claim that Mr. Govea was
unfairly denied worksite information is unsubstantiated and had no impact on the
election.

### F. The denial by the Union to Mr. Govea to provide information relating to
the date, time and place of the printing, preparation and mailing of ballots and to
have an observer present at the printing, preparation and mailing of ballots.

**Finding:**

The Committee finds that at the time the Election Chair received the request from Mr. Govea's attorney for information and to have an observer present at the printing, preparation and mailing of the ballots, the ballots had already been printed, prepared and sent to Garden City Printing for mailing on May 7, 2007. The Committee further finds that Mr. Govea was invited to attend and received notice of a May 3, 2007 meeting at Union Headquarters between the candidates and the Election Chair with one of the issues being the printing, preparation and mailing of ballots. Mr. Govea chose not to attend the meeting or even telephone the Election chair, Tara Pamulo. Since the request was received after the ballots were being printed, prepared and forwarded for mailing, the Protest is found to be unsubstantiated and therefore had no impact on the election.

**Facts Supporting the Findings:**

Ms. Pamulo, the Election Chair, testified that before the ballots were prepared a meeting was scheduled for May 3, 2007 at 1 p.m. at Allied Headquarters in Mineola, N.Y. (R-Pamulo, p. 31, 32). Letters went out to Ms. Stafford and Mr. Govea (R-Pamulo, p. 31) (Ex. Y). The letters included a separate election number to make it easier for the candidates and Members to get through to the Election Chair on Election issues. (R-Pamulo, p. 38). Normal business hours of the Election Chair were 9 a.m. to 4 p.m. (R-Pamulo, p. 39) One of the issues to be discussed was the ballots (R-Pamulo, p. 31, 34)

Mr. Govea received the letter on May 2, 2007, but due to the time difference, he could not call Ms. Pamulo. He did not call on the morning of May 3, 2007, but the reason was not the time difference, but coworkers telling him they couldn't get through to the Union, so he didn't bother. He also didn't bother to check that he was provided a new election telephone number to ease his access to the Election Chair for election issues (R-Govea, p. 10-13). At the meeting, it was determined how the ballots would be prepared and printed. Mr. Govea did not attend or call Ms. Pamulo (R-Pamulo, p. 34, 59.)

Neither Ms. Stafford or Mr. Govea asked Ms. Pamulo to have an observer at the preparation, printing and mailing of ballots and no observers were present. (R-Stafford, p. 59) (R-Govea, p. 28) (R-Pamulo, p. 60). The ballots and election notices were forwarded to Garden City Press with labels from the Union Membership list for mailing on May 7, 2007. (R-Pamulo, p. 35).

A letter was faxed from Kennedy, Jennik & Murray, P.C. on Friday, May 4, 2007 to the Election Chair; around 4 p.m., the close of the office business day, so it wasn't received until Monday, May 7, 2007 (See Ex. NN) In the letter as relates to this issue, it sought the time and place of preparation and mailing of ballots so an observer for Mr. Govea could be present. By phone on May 7, 2007 and by letter dated May 10, 2007, Union General Counsel advised Kennedy, Jennik & Murray, P.C. that the ballots had already been prepared and mailed on May 7, 2007, so effectively it was too late to have an observer present (See Ex. OO).

**G. The improper use of employer resources to support the candidacy of Ms. Stafford, including May 11th and 12th, 2007, Ms. Stafford was allowed to campaign at Aviation Security in Los Angeles by speaking to employees during work time and being accompanied by Mr. Antonio, a Union representative, who was on paid company time while campaigning.**

Finding:

The Committee in its investigation has found no Employer resources being used to support Ms. Stafford's campaign. On May 11th & 12th, 2007 while campaigning at Aviation Security at the airport in Los Angeles. She was not allowed into any secure areas and would speak to employee Members during their break time. She did not meet with the employer and was provided no special treatment other than any other member of the public. Although Mr. Antonio accompanied Ms. Stafford and campaigned for her on those two days, they were off days for him from work and Ms. Stafford paid him for his

campaign services out of her own personal funds. Ms. Stafford did not use Employer facilities to copy her flyers, but provided the Committee with receipts showing her own personal payment for those services (Ex. FF). Based on the above, the protest is found to be unsubstantiated and is therefore found to have had no impact on the election.

## Statement of Relevant Statutes

Section 401(g) of the LMRDA as relevant provides:

"....No moneys received by any labor organization by way of dues, assessment, or similar levy, and no money of an employer shall be contributed or applied to promote the candidacy of any person..."

The above prohibition against use of employer funds applies to indirect expenditures, including:
- campaigning or time paid for by the employer
- use of employer telephone, fax or copier
- use of employer property

## Facts Supporting the Findings:

Mr. Govea and Mr. Garland did not have any information on this protest (R-Govea, p. 29, 30) (R-Garland, p. 38, 39) Ms. Stafford denied taking any employer money or resources in her campaign either in California or in New York (R-Stafford, p. 21-29). Ms. Stafford accounted to the Committee for all campaign expenditures in both New York and California. Whether it was stamps, copying, envelopes, labeling, airfare, food, campaigners, etc. She accounted for them and testified under oath that she personally paid for them. (R-Stafford, p. 21-26, 28) (Ex. AA, BB, CC, DD, EE, FF, GG.)

45

Ms. Stafford hired Mr. Rodriguez to come with her to California and campaign for her on May 11th & 12th, 2007 and also to campaign for her two days in New York. She paid him cash out of her own personal funds, since Mr. Rodriguez took time off from his work to campaign. Ms. Stafford also personally paid his airfare and hotel and food in California. Mr. Antonio also campaigned for Ms. Stafford on May 11th & 12th, 2007 in California. She paid him $500-$600.00 out of her own personal funds since one of the days was a vacation day and the other was a regular day off from work. Ms. Stafford also personally paid his food costs. (R-Stafford, p. 21, 22, 23, 24, 28) (R-Rodriguez, p. 4, 5, 8) (R-Antonio, p. 59, 60, 61). Ms. Stafford didn't use any employer copy machines, but paid for copies at Office Depot.

Ms. Stafford did not meet with the employer at the airport. She and Mr. Rodriguez and Mr. Antonio leafleted and spoke with Members while on breaks or in outside areas. They were not provided with any access to Members by the employer, use of the employer facilities and were not allowed into secure areas. (R-Stafford, p. 26, 27, 29) (R-Rodriguez, p. 6, 7, 8) (R-Antonio, p. 60, 61.)

## II. The improper use of Union resources to support the candidacy of Ms. Stafford including information about Union Member worksites and membership contacts.

### Finding:

The Committee did not understand what Union resources this Protest was referring to. The Committee asked both Mr. Govea and Mr. Garland for an explanation of what Union resources Ms. Stafford is being accused of using and neither of them could explain (R-Govea, p. 34) (R-Garland, p. 39-42). Ms. Stafford testified that she never sought Union work location or Member contact information (R-Stafford, p. 59). Union worksite information was dealt with under Protest in Paragraph E herein, and found to be unsubstantiated. In addition to accounting for all her campaign expenditures, mailing,

cupying and leafleting, Ms. Stafford testified under oath that she did not use Union copy machines (R-Stafford, p. 22), that she didn't use Union paid for stamps for her campaign and the Union did not pay Mr. Rodriguez and Mr. Antonio for their time campaigning for her. (R-Stafford, p. 23, 28.) Ms. Stafford finally testified on this issue that she did not use any Allied facilities or services in California or New York (R-Stafford, p. 28, 29.) Based on the above, the Committee found no improper use of Union resources by Ms. Stafford and the protest is found to be unsubstantiated and is therefore found to have no impact on the election.

## Statement of Relevant Statutes

Section 481(g) of the LMRDA as relevant provides:

"...No money received by any labor organization by way of dues, assessment, or similar levy, and no money of an employer shall be contributed or applied to promote the candidacy of any person..."

The above prohibition against use of union funds applies to indirect expenditures including:

- campaigning on time paid for by the Union\
- use of Union telephone, fax or copier
- use of Union stamps, paper & envelopes
- use of Union employees to prepare campaign literature on Union time
- use of Union property or facilities

**I. Ballots were not mailed to significant numbers of Members and the Union interfered with the Members ability to request replacement ballots by not answering the telephone during business hours, by interrogating Union Members who**

telephoned to request a ballot and by not sending ballots to Union Members who
telephoned to request a ballot.

### Finding:

The Committee was not provided with even one witness who did not receive a
ballot, sought a replacement ballot and was unjustly denied it. Both Ms. Pamulo, the
Election Chair, and her assistant, Ms. Chan, testified to numerous Members who called
on the election designated telephone number and upon confirmation of their Membership
and new address, were provided with replacement ballots, no matter who they said they
were voting for. The Committee has received hearsay and direct information of some
Members not receiving ballots. Upon examination, the number of Members confirmed to
have not received ballots, and who were sent replacement ballots, totaled less than twenty
(20) and the Committee finds this amount out of a Membership of 5500 Members not to
be significant. However, of those Members who did not receive ballots and sought
replacement ballots, the Committee has received no confirmed information from any
Member requesting a replacement ballot that the election phone line was not answered
during business hours, that the election phone line was continually busy, that the Member
requesting a replacement ballot was interrogated (outside of being asked Membership
information, employment information and new address) or the replacement ballots were
not sent once entitlement was established. Based on the above, the Protest relating to the
failure to mail significant numbers of ballots to Members and interference with Members
attempts to get replacement ballots is unsubstantiated and therefore had no impact on the
election.

### Statement of Relevant Statutes

Section 401(e) LMRDA as relevant provides:

"...every Member in good standing...shall have the right to vote for or otherwise support the candidate of his choice...Each Member in good standing shall be entitled to one vote.."

Facts Supporting the Findings:

Prior to sending out nomination notices and election ballots, the Election Chair and her assistant updated the Membership lists and Member addresses. They did this by comparing the Membership list information to the monthly dues reports from the employers and correcting any discrepancies. Members on leave of absence also were sent ballots. These lists were further corrected based upon any returned nomination notices. (R-Pamulo, p. 4, 5, 13, 28, 29.)

A little used phone line was even provided to Members on the ballot to get replacement ballots if needed. This was provided to make it easier for Members or candidates to contact the Election Chair regarding ballot problems. This phone number was monitored by Ms. Pamulo and Ms. Chan from 9 a.m. to 4 p.m., which were the normal Union business hours (R-Pamulo, p. 37, 38, 39) (R-Chan, p. 4, 10, 11.) The ballots were forwarded to Garden City Press with labels and they sent them out on May 7, 2007, with confirmation of mailing from the Post Office. (R-Pamulo, p. 34, 35.)

During the monitoring of the phones, if a Member called for a replacement ballot, Ms. Pamulo and Ms. Chan would get their name, employment information, old address and new address. Once Membership was confirmed, a replacement ballot would be sent. Many people who called on this line were not Members, they were not in Guard titles, but had been told to call by Local 32 B-J, SEIU. Those persons, since they were not Members were not sent ballots. (R-Pamulo, p. 36, 39, 44, 45, 46.) (R-Chan, p.5,6.)

Ms. Pamulo testified to sending a replacement ballot to Peter Fabrikant from FJC Security on May 17, 2007, even though he told her on the phone he was told by 32 B-J to vote for Mr. Govea (R-Pamulo, p. 47, 48.) A similar situation occurred with Thomas Dundas and Ganesh Padarot, both from Aviation Safeguards, who were sent replacement

ballots on May 22, 2007 even though both were told by 32 B-J to vote for Mr. Govea. (R-Pamulo, p. 52, 53.) A Member, Baljit Kaur, called on May 22, 2007 and was sent a replacement ballot that day. (R-Pamulo, p. 53.) Ms. Chan testified to sending a replacement ballot to Vilma Rosotto from Aviation Safeguards on May 17, 2007 who was also called by 32 B-J and told to vote for Mr. Govea (R-Chan, p.7.) She also testified to sending out a replacement ballot to Shafqat Bhatti who called on May 21, 2007 (R-Chan, p.8.) She also testified to sending out a replacement ballot to Ookojo Morris from FJC on May 24, 2007 after he told her working families and 32 B-J had called him to vote for Mr. Govea and get rid of Allied. (R-Chan, p. 9.)

In addition to the above replacement ballots, Committee counsel, in attempting to get a complete set of the correspondence between Mr. Govea's counsel Kennedy, Jennik & Murray, P.C. and Union counsel, Weissman & Mintz, LLC, received from Weissman & Mintz, LLC., an additional letter dated May 18, 2007, which was placed into evidence as Exhibit AAA. This was a letter from Kennedy, Jennik & Murray, P.C. listing 21 names and asking for replacement ballots. Ms. Pamulo reviewed the names and found some 8 of the 21 to be Members with new addresses and forwarded replacement ballots.

In spite of the claim by Mr. Govea's counsel in Exhibit AAA, that Members were having difficulty getting through to the Election Chair, Ms. Pamulo testified that the Election phone line was never off the hook except when talking to a Member and was monitored constantly during office hours. Ms. Pamulo further testified no Member was interrogated and no Member was refused a replacement ballot once Membership and new address was confirmed. Further, no Member ever complained to Ms. Pamulo that they were having a hard time getting through on the election telephone line (R-Pamulo, p. 38, 39, 44, 45, 51, 54, 55, 60, 61.) Similar testimony was provided that no Member complained to Ms. Chan, Ms. Vanson or Ms. Stafford about having any difficulty getting through on the election telephone line in getting replacement ballots (R-Chan, p.5) (R-Vanson, p. 13) (R-Stafford, p. 59-61.)

Although Mr. Govea complained that fellow Members had not received ballots and could not get through to get replacement ballots, when asked to provide a name he

only provided one name, Carolina Franco. When the Committee asked when Ms. Franco tried to call the Election Chair, Mr. Govea had no information and although requested by the Committee, he would not provide contact information for Ms. Franco in California (R-Govea, p. 36-40.) Mr. Govea also stated he had never called Ms. Pamulo (R-Govea, p. 12.)

Mr. Garland also complained that fellow Members had not received ballots, claiming that number to be 30, but he could not remember even one name (R-Garland, p. 42, 43.) He also said he did not follow up to see if these alleged 30 Members received replacement ballots, so Mr. Garland could not provide to the Committee the name of even one Member who was denied the right to vote. (R-Garland, p. 43, 44.) On Mr. Garland's claim that the phone was constantly busy or was not answered, although he received a ballot with the election telephone number on it, Mr. Garland was mistakenly calling and giving out another number, which is why he was probably having difficulty getting through (R-Garland, p. 44-47) (Ex. Z-1). On the Election Chair being rude and interrogating Members or refusing to send replacement ballots, Mr. Garland had no information and did not follow up (R-Garland, p. 48, 49.) Mr. Campbell testified that he did not receive a ballot but voluntarily chose not to participate in the election and did not request a replacement. He testified he knew who to ask if he needed a ballot, but chose not to. (R-Campbell, p. 20, 21.)

**Discussion**

The Committee finds that the Election Chair has made exceptional attempts to try and update the current names and addresses of Members. The Membership has a history of moving residences and jobs frequently. By both cross-checking employer dues records with the Union Membership list and further correcting the list based upon returns of Member mailings, the list was updated. It appears to the Committee that many of the Members who had not received ballots, did not receive them due to the Members own failure to advise the Union and employer of a change of address. The number of

51

Members who the Election Chair could confirm did not receive ballots was less than 20, and all of them were provided with replacement ballots. The only Member testifying to not getting a replacement ballot was Mr. Campbell, but he knew the number to call but voluntarily chose not to call and get a replacement ballot and voluntarily chose not to participate.

Mr. Govea in his testimony originally claimed numerous of his co-workers in California did not receive ballots, but when the Committee asked for their names, he came up with only one name, Carolina Franco. When the Committee sought contact information for Ms. Franco to confirm her non-receipt, Mr. Govea and his counsel, although requested numerous times from the Committee, have refused to provide it. Mr. Garland claimed 30 co-workers in New York did not receive ballots, but when the Committee asked for their names, he came up with no names. He also said he never followed up to see if any of the unnamed persons received replacement ballots. The Committee finds the number of Members who did not receive ballots not to be significant and further finds based on the providing of replacement ballots by the Election Chair that there is no evidence of Members being denied the right to vote.

Regarding the protest on inability to contact the Election Chair for replacement ballots, the Committee has found no evidence that the election telephone line was not answered during business hours, was taken off the hook during business hours, that Ms. Pamulo or Ms. Chan were intimidating or interrogating Members or that replacement ballots were not being sent to Members legitimately requesting them. Ms. Pamulo and Ms. Chan both testified to monitoring the election telephone line, which was provided to Members on 5500 ballots and to the candidates, from 9 a.m. to 4 p.m. Monday through Friday from May 7, 2007 to May 30, 2007. They both testified that during those hours and that time period, the phone was never taken off the hook or rang unanswered. They both testified that when answering election calls, they did not ask the Members who they were voting for, or intimidate or interrogate the Members, but only asked questions to confirm Membership, employment and address change. They both testified that they provided replacement ballots to all Members who called them and had not received

ballots. Ms. Parnulo, Ms. Chan, Ms. Vanson and Ms. Stafford all testified that no Member complained to them about not getting through on the election telephone line, being interrogated or not receiving replacement ballots promised.

Mr. Govea never called the Election Chair or the election phone line provided to him, so he had no personal knowledge on this issue. He named only one Member having problems getting a replacement ballot, Carolina Franco, but this could not be confirmed by the Committee because of Mr. Govea's failure, although requested numerous times, to provide contact information. Mr. Garland had no knowledge of any specific Member who could not get a replacement ballot. In fact, he admitted to having dropped the ball and not following up on those unnamed Members who he claims had not gotten ballots, as to whether they were able to get replacement ballots. Mr. Garland claims to have had difficulty contacting the Election Chair, but although he admitted to being provided the election telephone number on his ballot, he had been calling the wrong number. Not one witness provided testimony or other evidence that would support this protest. Based on the above, the protest on behalf of Mr. Govea relating to ballots not being mailed and request for replacement ballots being interfered with is unsubstantiated and therefore had no impact on the election.

### J. Mr. Govea was denied his request to inspect the Membership list.

**Finding:**

Section 401(c) of the LMRDA provides a candidate for office in a labor organization the right once, within 30 days prior to the election to inspect the Union Membership list at the principal offices of the labor organization. In the case of mail ballot elections, this has been interpreted by the U.S. Department of Labor as the 30 days before the mailing of ballots. The mailing of ballots in the Allied election took place on May 7, 2007. The firm of Kennedy, Jennik & Murray, P.C. on behalf of Mr. Govea sought to inspect the Union Membership list on May 7, 2007. This was not within the 30

days prior to the mailing of the ballots, and in the opinion of the Committee, was properly rejected by the Union. The Union treated both candidates equally. Neither candidate, Mr. Govea or Ms. Stafford, sought to inspect the Union Membership list during the 30 day period prior to the mailing of ballots, as was their right. Neither candidate, Mr. Govea or Ms. Stafford was permitted to inspect the Union Membership list on or after May 7, 2007, the date of the mailing of the ballots. The Committee finds that the Union has not discriminated in favor or against either candidate on the inspection of Membership lists and has acted in compliance with Section 401 (c) of the LMRDA and finds this protest was unsubstantiated and therefore had no impact on the election.

## Statement of Relevant Statutes and Procedures

Section 401 (c) of the LMRDA as relevant provides:

"...every local labor organization, and its officers, shall be under a duty, enforceable at the suit of a bona fide candidate...to refrain from discrimination in favor of or against any candidate with respect to the use of lists of members...Every bona fide candidate shall have the right, once within 30 days prior to an election, of a labor organization in which he is a candidate, to inspect a list containing the names and last known addresses of all members of the labor organization who are subject to a collective bargaining agreement requiring membership therein as a condition of employment, which list shall be maintained and kept at the principal office of such labor organization by a designated official thereof."

Section 29 CFR Ch. IV, Paragraph 452.72 Period of Inspection as relevant provides:

"...the act specifies the maximum period during which the right of inspection of membership lists is to be granted. The opportunity to inspect the lists must be granted once during the 30-day period prior to the casting of ballots in the election. Thus, where a mail ballot system is employed under which ballots are returnable as soon as received by

54

members, the right to inspect must be accorded within the 30-day period prior to the mailing of ballots to members. It would be an unreasonable restriction to permit inspection of lists only after the ballots have been mailed or the balloting has commenced."

U.S. Department of Labor, Office of Labor Management Standards, a Guide for Election Officials at page 23, Requirement in Inspecting the Membership List.

"...A candidate's right to inspect the union's membership list is limited to a list of members who are subject to a collective bargaining agreement which requires union membership as a condition of employment.

Even if union membership is not required as a condition of employment, the union may nevertheless decide to allow inspection of its membership list. If the union decides to do so, it must treat all candidates equally and notify them of the decision to allow inspection.

The right to inspect the membership list is limited to one time within 30 days before the election or 30 days before the mailing of ballots in a mail ballot election.

A union must allow a bona fide candidate who is seeking to be nominated to run for office the opportunity to inspect the membership list once within 30 days before the election.

The union is required to maintain the membership list at its principal office but is not required to provide inspection at other places, such as a satellite union office or work locations of members.

Candidates do not have the right to copy the membership list, only the right to inspect and/ or compare it with a personal list of members.

If a candidate is permitted to use the membership list for any purpose other than inspection (such as copying) the union must inform all candidates of the availability of the list for that other purpose and give the same privilege to all candidates who request it."

Facts Supporting the Findings:

Ms. Stafford, in her candidacy for Vice President of Allied never made a request to view Union Membership lists (R-Stafford, p. 61) (R-Pamulo, p. 41) (R-Chan, p. 12.)

Mr. Govea, in his candidacy for Vice President of Allied, never personally made a request to view Union Membership lists (R-Govea, p. 13, 31, 40) (R-Pamulo, p. 41) (R-Chan, p. 12.) Mr. Garland claims to have gone to Allied's headquarters in Mineola, not to view the Membership list, but to get a copy of the Membership list. He does not know the date or the month and year. Mr. Garland claims he was told by Ms. Chan that he could inspect the Membership list, but he was not allowed to have a copy of it. Mr. Garland claims he declined to inspect the Membership list and only wanted a copy. (R-Garland, p. 23, 25, 26, 30, 49.) Ms. Chan denies getting any requests from Mr. Garland or any other Member for copies of Membership lists and has no memory of offering access to inspect Membership lists to Mr. Garland. (R-Chan, p. 12.) Ms. Pamulo denies getting any requests from Mr. Garland or Mr. Binyard to inspect Membership lists. (R-Pamulo, p. 42, 43.) Ms. Pamulo further testified that a candidate wishing to view Membership lists must do so in person and in her presence. (R-Pamulo, p. 43.) The law firm of Kennedy, Jennik & Murray, P.C. made a request on behalf of Mr. Govea that on Monday, May 7, 2007, the Union allow him to inspect a list containing the names and last known addresses of union members. (Ex. NN) (R-Govea, p. 31, 32) (R-Pamulo, p. 41.) The law firm of Kennedy, Jennik & Murray, P.C. was aware as early as April 19, 2007 that the date for mailing of ballots would be May 7, 2007. Mr. Govea's law firm learned of the ballot mailing date by receipt of a fax on April 19, 2007 of the Rules for Nominations and Elections of Allied, from Local 1877, SEIU in California. (See Ex. MM)
By letter dated May 10, 2007, Union counsel, Weissman & Mintz, LLC responded to the request by Mr. Govea's counsel as follows:

"You also request that Allied permit Mr. Govea's to inspect a list containing the names and last known addresses of all Allied members. As you know, Title IV, Section 401 (c) provides that:

every bona fide candidate shall have the right, once within 30 days prior to an election of a labor organization in which he is a candidate, to inspect a list containing the names and last known addresses of all members of the labor organization who are

56

subject to a collective bargaining agreement requiring membership therein as a condition of employment, which list shall he maintained and kept at the principal office such labor organization by a designated official thereof.

The code of Federal Regulations issued by the Office of Labor-Management Relations on this matter also provides in 29 C.F.R. § 452.72 that

> where a mail ballot system is employed under which ballots are returnable as soon as received by members, the right to inspect must he accorded within the 30-day period prior to the mailing of the ballots to members.

In this election, Mr. Govea, as the bona fide candidate, would have been permitted to inspect the membership list at Allied's principal and only office located at 332 Willis Avenue, Mineola, New York during the 30-day period between April 7 and May 7, 2007. If you have legal authority to dispute Allied's interpretation of Title IV on this matter, please let me know as soon as possible."

In effect this letter states, the May 7, 2007 date given by Mr. Govea to inspect the membership list, goes beyond the statutory time period within which Mr. Govea has a right to inspect. Additionally that Mr. Govea as the candidate would have had to perform the inspection himself at Allied Principal Office at 332 Willis Avenue, Mineola, New York.

By letter dated May 15, 2007, Mr. Govea's counsel, Kennedy, Jennik & Murray, P.C. responded to the May 10, 2007 letter from Union counsel, Weissman & Mintz, LLC as follows:

"The Union is also denying Mr. Govea's request that he be given the opportunity to inspect a list of the Members pursuant to LMRDA § 401 (c). Your quotation from the regulation regarding this right of inspection is incomplete. The regulation states: "It would be an unreasonable restriction to permit inspection of lists only after the ballots

have been mailed or the balloting has commenced." 29 C.F.R. § 452.72. Here, since the nominations were not completed until April 30, 2007, just seven days before the ballots were sent out, it is unreasonable for the Union to deny Mr. Govea's request. It is also unreasonable to limit the right of inspection of the membership list to the Union's New York office, since the Union represents members throughout the country, including California where Mr. Govea resides."

## Discussion

The right of a bona fide candidate who is seeking Union office to inspect a membership list is limited to one time within 30 days before the mailing of ballots. This is absolutely clear under the requirements for the inspection of a membership list under the Department of Labor Guide for Election Officials. The letter from Kennedy, Jennik & Murray, P.C. dated May 4, 2007 sets May 7, 2006 (probably intending May 7, 2007) as the date for the inspection of the Membership list. May 7, 2007 is the date for the mailing of ballots, not within the 30 days before the mailing of ballots. Therefore as of May 7, 2007, the one time right of Mr. Govea to inspect the Union membership list had expired. The Committee finds that it was not error for the Union to deny Mr. Govea's request to inspect the Union membership list on May 7, 2007 or thereafter. Ms. Stafford, a bona fide candidate for Union Vice President was also not allowed to inspect the Union membership list on or after May 7, 2007. Both candidates were treated equally in that respect.

The further claims of Kennedy, Jennik & Murray, P.C. in their May 15, 2007 letter; that the last sentence of 29 C.F.R. § 452.72 somehow extends the right to inspect the membership list beyond the 30 days prior to the mailing of ballots; that the short time period between the April 30, 2007 New York nomination meeting and the May 7, 2007 mailing of ballots also extends the right to inspect the membership list beyond the 30 days; and that because Allied has Members in California (fewer than 10 % of its membership is in California) that Allied is required to make its membership list available

to Mr. Govea in California. The last sentence of 29 C.F.R. § 452.72 simply provides that the Union cannot deny the right of inspection during the 30 days prior to mailing of ballots and gain compliance with the statute by allowing inspection on or after the mailing of ballots. This tortured interpretation in the May 15, 2007 letter is not the one given by the U.S. Department of Labor. The limited one week period between the New York nomination meeting and the mailing of ballots similarly does not extend the statutory right to inspect time period. Since the inspection of a Union membership list can be made by a bona fide candidate who is seeking nomination, the date of the nomination is not a cut off period. Mr. Govea's counsel was aware when they received the fax from Local 1877, SEIU on April 19, 2007, that the mailing of ballots was May 7, 2007. That provided Mr. Govea more than two weeks within the statutory 30 day period to arrange to come to Mineola, New York and inspect the Union membership list at the Union's principal offices. Finally, the claim that Mr. Govea had the right to have the membership list made available to him in California, because he lives in California, where the Union has less than 10 % of its Membership, goes against the clear provisions of the statute. The statute clearly provides that the principal office of the Labor Organization is where the inspection is to occur, not a satellite office or the work locations of its Members. Allied only has one office at 332 Willis Avenue, Mineola, New York and that is the only appropriate place in front of a designated official where a membership list can be inspected.

The final issue is Mr. Garland's testimony that on some unknown date, he went to Allied offices and asked to copy the membership list. He claims a Jennifer told him that he could not copy it, but he could inspect it, which he declined. This testimony has questionable validity for the Committee, since Mr. Garland neither provides a date or even a month and year when this allegedly occurred. Further, both Ms. Pamulo and Ms. Chan deny that Mr. Garland ever came to Allied seeking a copy of the membership list. Finally, Jennifer Chan, who is a clerical, would not have authority to vary the Union policy as set forth in Union counsel letter of May 10, 2007 which patterns the U.S. Department of Labor limitations on when a candidate can view the Union membership

list. Based on the above, it is the opinion of the Committee that the claim of Mr. Govea
that he was improperly denied his request to inspect the Union membership list is
unsubstantiated and therefore had no impact on the election.

### K. The Union refused to provide Mr. Govea the opportunity to inspect copies of the collective bargaining agreement between the Union and employers, prior to the election.

Finding:

Although there are no provision of Title IV of the LMRDA that require the Union
to provide a candidate for office with the opportunity to review all collective bargaining
agreements to which the Union is a party, this is a right provided to a Member of the
Union by Section 104 of the LMRDA. The first request for Mr. Govea to review
collective bargaining agreements is in the May 15, 2007 letter from Kennedy, Jennik &
Murray, P.C. (Ex. PP) This was consented to by the letter of Weissman & Mintz, LLC
dated May 18, 2007 (Ex. RR) at the Union's offices. The Committee finds that neither
Mr. Govea, or any member on his behalf, ever went to the Union offices to review the
collective bargaining agreements that were compiled there for review. Since the Union
made the agreements available at its offices, the Committee finds the protest of a refusal
to provide Mr. Govea with an opportunity to inspect collective bargaining agreements to
be unsubstantiated and therefore had no impact on the election.

**Facts Supporting the Findings**

Ms. Stafford in her candidacy for Vice President of Allied never made a request
to view all of the Union's collective bargaining agreements (R-Stafford, p. 61.) Mr.
Govea in his candidacy for Vice President of Allied never personally made a request of

Allied or Oscar Antonio, the Allied Business Representative in California to copy the Union's collective bargaining agreements (R-Govea, p. 41, 42.) Mr. Antonio testified that Mr. Govea never even asked him for a copy of their own collective bargaining agreement for the Los Angeles, California airports. (R-Antonio, p. 67, 68.) Mr. Garland claims to have requested copies of unspecified collective bargaining agreements in writing twice, but didn't have copies of the writings or have the dates of the requests. (R-Garland, p. 51, 52, 53, 54.) Mr. Garland had no personal information that Ms. Stafford used collective bargaining agreements to support her campaign (R-Garland, p. 52.) Ms. Pamulo, the Election Chair, testified she received no personal requests orally or in writing, from either Ms. Stafford, Mr. Govea, Mr. Binyard or Mr. Garland for copies of Allied's collective bargaining agreements (R-Pamulo, p. 41, 42, 43.)

By letter dated May 15, 2007, Mr. Govea's attorneys, Kennedy, Jennik & Murray, P.C. for the first time in writing requested to review collective bargaining agreements:

" ...I have also advised you that my client would be willing to review the collective bargaining agreements, a right provided to them by LMRDA § 104. You have not responded to the request." (Ex. FF)

By letter dated May 18, 2007, Union counsel, Weissman & Mintz, LLC responds to the request to review collective bargaining agreements:

"With respect to new matters that you raise; the union responds as follows...Second, the union will provide Mr. Govea with an opportunity to inspect its collective bargaining agreements. I will advise you when the union can have its current agreements conveniently compiled for Mr. Govea's review." (Ex. RR.)

## Discussion

61

It is clear from the above correspondence that a request to review collective bargaining agreements was made for the first time on May 15, 2007 on behalf of Mr. Govea and it was agreed to by the Union by letter dated May 18, 2007. The Committee has been unable to get any further information on this issue. There has been no testimony that Mr. Govea, or a Member on his behalf has gone to the Allied offices to review collective bargaining agreements. Nor has there been any testimony that Mr. Govea, or a Member on his behalf, has been denied access to Allied offices to review collective bargaining agreements. After the Union's offer to compile collective bargaining agreements at the Union offices for Mr. Govea's review, there has been no evidence or testimony from Mr. Govea or Mr. Garland or anyone else that this offer was withdrawn or refused. Under these circumstances, the protest that the Union refused to provide Mr. Govea the opportunity to inspect collective bargaining agreements is unsubstantiated and had no impact on the election.

### L. Weissman & Mintz, LLC, counsel to the Union is acting on behalf of Ms. Stafford instead of on behalf of the Union.

#### Discussion and Finding:

It is a violation of Section 401 (g) of the LMRDA to expend Union funds on behalf of a candidate. In the instant protest, the claim is that Union counsel was providing services to one of the candidates, Ms. Stafford. The Committee has found no evidence of Weissman & Mintz, LLC providing election related legal services to Ms. Stafford. Mr. Garland claims the impounding of the ballots by Weissman & Mintz, LLC was done at the request of Ms. Stafford or for her benefit. The Committee does not understand how this could benefit Ms. Stafford since she did not request that they be impounded and she was not an incumbent in the Vice President position. If the ballots are impounded, neither Ms. Stafford or Mr. Govea get the Vice President position, it remains vacant. So neither candidate seems to benefit from this action. The Committee, based on its overall

investigation, found that it was the appearance of Andy Friedman, a paid organizer for 32 B-J, SEIU, at the Allied Office Ballot Count together with the extensive involvement of Local 32 B-J SEIU and Local 1877, SEIU in the overall Allied Officer campaign, that caused Weissman & Mintz, LLC to impound the ballots. Both SEIU 32 B-J and 1877 had been attempting to raid Allied Member jobs and Weissman & Mintz, LLC believed they were illegally involving themselves in Allied's internal offices and Allied's internal officer's election. They wanted this illegality investigated before opening the ballots and that was their reason for impounding them. The Committee finds this to be a Union issue and that Weissman & Mintz on this issue were acting for the Union and not Ms. Stafford. The Committee finds the protest that Weissman & Mintz, LLC counsel to the Union were acting on behalf of Ms. Stafford instead of the Union to be unsubstantiated and therefore had no impact on the election.

### Statement of Relevant Statute

Section 401 (g) LMRDA as relevant provides:

"No moneys received by any labor organization by way of dues, assessment, or similar levy,...shall be contributed or applied to promote the candidacy of any person in an election subject to the provisions of this title."

Facts Supporting the Finding:

Mr. Govea had no knowledge relating to the protest that Weissman & Mintz, LLC, Union counsel were working for Ms. Stafford. (R-Govea, p. 43.) Ms. Stafford testified that Weissman & Mintz, LLC did not help her and provided no services during the nomination and election campaign (R-Stafford, P. 61.) Both Ms. Panrulo and Ms. Stafford testified that Andy Friedman, a paid organizer from Local 32 B-J, SEIU was at the ballot count for Mr. Govea. There was some commotion since during the Allied

campaign, Mr. Friedman was on the phone, constantly calling Allied Members and telling them that Ms. Stafford was a corrupt lawyer. (R-Stafford, p. 56, 57) (R-Pamulo, p. 56-58.) Objections of Ms. Stafford citing unlawful behavior of the Service Employees Internal Union by their involvement in Allied's Officers election. (Ex. D)

### M. Union money and resources from the Service Employees International Union, Local 32 B-J, Service Employees International Union, Local 1877, Service Employees International Union and their agents were unlawfully used to support and aid the candidacy of Felix Govea for Vice President of Allied International Union.

**Finding:**

The Committee has found flagrant violations of Section 401 (g) of the LMRDA by Mr. Govea accepting sizable campaign services from Local 32 B-J, SEIU in New York and Local 1877, SEIU in California. These services included the design of campaign flyers, the copying of campaign flyers and the distribution of campaign flyers at Allied Member jobsites by paid Union Organizers of Local 32 B-J and Local 1877, the collecting of names, addresses and phone numbers of Allied Members and the calling of these Members by paid Union Organizers of Local 32 B-J and Local 1877 and telling them to vote for Mr. Govea and not to vote for Ms. Stafford, falsely claiming she was a corrupt lawyer. Included in these illegal services was the use of Local 32 B-J and Local 1877 paid for telephones, fax machines, copy machines, computer, stamps, paper and envelopes. In addition, both Local 32 B-J and Local 1877 have paid for and provided paid Union Organizers for rallys in support of Mr. Govea. Many of the flyers given out by paid Union Organizers on behalf of Mr. Govea had in bold print "If you need more information about the election, or do not have a ballot, contact Andy Friedman at 412-519-0966." Andy Friedman, a paid Union Organizer for Local 32 B-J would tell Allied Members who called that he was from Local 32 B-J and to vote for Mr. Govea and not to

vote for Ms. Stafford because she was a corrupt lawyer. All of the above represents illegal use of Union services by Mr. Govea to campaign for Union Office in violation of Section 401 (g) of the LMRDA. These above services were not paid for by Mr. Govea who could account for no money contributed by him for his own California campaign, which he admitted was being run by Local 1877, SEIU. In his New York campaign, Mr. Govea claimed to rely on his New York supporter, Mr. Garland. However, Mr. Garland, Mr. McFarland and Mr. Campbell all testified that they contributed or raised no moneys for Mr. Govea's campaign in New York. The only campaigning they did for Mr. Govea, in Mr. Garland's case, was making phone calls and speaking to people and he made 40 copies of a campaign flyer for Mr. Govea using an employer (N.Y.C. Department of Homeless Services) copy machine and gave them out at his worksite and in Mr. McFarland's case, she made 12 copies of campaign flyers for Mr. Govea using an employer (N.Y.C. Human Resources Administration) copy machine and gave them out at her worksite. This use of Employer copy machines for Mr. Govea's campaign for Union office is also in violation of Section 401 (g) of the LMRDA. Based on the above, the Committee finds this protest to have merit and to be substantiated.

In determining an appropriate remedy, the Committee is mindful that the awarding of a new election is an equitable remedy only to be granted to candidates who have acted in compliance with the law and in good faith. Mr. Govea's bad faith actions in accepting from both Unions and Employers campaign services that conservatively are estimated at tens of thousands of dollars are flagrant violations of Section 401 (g) of the LMRDA and are an abuse of process. Mr. Govea has unclean hands and should not be rewarded for his violation of law, and the equitable relief of a new election should not be granted to someone who has acted in such bad faith. It would punish the Union who tried to reign in Mr. Govea's illegal use of Union services by letters of Union counsel and it would punish Ms. Stafford who acted properly and used her own personal funds for the Union campaign and properly accounted for use of those funds to the Committee. It is the recommendation of this Committee to the Allied Executive Board, that the relief to this meritorious protest be the same as the Committee recommended in response to the

meritorious protest B herein, and that the nomination and candidacy of Jesus Govea for the Union Office of Vice President be rescinded due to his improper nomination and that MaryBeth Stafford as the only nominee, in accordance with the Union Constitution and Bylaws be deemed and declared elected Vice President of Allied International Union. That due to the improper nomination , that the election be rescinded and that the impounded ballots, even if counted, be considered invalid and of no effect.

**Statement of Relevant Statutes**

Section 401 (g) of the LMRDA as relevant provides:

"…No moneys received by a labor organization by way of dues, assessment, or similar levy, and no moneys of an employer shall be contributed or applied to promote the candidacy of any person…"

Requirement on the Improper use of Union and Employer Funds in the U.S. Department of Labor Guide for Election Officials:

A union or employer may not contribute money or anything of value (such as the use of facilities, equipment, or supplies) to promote the candidacy of any individual in a union officer election.

The restriction on the use of union funds applies to all moneys received by the union by way of dues, assessment, or similar levy.

The prohibition against the use of union funds applies to any union and any employer, not just the union conducting the election or an employer of the union's members. For example, it is improper for a candidate to have campaign literature duplicated free of charge on a copy machine at a small business owned by a relative of the candidate.

Any expenditure of union or employer funds on behalf of a candidate, even if the amount is small, is a violation of federal law.

The use of union/employer funds or facilities is a violation of federal law even if union officials or the employer do not know about or approve of the use.

The prohibition against the use of union and employer funds applies to direct expenditures from the union or employer as well as indirect expenditures including:

- campaigning on time paid for by the union or employer
- use of union/employer owned or leased equipment such as telephones, fax machines and copy machines
- use of union/employer supplies such as stamps, paper and envelopes
- use of union employees to prepare campaign literature while on union time
- use of the union letterhead
- use of union/employer property or facilities
- printing articles which support or criticize an individual's candidacy in a union newspaper or other publication
- giving free services or special discounts to a candidate customer such as printing, photocopying, etc.

**Facts Supporting the Findings:**

This was the protest for which the Committee recieved the greatest outpouring of both witnesses and documents. The witnesses varied from Union officers, to candidates, to the Election Chair, to Union employees, to Members.

Ms. Pamulo, the Election Chair, received numerous calls from Members who were either telephoned or contacted at their worksites by persons who identified themselves as being from Local 32 B-J, SEIU and told them to vote for Jesus Govea for Vice President of Allied. Fiel Marshall, an Allied Member working for Summit Security, told Ms. Pamulo on May 17, 2007 of being contacted by representatives of Local 32 B-J, SEIU and being told to vote for Mr. Govea. Mr. Marshall didn't understand why Local 32

67

B-J was involving itself in Allied's internal Officer's Election. (R-Pamulo, p. 46, 47.) Peter Falmikant, an Allied Member working for FJC Security, told Ms. Pamulo on May 17, 2007 of being told at his worksite by Rauf, who identified himself as a representative of Local 32 B-J SEIU, to vote for Mr. Govea (R-Pamulo, p. 47, 48.)

Ms. Pamulo further testified to getting an anonymous fax as Election Chair on May 9, 2007 of a flyer to vote for Mr. Govea. At the bottom of the flyer it stated that if anyone needed information about the election or doesn't have a ballot, to contact Andy Friedman with a telephone number. This flyer was marked as Exhibit R. Ms. Pamulo was concerned since she was the Election Chair, and should be getting these calls for election information and replacement ballots, and she didn't know who Andy Friedman was. She called Andy Friedman from her cell phone and Andy Friedman left a voice message which Ms. Pamulo played for the Committee as follows:

"Melissa, this is Andy Friedman. I'm calling from 32 B-J. I'm following up. I was told to give you a call. I was taking a day off to work for Jesus Govea, who is running for Vice President of your Union, Allied International Union. If you didn't get a ballot to vote for him, you can call 516-742-3121. But I think, like you, he works for Aviation Safeguard. He is pretty frustrated with the union not doing anything, just taking his dues. And he wants it to change and is working really closely with SEIU. And hopefully, you will call that number." (R-Pamulo, p. 49-51.) Andy Friedman is listed as a paid organizer for Local 32 B-J, SEIU in the 2006 LM-2 Labor Organization Annual Report of the Union (See Ex. LL.) Andy Friedman also attempted to attend the Allied ballot count on behalf of Mr. Govea and transported Mr. Govea's Observers to the ballot count. (R-Pamulo, p. 57, 58.)

On May 22, 2007, Ms. Pamulo testified she received calls from Thomas Dundas and Ganesh Padarot, both Members employed by Aviation Safeguards who said they were contacted by Neil Diaz, who identified himself as being from Local 32 B-J, SEIU and to vote for Mr. Govea. Mr. Padarot said the number Mr. Diaz called from was 212-385-5078. (R-Pamulo, p. 52, 53.) Mr. Diaz had given his business card to numerous Members of Allied and it was put in as Ex. HH. The business card lists Neil Diaz as an

Organizer for Local 32 B-J, SEIU with the office address of 101 Avenue of the Americas, New York, New York 10013 and office phone of 212-388-3678, the same phone Neil Diaz called Mr. Padarot from to solicit his vote for Mr. Govea. Mr. Diaz is also listed as a paid organizer in the 2006 LM-2 filed by Local 32 B-J, SEIU. (Ex. LL.)

Ms. Chan, in assisting Ms. Pamulo with fielding election telephone calls, was also contacted by Members and non-members who had been solicited by Local 32 B-J. On May 17, 2007 Ms. Chan was called by a Vilma Rosotto, a Member who worked for Aviation Safeguards. Ms. Rosotto said she received a call from Local 32 B-J and was told to vote for Mr. Govea. (R-Chan, p. 7.) Ms. Chan was also called on May 24, 2007 by Ookojo Morris, a Member who worked for FJC who was called by Working Families, an affiliate of Local 32 B-J and told to vote for Mr. Govea.

Ms. Stafford, a candidate for Vice President of Allied, testified for 27 pages citing dozens of violations of Section 401 (g) of the LMRDA on behalf of Mr. Govea, at dozens of Allied Member worksites where more than 1000 Allied Members are employed. These violations consisted of Mr. Govea receiving campaign services from Local 32 B-J, SEIU, a labor union. (R-Stafford, p. 30-57.) Ms. Stafford started campaigning in New York Allied worksites on May 14, 2007. She went to Waverly Job Center, 387 Dean Street and Aviation Safeguards at JFK airport. At Waverly and Dean Street locations, she was advised by Allied Members that representatives of Local 32 B-J, SEIU since May 10, 2007 had been there campaigning for Mr. Govea and handing out leaflets. (Ex. Q, P, R, GG.) There were so many organizers from Local 32 B-J, SEIU at these locations campaigning for Mr. Govea that the Members were confused as to whether there was an Officers Election between Mr. Govea and Ms. Stafford or an election between Allied and Local 32 B-J. (R-Stafford, p. 30-36.) At Terminal 7 of JFK Airport, Ms. Stafford observed an individual handing out flyers and his business cards to about a dozen Allied Members. Ms. Stafford went up to him and he handed her a flyer to vote for Mr. Govea, as Vice President of Allied (Ex. JJ) and gave her his business card, which identified him as Neil Diaz, an Organizer for Local 32 B-J, SEIU with office address of 101 Avenue of the Americas, New York, New York 10013, with office phone 212-388-3678 and office

fax 212-388-3777 and email of ndiaz@SEIU32bj.org (Ex. HH.) Mr. Diaz, also asked Ms. Stafford if she wanted to sign a card to become a Member of Local 32 B-J. (R-Stafford, p. 37, 38, 46.)

On May 15, 2007, Ms. Stafford campaigned at various locations of the Department of Homeless Services; Powers location had about 60 Members, Bellevue Men's Shelter had about 80 Members, Beaver Street had about 50 Members and Catherine Street had about 80 Members. Representatives of Local 32 B-J had been there the prior day handing out flyers (Ex. R) and urging Members to vote for Mr. Govea. The organizer from Local 32 B-J at the Department of Homeless Services had been Raul, and Raul and the other organizers from Local 32 B-J were causing so much confusion at the Beaver Street site that Ms. Stafford was not allowed to even campaign there. (R-Stafford, p. 39-43.)

On May 17, 2007, Ms. Stafford campaigned at various locations of Summit Security, which totaled more than 200 Allied Members. At each site, the Members said that Local 32 B-J had been there campaigning for Mr. Govea, giving out flyers to vote for Mr. Govea. (Ex. P & R) and even gave out a flyer to go to a rally on May 16, 2007 (Ex. U). Each Summit location that Ms. Stafford went to was plastered with flyers that Members advised her had been given out by Local 32 B-J representatives. (R-Stafford, p. 43-46.)

On May 18, 2007, Ms. Stafford campaigned at various locations of Columbia University of about 8 sites which totaled more than 90 Allied Members and the Human Resources Administration (HRA) Bergen location which had about 30 Allied Members. At each Columbia location, Ms. Stafford was advised by the Members there that Local 32 B-J had already been there campaigning for Mr. Govea and handing out flyers. (Ex. Q & KK) (R-Stafford, p. 47-49.) At the Bergen Street HRA site, Supervisor Jones told Ms. Stafford that Local 32 B-J representatives were there pretty much on a daily basis telling the guards to vote for Mr. Govea and giving out flyers. (Ex. Q & KK) (R-Stafford, p. 50, 51.)

70

On May 21, 2007, Ms. Stafford campaigned at Summit Security at 1411 Broadway. She was told by Members there that Local 32 B-J representatives had already been to the site telling them to vote for Mr. Govea and handing out flyers (Ex. Q & KK.) (R-Stafford, p. 51, 52.) At 94 Flatbush Avenue, an FJC, HRA location, Ms. Stafford was told by a Member that he received a call the prior night from a Local 32 B-J representative who told him to vote for Mr. Govea and not to vote for Ms. Stafford because she was a corrupt lawyer. Ms. Stafford had been further told by a supervisor, Mac Gyamfi, that Local 32 B-J has been at the location telling Members to vote for Mr. Govea and giving out flyers. (Ex. R) That the Members at the locations were confused and instead of an Officers election they thought this was a representation election for Local 32 B-J. (R-Stafford, p. 52-54.)

Ms. Stafford ended her testimony on this issue with her information about Andy Freidman, whose name and phone number were on the bottom of Mr. Govea's flyers (Ex. P, Q & R.) Mr. Friedman is listed on Form LM-2, Local 32 B-J, SEIU's 2006 Annual Report (Ex. LL) as a paid organizer of Local 32 B-J. Although, a paid organizer for a rival union, Mr. Friedman, in addition to making calls for Mr. Govea, also transported Mr. Govea's Ballot Observers to Allied offices and tried to get into the ballot count. (R-Stafford, p. 33, 34, 55-58, 62, 63.)

Paul Rodriguez, who was being paid by Ms. Stafford to campaign for her on May 16 & 17, 2007, testified to being told by Allied Members at 250 Church Street, 109 East 16th Street, 12 West 14th Street and 132 West 125th Street that Local 32 B-J representatives had been there on a daily basis asking Members to vote for Mr. Govea. (Ex. P.) (R-Rodriguez, p. 9-12)

Peggy Vanson, the Allied President, and Joseph Glennan, The Allied Secretary Treasurer, testified to going to Aviation Safeguards at JFK Airport, Terminal 7 in late May 2007 to discuss union business with Allied Members. They saw a Local 32 B-J Organizer, Neil Diaz, (Ex. HH) handing out flyers and asking Allied Members to vote for Mr. Govea. (R-Vanson, p. 10, 11.) (R-Glennan, p. 22-25.)

Anthony M. Evans, an Allied Member, employed by FJC Security at the Bellevue Hospital Shelter was interviewed by the Committee on this issue. On May 12, 2007, Mr. Evans testified that four representatives of Local 32 B-J, SEIU were outside his worksite giving out flyers and urging Allied Members to vote for Mr. Govea. Mr. Evans knew those four people to be representatives of Local 32 B-J because they identified themselves as being representatives of Local 32 B-J, SEIU. Mr. Evans identified three flyers all supporting Mr. Govea's candidacy for Vice President of Allied being handed out by the representatives of Local 32 B-J. These flyers were placed into evidence as Exhibit P, Q & R and were actually handed to Mr. Evans by the Local 32 B-J representatives on May 12, 2007. These flyers were being given out to all the FJC workers who were Members of Allied. The four representatives of Local 32 B-J at the same time as they were giving out flyers to vote for Mr. Govea were also giving out cards asking the Allied Members to become Members of 32 B-J, SEIU. (R-Evans, P. 4-9.)

Mr. Evans observed campaigning for Mr. Govea on May 22, 2007, after he was leaving work from his 8 a.m. to 4 p.m. shift. Mr. Evans observed the same four representatives from Local 32 B-J as he had observed on May 12, 2007. They would approach groups of Allied Members leaving work and urged them to vote for Mr. Govea. That Mr. Govea would do better things for them. (R-Evans, p. 9-11.) There were about 130 Members of Allied who were at the Bellevue Shelter. (R-Evans, p. 15.)

Nicole Dixon, an Allied Member, employed by FJC Security as a Guard in an Emergency Assistance Unit of the Department of Homeless Services, testified relative to this issue. On May 14, 2007, she saw two representatives of Local 32 B-J, SEIU, one by the name of Raul, tell Allied Members to vote for Mr. Govea, and that he would get you better wages. Ms. Dixon knew the two individuals to be representatives of Local 32 B-J because they identified themselves as such. (R-Dixon, p. 5-8.) On a date prior to May 14, 2007, Ms. Dixon saw two representatives of Local 32 B-J, Raul and another person. She saw the two representatives of Local 32 B-J on this date handing out flyers which asked Allied Members to vote for Mr. Govea (See Ex. P flyer.) These were the same two

72

representatives that identified themselves to her on May 14, 2007 as being representatives of Local 32 B-J. (R-Dixon, p. 8-12.)

Arthur C. Peters, a Member of Allied employed by FJC Security, testified relative to this issue. He testified that on May 20, 2007 at about 8:15 p.m. he received a call on his cell phone from a person calling on behalf of Local 32 B-J. The man calling on behalf of Local 32 B-J asked Mr. Peters if he had voted in the Allied Union election and told him to vote for Mr. Govea because he is the man for the job. He further stated to Mr. Peters not to vote for Ms. Stafford because she is a corrupt attorney. The same person called Mr. Peters two more times, identifying himself as being from Local 32 B-J, asking Mr. Peters to vote for Mr. Govea but not making any further negative comments about Ms. Stafford. (R-Peters, p. 3-8.)

Terri Simmons, a Member of Allied employed by FJC Security testified on this issue. Ms. Simmons had not received her ballot to vote and asked a friend if she knew the number to call to receive a replacement. The friend said she saw this name Andy Friedman and a telephone number on a flyer to call if you need a ballot. Ms. Simmons called Mr. Friedman who told her that he was from Local 32 B-J and to vote for Mr. Govea because Ms. Stafford calls herself a lawyer but she is a corrupt lawyer and that Ms. Simmons would have to call Allied if she needed a ballot. (R-Simmons, p. 8-10.)

Joseph Guerrier, a Member of Allied working for Summit Security at 1411 Broadway, submitted an affidavit on this issue. (Ex. CCC) In the affidavit, he said he was approached on May 21, 2007 while at work by a man who identified himself as a representative of Local 32 B-J, SEIU. The representative of Local 32 B-J told Mr. Guerrier to vote for Mr. Govea in the Allied Union election and gave him a flyer that said to vote for Jesus Govea. (See Ex. CCC.)

The Committee also took testimony on the possible violations of Local 1877, SEIU, a labor organization, in providing services to Mr. Govea in his election campaign for Allied Union office. The Committee interviewed Oscar Antonio who is a Member of Allied in California, works for Aviation Security at LAX Airport and acts as a Business Agent there for Allied. Mr. Antonio testified that on May 15, 2007, he went to the food

cond at the airport and saw two representatives of Local 1877, SEIU giving out flyers to Allied Members to vote for Mr. Govea for Vice President of Allied. They refused to give Mr. Antonio a flyer. One of the representatives from Local 1877, SEIU, whose name was Brian said to Mr. Antonio that Local 1877 wanted Mr. Govea to be Vice President of Allied, that we don't want the lady, referring to Ms. Stafford. (R-Antonio, p. 61-63.)

On May 18, 2007, Mr. Antonio was handed a flyer to vote for Mr. Govea with Andy Friedman's name and telephone number on the bottom. Mr. Antonio spoke with Mr. Friedman, who said he was from SEIU and he was working to get Mr. Govea as the Vice President of Allied. (R-Antonio, p. 83, 84.) Finally, Mr. Antonio testified to a conversation he had with Mr. Govea on May 16, 2007 at 7:30 a.m. In the conversation, Mr. Govea said he is working with SEIU to make a change at Allied. (R-Antonio, p. 64, 65.) Mr. Antonio also had information that Mr. Govea was himself handing out flyers at LAX Airport on Company time, asking Members to vote for him as Vice President and the flyers he was handing out had the name and telephone number of Andy Friedman, an organizer for Local 32 B-J, SEIU. (R-Antonio, p. 66.) Mr. Govea, in his testimony, admitted that Local 1877, SEIU prepared campaign literature for him in his Allied Vice President campaign which he accepted and did not pay them for. (R-Govea, p. 18.) Mr. Govea claims he paid to make 100 copies of campaign literature and claims he paid for some of his phone calls, but although requested by the Committee, he has failed to provide documentation of this. Mr. Govea's attorneys submitted to the Committee a series of documents which were marked as Exhibit MM. Two of these documents consisted of a fax of Allied's notice of the Allied California nomination meeting and the Rules of Nomination and Election to run for Union Office in Allied. The submitted documents have a fax marking dated April 19, 2007 from Local 1877, SEIU to Mr. Govea's attorneys, Kennedy, Jennik & Murray, P.C. When questioned about this and various other services performed by Local 1877 and Local 32 B-J, Mr. Govea seemed confused and evasive as follows:

Q. "Now, has Local 1877 of the Service Employees International Union provided you with any money or services for your election campaign?

74

A. "No, no money. I have never received a penny from them."

Q. "How about services? Did they perform any copying services for you?"

A. "No, they did not."

Q. "Did they prepare any campaign literature for you?"

A. "They helped me out, yes."

Q. "Did you pay them for this campaign literature?"

A. "I did not pay them for this campaign literature."

Q. "Did they distribute any of your campaign literature in New York City?"

A. "1877? No, they didn't."

Q. "How about 32BJ of the Service Employees International Union, did they distribute any of your campaign literature in New York City?"

A. "I don't know. I talked to Melvin, to some other people, but they never told me they distributed anything from 32BJ. So, I don't know anything about that."

Q. "Can you tell us who Andy Friedman is?"

A. "Who?"

Q. "Andy Friedman?"

A. "I think he's one of the workers in New York. I'm not sure."

Q. "What workers in New York?"

A. "I'm not sure, but I think he's one of the workers in New York for the airport."

Q. "Do you know whether or not Andy Friedman is an organizer for the Service Employees International Union, 32 BJ?"

A. "Well, nope."

Q. "Can you tell us why Andy Friedman's name and telephone number of (412) 519-0966 appear on three separate pieces of your campaign literature?"

A. "I don't know. You have to ask him."

Q. "Did you authorize him to give out campaign literature on your behalf?"

A. "That one, I don't remember, sir. Honestly, I don't remember that one."

(R-Govea, p. 17-19.) See also on this issue:

75

Q. "Did you also use the facilities of Local 1877 of the Service Employees International Union to fax these two documents to your attoneys?"

A. "No."

Q. "Do you have any idea why Local 1877 of the Service Employees International Union would have faxed these two documents to your attorney?"

A. "They were providing assistance to me."

Q. "They were providing assistance, Local 1877 of the Service Employees International Union?"

A. "Like I said, they were helping me out."

Q." How were they helping?"

A. "Not with money, with the resources, they were helping me out to make the flyers."

Q. "They designed the flyers for you?"

A. "Not make, pass out the flyer."

Q. "Pass out the flyers?"

A. "Yes."

Q. "Who designed and made the flyers?"

A. "Who made the flyer?"

Q. "Yes."

A. "That I don't know, but I approve of them."

Q. "I'm sorry?"

A. "I approve of them."

Q. "You approve of these three flyers that have the name Andy Friedman and telephone number (412) 519-0966?"

A. "No"

Q. "You don't approve those?"

A. "No"

Q. "How about a flyer with you're the picture as well as a picture of the Larry Binyard, as well as the name Andy Friedman, and telephone number, did you approve?"

A. "I did approve, sure, the picture and my name, yeah."

(R-Govea, p. 25, 26.)

Mr. Govea stated that he did not pay or reimburse Local 32 B-J, SEIU, Local 1877, SEIU or any of their affiliates for Union election campaign services they provided or paid for. (R-Govea, p. 21-24, 43-45.) Mr. Govea further stated he was aware that Local 32 B-J, SEIU was performing these Union election campaign services on his behalf. (R-Govea, p. 45.) Mr. Govea also stated he believed that his co-workers in New York, put together by Mr. Garland, were paying his New York Union election campaign costs. (R-Govea, p. 21, 22, 41, 45.) Mr. Garland, however, testified that he did not contribute or raise any money for Mr. Govea's campaign for union office or pay for any services provided to Mr. Govea's campaign. (R-Garland, p. 14, 15, 23.) Mr. Garland's campaigning for Mr. Govea was limited to talking to other Members, telephoning other Members and distributing Vote for Govea campaign flyers at his work location. Mr. Garland did admit to using an Employer Department of Homeless Services copy machine to make 40 copies of Vote for Govea flyers and did not reimburse them for the cost. (R-Garland, p. 14-18.) Ms. McFarland testified that the only campaigning or support she provided to Mr. Govea was to talk to co-workers and to make 12 copies of a Vote for Govea flyer at a Employer Human Resources Administration copy machine and hand them out after work. She didn't testify to providing money or raising money for Mr. Govea. (R-McFarland, p. 6-8.)

The firm of Kennedy, Jennik & Murray, P.C. has provided many hours of service on behalf of Mr. Govea and Mr. Garland. These services included the preparation of letters, the preparation of affidavits, the preparation of protests and the representation of Mr. Govea, Mr. Garland, Mr. Watson, Mr. Campbell and Ms. McFarland before the Committee. (See Ex. B, C, MM, NN, PP, AAA, BBB.) Mr. Govea in his testimony has

admitted that he has not yet paid Kennedy, Jennik & Murray, P.C. any monies for their Union election legal services.(R-Govea, p. 15.) Mr. Garland in his testimony has admitted that he has not yet paid Kennedy, Jennik & Murray, P.C. any monies for their Union election legal services. (R-Garland, p. 22.)

On May 10, 2007, a letter was sent from Union counsel, Weissman & Mintz, LLC to Mr. Govea's Union election counsel, Kennedy, Jennik & Murray, P.C.. In this letter Union counsel notifies Mr. Govea's counsel that the Union has a good faith belief that Local 32 B-J, SEIU, a labor organization, is providing funding for his election campaign for Vice President of Allied and that such actions violate Section 401 (g) of the LMRDA. (See Ex. OO.)

## Discussion

In their Guidelines to Union Elections, the U.S. Department of Labor is exceedingly clear in stating that Union and Employer funds cannot be used to promote the candidacy of any individual in a Union Officer election. This includes not only money, but personnel, equipment or supplies. These indirect expenditures as relevant to the Committee's investigation include

- Campaigning on time paid for by a union/employer
- Use of union/employer owned or leased equipment such as telephones, fax machines, and copy machines.
- Use of union/employer supplies such as stamps, paper and envelopes.
- Use of union employees to prepare campaign literature while on union time.

The prohibition against the use of union and employer funds applies to any union and any employer, not just the union conducting the election or an employer of the union's members. Any expenditures of union or employer funds on behalf of a candidate, even if the amount is small or even if the union officers or employer are unaware of it, is still a violation of federal law.

The Committee finds it to be undisputed that Local 1877, SEIU is a labor organization and contributed services, use of equipment and supplies to promote the candidacy of Jesus Govea in Allied International Union's officer election for Vice President. This is based upon Mr. Antonio's testimony that he observed two people whom he knew to be paid employees of Local 1877, SEIU hosting a mini-rally in the airport food court, telling Allied Members to vote for Mr. Govea and giving Allied Members flyers urging them to vote for Mr. Govea. Mr. Govea in his testimony admitted that Local 1877, SEIU provided assistance to him in the form of preparing and handing out flyers. Mr. Govea claimed to have made some copies of flyers, but he failed to provide promised evidence that he paid for copies. The Committee also has received evidence that on at least one occasion, Local 1877, SEIU used their labor organization fax machine to fax Union election related materials to Mr. Govea's election attorney, Kennedy, Jennik & Murray, P.C. Mr. Govea admitted that he has not paid or reimbursed Local 1877, SEIU for their Union election campaign services and the Committee has not been able to find any legal source of funding under Section 401 (g) of the LMRDA. The Committee finds that Local 1877, SEIU contributed services of value to promote the candidacy of Jesus Govea for Vice President of Allied International Union in violation of Section 401 (g) of the LMRDA.

The Committee finds it to be undisputed that Local 32 B-J, SEIU, is a labor organization and contributed services, use of equipment and supplies to promote the candidacy of Jesus Govea in Allied International Union's officer election for Vice President. Some ten witnesses testified before the Committee submitting numerous documents into evidence in support. The testimony effectively provided that for the entire election period in May of 2007 that Local 32 B-J, SEIU had up to four representatives visiting just about every Allied Union Member worksite of PJC Security, Summit Security, Columbia University and Aviation Safeguards where thousands of Allied Members are employed. At each of these worksites, the Local 32 B-J representatives would talk to Allied Members, urging them to vote for Mr. Govea, would hand out flyers to vote for Mr. Govea, leave hundreds of these flyers at each worksite and ask Allied

Members to come to rallys. The flyers given out in support of Mr. Govea's candidacy contained a Local 32 B-J contact person, Andy Friedman, a paid Union organizer, and a contact telephone number. Each of these Local 32 B-J representatives campaigning for Mr. Govea would identify themselves to Allied Members as being representatives of Local 32 B-J on behalf of Mr. Govea, both orally and by wearing nametags. At least one of the Local 32 B-J representatives would give out his business card, identify himself as Neil Diaz, an organizer for Local 32 B-J, SEIU, with office address, phone, fax and email.

Also during the election period, the effective testimony provided that Local 32 B-J representatives by telephone on a daily basis, solicited Allied Members to vote for Mr. Govea and not to vote for Ms. Stafford. Each of the Local 32 B-J representatives would identify him or herself as a representative of Local 32 B-J on the telephone, before asking the Member to vote for Mr. Govea. Chief among these Local 32 B-J representatives was Andy Friedman, a paid organizer for Local 32 B-J, whose name and telephone contact information appeared on Mr. Govea's flyers. In his phone conversations with Allied Members, Mr. Friedman in telling Allied Members not to vote for Ms. Stafford, would also call her a corrupt or fake attorney. Mr. Friedman also transported Mr. Govea's supporters to the ballot count and tried to enter Allied's offices.

Mr. Govea admitted that he did not pay any moneys to Local 32 B-J for the services provided or any reimbursement. Mr. Govea claimed that his Union Member supporters in New York through Mr. Garland were raising money to fund his New York Union election campaign. Mr. Garland denied this, stated that he never provided any of his own money or raised any money to fund Mr. Govea's New York Union election campaign.

No other witnesses were found by the Committee or were provided by Mr. Govea who could identify a legal source of funding for the election campaign services provided to Mr. Govea by Local 32 B-J. Since Local 32 B-J designed Mr. Govea flyers, copied them, provided the copy paper, provided the telephone and phone lines to call Allied Members for Mr. Govea and provided paid Local 32 B-J employees to hand out flyers at

Allied worksites, talk to Allied Members and made phone calls for Mr. Govea, and since no legal source of funding can be identified, it must have been Local 32 B-J, a labor organization, who paid for these services for Mr. Govea.

The Committee finds that Local 32 B-J, SEIU contributed services of sizable value to promote the candidacy of Jesus Govea for Vice President of Allied International Union in violation of Section 401 (g) of the LMRDA.

Since Mr. Gurland and Ms. McFarland both admitted to using Employer owned or leased copy machines to make copies of flyers that urged Allied Members to vote for Mr. Govea and then gave them out to Allied Members, this establishes another violation of Section 401 (g) of the LMRDA. In Mr. Garland's case, he used a copy machine of the N.Y.C. Department of Homeless Services to make 40 copies of Govea flyers, which he handed out to Allied Members and in Ms. McFarland's case, she used a copy machine of the N.Y.C. Human Resources Administration to make 12 copies of Govea flyers, which she handed out to Allied Members. Both these Employers, through the admitted use of their copy machines, contributed services of value to promote the candidacy of Jesus Govea for Vice President of Allied International Union in violation of Section 401 (g) of the LMRDA.

In recommending an appropriate remedy for this substantiated protest, the Committee must consider a number of factors. First, that there was no incumbent running in this Election. The prior Vice President had passed away and neither Mr. Govea or Ms. Stafford had held prior Union elected office. Second, the Committee has already recommended a remedy in response to substantiated protest B, which found that Mr. Govea was not properly nominated and therefore did not have a right to run for the office of Vice President. The remedy was to rescind Mr. Govea's nomination, declare the election, the ballots and any election results invalid, and to declare Ms. Stafford the Vice President of Allied International Union because her nomination was unopposed. Third, the ballots for Vice President have never been counted, because they were impounded by Union counsel due to the alleged violation of Title IV of the LMRDA and Local 32 B-J promoting the candidacy of Mr. Govea. These alleged violations the Committee has now

substantiated. Fourth, the Union counsel warned Mr. Govea by letter to his counsel on May 10, 2007, of these alleged serious violations of Title IV of the LMRDA by Local 32 B-J's illegal promotion of his candidacy. In spite of being warned, it appears to the Committee that after the May 10, 2007 warning, instances of illegal promotion of his candidacy by Local 32 B-J increased sizably instead of stopping. The Committee finds that this demonstrates bad faith and unclean hands by Mr. Govea on this issue, and believes that any remedy should not allow Mr. Govea to profit from this increased illegal behavior. Taking into account all of the above factors, a new election, even if supervised would only reward Mr. Govea and SEIU, his supporters, for their bad faith actions in violation of the LMRDA. It is therefore the recommendation of this Committee that the remedy recommended for protest B, be the overall remedy for the two substantiated protests. The remedy recommended by the Committee is that the nomination and candidacy of Mr. Govea for Vice President of Allied International Union be rescinded due to his failure to be nominated by one fellow Member and seconded by two additional fellow Members in violation of the Constitution and Bylaws of Allied International Union and due to his and SEIU's further actions in illegally promoting his candidacy in violation of Title IV of the LMRDA. That with no opposition to her candidacy, MaryBeth Stafford, as the only properly nominated candidate, be declared the Vice President of Allied International Union.

## Delivery of the Report

This report is being delivered to the Executive Board of Allied International Union. It is recommended that the findings of the Committee be reported to the Membership. The OLMS Guidelines require that the Protesting Members be notified of the decision on their protests in writing regardless of whether the Protest is denied or a decision is made to rerun the election or take other corrective action. If the protest is denied the Protesting Members should be advised of the basis for the decision and the

procedures and time limits in the Constitution and Bylaws that must be followed to appeal the decision.

## Right of Appeal

Any protest relating to the nomination and election of officers, must be verified and must be made to the Union within five (5) days after the election, setting forth in writing, a complete statement constituting the grounds for such protest. Any member making a timely protest may appeal the decision of the Union thereon by Complaint to the Office of Labor Management Standards.

## Complaint to the Office of Labor Management Standards (OLMS)

A union member has the right under federal law to file a complaint with the OLMS regarding the conduct of a union officer election within one month after meeting certain conditions. Before filing an election complaint with OLMS, a member must have either exhausted internal remedies within the union or pursued them for three months without obtaining a final decision from the union.

Respectfully submitted,

Miriam Carona
Richard Puccio
James Lee

83

05/07/2037  13:18    516-742-8234    ALLIED INT UNION    PAGE 19/62

*067*0



**RECEIVED**
U.S. DEPARTMENT OF LABOR
OFFICE OF LABOR MANAGEMENT STANDARDS

MAR 27 1998

NEW YORK DISTRICT OFFICE

CONSTITUTION AND BY-LAWS

OF

ALLIED INTERNATIONAL UNION

332 Willis Avenue
Mineola, N.Y. 11501

Revised March 1996

## INDEX

PREAMBLE .............................................. Page  A

ARTICLE I - Name .....................................  3

ARTICLE II - Jurisdiction ............................  3

ARTICLE III - Objects and Purpose ...................  4

ARTICLE IV - Membership ..............................  5

ARTICLE V - Officers ................................  6

ARTICLE VI - Nomination & Election of Officers ....  11

ARTICLE VII - Duties of Officers ...................  14

ARTICLE VIII - Bonding .............................  19

ARTICLE IX - General Duties of Officers ...........  20

ARTICLE X - Salaries & Benefits of Officers .......  20

ARTICLE XI - Executive Board .......................  22

ARTICLE XII - Funds .................................  23

ARTICLE XIII - Meetings .............................  25

ARTICLE XIV - Responsibilities of Membership .......  29

ARTICLE XV - Dues & Assessments .....................  31

ARTICLE XVI - Charges ...............................  32

ARTICLE XVII - Discipline ...........................  33

ARTICLE XVIII - Appeals .............................  38

ARTICLE XIX - Strikes ...............................  39

ARTICLE XX - Organizers .............................  39

ARTICLE XXI - Illegal Use of Name ..................  40

ARTICLE XXII - Effective Date .......................  40

ARTICLE XXIII - Changes/Amendments ..................  40

# PREAMBLE

As almost every improvement in the condition of the
working people was accomplished by the efforts of organized
labor, and as the welfare of workers can best be protected and
advanced by their united action in one great labor organization,
we have organized ALLIED INTERNATIONAL UNION to protect its
members from unjust and injurious competition, to secure unity
of action among all workers and to generate esteem and respect
and promote harmony and good feelings amongst ourselves.

## ARTICLE I

### Name

This Union shall be known as ALLIED INTERNATIONAL UNION. The principal and main office of Allied International Union shall be located at such place as is designated by the International Executive Board.

ARTICLE II

Jurisdiction

The jurisdiction of ALLIED INTERNATIONAL UNION shall
include guards, security officers, watchmen, captains,
lieutenants, sergeants, investigators and policemen in the United
States, Puerto Rico, Canada and the Virgin Islands.

## ARTICLE III

### Objects and Purposes

The objects and purpose of ALLIED INTERNATIONAL UNION
shall include the following: to promote the best interests of its
members and their families; to organize the unorganized persons
and to unite within ALLIED INTERNATIONAL UNION all persons employed
as guards, security officers, watchmen, captains, lieutenants,
sergeants, investigators and policemen under its jurisdiction; to
bargain collectively on behalf of all persons within its jurisdiction
and to negotiate, make and administer collective bargaining agree-
ments; to improve the wages, hours of work and to increase the job
security and better the working and living conditions of all persons
employed within its jurisdiction; to secure and promote laws for the
benefit of all persons within its jurisdiction and labor generally;
to engage in activities to further train its members regarding
labor information, safety, health, job opportunities and union work;
to promote health, welfare, pension, recreational and civic programs
in the interests of its members and their families; to install the
spirit of patriotism and devotion to country among its members and
their families within the labor movement; to carry out and enforce
the provisions of the Constitution and By-Laws; to publish newspapers,
periodicals and other literature and to do all things necessary and
proper, in accordance to the law, to carry out the foregoing objects
and purposes.

## ARTICLE IV

### Membership

Section 1:

Eligibility: (a) any person employed in any of the operations or occupations included in Article II of this Constitution and By-Laws may make application for membership in this Union. All applications for membership must be made in writing on a form provided for that purpose by this Union.

(b) all applications for membership shall be approved by the Executive Board of Allied International Union and conform to the provisions of applicable law.

Section 2:

Initiation Fees and Dues: the initiation fees for membership in Allied International Union and monthly dues shall be in such amount as may be set up by the Executive Board and approved by the membership from time to time.

Section 3:

Reapplication for Membership: an applicant for membership in this Union whose application has been rejected may not reapply for membership less than six months after such applicant's previous application has been rejected.

Section 4:

Obligation of Members: (a) every member of Allied International Union is obligated to abide by, support and maintain the Constitution

and By-Laws thereof, and to render to the Union such services as may
be reasonably demanded of such member.  It shall be incumbent upon
members to maintain friendly relations with each other.

(b)  It shall be the duty of every member of Allied Inter-
national Union to use every honest effort to persuade, by appeal to
reason, all persons employed in any of the operations or occupations
included in Article II of this Constitution and By-Laws to become a
member of this Union having jurisdiction over same.

(c)  Members working at sites with persons performing work
which comes under the jurisdiction of this Union but who are not
members thereof must report same to the Union office.

(d)  No member of Allied International Union shall hold
membership in any club, society, combination or other organization
the intent and purpose of which is to interfere with the responsibility
of any member toward this Union as an institution, or to interfere
with the performance of the legal or contractual obligations of this
Union.


Section 5:

No member having any financial interest, direct or indirect,
in any shop under the jurisdiction of Allied International Union, shall
be eligible to hold any office or represent the Union as a delegate or
to vote on any questions involving the relationship between labor and
management or pertaining to wages, hours or other conditions of employ-
ment or to nominate or to elect officers.

### Section 5:

Vacancies: (a) In the event a vacancy occurs in the office of International Secretary-Treasurer, the International President shall have the authority to fill the vacancy for the unexpired portion of the term by appointing a member who fills all other requirements as stated in this Constitution and By-Laws in which such vacancy occurs. Such appointment shall be approved by the Executive Board.

(b)  In the event a vacancy occurs in the office of International Vice President, the International President shall have the authority to fill the vacancy for the unexpired portion of the term by appointing a member who fill all other requirements as stated in this Constitution and By-Laws in which such vacancy occurs. Such appointment shall be approved by the Executive Board.

(c)  In the event a vacancy occurs in the office of International President, the International Vice President shall immediately assume the office and occupy same for the unexpired portion of the term.

(d)  No member of this Union shall be eligible for appointment to a vacant office by the International President pursuant to subdivisions (a) and (b) of this Section unless, at the time of such appointment, such member would be eligible under the provisions of this Constitution and By-Laws for nomination to such office.

Section 6:

Withdrawal Card: Withdrawal cards will be granted and accepted only with the approval of the Executive Board.

Section 7:

Good-Standing Membership:    A member in good standing in Allied International Union is one who has been admitted to membership as provided in the Constitution and By-Laws and who has not voluntarily withdrawn from membership and has not been suspended or expelled from membership.

Section 8:

Membership Suspension: Any member who is three months or more in arrears in the payment of dues or assessments shall be automatically suspended from all rights and privileges of membership. The responsibility of maintaining membership in good standing rests with the member and suspension, if it occurs, is the voluntary act of the member involved.

Section 9:

Membership Reinstatement: Any member who has been suspended or expelled for the non-payment of dues may be reinstated only upon the payment of all monies due at the time of suspension or expulsion, together with all initiation fees and dues as accrued during the period of expulsion unless otherwise ordered for good cause shown and approved by the Executive Board. Any member who has done anything detrimental to this Union shall have the question of reinstatement to membership only with the approval of the Executive Board.

05/07/2037  19:19    516-742-2224    ALLIED INT UNION    PAGE  29/62

## ARTICLE V

### Officers

#### Section 1:

Enumeration of Officers: The officers of Allied International Union shall be an International President, an International Vice President and an International Secretary-Treasurer.

#### Section 2:

Eligibility: No member shall be eligible for nomination for any office in Allied International Union unless, at the time of their nomination:

(a) They are a citizen of the United States; and

(b) They have been a member in good standing of this Union continuously for a period of at least one (1) year immediately preceding the nomination; and

(c) They have attended at least a majority of the general membership meetings of the Union in the year immediately preceding the nomination as evidenced by their signature on the membership attendance sheet; and

(d) They have not been fined or suspended by the Union during the period of one year immediately preceding the nomination; and

(e) They have not, during the period of one (1) year immediately preceding the nomination, acted as a strikebreaker or scab in this or any other industry; and

(f) They are employed in the industry as defined in Article II of this Constitution and By-Laws under the jurisdiction of this Union.



The International President, International Vice President and International Secretary-Treasurer and any full-time paid employee of the Union shall be deemed employed in the industry during the period they occupy such respective offices; and

(g) They are not disqualified from holding office by the provision of applicable law. If a member is not eligible for nomination to office, such member shall not be eligible for election to any office in this Union. None of the foregoing eligibility requirements may be waived.

Section 3:

Officers Leaving Industry: Any incumbent officer who leaves the industry or retires from same shall forthwith leave office and such office shall be declared vacant by the International President, except that the International President, International Vice President, International Secretary-Treasurer and any full-time paid employee of the Union shall not be deemed to have left the industry during the period they occupy such respective office.

Section 4:

Resignation of Officers: (a) All officers of this Union except the International President, International Vice President and International Secretary-Treasurer may resign from office at any time by submitting their resignation, in writing, to the Executive Board at any time. The Executive Board shall consider such resignation at its first regular meeting occurring more than thirty days from the submission of such resignation. If the Executive Board shall find the accounts of any such officer correct, it may accept such resignation.

## ARTICLE VI

### Nomination and Election of Officers

#### Section 1:

Nominations: Nominations for officers of Allied International Union shall take place at a special meeting of the membership in April of the year in which elections are to be held. Nominations for officers may be made at the nomination meeting by any member in good standing (unless otherwise restricted or limited by this Constitution) and seconded by two members in good standing eligible to offer a second. No nominee shall become a candidate unless he be present at the time of nomination or if absent, then prior to such nomination or within five days of nomination, he shall indicate, in writing, his acceptance of the nomination and willingness to serve if elected and file written notice with the International President of this Union. No member shall be eligible to accept nomination for more than one office at any election. At least fifteen (15) days prior to the date of the nomination meeting, notice thereof shall be mailed by this union to each member at his last known address as it appears in the Union's records. The Executive Board shall fix the time and place for the holding of nominations. Nominations shall not be closed until a reasonable opportunity has been afforded for all nominations.

#### Section 2:

Elections: Elections shall be held at a special meeting of the membership in May of the year in which elections are to be held and not more than five years from the effective date of the prior

election of officers at such time and place as fixed by the Executive Board. Not less than fifteen (15) days prior to the election, notice thereof shall be mailed to each member at his last known address as it appears on the Union books. Voting at elections shall be by secret ballot and each member in good standing (unless otherwise restricted or limited in this Constitution) shall be entitled to one vote. Where there is only one candidate for an office and there are no contestants for such office or offices, in that event the nominee shall be deemed and declared elected to such office. The Executive Board shall determine the form and manner of voting, the nature of the voting machinery, if any, the number and location of polling places, if any, and the hours during which voting shall take place, if any. Voting by mail shall be permitted. No member shall write or be permitted to write in the names of persons who were not duly nominated at the nomination meeting. Where there is a contest for office, a majority of all votes cast shall be required to elect. A run-off shall be held in case of a tie vote or if no one candidate receives a majority of all votes cast. An election committee, approved and appointed by the Executive Board, shall count the ballots.

Within five (5) days after the holding of an election a member in good standing may file with the Executive Board of this Union objections to the conduct of the election or conduct effecting the results of the election. Unless objectives are made and filed with the Executive Board as herein specified, all objections shall be deemed waived. Objections must be written and filed in quadruplicate, signed by the member, his signature verified before a notary public

86/87/2007  13:28  516-742-8284    ALLIED INT UNION    PAGE  33/92

and shall contain a complete statement of the facts constituting the
grounds of objections.  The Executive Board (excluding those members
involved in the objection) shall investigate the objections and hold
such hearings as it deems necessary.  Its findings and recommendations
shall be reported to the members following the conclusion of its
investigation.

Ballots and other records pertaining to the election shall
be preserved for one year from the date of such election and shall be
the responsibility of the International Secretary-Treasurer.

No member shall resort to proceedings before any court,
administrative agency or governmental officials until he has exhausted
the remedies provided for herein.  His duty to exhaust his internal
remedies shall expire and cease to be binding upon him if a final
decision has not been rendered within thirty (30) days after he has
invoked such remedies but it shall be the duty and responsibility of
every member to pursue the remedies provided for in this Constitution
with promptness and to cooperate with the Union so that a final
determination may be rendered in thirty (30) days.

### Section 3:

The officers elected shall be installed at the regular June
membership meeting following the election and shall assume the duties
of their respective office on the first day of July immediately
following.



05/07/2027  13:15   51E-742-0234     ALLIED INT UNION                        PAGE  34/52

Upon installation each newly elected officer shall raise
their right hand and recite the following oath of office:

"I, __name__, do hereby pledge myself to faithfully
perform the duties of the office to which I am
elected to the best of my ability and for the
benefit and honor of Allied International Union.
I further solemnly swear that I do not belong nor
will I belong at any further time to
organizations that believe or teach the overthrow
of the government of the United States of America
by force or by any illegal or unconstitutional
methods."

## Section 6:

Term of Office: The term of office for the officers of Allied
International Union shall be three (3) years commencing with the first
day of July immediately following their election.

## ARTICLE VII
## Duties of Officers

## Section 1:

International President: The International President shall
be the full-time principal executive officer of Allied International
Union and shall devote the entire time to the business of Allied
International Union.  The International President shall preside at
general membership meeting, special meetings and at meetings of the

Executive Board, to decide all questions of order at meetings, to enforce the provisions of the Constitution and By-Laws of the Union as well as all duly adopted rules, resolutions and regulations, to exercise a general supervision over the officers of and over the staff of the Union and to perform all other duties which may pertain to the office of the International President. The International President shall be a member ex-officio of all committees.

The International President shall fill all vacancies as provided for in this Constitution and By-Laws.

The International President may employ and discharge business representatives, organizers, business managers, administrative technical, clerical or other employees as may be required. He shall, upon consultation with the Executive Board, fix the salaries of all persons employed by Allied International Union. He shall appoint all committees not otherwise provided for by this Constitution and By-Laws and he shall designate the duties and direct the performance of the International Vice President and International Secretary-Treasurer.

The International President shall have the authority to integrate the provisions of this Constitution and By-Laws with the approval of the Executive Board.

The International President shall sign all papers and documents which require the signature of the International President.




The International President shall make reports of his official acts during his term of office to the general membership.

The International President shall be the only officer authorized to enter into contracts on behalf of Allied International Union unless the International President delegates that authority to someone else.

The International President shall order checks to be drawn to pay office expenses as they accrue. For the purpose hereof, the term "office expense" shall be understood to include, without limitation, rent, maintenance, salaries, expense money for officers, staff and committees, furniture, office supplies, telephones, electricity, postage, printing and all other disbursements and expenditures necessary or incident to the operation and maintenance of Allied International Union.

The International President shall endeavor at all times to organize all non-union shops.

The International President shall have such other and further duties in addition to those herein enumerated and shall perform those duties as are usual to this office and as are performed by the International President in accordance with the practices of Allied International Union.

Section 2:

Internationl Vice President: The International Vice
President shall be a full-time paid officer and shall devote the
entire time to the business of Allied International Union. He
shall assist the International President and take direction from
same.  In the event of the death, removal, disability or resig-
nation of the International President, the International Vice
President shall proceed to fulfill all the duties of the office of
the International President until the election of a new
International President is provided.  Same is to be done with the
approval of the Executive Board.

In the event of the death, removal, disability or
resignation of the International Vice President, his successor shall
be appointed by the International President with the approval of the
Executive Board.  The office of International Vice President may be
combined with that of any other elected official for the remainder
of the unexpired term with the approval of the Executive Board.

The International Vice President shall attend all
meetings and shall take the chair whenever requested to do so by
the International President.  The International Vice President shall
perform all the duties of the International President in the latter's
absence.  The International Vice President shall also act as business
agent and organizer of Allied International Union.

05/07/2237  13:23    516-742-9204         ALLIED INT UNION                    PAGE  06/63

Section 3:

   International Secretary-Treasurer:  The International
Secretary-Treasurer shall be a paid full-time officer and shall
devote the time to the business of Allied International Union
under the direction of the International President.  The Inter-
national Secretary-Treasurer shall attend all meetings.  The
International Secretary-Treasurer shall also act as business
agent and organizer of Allied International Union.  The Inter-
national Secretary-Treasurer shall act as Secretary of
Convention of all meetings and shall keep a record of their
proceedings.  The International Secretary-Treasurer shall have
custody of the seal of Allied International Union and all of its
books, records and papers.  The International Secretary-Treasurer
shall have charge of all funds of Allied International Union and
shall print and furnish all books, cards and blanks necessary to
transact the business of Allied International Union.

   The International Secretary-Treasurer shall issue annual
reports showing receipts and expenditures and an itemized account
of all bills rendered and shall annually present to the membership
a complete statement showing the financial and general condition of
Allied International Union.

   The International Secretary-Treasurer shall have further
duties in addition to those herein enumerated as are usual to his
office and shall perform such duties in connection with the finances
of Allied International Union as the International President may
direct.

05/27/2007  13:18    516-742-8284                 ALLIED INT UNION                      PAGE  39/52

The International Secretary-Treasurer shall issue no voucher nor pay any money out of the treasury account without the approval of the International President.

The International Secretary-Treasurer shall have the books and accounts of Allied International Union audited semi-annually by a certified public accountant to be appointed by the International President with the approval of the Executive Board. Such audit shall be made as soon after the end of June and December as may be practicable, with the December audit to be certified.

The International Secretary-Treasurer shall draw all checks ordered to be drawn by the International President and all checks must be signed by two officers.

The International Secretary-Treasurer shall preserve the ballots and all other records pertaining to an election for one year.

## ARTICLE VIII
### Bonding

All officers shall be bonded in accordance with applicable federal and state law. The premium of the bond shall be fixed by the Executive Board and paid for by Allied International Union.

09/07/2007  13:10    516-742-0204              ALLIED INT UNION                    PAGE  48/52

## ARTICLE IX

### General Duties of Officers

All officers of Allied International Union shall carry out
the provisions of the Constitution and By-Laws and shall perform
such other duties as Allied International Union and its Executive
Board may prescribe.

## ARTICLE X

### Salaries & Benefits of Officers

The salary of the International President shall be four times
greater than the highest existing wage scale of the highest paid
member.

The salary of the International Vice President shall be two
and one-half times greater than the highest existing wage scale of the
highest paid member.

The salary of the International Secretary-Treasurer shall be
two and one-half times greater than the highest existing wage scale
of the highest paid member.

The International President, International Vice President and
International Secretary-Treasurer shall be allowed an annual vacation
with pay.  Their vacation shall be two weeks greater than the maximum
vacation time given to any union employee and may be accumulated from

year to year.  The International President, International Vice
President and International Secretary-Treasurer shall be paid
their full salaries during any period of illness up to the
expiration of their respective terms of office.  However, any
monies received from disability insurance shall be remitted to
Allied International Union.  The International President, Inter-
national Vice President and International Secretary-Treasurer
shall be allowed six personal days with full pay per year and may
be accumulated from year to year.  The International President,
International Vice President and International Secretary-Treasurer
shall be paid their full salaries for the following twelve (12)
holidays:

| | |
|---|---|
| New Year's Day | Labor Day |
| Washington's Birthday | Columbus Day |
| Memorial Day | Martin Luther King, Jr. Birthday |
| Independence Day | Thanksgiving |
| Employee's Birthday | Day after Thanksgiving |
| Christmas Day | Floating Holiday (to be determined |
| | by management) |

The International President, International Vice President and
International Secretary-Treasurer shall be paid severance pay at the
full salaries based on one week for every year of elected service.


The International President, International Vice President
and International Secretary-Treasurer shall receive the following
health and welfare benefits: major medical (family coverage), doctor
(family coverage), dental (family coverage) vision (family coverage),
prescription (family coverage), life insurance in the amount of
$50,000 (individual coverage).

The International President, International Vice President and International Secretary-Treasurer shall be entitled to an annuity insurance plan and/or profit sharing plan. The International President, International Vice President and International Secretary-Treasurer shall be entitled to an executive pension plan which shall be open to all union employees.

The International President, International Vice President and International Secretary-Treasurer shall be entitled to a pension as provided for in the Allied Security Pension Fund for all other members.

## ARTICLE XI

### Executive Board

(a)  The Executive Board of Allied International Union shall consist of the International President, International Vice President, International Secretary-Treasurer.

(b)  A majority of the Executive Board shall constitute a quorum for the transaction of business at any meeting of the Executive Board. The action of a majority of the Executive Board present at a meeting at which a quorum is present shall be the action of the Executive Board.

- 22 -

05/07/2007  19:19   516-742-2234        ALLIED INT UNION              PAGE  43/62

(c)  The Executive Board shall meet   regularly once a month
on the second Thursday at 11:00 a.m. at the offices of Allied
International Union.  Special meetings of the Executive Board may
be held at such other times as the International President may deter-
mine, provided that advance notice of such special meetings is given
to the members of the Executive Board.  Each member of the Executive
Board shall have one vote and action shall be by majority vote of
those present at a meeting.  The International President shall cast
his vote in the event of a tie.

(d)  The Executive Board shall have governing authority and
shall supervise all business of Allied International Union between
membership meetings.  It shall have all such powers as may be necessary
and appropriate to fulfill the duties and functions elsewhere assigned
to it with this Constitution and By-Laws and to effectuate the purposes
of Allied International Union.  The Executive Board shall have the
power to adopt such rules and regulations and resolutions not in
conflict with this Constitution and By-Laws as it may deem necessary and
advisable to carry out the objects and purposes of Allied International
Union.

(e)  The Executive Board shall provide for the salaries,
benefits, allowances, direct and indirect disbursement, expenses  and
reimbursement of expenses for officers, business representatives, union
employees, attorneys, accountants and such other special or expert
services as it may deem necessary.

'(f)   The Executive Board on behalf of Allied Interstate Union shall initiate, defend, compromise, settle, arbitrate or release or pay the expense and costs of any legal proceedings or actions of any nature, if, in its judgment, it shall be necessary or desirable to protect, preserve or advance the interests of Allied International Union.

(g)   The Executive Board shall determine which grievances shall be prosecuted against employers and whether the same shall be by arbitration or otherwise, and in its judgment, settle and dispose of such matters.

(h)   The Executive Board shall determine all protests, grievances and disputes between members or group of members, or in its judgment, provide for the determination of such matters by arbitration or other means.

(i)   The Executive Board shall do all acts, not otherwise expressly provided for in this Constitution and By-Laws, which it may deem necessary or proper  for the protection of property and for the benefit of Allied International Union.

(j)   The Executive Board shall act as a trial board and function, as such pursuant to this Constitution and By-Laws.

(k)   The Executive Board shall determine the membership eligible to vote agreements, elections, strikes and the composition of member-ship and adopt such other rules and regulations concerning the conduct

05/07/2007  13:10   516-742-0284           ALLIED INT UNION              PAGE  45/62

and activities of workers not inconsistent with this Constitution
and By-Laws.

(1)  The Executive Board shall present a report of its
activities at each general membership meeting of Allied International
Union.  Except as otherwise provided in this Constitution and By-Laws,
all acts and decisions of the Executive Board shall be subject to the
approval of the membership.

## ARTICLE XII

### Funds

Allied International Union shall, under no circumstances, lend
any part of its funds to any of its members.

## ARTICLE XIII

### Meetings

#### Section 1:

Regular Meetings:  The regular general membership meetings
shall be held four  times a year at such time and place as the
Executive Board may designate.

The International President shall issue notice of the
regular general membership meetings.  All notices shall be deemed
properly sent if addressed as it appears on the Allied International
Union records.  At least one week prior notices shall be given but
failure to do so shall not prevent the meeting from being held or
render invalid any action taken thereat.

The order of business at a regular general membership meeting
shall be as follows:

    (a)  Roll call of officers

    (b)  Pledge of Allegiance

    (c)  Reading of Minutes of last General Membership or
         Special Meetings.

    (d)  Correspondence

    (e)  Executive Board report

    (f)  Business Agents report

    (g)  Obligations and initiations

    (h)  Unfinished business

    (i)  New business

    (j)  Nominations for office and elections

    (k)  Installation of officers

    (l)  Good and welfare

    (m)  Adjournment

Section 2:

    Special Meetings:  At the request of the Executive Board,
which request shall set forth the purpose of the proposed meeting,
the International President shall call special meetings of Allied
International Union upon written notice to the members in good
standing.  The notice of a special meeting shall state, in general
terms, the nature of the business to be brought before such
special meeting and only the business so stated shall be considered
and acted upon at the meeting.

## Section 3:

Quorum: A quorum for the purpose of transacting any business by Allied International Union shall consist of not less than thirty (30) members in good standing present in person at any regular general membership meeting or special meetings. No action of any meeting shall be invalid for lack of a quorum unless the question of lack of a quorum was raised before such action was taken. Unless otherwise specifically provided in the Constitution and By-Laws all decisions of an Allied International Union meeting shall be by majority vote of the members voting. There shall be no proxy vote.

## Section 4:

Pledge of Allegiance: After the roll call of officers, the members shall rise in unison to recite the Pledge of Allegiance to our Flag and Country.

## Section 5:

Temporary Presiding Officer: In the absence of the International President from any meeting the International Vice President shall call the meeting to order and conduct same.

## Section 6:

Participation in Meetings: Only members in good standing shall be permitted to attend and participate in meetings of Allied

25/07/2007  13:18    516-742-9204

ALLIED INT UNION                                    PAGE  46/62

International Union.  The Executive Board shall determine the means of identification and admission of members to meetings.

The Presiding Officer shall have the right to take all necessary steps to preserve order at meetings.  The presiding officer shall have the right summarily to evict any member who refuses to abide by his rulings or who speaks without being recognized, is or appears to be intoxicated or under the influence of alcoholic beverages or drugs or who is noisy, profane or in any other respect disorderly.  It shall be the duty of all members present to assist the presiding officers in preserving order and in evicting such persons from the meeting and shall not be permitted to return thereto.

Section 7:

Voting by International President: The International President or presiding officers shall not vote on any question unless there is a tie vote in which case the International President or presiding officer shall cast the deciding vote.

Section 8:

Rules of Order:  The presiding officer shall decide all questions of order without debate subject to appeal to the Executive Board of Allied International Union.  Any member of the majority may move for a reconsideration of any question, provided that a question decided by ballot shall not be reconsidered.  The following motion

ALLIED INT UNION

PAGE  49/52

1.      to adjourn

2.      to lay on the table

3.      for previous questions

4.      to postpone indefinitely shall have precedence
        in the order above set forth and are not debatable

The previous questions may be called for when, if a majority
sustains the call, the main questions shall be decided without debate.
Except as otherwise provided in this Constitution and By-Laws, all
Allied International Union meetings shall be conducted in accordance
with Roberts Rules of Order.

Section 9:

Governing Power:  In between general membership and special
meetings the Executive Board of Allied International Union shall be
the governing body and shall have the power and right to bind the
membership.

ARTICLE XIV

Responsibilities of Membership

Section 1:

All members of Allied International Union shall be required
to conduct themselves in accordance with orderly procedures as
established by this Constitution and By-Laws and as directed by
officers. No member shall, at any time, make slanderous, abusive
or profane statements or participate in any action for the

of supporting secession or dual unionism or do any act which
obstructs any of the functions or procedures of Allied International
Union. Any member found guilty of these or any other related
actions by the Executive Board of Allied International Union shall
be banished from membership with total loss of all benefits
connected with that membership.

Section 2:

Except with respect to proceedings for trials and appeals,
all grievances and protests of any nature in connection with the
affairs of this Union shall be in writing, signed by the member
submitting the same and shall be submitted promptly to the Union
office for consideration by the Executive Board. Regardless of any
protest or grievance that has been filed, it shall be the obligation
of all members faithfully to observe the terms and conditions of
this Constitution and of all collective bargaining agreements and
faithfully to observe all orders, directions and instructions of the
officers of this Union, pending determination of the protest or
grievances.

Section 3:

Each members shall be responsible for promptly notifying the
Union office, in writing, of his residence address and of all
changes thereof, in such form as shall be prescribed by the Secretary-
Treasurer and for obtaining from the Union written acknowledgment of
receipt thereof. The Union shall not be responsible for failure to
give any notice to any member who fails to comply with this requirement.

## ARTICLE XV

### Dues and Assessments

**Section 1:**

The general membership shall fix the dues and initiation fees of its members. However, such dues shall not be less than _____ dollars ($13.00) per month for any member who is employed full-time or part-time in the industry and such initiation fees shall not be less than seventy-five dollars ($75.00).

**Section 2:**

If the International President shall determine that it is in the interest and welfare of the Union and/or to promote good will and/or facilitate organizing, he may waive or reduce the initiation fee or other fees or reduce the amount of dues to be paid by any members but the monthly dues shall, at no time, be less than those prescribed in Section 1 hereof.

**Section 3:**

The amount of dues and/or initiation fees may be increased or assessments levied upon the recommendation of the Executive Board and with the approval by majority vote by secret ballot of the members in good standing at a general or special membership meeting after reasonable notice has been given that the question, will be voted upon at such meeting.

## ARTICLE V

### Charges

**Section 1.**

Each member of Allied International Union shall have the
right to fair treatment in the application of Union rules and law
enforcement within this Constitution and By-Laws.  In applying the
rules and procedures relating to Union discipline, the essential
elements of due process of law, notice, hearing and judgment,
within the meaning shall be observed, without, however,
requiring the technical rules to be followed in courts of law.
Each member shall have the right to be represented only by any member
of the Union.  No lawyer shall be permitted to appear on behalf
of any member at Union trials, hearings or other proceedings.
In order that these fundamentals of fairness, and due process of
law ... the working men, this Union
adopts the foregoing rules ... set forth with the specific
understanding that they are procedural guides designated to attain
... to the individual member and the Union, nor shall the
Union ... Union proceedings.

**Section 2.**

The basis for charges against members and officers for
which they may stand trial, shall, among other things, consist of
the following:

(a)  For making false or misleading statements on his
application for membership or giving false answers in connection
therewith.

## NOTICE XVI

### Charges

Section 1:

Each member of Allied International Union shall have the right to fair treatment in the application of Union rules and law in accordance with this Constitution and By-Laws.  In applying the rules and procedures relating to Union discipline, the essential requirements of due process of law, notice, hearing and judgment based upon the evidence, shall be observed, without, however, requiring the technical formality followed in courts of law. Members shall have the right to be represented only by any member in good standing; no lawyers shall be permitted to appear on behalf of members in internal Union trials, hearings or other proceedings. Recognizing that these requirements of fairness and due process of law will be administered by groups of laboring men, this Union adopts the procedures hereinafter set forth with the specific understanding that they are procedural guides designated to attain justice both to the individual member and the Union, nor shall the rules of evidence govern such proceedings.

Section 2:

The basis for charges against members and officers for which they shall stand trial, shall, among other things, consist of the following:

(a)  For making false or misleading statements on his application for membership or giving false answers in connection therewith

(b) For fraudulently receiving any money due to the Union or misappropriating or attempting to misappropriate money or property of the Union.

(c)  For failure to pay a fine or assessment.

(d)  For disobeying or failing to comply with any regulation rule, mandate, order or decision of the Executive Board or the Union.

(e)  for working as a strike breaker or violating the standards as to wages, hours or working conditions established by the Union.

(f)  For any action or conduct detrimental to the interests of the Union or which would tend to bring the Union into disrepute; for slandering or libeling the Union or any officer, Executive Board member or business agent thereof, or distributing, directly or indirectly, any circular, leaflet or written or printed matter which contains defamatory, derogatory or scurrilous statements concerning the Union or any officer, Executive Board member or business representatives thereof.

(g)  for entering into individual contracts of employment with an employer.

(h)  For violating any provision of or for failure to perform any of the duties specified in or acting contrary to this Constitution.

(i)  Secession; or fostering the same.

(j) For being a member of the Communist party
or other subversive organization or who subscribes or lends support
to their doctrines.

(k) For any activities which would tend to bring the
Union, its officers and representatives into disrepute.

(l) For gross disloyalty or conduct unbecoming a member

(m) For publicizing the internal affairs of the Union

(n) For deliberately aiding or abetting another member
in violation of any section of this Constitution

(o) For violating the Oath of Loyalty to the Union or
such other acts and conduct which shall be considered inconsistent with
the duties, obligations and fealty of a member or violation of sound
Union principals

(p) For knowingly preferring false charges against any
other member or officer

(q) For wrongfully taking or retaining any money, books,
papers or any other property of the Union; or the mutilation, erasure,
destruction or injury in any form to any book, bills, receipts,
vouchers or other property of the Union

(r) For acting in a disorderly manner at meetings or
under the influence of liquor, alcoholic beverages or drugs and
persisting in disrupting the business of the Union after the President
has asked him to desist

(s) Abuse of fellow members and/or officers by written
or oral statements; abuse of fellow members and/or officers in the
meeting hall or Union office.

Section 2:

All proceedings under this Article shall be initiated by the filing of written charges, specifying the acts of conduct with which the accused is charged, with the Secretary-Treasurer.  The Secretary-Treasurer shall promptly transmit a copy thereof to the accused at his last known address, together with written notice of the time and place of the hearing thereon, which shall be held not less than five days after the date of notice.

Section 3:

Hearings shall be held by the Executive Board, or by a committee appointed by said Board to report the evidence to it, provided that all decisions shall be made by said Board.  The accused shall be afforded a full and fair hearing and shall have the right to appear at such hearing, produce and cross-examine witnesses, file statements and be represented by any member of ALLIED INTERNATIONAL UNION in good standing, designated by him for that purpose.  Decisions shall be rendered after the close of the hearing and shall be in writing.  A copy thereof shall be served by the Secretary-Treasurer upon the accused and the accuser.  In any case where the accused or the accuser are members of the Executive Board, neither the accused nor the accuser shall sit on such Board and the remaining members shall have the power to act.

Section 4:

Hearings may be held on any charge notwithstanding the failure of the accused, after being given notice pursuant to the provisions of this Article, to appear thereat.

## Section 5:

Appeals from decisions rendered pursuant to the provisions of this Article may be taken in the manner provided herein.

## Section 6:

Whenever charges have been filed with the Executive Board against an officer or officers of the Union, the Executive Board shall have the following powers which it may exercise prior to a hearing or decision on such charges:

(a)  Summarily to suspend the accused officer or officers

(b) To appoint a temporary officer or officers who shall have the powers of the officer or officers so suspended, pending the decision of the Executive Board upon the charges against the accused but under no circumstances shall such temporary officer act as such for more than thirty (30) days.

In the event that the Executive Board exercises any of the powers provided for in this Section, it shall render its decision upon the charges expeditiously.

## Section 7:

A member who has been expelled from ALLIED INTERNATIONAL UNION pursuant to the provisions of this Article may be reinstated to membership by the Executive Board.  The Executive Board may condition the reinstatement of an expelled member by such limitations or conditions as it may prescribe.

(u) For using the name of the Union or soliciting funds, advertising, etc. without the consent of the Union or its authorized officers

## ARTICLE XVII

## Discipline

### Section 1:

(a) The term "discipline" when used in this section shall include, without limitation, a fine, removal from office or job disqualification to run for office or suspension or expulsion from membership.

(b) Any member, officer or representative of ALLIED INTERNATIONAL UNION who, after a hearing, is found guilty of dishonesty, misconduct or conduct detrimental to the welfare of ALLIED INTERNATIONAL UNION, or of violating any provision of this Constitution or a decision of the Executive Board, or as specified in the Article entitled "Charges" shall be subject to discipline as determined by the Executive Board.

(c) Subject to the provisions of paragraph (a), the Executive Board of a Local shall have the power to discipline a member or officer it finds guilty of any conduct specified in paragraph (b) after a hearing

(d) The Executive Board shall have power to discipline any member, officer or paid representative of the Union it finds guilty of any conduct specified in paragraph (b) after a hearing

or any officer or member of ALLIED INTERNATIONAL UNION on account of any controversy for which a remedy by trial or appeal is provided for in this Constitution and By-Laws unless and until he has first exhausted all such remedies of trial and appeal.

## ARTICLE XIX

### Strikes

#### Section 1:

No strike shall be ordered except by the Executive Board. The calling of a strike shall be requested of the International President who shall refer the issue to the Executive Board. Upon the consent of the Executive Board, the International President shall order the members to stop work.

## ARTICLE XX

### Organizers

#### Section 1:

The International President may appoint regular and special organizers as he deems necessary or proper for the welfare of ALLIED INTERNATIONAL UNION. Such organizers shall hold their positions at the will of the International President.

The compensation of regular and special organizers shall be fixed by the International President with the approval of the Executive Board.

No officer, business agent, organizer or union employee of Allied International Union, while employed by the Union as a full-time

employee, shall hold any position with any other employer or act as an employer, or participate in a business which is in competition with the employer who has employees in a category covered by collective bargaining agreements entered into by Allied International Union. However, an officer, business agent, organizer or union employee may, with the permission of the Executive Board, conduct such of his outside business interests as the Executive Board shall determine will not interfere with his union duties.

## ARTICLE XXI

### Illegal Use of Name

It shall be unlawful for any individual member or any group of individuals to use the name "ALLIED INTERNATIONAL UNION", its emblem or trade-mark for any purposes whatsoever without the written authority to do so from the Executive Board.

## ARTICLE XXII

### Effective Date

This Constitution and By-Laws shall be submitted and read at one regular general membership or special meeting, after notice thereof is given and voted upon at the same meeting.  If adopted by a majority of the members present and voting, they shall thereafter take effect immediately.

## ARTICLE XXIII

Any provision of this Constitution and By-Laws may be modified, amended or repealed or a new Constitution and By-Laws may be adopted but only in accordance with the following procedure (any differ...

ratification, amendment or repeal and any provision of this
Constitution, and Bylaws is hereinafter in this Article referred
to as an "amendment"

(a)  All proposals to adopt an amendment shall
first be submitted, in writing, to the Executive Board whose duty it
shall be to examine same and to report to the membership thereon
no later than at a general membership meeting occurring not more than
three months after the submission of the proposal to the Executive
Board.

(b)  If the Executive Board shall be the
majority of those present voting on the question, disapprove the
proposed amendment, it shall report that fact to a membership meeting
as provided in subdivision "(a)" of this Article and no further action
shall be taken by the membership with respect to the proposed amendment.
In such case, the report of the Executive Board to the membership
meeting need give only the substance of the proposed amendment.

(c)  If the Executive Board shall, by
majority of those present voting on the question, approve the proposed
amendment, then it shall report the proposed amendment, together with
its recommendation with respect thereto, to a membership meeting as
provided in subdivision "(a)" of this Article.  The recommendation of
the Executive Board for adoption may be adopted by the Executive Board
by majority vote of its members voting on the question.

41



May 4, 2007

Via facsimile (516-742-0204) and overnight mail

Executive Board
Allied International Union
332 Willis Avenue
Mineola, NY 11501

     Re:    Allied International Union

Dear Sir/Madam:

    Melvin Garland, a member in good standing of the Allied International Union ("the Union") hereby protests the election of President and Secretary-Treasurer of the Union. The grounds for the protest are as follows:

    1.    Violation of the Union Constitution, Article VI, Section 1 - "Nominations shall not be closed until a reasonable opportunity has been afforded for all nominations." Violation of Section 401 (e) of the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 481(e) - "In any election required by this section which is to be held by secret ballot, a reasonable opportunity shall be given for the nomination of candidates ..."

    The facts which support this protest are the following:

    I attended the nomination meeting held on April 30, 2007 in Brooklyn, NY intending to be nominated for the office of President and to nominate member Larry Binyard for the office of Secretary-Treasurer. The nomination notice advised members that the nominations meeting would be conducted between 6:00 and 8:00 pm. However, when I appeared at 6:40 pm the nominations already closed. The meeting was ended before 8:00 pm without any further opportunity for members to nominate candidates. I was told before 8:00 pm that the nominations were closed.

    On May 3, 2007, my counsel wrote to the Chair of the Union Election Committee stating, among other things, the above facts and requesting that my name and Mr. Binyard's name be placed on the ballot. A copy of that letter is attached and made a part of this protest. The request was denied in a telephone call from the Union's counsel to my counsel.

    The Rules for Nominations and the Election state that a nomination may be accepted in writing within five (5) days of the nomination. If they had been given the opportunity to nominate, as required by the Rules and by federal law, the following nominations would have been made:



May 4, 2007
age 2

Larry Binyard, William Watson, and Demarri Campbell were prepared to nominate Melvin Garland for President. Melvin Garland was prepared to accept the nomination.

Melvin Garland, William Watson and Demarri Campbell were prepared to nominate Larry Binyard for Secretary-Treasurer. Larry Binyard was prepared to accept the nomination.

2.    Violations of Union Constitution, Article VI, Section 1 - "At least 15 days prior to the date of the nomination meeting, notice thereof shall be mailed by this union to each members at his last known address as it appears in the Union's records."

The facts which support this protest are the following: The nomination notices were not mailed at least 15 days prior to the nomination meetings. The nomination notices were not mailed to each member at his last known address as it appears in the Union's records. For example, I did not receive a copy of the nomination notice although I had received a copy of the Christmas party mailing and I have not moved since. At my worksite, 20 of 22 members advised me that they did not receive a copy of the nominations notice in the mail.

For these reasons, this protest should be granted and the nominations meeting should be conducted again, a nominations notice mailing should be sent to all members and all members should be provided with the opportunity to nominate candidates for office.

_Melvin Garland_
Melvin Garland

Sworn to before me this 4th
day of May, 2007

_Susan M. Jennik_
Notary Public

SUSAN M. JENNIK
NOTARY PUBLIC, STATE OF NEW YORK
No. 4764982
QUALIFIED IN NEW YORK COUNTY
COMMISSION EXPIRES - 7/8/10

May 31, 2007



**Via facsimile and overnight mail**

Executive Board
Allied International Union
332 Willis Avenue
Mineola, NY 11501

     Re:    Allied International Union

· Dear Sir/Madam:

     Melvin Garland, a member in good standing of the Allied International Union ("the Union") and observer for Jesus Govea, a candidate for Vice President of the Union, hereby objects to the conduct of the election which is in process. Although the election has not been completed, the Executive Board is apparently accepting objections to the conduct of the election to this point and I submit these objections in order to avoid waiving any time deadline.

     By filing these objections, I am not waiving my objection that the ballots have not been counted. The ballots should be counted immediately before these objections or any objections by Mary Beth Stafford are heard and decided.

     1.    Mr. Govea was unlawfully denied the right to do a mailing to the membership list although his opponent was allowed to do a campaign mailing. The Union imposed conditions on Mr. Govea which were not imposed on his opponent and which do not permit the Union to deny Mr. Govea's reasonable request for a mailing.

     2.    Mr. Govea was unlawfully denied information about the worksites where the Union represents members although his opponent was able to use such information in her campaign.

     3.    Mr. Govea was unlawfully denied the right to have an observer present at the printing, preparation and mailing of the ballots. His request for the information about when and where the ballots would be printed, prepared and mailed was denied.

     4.    Employer resources were used to support the candidacy of Ms. Stafford, including but not limited to: On May 11 and 12, 2007, Ms. Stafford was allowed to campaign at Aviation Security in Los Angeles by speaking to employees during their working time. She was accompanied by Oscar Antonio, a Union representative, who was also on paid Company time while he did this campaigning.

     5.    Ms. Stafford used Union resources to support her campaign, including but not limited to: information about the locations where Union members work; and membership contact information she could only obtain from the Union,

May 31, 2007
Page 2

     6.     Ballots were not mailed to a significant number of members who were thus denied the right to vote.

     7.     The Rules for Nominations and the Election state: "If a member does not received a ballot, a duplicate can be requested by calling the Chair of the Election Committee at (916) 742-6320." The Union interfered with the rights of members to request a ballot by phone if they did not receive one or if they spoiled their ballot by, among other acts:

       i.     not answering the Union telephone during business hours;
      ii.     leaving the Union telephone off the hook during business hours so that members would not be able to get through to request a ballot;
     iii.     intimidating and interrogating Union members who were able to get through on the telephone to request a ballot;
     iv.     not sending ballots to Union members who called to request a ballot.

     8.     The Union denied Mr. Govea's reasonable request to inspect the membership list prior to the counting of the ballots.

     9.     The Union denied the opportunity of members to nominate Melvin Garland and Larry Binyard for the offices of President and Secretary-Treasurer. This objection was previously sent to the Executive Board on May 4, 2007, a copy of which is attached. It is being restated herein if for some reason the Executive Board has determined that it does not need to respond to the earlier filed protest.

     10.     The Union refused to provide Mr. Govea the opportunity to inspect copies of the collective bargaining agreements between the Union and employers, prior to the election even though Ms. Stafford has access to such information which she has used to support her campaign.

     11.     Weismann & Mintz, counsel to the Union, is acting on behalf of Ms. Stafford instead of on behalf of the Union and thus, Union resources are being used for Ms. Stafford's campaign.

May 31, 2007
Page 3

Conclusion

The Union should immediately open the ballots. In the event Mr. Govea does not have a majority of the votes cast for him, these objections to the conduct of the election require that the Union rerun the election and ensure that the unlawful acts described above are not repeated.

Melvin Garland

Sworn to before me this 31st day of May, 2007

Notary Public

SUSAN M. JERNICK
Notary Public, State Of New York
No. 4764363
Qualified in New York County
Commission Expires 11/8/10

May 30, 2007

Executive Board
Allied International Union
332 Willis Avenue
Mineola, New York  11501

Re:    Objections to Election for Vice President

Dear Executive Board:

I, MaryBeth Stafford, a candidate for the vacant position of Vice President of Allied
International Union, do hereby file this objection to the election for that office.

Jesus Govea was not properly nominated as a candidate for Vice President.  Pursuant to
the Rules for Nominations and the Election, which was distributed to all members of Allied, "a
candidate must be nominated and then seconded by two (2) members in good standing.  No
member can become a candidate unless he or she is nominated and seconded at the nomination
meeting."  At the nomination meeting held in Los Angeles on April 25, 2007, one member
nominated Mr. Govea and one member seconded the nomination.  There were no other members
present to provide the required number of seconds to the nomination.

Once the campaign for the office of Vice President began, Govea violated Section 401(g)
of the LMRDA by accepting moneys from SEIU, SEIU Local 32BJ and/or their agents.  These
moneys, from another labor union, were unlawfully contributed and applied to aid the candidacy
of Govea throughout the campaign.  Attached to this letter of objection are four (4) pages of
examples of unlawful SEIU activity on behalf of Govea.  I have other evidence which I can
provide to the Executive Board.  As one more example of SEIU's unlawful activities on behalf of
Govea, I am also attaching a flyer that was distributed to members at various work locations,
including but not limited to HRA sites where Allied members work for FJC Security Services.

MaryBeth Stafford

Sworn to and subscribed before me
this 30th day of May, 2007

NOTARY PUBLIC
Ann M. Compagnone
Notary Public, State of New York
No. 02CO4963559
Qualified in Kings County
Comm. Expires May 7, 20__

****SEIU had meeting at McDonalds in Terminal 7. Oscar went to the meeting where a woman gave him papers to fill out to join SEIU. A man approached him and grabbed the papers out of his hands. The man told Oscar that he should be supporting Jesus, and that SEIU was behind Jesus because there is too much favoritism at LAX and Allied has done nothing about this. Oscar told him that if the meeting was for Aviation Safeguard officers, that he had a right to be there. The guy (would not identify himself) told Oscar that he can't be there because Oscar was going around with "the lady from Allied" asking people to vote for her, and not Jesus.

514/07: Met S/O Edwin Carvalho (718-363-1939) at the Waverly Job Center HRA site – FJC Security. He told me that Jesus was at his site on Thursday May 10th asking people to vote for him. (Jesus was working in California that day). Jesus allegedly said that he was a union rep for Allied and that Edwin should vote for him. S/O Carvalho also stated that 32BJ is in his site all the time asking people to join their union.

MaryBeth went to 387 Dean Street to distribute campaign literature. Was told by security officers that 32BJ was already there asking them to vote for Jesus. (32BJ rep was white male, 50's).
S/O's gave me "Vote for Jesus" flyer. (Tecora Steele - site cpt.)

5/15/07: MB visited Powers Assessment – FJC Security. Spoke with S/O Nicole Dixon who stated that 32BJ reps were in front of Powers the previous day handing out leaflets for Jesus. She knew them to be from 32BJ because they were the same people that came to her site in the past asking her to sign up for 32BJ. Site Captain Patricia Mills confirmed that 32BJ reps were handing out leaflets for Jesus. She also knew them to be from 32BJ because they have been to her site on several occasions asking officers to sign up with 32BJ. S/O Dixon gave MB the Jesus flyer.

5/17/07 at 1:30 p.m.: Erroll Marshall – Summit Security (646-245-2822) called Tara @ Allied, stated that somebody from Allied came down to his site (111 W. 40th Street) and took all the names and phone numbers from the Summit Security officers. The following day he received a call from someone from 32BJ stating that he should call Tara at Allied to request a ballot. He was told that he should vote for Jesus Govea. S/O Marshall was confused, does not understand why 32BJ would call him to tell him to vote for Jesus. (MB went to that site, several officers told her that they were told to vote for Jesus at 32BJ – officers think this is an election between Allied and 32BJ).

5/17/07 at 2:00 p.m. Peter Fabukant – FJC Security – DHS (212-724-0176) called Tara for ballot. He was told by Raul at 32BJ to call for the ballot.

5/17/07 at 2:15 p.m.: Woman called Allied asking for Tara. Said that she received a call from 32BJ (no name specified). She was told to call Tara for ballot and to vote for Jesus. Tara asked for her SS# to look her up in the system, the S/O told her no, and hung up phone. (917-365-4601 via *69).

5/17/07 at 2:28 p.m.: Joseph Furell – FJC Security, called looking for Tara at Allied. Jennifer told him that she stepped away from her desk and that she would help him. He said he wanted a ballot to vote for 32BJ. Jennifer asked him for his name and Allied computer showed him as terminated. He stated that he has been working with FJC for 3 years. Jennifer asked him what site he worked at. He said "you need to know what site I work at?" Jennifer then heard someone in the back round state "say Bellevue" Jennifer asked him if FJC was taking dues, he replied yes. Jennifer told him to fax his paystub. He then asked for her name and then hung up on her. (646-506-4312 – via *69)

5/17/07 at 3:15 p.m.: Vilma Rosado – Aviation Safeguard Terminal 7 called. She stated to Jennifer that she received a call from 32BJ who told her to call Union for a ballot and vote for Jesus.

5/18/07: visited Columbia university – summit security -- 628 114th street. Met S/O who was afraid too give me his name but he gave me a flyer that was addressed "Attention Summit Officers" regarding meeting to learn of the next steps in the Summit Security campaign. S/O gave me the flyer.

5/18/07: MaryBeth visited 275 Bergen Street (FJC – HRA) and was told that 32BJ was at the site on Friday, May 11th telling the security officers to vote for Jesus.

5/18/07: @ 11:24 a.m.: "Patty" from Aviation Safeguards called requesting a ballot. Jennifer asked for her SS# to verify eligibility. She said "never mind" and hung up. (646-610-1941 via *69).

5/21/07: MaryBeth visited 1411 Broadway – Summit Security site. Spoke to a few security officers who said that people from 32BJ had been to their site with handouts to vote for Jesus. Supervisor Mr. Joseph gave MB the handout.

5/21/07: MaryBeth visited 94 Flatbush (FJC -- HRA). She met Security Officer Arthur Peters (646-217-2381). He told her that the night before. May 20th, he received a call from someone who stated that they were from 32BJ. The person told him not to vote for MaryBeth because she was a corrupt lawyer, and other bad things he did not want to repeat. They told him to vote for Jesus. S/O showed MaryBeth his cell phone indicating the received call at 8:15 the night before, but the call was blocked, no # available.

5/21/07 @ 1:23 p.m. "Patty" called (she was the same woman who called on 5/18/07) requesting 3 ballots. S/O gave her SS# to verify membership. She is Shafqat Bhatti. She said she never received ballot. She said that the extra ballots she requested were for her sister. Jennifer told her that she can not request ballots for other people., they must call themselves.

5/22/07: Thomas Dundus – Aviation Safeguard called Tara for a ballot. He told her that he received a call from a Neil Diaz from 32BJ who told him to get a ballot to vote for Jesus.

5/22/07: Ganesh Padarot – Aviation called Allied and asked for a 32BJ ballot. He told Tara that he received a call from Neil Disz at 32BJ (212-388-3678) who told him to vote for Jesus.

5/22/07 @ 10:13 a.m.: Beljit Kaur (718) 785-6534) called requesting a ballot. She said she received a call from a gentleman who told her to call the Union to get a ballot.

5/22/07: Received a call from James Corbin at Aviation Safeguards. He said he received a call from Mr. Jacobs from 32BJ who told him to call Allied Union for a ballot. Looked him up and discovered that he is not a member of the union. He said he signed the papers to be in 32BJ and could not understand why we didn't have him eligible to vote. He is a baggage handler, not a security officer. (718-471-0139 via*69).

5/23/07 @ 10:25 a.m.: Dunnell Washington's wife called requesting ballot. She said she received a voicemail from Jonathan at Allied Union stating that if he did not receive a ballot, to call Tara to get one sent to him.

5/23/07 @ 11:41 a.m.: "Mary" (718-299-6768) called on behalf of S/O William Wardrick. She said that her father, Mr. Wardrick had passed away, but that she had received a call on her answering machine for her father from Jonathan from "Working Families 32BJ". Stated to call to get a ballot and vote for Jesus. Jonathan - 718-246-3713.

5/23/07 at 12:36 p.m.: Security Officer Robin Martin – FJC Security called and said that she was told to call Allied to get a ballot to vote for Jesus.
5/24/07: Received call from Security Officer Terri Simmons – FJC Security DHS. She stated that she had called Andy Friedman to get a ballot several days prior (got his name from flyer), and he returned her call on 5/24/07 at 1:00 pm. He told her that he did not have any extra ballots to send to her, but that she should call Allied to request one. S/O Simmons asked him who he worked for since he did not work for Allied, and he told her that he was with 32BJ, and that she should vote for Jesus because MaryBeth is making promises that she will not keep and that he felt that Jesus was better for the job. He further stated that MaryBeth is a corrupt lawyer. When S/O Simmons asked him what he meant by that, he replied that MaryBeth might not even be a lawyer at all, that she was a "fake lawyer".

5/24/07: Oukojo Morris (718-444-5939) FJC Security – DHS called and stated to Jennifer that a woman called him from Working Families and said that they were a sponsor for Jesus. They told him to call Allied to get a ballot to vote for Jesus. (Woman who called – 718-256-3713). He said he had talked to 32BJ and they had him sign something to get rid of Allied Union. He said that this is where Working Families caller got his phone number from.

5/23/07: LAX airport: A woman who works for SEIU went to terminals and spoke to Aviation Safeguard employees asking officers to vote for Jesus. She stated "what has Oscar -- Allied shop steward -- done for you? He gets $500/per month and has done nothing for you -- vote for Jesus and SEIU".

## IMPORTANT INFORMATION REGARDING YOUR JOB!

You will soon be getting a ballot in the mail from Allied International Union – DO NOT throw it away. You now have the opportunity to Vote for Change. Vote for a Better Union.

---

### Allied International Union Members are Voting for Jesus Govea for Vice President.

They are Voting for Change and Voting for a Better Union.

---

One job like you, I work hard every day to make ends meet. I've worked for Aviation Safeguards at Los Angeles Airport for four years. I believe that all of our jobs are extremely important. But our jobs deserve more respect, and that we deserve better compensation.

Our current union leadership has failed us. For years they have taken our dues money for their salaries and have done nothing to get us better wages or to represent us when our employers are treating us unfairly. Most of all they have done nothing to make sure security officers and airline industry workers get the respect we deserve. I am committed to providing the leadership that the union needs to fight to change the conditions we work under, and how we are compensated.

This won't be easy, but there is no hope as long as our current union leaders remain in office. I have been leading the fight to improve working conditions at LAX together with my co-workers. Hundreds of my co-workers in California and in New York are ready to support me, and ready to fight at my side to improve our profession.

I intend to work closely with the Service Employees International Union (SEIU), the largest union in the country, in their national campaign to Stand for Security and their national Airports Campaign. We need to join in these important fights to improve our lives, and bring dignity and respect to the work of all security officers and aviation industry workers.

Vote for Change. Vote for a Better Union. Vote for me as your Vice-President."

Jesus Govea, Aviation Safeguards

"I work hard every day, and at the end of the week, there's never enough to pay for all the things I need to provide for my family. It's the union's job to help members to fight to improve our wages and benefits. Our current union leaders have been failing us for years. It's time for a change.

That's why I'm voting for Change, and Voting for Jesus Govea."

-Larry Hayford, FJC Security, New York City

---

If you need more information about the election, or do not have a ballot, contact Andy Friedman at 412 519 0966.

07/05/2007  15:47    516 742-8294       ALLIED INT UNION                    PAGE  02/05

Tel (516) 742-6320                                              1-800-677-5484
Fax (516) 742-0204

# ALLIED INTERNATIONAL UNION
### 332 WILLIS AVENUE • MINEOLA, NEW YORK 11501



June 29, 2007

Melvin Garland
558 East 181st Street
Apt # 5K
Bronx, NY 10457

Dear Mr. Garland;

The Executive Board is in receipt of your protest relating to the Nomination and Election of Officers recently held by the Allied International Union.  Since your protest will require further factfinding and investigation, the Union has chosen to retain an attorney to be present at interviews investigating your protest.  The attorney is Mark Soroka, Esq. Taubman, Kimelman and Soroka LLP, 30 Vesey Street, 6th Floor, New York, NY 10007 (212) 227-8140.

On counsels advise, we have appointed a committee of rank and file Members who are not Officers of the Allied International Union to investigate your protest, interview whomever they deem necessary and report their findings to the Executive Board.

We will move on this matter as expeditiously as possible and would appreciate your cooperation in presenting your protest, providing information and appearing before the Committee for an interview.

Fraternally yours

Allied International Union



27/05/2007  15:47   516-742-0204            ALLIED INT UNION                    PAGE  05/05

Tel (516) 742-6320                                                                  1-800-677-6464
Fax (616) 742-0204

# ALLIED INTERNATIONAL UNION
## 382 WILLIS AVENUE • MINEOLA, NEW YORK 11501



June 29, 2007

MaryBeth Stafford
79 Beach Road
Massapequa, NY 11758

Dear Ms. Stafford;

The Executive Board is in receipt of your protest relating to the Nomination and Election of Officers recently held by the Allied International Union. Since your protest will require further factfinding and investigation, the Union has chosen to retain an attorney to be present at interviews investigating your protest. The attorney is Mark Soroka, Esq., Taubman, Kimelman and Soroka LLP, 30 Vesey Street, 6th Floor, New York, NY 10007 (212) 227-8140.

On counsels advice, we have appointed a committee of rank and file Members who are not Officers of the Allied International Union to investigate your protest, interview whomever they deem necessary and report their findings to the Executive Board.

We will move on this matter as expeditiously as possible and would appreciate your cooperation in presenting your protest, providing information and appearing before the Committee for an interview.

Fraternally yours

Allied International Union



07/05/2007  15:47   516-742-0204         ALLIED INT UNION                    PAGE  04/05

Tel (516) 742-6320                                              1-800-577-6464
Fax (516) 742-0204

# ALLIED INTERNATIONAL UNION

### 332 WILLIS AVENUE • MINEOLA, NEW YORK 11501



June 29, 2007

Jesus Govea
4783 West 133rd Street
Apt. # 17
Hawthorne, CA 90250

Dear Mr. Govea;

The Executive Board is in receipt of your protest relating to the Nomination and Election of Officers recently held by the Allied International Union. Since your protest will require further factfinding and investigation, the Union has chosen to retain an attorney to be present at interviews investigating your protest. The attorney is Mark Soroka, Esq., Tauhman, Kimelman and Soroka LLP, 90 Vesey Street, 6th Floor, New York, NY 10007 (212) 227-8149.

On counsels advise, we have appointed a committee of rank and file Members who are not Officers of the Allied International Union to investigate your protest, interview whomever they deem necessary and report their findings to the Executive Board.

We will move on this matter as expeditiously as possible and would appreciate your cooperation in presenting your protest, providing information and appearing before the Committee for an interview.

Fraternally yours

Allied International Union



07/05/2007  15:47    516-742-0204           ALLIED INT UNION                      PAGE  03/05

Tel  (516) 742-6320                                                                    1-800-577-5464
Fax (516) 742-0204

# ALLIED INTERNATIONAL UNION

## 332 WILLIS AVENUE • MINEOLA, NEW YORK 11501.



June 29, 2007

Larry Binyard
684 Alabama Avenue
Brooklyn, NY 11207

Dear Mr. Binyard;

The Executive Board is in receipt of your protest relating to the Nomination and
Election of Officers recently held by the Allied International Union. Since your protest
will require further factfinding and investigation, the Union has chosen to retain an
attorney to be present at interviews investigating your protest. The attorney is Mark
Soroka, Esq., Taubman, Kimelman and Soroka LLP, 30 Vesey Street, 6th Floor, New
York, NY 10007 (212) 227-8140.

On counsels advise, we have appointed a committee of rank and file Members
who are not Officers of the Allied International Union to investigate your protest,
interview whomever they deem necessary and report their findings to the Executive
Board.

We will move on this matter as expeditiously as possible and would appreciate
your cooperation in presenting your protest, providing information and appearing before
the Committee for an interview.

Fraternally yours

Allied International Union



# TAUBMAN KIMELMAN & SOROKA, LLP

PHILIP S TAUBMAN
SNH A. KIMELMAN*
ARK STEVEN SOROKA

ANTONETTE M McCETIC

*ALSO ADMITTED IN NJ AND FL

COUNSELLORS AT LAW
30 VESEY STREET, 6TH FLOOR
NEW YORK, NEW YORK 10007
(212) 587-8140
TELECOPIER (212) 385-0662
Website: TKSLawyers.com

OF COUNSEL
JULIUS GANTHAN
ANNETTE Z KOLMAN
CHARLES LAVINE
ANTHONY G. GROSS



July 6, 2007

Melvin Garland
538 East 181st Street
Apt. 5K
Bronx, New York 10457

Re:     Protest to the Nomination and
        Election of Officers recently held
        by the Allied International Union

Dear Mr. Garland:

        This office has been retained as counsel to a Committee of your fellow
Members of the Allied International Union, who have been appointed to
investigate all protests including yours, to the Nomination, Campaigning for
and Election of Officers to the Allied International Union. We have been
directed to move forward quickly, and to that end, I am asking that you submit
to this office by July 13, 2007, all documentary evidence and affidavits relating
to your protest.

        We would also like to schedule a date and time either in my office in
Manhattan or at the Union Headquarters in Mineola where you can give
statements, provide testimony and be questioned by myself and the Committee
relating to your protest and relative to issues surrounding the Nomination,
Campaigning For and Election of Officers. At that time we would also like to
schedule the testimony and questioning of any witnesses you wish to present.
In addition to yourself, the Committee would be most interested in
interviewing William Watson and Demarri Campbell, but will be happy to
interview all witnesses produced that have information relevant to all protests.
All witnesses who appear before the Committee may appear with counsel.

TAUBMAN KINELHAN & SOROKA, LLP

Your prompt attention in contacting me to promptly schedule these interviews would be appreciated.

Yours truly,

MARK STEVEN SOROKA

MSS:ec

# TAUBMAN KIMELMAN & SOROKA, LLP

COUNSELLORS AT LAW

PHILIP E. TAUBMAN
JERY A. KIMELMAN
ARK STEVEN SOROKA

ANTOINETTE M. HILCETIC

*ALSO ADMITTED IN NJ AND FL

30 VESEY STREET, 6TH FLOOR
NEW YORK, NEW YORK 10007
(212) 227 8140
TELECOPIER (212) 385-0562
Website: TKSLawyers.com

OF COUNSEL
JULIUS GANTNAN
ANNETTE Z. KOLMAN
CHARLES LAVINE
ANTHONY G. GROSS

July 6, 2007



Mary Beth Stafford
79 Beach Road
Massapequa, New York 11758

Re:    Protest to the Nomination and
       Election of Officers recently held
       by the Allied International Union

Dear Ms. Stafford:

This office has been retained as counsel to a Committee of your fellow Members of the Allied International Union, who have been appointed to investigate all protests including yours, to the Nomination, Campaigning for and Election of Officers to the Allied International Union. We have been directed to move forward quickly, and to that end, I am asking that you submit to this office by July 13, 2007, all documentary evidence and affidavits relating to your protest.

We would also like to schedule a date and time either in my office in Manhattan or at the Union Headquarters in Mineola where you can give statements, provide testimony and be questioned by myself and the Committee relating to your protest and relative to issues surrounding the Nomination, Campaigning For and Election of Officers. At that time we would also like to schedule the testimony and questioning of any witnesses you wish to present, that have information relevant to any protests. All witnesses who appear before the Committee may appear with counsel.

TAUBMAN KIMELMAN & SOROKA, LLP

Your prompt attention in contacting me to promptly schedule these interviews would be appreciated.

Yours truly,

MARK STEVEN SOROKA

MSS:cc

# TAUBMAN KIMELMAN & SOROKA, LLP

COUNSELLORS AT LAW

PHILIP E. TAUBMAN
RON A. KIMELMAN
R. STEVEN SOROKA

ANTONETTE M. McCETIC

*ALSO ADMITTED IN NJ AND FL

30 VESEY STREET, 6TH FLOOR
NEW YORK, NEW YORK 10007
(212) 227-8140
TELECOPIER (212) 385-0652
Website: TKSSlawyers.com

OF COUNSEL
JULIUS SANTMAN
ANNETTE Z. KOLMAN
CHARLES LAVINE
ANTHONY G. GROSS



July 6, 2007

Jesus Govea
4783 West 133rd Street
Apt. 7
Hawthorne, California 90250

Re:  Protest to the Nomination and
Election of Officers recently held
by the Allied International Union

Dear Mr. Govea:

This office has been retained as counsel to a Committee of your fellow Members of the Allied International Union, who have been appointed to investigate all protests including yours, to the Nomination, Campaigning for and Election of Officers to the Allied International Union. We have been directed to move forward quickly, and to that end, I am asking that you submit to this office by July 13, 2007, all documentary evidence and affidavits relating to your protest.

We would also like to schedule a date and time either in my office in Manhattan or at the Union Headquarters in Mineola where you can give statements, provide testimony and be questioned by myself and the Committee relating to your protest and relative to issues surrounding the Nomination, Campaigning For and Election of Officers. At that time we would also like to schedule the testimony and questioning of any witnesses you wish to present, that have information relevant to any protests. All witnesses who appear before the Committee may appear with counsel.

TAUBMAN K'NELMAN & SOROKA, LLP

Your prompt attention in contacting me to promptly schedule these interviews would be appreciated.

Yours truly,

MARK STEVEN SOROKA

MSS:cc

# TAUBMAN KIMELMAN & SOROKA, LLP

COUNSELLORS AT LAW

30 VESEY STREET, 6TH FLOOR

NEW YORK, NEW YORK 10007

(212) 587-8140

TELECOPIER (212) 385-0022

Website: TKSLawyers.com

PHILIP E. TAUBMAN
JENN A. KIMELMAN
MARK STEVEN SOROKA
———
ANTONETTE M HILGETIC
———
*ALSO ADMITTED IN NJ AND FL

OF COUNSEL
JULES GANTMAN
ANNETTE E. KOLNAN
CHARLES LAVINE
ANTHONY G. GROSS

July 6, 2007



Larry Binyard
684 Alabama Avenue
Brooklyn, New York 11207

> Re:  Protest to the Nomination and
> Election of Officers recently held
> by the Allied International Union

Dear Mr. Binyard:

This office has been retained as counsel to a Committee of your fellow Members of the Allied International Union, who have been appointed to investigate all protests including yours, to the Nomination, Campaigning for and Election of Officers to the Allied International Union. We have been directed to move forward quickly, and to that end, I am asking that you submit to this office by July 13, 2007, all documentary evidence and affidavits relating to your protest.

We would also like to schedule a date and time either in my office in Manhattan or at the Union Headquarters in Mineola where you can give statements, provide testimony and be questioned by myself and the Committee relating to your protest and relative to issues surrounding the Nomination, Campaigning For and Election of Officers. At that time we would also like to schedule the testimony and questioning of any witnesses you wish to present. In addition to yourself, the Committee would be most interested in interviewing William Watson and Demarri Campbell, but will be happy to interview all witnesses produced that have information relevant to all protests. All witnesses who appear before the Committee may appear with counsel.

TAUBMAN KIMELMAN & SOROKA, LLP

Your prompt attention in contacting me to promptly schedule these interviews would be appreciated.

Yours truly,

MARK STEVEN SOROKA

MSS:ec

05/27/2007  19:08    516-742-0204        ALLIED INT UNION                PAGE  17/52



## Rules for Nominations and the Election

To be eligible to run for office, a candidate must be a member in good standing
continuously for a period of at least one (1) year immediately preceeding the nomination
meeting; a candidate cannot be three (3) months or more in arrears in dues on the date of
the nomination meeting; and a candidate must be employed in the industry as a guard,
security officer, watchman, captain, lieutenant, sergeant, investigator or policeman, or be
a full-time officer or paid employee of the Union.

To run for office, a candidate must be nominated and then seconded by two (2) members
in good standing. No member can become a candidate unless he or she is nominated and
seconded at the nomination meeting. A member who cannot attend the meeting may
state his or her intention to accept a nomination for office if nominated and seconded at
the meeting by filing written notice with the Chair of the Election Committee at Allied
International Union, 332 Willis Avenue, Mineola, NY 11501 prior to such nomination or
within five (5) days of the nomination.

Each member must present identification at the meeting and sign the attendance sheet. If
there is no contest for any office and the candidates are found to be properly qualified,
the nominees shall be declared elected.

If there is a contest for one (1) or more positions, an election will be held by mail ballot.
Ballots will be mailed with instructions to all members in good standing on May 7th,
2007. If a member does not receive a ballot, a duplicate can be requested by calling the
Clerk of the Election Committee at (516) 742-6320.

To be eligible to vote, a member must be in good standing. No write-in votes will be
permitted. The ballots must be received by the Post Office no later than 9:00 a.m. on
May 29th, 2007. The tally will be conducted at the Union office on May 30th, 2007 at
10:00a.m.

A5/27/2007  13:18    516-742-0204          ALLIED INT UNION                    PAGE  16/57

Tel (510) 742-6820                                                1-800-577-5464
Fax (516) 742-0204

# ALLIED INTERNATIONAL UNION
## 332 WILLIS AVENUE • MINEOLA, NEW YORK 11501



### NOMINATION AND ELECTION NOTICE

#### Special Nomination Meeting

Officers positions to to filled:                President
                                                Vice President
                                                Secretary-Treasurer

#### Schedule of Nomination Meeting

Dates:    April 30th   – Members who live and work in the New York – New Jersey area

#### Location and Times of Nomination Meeting

Place:   Bedford Stuyvesant Multi-Service Center      Time: 10 a.m. – 12 p.m.
         1958 Fulton Street                                 6 p.m. – 8 p.m.
         Brooklyn, NY 11233





### ELECTION COMMITTEE
### MINUTES OF NOMINATION MEETING
### APRIL 30, 2007
### 6:00 P.M. — 8:00 P.M.

6:00 p.m.    Meeting called to order.  Discussion of nominations.

6:30 p.m.    Nomination meeting called to order by Tara Pamulo, Election
Chairperson.

Any nominations for the office of President of Allied International Union?

Owen Williams nominates Peggy Vanson for President, seconded by Terri
Simmons, Delores Selby, Kim Stevenson and Otha Tanks.

Any nominations for the office of Vice President of Allied International
Union?

Terri Simmons nominates MaryBeth Stafford for Vice President, seconded
by Owen Williams, Delores Selby, Kim Stevenson.

Any nominations for the office of Secretary Treasurer of Allied
International Union?

Owen Williams nominates Joseph Glennan for Secretary Treasurer,
seconded by Terri Simmons, Delores Selby, Kim Stevenson and Otha Tanks.

7:40 p.m.    Tara Pamulo, Election Chairperson, asked if anyone had anymore
nominations or Union issues to bring them to the table now.  No requests were made so
Ms. Pamulo asked attendees to vote to close meeting.  Aye votes: All in attendance. No
objections were made.  No Union issues were brought to the table.

7:50 p.m.    Otha Tanks, Boyce McFarland, Heywood Gerst, Leon Gavin, Venlery
McCloud remained in auditorium to discuss Union issues. Tara Pamulo and MaryBeth
Stafford accompanied Officer Melvin Garland in the hallway outside the auditorium
where the meeting was held to discuss his pending grievance with his employer F.J.C.
Security.  After Mr. Garland voiced his concern regarding his pending grievance,
MaryBeth called Mr. Morgan from F.J.C. to schedule a grievance hearing for Thursday
5/3/07.  Mr. Garland was assured that he would be represented on Thursday.

8:15 p.m. Joseph Glennan paid Bedford-Stuyvesant Multi-Service Center for room rental
via check.



# When's the last time Allied International Union helped you get a raise? Sick days? Vacation?

## Most likely your answer is <u>NEVER!</u>

That's because the current union leadership and people like Mary Beth Stafford are only interested in taking your dues money.

---

**Jesus Govea** has been a working member of Allied International Union for over four years at LAX airport, **leading the fight to win better wages, sick days, healthcare and more.** Allied International Union has done nothing to help Jesus and his co-workers in that fight.

**Jesus Govea** and the thousands of workers who support him believe that **real union leadership** is about helping workers win better wages and better working conditions. That's the experience and commitment Jesus Govea will bring to Allied International Union.

---

# Vote for Change.

# <u>Vote for Jesus Govea for Vice President</u>

You should have recently received a ballot in the mail from Allied International Union. Follow all the instructions carefully, and exactly. Mail the ballot back right away. **If you need more information about the election, or do not have a ballot, contact Andy Friedman at 412-519-0966.**



# Are you disappointed with Allied International Union?

## Vote for Change.
## Vote for Jesus Govea.

**Jesus Govea** has been a working member of Allied International Union for over four years as LAX airport, **leading the fight to win better wages, sick days, healthcare and more.**

**Jesus Govea** believes that **real union leadership** is about helping workers win better wages and better working conditions.

The current **Allied International Union leaders**, including Mary Beth Stafford, continue to sign substandard contracts for workers with:

➤ little or no raises

➤ little or no health insurance

➤ little or no sick days or vacation

Now, they want you to vote for Mary Beth Stafford. **A vote for her is a vote to keep Allied International Union weak and ineffective.** Vote for her if you think your wages, health insurance, vacation, personal and sick time are good enough.

## Vote for Change.

## Vote for Jesus Govea for Vice-President.

You should have recently received a ballot in the mail from Allied International Union. Follow all the instructions carefully, and exactly. Mail the ballot back right away. **If you need more information about the election, or do not have a ballot, contact Andy Friedman at 412-519-0966.**



## IMPORTANT INFORMATION REGARDING YOUR JOB:

You will soon be getting a ballot in the mail from Allied International Union – **DO NOT** throw it away. You now have the opportunity to **Vote for Change. Vote for a Better Union**.

---

### Allied International Union Members are Voting for Jesus Govea for Vice President.

They are Voting for Change and Voting for a Better Union.

---



"I'm just like you. I work hard every day to make ends meet. I've worked for Aviation Safeguards at Los Angeles Airport for four years. I believe that all of our jobs are extremely important, that our jobs deserve more respect, and that we deserve better compensation.

Our current union leadership has failed us. For years they have taken our dues money for their salaries and have done nothing to get us better wages or to represent us when our employers are treating us unfairly. Most of all they have done nothing to make sure security officers and airline industry workers get the respect we deserve. I am committed to providing the leadership that the union needs to fight to change the conditions we work under, and how we are compensated.

"This won't be easy, but there's a lot we can do

"I work hard every day, and at the end of the week, there's never enough to pay for all the things I need to provide for my family. It's the union's job to help members to fight to improve our wages and benefits. Our current union leaders have been failing us

Tel. (616) 742-6320                                              1-800-577-5464
Fax (516) 742-0204

# ALLIED INTERNATIONAL UNION

### 332 WILLIS AVENUE • MINEOLA, NEW YORK 11501



### NOMINATION AND ELECTION NOTICE

#### Special Nomination Meeting

Officers positions to be filled:                  President
                                                  Vice President
                                                  Secretary-Treasurer

#### Schedule of Nomination Meeting

Dates:   April 27th  - Members who live and work in the Washington D.C. area

#### Location and Times of Nomination Meeting

Place:   Key Bridge Marriott.                  Time:  1 p.m. – 4 p.m.
         1401 Lee Highway
         Arlington, VA 22209
         (Room # will be posted in lobby)



Tel (516) 742-6320                                                    1-800-577-5464
Fax (516) 742-0204

# ALLIED INTERNATIONAL UNION

## 332 WILLIS AVENUE • MINEOLA, NEW YORK 11501



### NOMINATION AND ELECTION NOTICE

#### Special Nomination Meeting

Officers positions to be filled:                    President
                                                     Vice President
                                                     Secretary-Treasurer

#### Schedule of Nomination Meeting

Dates:   April 25th  -  Members who live and work in the Los Angeles, CA area

#### Location and Times of Nomination Meeting

Place:   Renaissance Los Angeles Hotel          Time;  1 p.m. – 5 p.m.
         9620 Airport Boulevard
         Los Angeles, CA 90045
         (Room # will be posted in lobby)



ALLIED INTERNATIONAL UNION
NOMINATION MEETING
BROOKLYN, NY
ATTENDANCE SHEET
APRIL 30TH, 2007

| SECURITY OFFICER | COMPANY |
|---|---|
| James D. Lee | U.S Security |
| OTHA Town | U.S SECURITY |
| _Jeremiah Hamilton_ | FJC |
| Robbie Watson | FJC |
| Stephen Pusey | AARGO |
| Giulia Valdez | Concourse Hoorse |
| Charlston Romero | US SECURITY |
| Dandy Wright | U.S SECURITY |



# ELECTION COMMITTEE
## MINUTES OF NOMINATION MEETING
### APRIL 30, 2007
### 10:00 A.M. – 12:00 P.M.

10:00 a.m.    Meeting called to order at conference room 5 of Bedford Stuyvesant Multi-Service Center.

10:30 a.m.    Nomination meeting called to order by Tara Pamulo, Election Chairperson.

Any nominations for the office of President of Allied International Union?

James Lee nominates Peggy Vanson for President, seconded by Otha Tauks, Rubbie Watson and Reatha Williams

Any nominations for the office of Vice President of Allied International Union?

James Lee nominates MaryBeth Stafford for Vice President, seconded by Reatha Williams and Otha Tauks.

Any nominations for the office of Secretary Treasurer of Allied International Union?

James Lee nominates Joseph Glennan for Secretary Treasurer, seconded by Reatha Williams and Otha Tauks.

11:30 a.m.    Peggy Vanson spoke to Carlston Romero regarding Union issues. Tara Pamulo spoke to Reatha Williams regarding Union issues.

11:40 a.m.    Tara Pamulo spoke to Cecilia Walsh regarding Unions issues.

12:00 p.m.    Tara Pamulo, Election Chairperson, asked if there were anymore nominations or issues please bring them to the table now. No Issues were brought forward. Ms. Pamulo closed meeting.





# ALLIED INTERNATIONAL UNION
## NOMINATION MEETING
### BROOKLYN, NY
### ATTENDANCE SHEET
### APRIL 30ᵀᴴ, 2007

| SECURITY OFFICER | COMPANY |
|---|---|
| OTHA TOOKS | US SECURITY |
| William Watson | FJC Security |
| Larry Bunyard | FJC Security |
| NOOR M MIAH | FJC Security |
| REXFORD BOWEN | Whitfield |
| Morgan Camacho | Summit Security |
| Marytelly Sheppard | |
| Jim Simmons | FJC |
| Don Stevenson | FJC |
| Owen Williams | FJC |
| | |
| Dolores Kelly | F.J.C. |
| LEON GATH | UNION REP |
| Duttice Hylton | FJC |
| Daniel Campbell | FJC |
| Robert Drish | FJC |
| Major Williams | Brice |
| Haywood Gerst | WATCH DOG PATROLS INC |
| Baye McFarlane | Watch Dog Security |

05/37/2007  13:19    516-742-8284          ALLIED INT UNION                    PAGE  16/62

# ALLIED INTERNATIONAL UNION
## NOMINATION MEETING
## BROOKLYN, NY
## ATTENDANCE SHEET
## APRIL 30TH, 2007

| SECURITY OFFICER | COMPANY |
|---|---|
| MELVIN M GARLAND JR | F.J.C. |



ELECTION COMMITTEE
MINUTES OF NOMINATION MEETING
APRIL 30, 2007
6:00 P.M. – 8:00 P.M.

6:00 p.m.    Meeting called to order.  Discussion of nominations.

6:30 p.m.    Nomination meeting called to order by Tara Pamulo, Election Chairperson.

Any nominations for the office of President of Allied International Union?

Owen Williams nominates Peggy Vanson for President, seconded by Terri Simmons, Delores Selby, Kim Stevenson and Otha Tanks.

Any nominations for the office of Vice President of Allied International Union?

Terri Simmons nominates MaryBeth Stafford for Vice President, seconded by Owen Williams, Delores Selby, Kim Stevenson.

Any nominations for the office of Secretary Treasurer of Allied International Union?

Owen Williams nominates Joseph Glennan for Secretary Treasurer, seconded by Terri Simmons, Delores Selby, Kim Stevenson and Otha Tanks.

7:00 p.m.    Tara Pamulo, Election Chairperson, asked if anyone had anymore nominations.  No nominations were made.

7:40 p.m.    Tara Pamulo, Election Chairperson, asked if anyone had anymore nominations or Union issues to bring them to the table now.  No requests were made so Ms. Pamulo asked attendees to vote to close meeting.  Aye votes: All in attendance. No objections were made.  No Union issues were brought to the table.

7:50 p.m.    Otha Tanks, Boyce McFarland, Haywood Gerst, Leon Gavin, Verdery McCloud remained in auditorium to discuss Union Issues.  Tara Pamulo and MaryBeth Stafford accompanied Officer Melvin Garland in the hallway outside the auditorium where the meeting was held to discuss his pending grievance with his employer F.J.C. Security.  After Mr. Garland voiced his concern regarding his pending grievance, MaryBeth called Mr. Morgan from F.J.C. to schedule a grievance hearing for Thursday 5/3/07.  Mr. Garland was assured that he would be represented on Thursday.

8:15 p.m. Joseph Glennan paid Bedford-Stuyvesant Multi-Service Center for room rental via check.

**ELECTION COMMITTEE
PO BOX 310
WILLISTON PARK, NY 11596-0310**



May 1, 2007

Mr. Jesus Govea
4783 West 133ʳᵈ Street
Apt. # 17
Hawthorne, CA 90250

Dear Mr. Govea;

As you know, Allied International Union will conduct its regularly scheduled election of officers on May 30ᵗʰ, 2007.

Please be advised that there is a meeting scheduled for all candidates at 1:00 p.m. on May 3ʳᵈ, 2007 at 332 Willis Avenue Mineola, NY 11501. At this meeting, the Election Committee will review the procedures to be followed in the election and discuss campaign rules.

I am enclosing a copy of the Allied International Union "Election and Campaign Rules" for your information. If you have any questions about the election please call me at 516-742-3121.

Sincerely,

Tara Pamulo
Election Chairperson



# ALLIED INTERNATIONAL UNION

## ELECTION NOTICE

A secret ballot election for the office of Vice President is being conducted by mail. Enclosed is a ballot for this election. Any member who spoils a ballot may request a new ballot by contacting the Election Chairperson Tara Pamulo at 516-742-3121. If you request and return another ballot, only the replacement ballot will be counted.

**Instructions for mail Voting**

Please read the following instructions carefully before marking and mailing your ballot.

Mark an "x" in the box next to the name of the candidate of your choice. Do not place your name, initials or any other identifying information on the ballot. Ballots containing any identifying information will be voided.

Place your marked ballot in the small envelope labeled "Secret Ballot Envelope" and seal it. Do not write on this envelope. You must use the Secret Ballot Envelope to insure that ballot secrecy is maintained. Failure to use the Secret Ballot Envelope will result in your ballot being voided when the ballots are counted.

Insert the Secret Ballot Envelope containing your marked ballot into the return envelope pre-addressed and pre-stamped to the Election Committee and seal it.

Ballot secrecy can only be preserved if you personally mark and mail your ballot. Do not allow anyone else to mark your ballot. Do not hand deliver your ballot to the Union office.

**IMPORTANT**: Mail your ballot in sufficient time for it to be received at PO Box 310, Williston Park, NY 11596-0310 no later than 9:00 a.m. on May 29th, 2007.



**OFFICIAL BALLOT**

SEIU SERVICE INTERNATIONAL UNION

MAY 30TH, 2007

Mark an "x" in the box next to the name of the candidate of your choice. Do not put your name, initials, or any other identifying information on the ballot. Ballots containing any identifying information will be voided.

**VICE PRESIDENT**

VOTE FOR ONLY ONE

☐ Mary Beth Stafford

☑ Jesus Garza

# Secret Ballot Envelope

(Do not write your name or other
indentifying information on this
envelope)



ALLIED INTERNATIONAL UNION
PO BOX 310
WILLISTON PARK, NY 11596-0310





ALLIED INTERNATIONAL UNION
PO BOX 310
WILLISTON PARK, NY 11596-0310

D-1



ALLIED INTERNATIONAL UNION
PO BOX 310
WILLISTON PARK, NY 11596-0310

D-2



ALLIED INTERNATIONAL UNION
PO BOX 310
WILLISTON PARK, NY 11596-0310

D-3



ALLIED INTERNATIONAL UNION
PO BOX 310
WILLISTON PARK, NY 11596-0310

D-4

## AFFIDAVIT

Corryan Cohen swears under the penalty of perjury that the following statements are true.

I, Corryan Cohen received $125 from MaryBeth Stafford for services rendered (labeling campaign envelopes) on May 10, 2007.  I received no additional monies from Allied International Union.

_Corryan Cohen_

Corryan Cohen

Sworn to me on this
_____ day
of July, 2007
August, 2007

_signature_          8/2/07

LYNNE C. KRAMER
Notary Public of N.Y.
Lic No. 01KR6066552
Qualified in Nassau County
Term Expires November 2009

NOTARY PUBLIC

Ex    AA

6-1-07
Pd 1000 on
# 958

**WorldPoints**

Pr____    MARYBETH STAFFORD                    May 2007 Statement
_____ 9138                         Credit Line:              $18,200.00
                                               Cash or Credit Available:  $16,004.98

Customer Service
For information on Your Account visit:
www.bankofamerica.com

Mail Payments to:
BANK OF AMERICA
P.O. BOX 15716
WILMINGTON, DE 19886-6716

Mail other inquiries to:
BANK OF AMERICA
P.O. BOX 15026
WILMINGTON, DE 19850-5026

Call toll-free 1-800-766-0625
TDD hearing-impaired 1-800-346-3178

**Account Information**

| Summary of Transactions | | Billing Cycle and Payment Information | |
|---|---|---|---|
| Previous Balance | $756.97 | Days in Billing Cycle | 30 |
| Payments and Credits − | $756.97 | Closing Date | 05/23/07 |
| Cash Advances + | $0.00 | | |
| Purchases and Adjustments + | $3,195.02 | Payment Due Date | 06/18/07 |
| Periodic Rate Finance Charges + | $0.00 | Current Payment Due | $31.00 |
| Transaction Fee Finance Charges + | $0.00 | Past Due Amount + | $0.00 |
| | | Total Minimum | |
| New Balance Total | $3,195.02 | Payment Due − | $31.00 |

**Transactions**

| | Posting Date | Transaction Date | Reference Number | Account Number | Category | Amount |
|---|---|---|---|---|---|---|
| Payments and Credits | | | | | | |
| Purchases and Adjustments: | | | | | | |
| _____ WANTAGH NY | 04/30 | 05/28 | 5859 | 9135 | C | 88.73 |
| AMERICAN 0121343761661 AA.COM/AA RESTX | 05/09 | 05/08 | 5488 | 9138 | C | 895.80 |
| 05/11 JFK/LAX RNDTRP LAX/JFK | | | | | | |
| STAPLES   00101309 MASSAPEQUA NY | 05/10 | 05/03 | 7748 | 9138 | C | 75.92 |
| _____ G FLORAL PARK NY | 05/12 | 05/10 | 2804 | 9138 | C | 78.21 |
| AMERICAN 0121345639316 AA.COM/AA RESTX | 05/14 | 05/12 | 6124 | 9135 | C | 100.00 |
| LUXURY ONEWAY | | | | | | |
| RENAISSANCE HOTELS 997 LOS ANGELES CA | 05/14 | 05/13 | 3214 | 9138 | C | 105.60 |
| ARRIVAL DATE 5/13/07's | | | | | | |
| STAPLES   00102849 GARDEN CITY PK NY | 05/16 | 05/15 | 7984 | 9135 | C | 13.19 |
| GULF    86100037 WANTAGH   NY | 05/19 | 05/17 | 1207 | 9135 | C | 53.90 |
| _____02 WANTAGH   NY | 05/21 | 05/18 | 2273 | 9138 | C | 116.85 |
| UPS 000001C8R57    800 811-1648 GA | 05/21 | 05/20 | 2715 | 9138 | C | 98.84 |

WORLDPOINTS
    3,191   MONTHLY EARNINGS
        0   BONUS POINTS THIS MONTH
   39,945   POINTS AVAILABLE





that was easy.

Low prices. Every item. Every day.
110% Price-Match. Guaranteed.
2310 Jericho Turnpike
Garden City Park, NY 11040
(516) 739-6903

SALE                    554978 5 005 17833
                        0248 05/10/07 12:33

*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*

$5,000 SHOPPING SPREE AT STAPLES!
ENTER TO WIN!

We care about what you think!
Take a short survey and be entered
into a monthly drawing.  Just log on to
www.staples-survey.com
or call 1-800-990-7365

Your survey code: 0700 5663 3437 3075

***Tome nuestra encuesta en español en
la página del Internet o por teléfono.
Consiga las reglas en la tienda.***

See store for rules.
Survey code expires 05/17/2007.
*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+*+

QTY SKU                       OUR PRICE

      REWARDS NUMBER 2265500005
3900 2001+ R&M2 PSTL
   3814B8    0.105ea          340.50
3900 MACHINE FOLDING
   3017B0    0.020ea           66.00
SUBTOTAL                      412.50
   Standard Tax 8.625%         35.58
TOTAL                         $448.08

MasterCard                    448.08
Card No.: XXXXXXXXXXXX7344 <S>
Auth No.: 2259502089


         TOTAL ITEMS    5600


              Compare and Save
           with Staples-brand products.



```
==============================
        WILLISTON PARK MFO
    WILLISTON PARK, New York
            115982230
          3548530556-0097
05/10/2007 (800)275-8777 11:33:51 AM
==============================
========= Sales Receipt =========
Product      Sale Unit      Final
Description   Qty Price      Price

Spc Drops    50  $39.00    $2,067.00
An PE
C1/100
                          ==========
Total:                     $2,067.00

Paid by:
MasterCard                 $2,067.00
  Account #:   XXXXXXXXXXXX7844
  Approval #:  21954B
  Transaction #:  504
  23903190338

Order stamps at USPS.com/shop or
call 1-800-Stamp24.  Go to
USPS.com/clicknship to print

shipping labels with postage.  For
other information call
1-800-ASK-USPS.

Bill#:1000309280083
Clerk:03

All sales final on stamps and postage.
Refunds for guaranteed services only.
     Thank you for your business.

            Customer Copy
```



that was easy.

Low prices. Every Item. Every day.
110% Price-Match. Guaranteed.
2310 Jericho Turnpike
Garden City Park, NY 11040
(516) 739-3909

SALE              364878 5 005 17893
                  0248 05/10/07 12:38

#############################

$5,000 SHOPPING SPREE AT STAPLES!
          ENTER TO WIN!

We care about what you think!
Take a short survey and be entered
into a monthly drawing.  Just log on to
     www.staples-survey.com
     or call 1-500-890-7905

Your survey code: 0100 3683 3437 5025

***Tome nuestra encuesta en español en
la página del Internet o por teléfono.
Consiga las reglas en la tienda.***

        See store for rules.
   Survey code expires 05/17/2007.
#############################

QTY SKU                      OUR PRICE

REWARDS NUMBER 2259509808
3900 20014 B2W2 PSTL
    381439      0.105ea      346.50
3903 MACHINE FOLE2MG
    381720      0.020ea       68.00
SUBTOTAL                     412.50
    Standard Tax 8.625%       55.58



```
DELAWARE NORTH COMPANIES
   Los Angeles Intl. Airport
         Daily Grill

5003 LUIS
---------------------------------
6 1/1         6015
       MAY11'07  4:00PM
---------------------------------

  1 Soft Drink         3.10
  1 Heat Loaf         15.40
  1 Chicken Caesar    13.95
  1 Spag. & Meatbell  12.90
  1 Turkey Brst Sand   9.55
    10 %
    Airport -10%      5.49-

    Subtotal         48.41
    Total Tax         4.05
  6:01 Total Due  $53.49
```

```
            Hudson Group
              Los Angeles Airport
              Los Angeles, CA 90045

Store:742
                             1.68  C:
Beverage WT
                             3.49  Ti
Magazines
                            ------
                             5.48
Sub-Total                     .29
Sales Tax    3.49  8.250%   ------
                             5.77
Sale Total

                            10.00
Cash

                             4.23
Change

  ====              ====
  ****    Thank You    ****
  ****  Have a Great Day!  ****

TRN# 092531      05/11/07      8:08 PM
Terminals 06, Drawer# 01, Cashier# 003150
```

```
            HX34est
         Starbucks T6 AR
     Los Angeles Int'l Airpo

8044 Marleny
---------------------------------
CHK 5721 MAY11'07  8:56PM


  2 TALL ZEN TAZO TE
  1 SPKR ICED COFFEE
    10 %
    10% AIR FOOD DSC

    Subtotal
    Tax
    Amt Paid
    Cash
    Change Due

            HX34est
         Starbucks T6 AR
     Los Angeles Int'l Air
```



```
           HX5H026
        Starbucks T6
    Los Angeles Int'l Airport

1213 Juanita
COR COSE MAY 12'07 10:45AM

  1 GRND ICED COFFEE    2.20
  1 BANANA              1.30

    Subtotal            3.50
    Tax                 -.25
    Amt Paid            3.75
    Cash                6.00
    Change Due          6.21

         HX5H026 T6
      Starbucks T6
  Los Angeles Int'l Airport
```



& & & 495 & & &
*****Espresso Bar ******
LAX RENAISSANCE MORIURA
WENDY

0629 '2MAY'07  9:35AM

SN COFFEE            2.50
IS TOTAL DUE:   $2.50

ASE COMPLETE FOR ROOM CHARGES

TUITY_____

AL_____

H NUMBER_____

HT LAST NAME._____

GNATURE_____

---

SUSHI BOY
LAX
THANK YOU!

06/12/2007    000000
#3532    1:51PM SERV.0020002

MINI CR BOWL        $4.00
BOTTLE WATER        $2.80
ROSE ST             $6.50
                   -20.00%
                    -1.36
%1                  $5.44
ROSE ST.            $0.45
TAX1

***TOTAL           $5.89
CASH              $10.00
CHANGE             $4.11

---

SUSHI BOY
LAX
THANK YOU!

06/12/2007    000000
#3532    1:51PM SERV.0020002

MINI CR BOWL
BOTTLE WATER

---

HNGHOST
LOS ANGELES INT'L AIRPORT
LOS ANGELES, CALIFORNIA

7006 RaL7

TRN 043  MAY12'07  9:07PM

685399343SD6D
1 TRACK CAPRI ROLL    35.00

Subtotal              35.00
Tax                    2.80
Amt Paid           37.89
Cash              100.00
Change Due          62.11

THANK YOU, PLEASE COME AGAIN



OFFICE DEPOT

8900 S. SEPULVEDA BLVD.
LOS ANGELES, CA 90045
310-558-0650

Office DEPOT

SALE        S 306906 REG012 TRX4609
05/19/07 16:27  EMP 491408   POS 5.03A

166956 8W D5 LETTER
  200 @ C.025              5.60
167520 8W D5 LETTER
  200 @ 0.020              5.60
          SUBTOTAL         19.60
CA 8.25% SALES TAX          1.62
          TOTAL            21.22
          CASH             22.00
          CHANGE           0.78

OFFICE DEPOT

For a chance to Win
One of 40-$100 or 1-$1000
Quarterly Shopping Sprees,
visit www.od.bizrate.com
En Espanol

THANK YOU


TOTAL = $ 38.54

Ink Depot Toner Replacement Never out of
stock. Guaranteed.

Restrictions apply. Not available in Alaska,
Hawaii or Canada. See store for details.

# *FJC Officers Win Union!*

### Friday, April 27, 2007

*FJC recognizes 32BJ as the union to represent NY Port Authority FJC officers.*



As a result of an overwhelming majority of FJC security officers coming together and signing union authorization cards FJC Security has recognized SEIU, Local 32BJ as the union to represent FJC officers and guards at all of the New York-based Port Authority sites!

Next, the officers will set up a bargaining committee and begin to identify areas where they want to make improvements for negotiations for a union contract.

FJC officers at the New York Port Authority sites would like to encourage you to stand up and fight to get SEIU, Local 32BJ, a union that will support you in getting the wages, benefits and training you deserve.



Sign an Authorization Card & get involved now!

Find out how: Call Lorrie Garcia (212) 388-3132 or Luz Garate (212) 388-3922.



**32BJ**
**SEIU**
Stronger Together

NEIL DIAZ
Organizer

917 417 0229

SERVICE EMPLOYEES INTERNATIONAL UNION, CIC

101 Avenue of the Americas • New York, NY 10013-1991
212.388.3670 • Fax 212.388.3777 • ndiaz@seiu32bj.org



# May 16th NYC Security Organizing Campaign Kick Off Event

## A New Day For Security Officers / Justice for our First Responders

• Security Officers from different security companies throughout the city have come together to stand with their brothers and sisters to fight for better living conditions and to professionalize the security industry.

• **We deserve:** Better wages, affordable health care, adequate training, dignity, and respect in the workplace.

## BE THERE ON MAY 16TH TO STAND FOR JUSTICE!!

### John Street Methodist Church, 44 John Street, 5:30pm

(4, 5, 2, 3, J , M, Z, to Fulton Street A, C to Broadway/Nassau: John Street is 1 Block south of Fulton Street)





101 Avenue of the Americas, 18th Fl.      New York, NY



**"During the five years I've worked at LAX, my co-workers and I have seen a lot of problems...**

**...Allied Union never seemed to care."**

☑ Our pay policies used to tie our union dues to our wages...

☑ Our co-workers got screwed out of their wages and...

☑ When management's...

☑ As far as we know...

## That's why my co-workers and I decided we needed to make a change.

We know what we need. Better than any high paid lawyer does who doesn't do our work. Please join us in making a change for the better by voting for me and sending in your mail ballot today.

## Vote for Jesus. Vote for all of us. Vote for a change.



  



# Attention SUMMIT
# Officers

**We are inviting all officers to attend a meeting in order to learn what the next steps are in our SUMMIT Security Campaign.**

**WHEN:**      **MONDAY**
                **MAY 14, 2007**

**WHERE:**     **Presbyterian Church**
                **Broadway corner of W 114ᵗʰ st**

**TIME:**      **For the midnight shift  @ 7:45 AM**
                **For the Night shift       @ 2:00 PM**
                **For the Day shift         @ 3:45 PM**

**For more information call Ignacio at (212) 388- 3532**

Return

U.S. Department of Labor
Employment Standards
Administration
Office of Labor-Management
Standards
Washington, DC 20210

# FORM LM-2 LABOR ORGANIZATION
# ANNUAL REPORT

MUST BE USED BY LABOR ORGANIZATIONS WITH $250,000 OR
MORE IN TOTAL ANNUAL RECEIPTS AND LABOR ORGANIZATIONS
IN TRUSTEESHIP

Form Approved
Office of Management and
Budget
No. 1215-0188
Expires: 11-30-2005

This report is mandatory under P.L. 86-257, as amended. Failure to comply may result in criminal prosecution, fines, or civil penalties as provided by 29 U.S.C. 439 or 440.

READ THE INSTRUCTIONS CAREFULLY BEFORE PREPARING THIS REPORT.

| For Official Use Only | 1. FILE NUMBER  011-851 | 2. PERIOD COVERED  From  1/1/2006  Through  12/31/2006 | 3. (a) AMENDED - Is this an amended report:  No  (b) HARDSHIP - Filed under the hardship procedures:  No  (c) TERMINAL - This is a terminal report:  No |
|---|---|---|---|

| 4. AFFILIATION OR ORGANIZATION NAME  SERVICE EMPLOYEES | 8. MAILING ADDRESS (Type or print in capital letters) |
|---|---|
| 5. DESIGNATION (Local, Lodge, etc.)  LOCAL UNION | 6. DESIGNATION NBR  32 | First Name  MICHAEL P. | Last Name  FISHMAN |

| 7. UNIT NAME (if any) | P.O Box - Building and Room Number |
|---|---|

| | Number and Street  101 AVENUE OF THE AMERICAS |
|---|---|
| 9. Are your organization's records kept at its mailing address?   Yes | City  NEW YORK |
| | State  NY | ZIP Code + 4  10013-1906 |

Each of the undersigned, duly authorized officers of the above labor organization, declares, under penalty of perjury and other applicable penalties of law, that all of the information submitted in this report (including information contained in any accompanying documents) has been examined by the signatory and is, to the best of the undersigned individual's knowledge and belief, true, correct and complete (See Section V on penalties in the instructions.)

| 26. SIGNED: | Michael P Fishman | PRESIDENT | 27. SIGNED: | Hector J Figueroa | TREASURER |
|---|---|---|---|---|---|
| Date: | Mar 28, 2007 | Contact Info: | 212-388-3800 | Date: | Mar 28, 2007 | Contact Info: | 212-388-3800 |

Form LM-2 (Revised 2003)



DOL Form Report (ERDS)

Page 2 of 48

## ITEMS 10 THROUGH 21

FILE NUMBER 011-681

10. During the reporting period did the labor organization create or participate in the administration of a trust or a fund or organization, as defined in the instructions, which provides benefits for members or beneficiaries?    Yes

11. During the reporting period did the labor organization have a Political Action Committee (PAC) fund?    Yes

12. During the reporting period did the labor organization have an audit or review of its books and records by an outside accountant or by a parent body auditor/representative?    Yes

13. During the reporting period did the labor organization discover any loss or shortage of funds or other assets? (Answer "Yes" even if there has been repayment or recovery.)    Yes

14. What is the maximum amount recoverable under the labor organization's fidelity bond for a loss caused by any officer, employee or agent of the labor organization who handled union funds?    $500,000

15. During the reporting period did the labor organization acquire or dispose of any assets in a manner other than purchase or sale?    Yes

16. Were any of the labor organization's assets pledged as security or encumbered in any way at the end of the reporting period?    Yes

17. Did the labor organization have any contingent liabilities at the end of the reporting period?    Yes

18. During the reporting period did the labor organization have any changes in its constitution or bylaws, other than rates of dues and fees, or in practices/procedures listed in the instructions?    No

19. What is the date of the labor organization's next regular election of officers?    September 2009

Form LM-2 (Revised 2003)

20. How many members did the labor organization have at the end of the reporting period?    78,955

21. What are the labor organization's rates of dues and fees?

| Rates of Dues and Fees | | | | |
|---|---|---|---|---|
| Dues/Fees | Amount | Unit | Minimum | Maximum |
| (a) Regular Dues/Fees | 0 per | MONTH | $29 | $35 |
| (b) Working Dues/Fees | 0 per | MONTH | $0 | $0 |
| (c) Initiation Fees | 0 per | NEW MEMBER | $50 | $150 |
| (d) Transfer Fees | 0 per | MONTH | $0 | $0 |
| (e) Work Permits | 0 per | MONTH | $0 | $0 |

## STATEMENT A - ASSETS AND LIABILITIES

FILE NUMBER: 011-661

| | ASSETS | Schedule Number | Start of Reporting Period (A) | End of Reporting Period (B) |
|---|---|---|---|---|
| **ASSETS** | 22. Cash | | $5,060,600 | $3,514,689 |
| | 23. Accounts Receivable | 1 | $2,551,074 | $2,902,741 |
| | 24. Loans Receivable | 2 | $12,547 | $12,471 |
| | 25. U.S. Treasury Securities | | $695,954 | $1,488,977 |
| | 26. Investments | 5 | $13,341,505 | $6,563,813 |
| | 27. Fixed Assets | 6 | $9,342,474 | $9,341,355 |
| | 28. Other Assets | 7 | $1,619,044 | $1,272,520 |
| | 29. TOTAL ASSETS | | $32,643,498 | $25,406,589 |

| | LIABILITIES | Schedule Number | Start of Reporting Period (A) | End of Reporting Period (B) |
|---|---|---|---|---|
| **LIABILITIES** | 30. Accounts Payable | 8 | $2,777,182 | $3,227,630 |
| | 31. Loans Payable | 9 | $0 | $0 |
| | 32. Mortgages Payable | | $0 | $940,176 |
| | 33. Other Liabilities | 10 | $1,822,776 | $2,091,008 |
| | 34. TOTAL LIABILITIES | | $4,599,957 | $6,258,814 |

| 35. NET ASSETS | | | $28,043,541 | $22,147,755 |

Form LM-2 (Revised 2003)

DOL Form Report (BRDS)

## STATEMENT B - RECEIPTS AND DISBURSEMENTS

FILE NUMBER: 011-661

| CASH RECEIPTS | SCH | AMOUNT |
|---|---|---|
| 36. Dues and Agency Fees | | $49,784,514 |
| 37. Per Capita Tax | | $0 |
| 38. Fees, Fines, Assessments, Work Permits | | $799,800 |
| 39. Sale of Supplies | | $0 |
| 40. Interest | | $558,909 |
| 41. Dividends | | $440,476 |
| 42. Rents | | $340,300 |
| 43. Sale of Investments and Fixed Assets | 3 | $3,878,000 |
| 44. Loans Obtained | 9 | $0 |
| 45. Repayments of Loans Made | 2 | $35,033 |
| 46. On Behalf of Affiliates for Transmittal to Them | | $1,025,206 |
| 47. From Members for Disbursement on Their Behalf | | $0 |
| 48. Other Receipts | 14 | $5,113,098 |
| 49. TOTAL RECEIPTS | | $62,072,464 |

| CASH DISBURSEMENTS | SCH | AMOUNT |
|---|---|---|
| 50. Representational Activities | 15 | $21,934,787 |
| 51. Political Activities and Lobbying | 16 | $3,747,200 |
| 52. Contributions, Gifts, and Grants | 17 | $703,788 |
| 53. General Overhead | 18 | $10,264,925 |
| 54. Union Administration | 19 | $3,434,400 |
| 55. Benefits | 20 | $7,055,335 |
| 56. Per Capita Tax | | $12,175,508 |
| 57. Strike Benefits | | $18,815 |
| 58. Fees, Fines, Assessments, etc. | | $0 |
| 59. Supplies for Resale | | $0 |
| 60. Purchase of Investments and Fixed Assets | 4 | $2,581,536 |
| 61. Loans Made | 2 | $34,557 |
| 62. Repayment of Loans Obtained | 9 | $0 |
| 63. To Affiliates of Funds Collected on Their Behalf | | $973,643 |
| 64. On Behalf of Individual Members | | $0 |
| 65. Direct Taxes | | $1,668,473 |
| | | |
| 66. Subtotal | | $63,681,544 |
| 67. Withholding Taxes and Payroll Deductions | | |
| 67a. Total Withheld | $5,997,601 | |
| 67b. Less Total Disbursed | $5,974,332 | |
| 67c. Total Withheld But Not Disbursed | | $23,269 |
| 68. TOTAL DISBURSEMENTS | | $63,636,276 |

Form LM-2 (Revised 2003)

DOL Form Report (ERDS)                                                    Page 5 of 48

## SCHEDULE 1 - ACCOUNTS RECEIVABLE AGING SCHEDULE          FILE NUMBER: 011-651

| Entity or Individual Name (A) | Total Account Receivable (B) | 30-180 Days Past Due (C) | 180+ Days Past Due (D) | Unliquidated Account Receivable (E) |
|---|---|---|---|---|
| AMERICAN BUILDING MAINTENANCE | $5,429 | $5,429 | $0 | $0 |
| BROWN, HARRIS, STEVENS RESIDENTIAL MANAGEMENT LLC | $7,204 | $7,204 | $0 | $0 |
| CHARLES H GREENTHAL | $9,216 | $9,216 | $0 | $0 |
| CLEANERS OF AMERICA | $9,019 | $9,019 | $0 | $0 |
| DOUGLAS ELLIMAN PROPERTY MANAGEMENT | $12,960 | $12,960 | $0 | $0 |
| HARVARD MAINTENANCE INC. | $5,632 | $5,632 | $0 | $0 |
| J & C LAMB MANAGEMENT CORP. | $7,249 | $7,249 | $0 | $0 |
| PBM | $9,799 | $9,799 | $0 | $0 |
| ROSE ASSOCIATES INC. | $6,234 | $6,234 | $0 | $0 |
| SHAMROCK BUILDING SERVICES | $27,347 | $27,347 | $0 | $0 |
| TUDOR REALTY SERVICES CORP. | $10,518 | $10,518 | $0 | $0 |
| USSI / AEROSTAR | $11,182 | $11,182 | $0 | $0 |
| W & M PROPERTIES | $11,476 | $11,476 | $0 | $0 |
| Totals from all other accounts receivable | $2,470,294 | | | $0 |
| TOTALS (Column (B) Total will be automatically entered in Item 25, Column (B)) | $2,602,741 | $132,477 | $0 | $0 |

Form LM-2 (Revised 2003)

DOL Form Report (ERDS)                                                      Page 6 of 48

## SCHEDULE 2 - LOANS RECEIVABLE                        FILE NUMBER: 011-681

| List below loans to officers, employees, or members which at any time during the reporting period exceeded $250 and list all loans to business enterprises regardless of amount. (A) | Loans Outstanding at Start of Period (B) | Loans Made During Period (C) | Cash (D)(1) | Other Than Cash (D)(2) | Loans Outstanding at End of Period (E) |
|---|---|---|---|---|---|
| Name: OLEKANMA, NWABUEZ - E<br>Purpose: AUTO LOAN<br>Security: LAST PAYCHECK<br>Terms: $50/WEEK | $1,749 | $1,999 | $2,349 | $0 | $1,399 |
| Name: QUIROZ, RICARDO<br>Purpose: AUTO LOAN<br>Security: NONE<br>Terms: LEGL ACT TO COLL | $1,410 | $0 | $0 | $0 | $1,410 |
| Name: ALVARADO, JULIAN<br>Purpose: AUTO LOAN<br>Security: NONE<br>Terms: LEGL ACT TO COLL | $1,249 | $0 | $0 | $0 | $1,249 |
| Name: BERNARDEZ, ALBERTO - O<br>Purpose: AUTO LOAN<br>Security: LAST PAYCHECK<br>Terms: $50/WEEK | $849 | $0 | $849 | $0 | $0 |
| Name: LENYA, GUILLERMO - E<br>Purpose: AUTO LOAN<br>Security: LAST PAYCHECK<br>Terms: $50/WEEK | $499 | $0 | $499 | $0 | $0 |
| Name: MOTERROSA, ARMANDO - E<br>Purpose: AUTO LOAN<br>Security: LAST PAYCHECK<br>Terms: $50/WEEK | $599 | $2,050 | $1,550 | $0 | $1,099 |
| Name: PATTERSON, JOHNNIE - E<br>Purpose: AUTO LOAN<br>Security: LAST PAYCHECK<br>Terms: $50/WEEK | $899 | $1,999 | $1,949 | $0 | $849 |
| Name: BOLDEN, TREVOR - E<br>Purpose: AUTO LOAN<br>Security: LAST PAYCHECK<br>Terms: $50/WEEK | $850 | $0 | $850 | $0 | $0 |
| Name: CABRERA-APONTE, LEGNA - E<br>Purpose: AUTO LOAN<br>Security: LAST PAYCHECK<br>Terms: $50/WEEK | $599 | $0 | $599 | $0 | $0 |
| Name: CARSADEY, MICHAEL - E<br>Purpose: AUTO LOAN<br>Security: LAST PAYCHECK<br>Terms: $50/WEEK | $1,249 | $0 | $1,249 | $0 | $0 |
| Name: KRAVETZ, ADAM - E<br>Purpose: AUTO LOAN<br>Security: LAST PAYCHECK<br>Terms: $50/WEEK | $1,799 | $0 | $1,799 | $0 | $0 |
| Name: MATO, JOHN - E<br>Purpose: AUTO LOAN<br>Security: LAST PAYCHECK<br>Terms: $50/WEEK | $899 | $0 | $899 | $0 | $0 |
| Name: ROJAS, JOEL - E<br>Purpose: AUTO LOAN<br>Security: LAST PAYCHECK<br>Terms: $50/WEEK | $99 | $1,999 | $2,099 | $0 | $0 |
| Name: RODRIGUEZ, SYLVIA - E<br>Purpose: AUTO LOAN | | | | | |

| | | | | |
|---|---|---|---|---|
| Security: LAST PAYCHECK<br>Terms: $50/WEEK | $299 | $1,999 | $2,298 | $0 | $0 |
| Name: ALONZO, MARGARITA - E<br>Purpose: AUTO LOAN<br>Security: LAST PAYCHECK<br>Terms: $50/WEEK | $69 | $0 | $69 | $0 | $0 |
| Name: BENITES, LAZARO - E<br>Purpose: AUTO LOAN<br>Security: LAST PAYCHECK<br>Terms: $50/WEEK | $0 | $1,999 | $1,899 | $0 | $0 |
| Name: CABRERA, PATRICIA - O<br>Purpose: AUTO LOAN<br>Security: LAST PAYCHECK<br>Terms: $50/WEEK | $0 | $1,909 | $1,800 | $0 | $399 |
| Name: FRANCO, DANILO - E<br>Purpose: AUTO LOAN<br>Security: LAST PAYCHECK<br>Terms: $50/WEEK | $0 | $1,899 | $350 | $0 | $1,649 |
| Name: GARATE, LUZ - E<br>Purpose: AUTO LOAN<br>Security: LAST PAYCHECK<br>Terms: $50/WEEK | $0 | $1,872 | $1,800 | $0 | $72 |
| Name: GARCIA, GALO - E<br>Purpose: AUTO LOAN<br>Security: LAST PAYCHECK<br>Terms: $50/WEEK | $0 | $1,999 | $1,700 | $0 | $299 |
| Name: HENRY, LASHAWN - E<br>Purpose: AUTO LOAN<br>Security: LAST PAYCHECK<br>Terms: $50/WEEK | $0 | $3,096 | $3,349 | $0 | $649 |
| Name: HERNANDEZ, JUAN - O<br>Purpose: AUTO LOAN<br>Security: LAST PAYCHECK<br>Terms: $50/WEEK | $0 | $1,999 | $700 | $0 | $1,299 |
| Name: LAWSON, TOMMIE - E<br>Purpose: AUTO LOAN<br>Security: LAST PAYCHECK<br>Terms: $75/WEEK | $0 | $1,999 | $1,899 | $0 | $0 |
| Name: MITCHELL, JERRY J - E<br>Purpose: AUTO LOAN<br>Security: LAST PAYCHECK<br>Terms: $50/WEEK | $0 | $664 | $460 | $0 | $204 |
| Name: ORTIZ, GEORGE A<br>Purpose: AUTO LOAN<br>Security: NONE<br>Terms: LEGL ACT TO COLL | $0 | $1,995 | $850 | $0 | $1,145 |
| Name: SANCHEZ, GLADYS  E<br>Purpose: AUTO LOAN<br>Security: LAST PAYCHECK<br>Terms: $50/WEEK | $0 | $1,999 | $1,350 | $0 | $649 |
| Name: ALCANTARA MARIGEL - E<br>Purpose: AUTO LOAN<br>Security: LAST PAYCHECK<br>Terms: $50/WEEK | $0 | $1,999 | $1,999 | $0 | $0 |
| Total of loans not listed above | | | | | $0 |
| Total of all lines | $12,947 | $34,557 | $35,033 | $0 | $12,471 |
| Totals will be automatically entered in... | Item 24<br>Column (A) | Item 61 | Item 46 | Item 69<br>with<br>Explanation | Item 24<br>Column (D) |

Form LM-2 (Revised 2003)

## SCHEDULE 3 - SALE OF INVESTMENTS AND FIXED ASSETS

FILE NUMBER: 011-651

| Description (if land or buildings give location) (A) | Cost (B) | Book Value (C) | Gross Sales Price (D) | Amount Received (E) |
|---|---|---|---|---|
| SHORT TERM INVESTMENTS - US TREASURY | $5,426,071 | $5,426,071 | $5,426,071 | $5,426,071 |
| MUTUAL FUNDS | $5,270,710 | $4,681,580 | $4,681,580 | $4,681,580 |
| US GOVERNMENT OBLIGATIONS | $3,646,987 | $3,629,011 | $3,629,011 | $3,629,011 |
| CORPORATE BONDS | $1,619,536 | $1,625,400 | $1,625,400 | $1,625,400 |
| US TREASURY NOTES | $599,133 | $598,969 | $598,969 | $598,969 |
| Total of all lines | $16,562,437 | $15,961,031 | $15,961,031 | $15,961,031 |
| | | | 14. Less Reinvestments | $12,083,031 |
| (Net Sales total will automatically entered in Item 43) | | | 16. Net Sales | $3,878,000 |

Form LM-2 (Revised 2003)

DOL Form Report (ERDS)

## SCHEDULE 4 - PURCHASE OF INVESTMENTS AND FIXED ASSETS   FILE NUMBER: 011-661

| Description (if land or buildings, give location) (A) | Cost (B) | Book Value (C) | Cash Paid (D) |
|---|---|---|---|
| SHORT-TERM INVESTMENTS - US TREASURY | $6,824,385 | $6,824,385 | $6,824,385 |
| MUTUAL FUNDS | $3,500,000 | $3,500,000 | $3,500,000 |
| US GOVERNMENT OBLIGATIONS | $2,196,712 | $2,196,712 | $2,196,712 |
| OFFICE FURNITURE AND EQUIPMENT | $582,606 | $582,606 | $582,606 |
| CORPORATE BONDS | $522,550 | $522,550 | $522,550 |
| BUILDING IMPROVEMENTS | $469,686 | $469,686 | $469,686 |
| LEASEHOLD IMPROVEMENTS | $348,647 | $348,647 | $348,647 |
| Total of all lines | $14,444,586 | $14,444,585 | $14,444,586 |
| | | 14. Less Reinvestments | $12,083,031 |
| (Net Purchases total will automatically entered in Item 60) | | 15. Net Purchases | $2,361,536 |

Form LM-2 (Revised 2003)

## SCHEDULE 5 - INVESTMENTS

FILE NUMBER: 011-661

| Description (A) | Amount (B) |
|---|---|
| **Marketable Securities** | |
| 1. Total Cost | $9,228,607 |
| 2. Total Book Value | $9,242,612 |
| 3. List each marketable security which has a book value over $5000 and exceeds 5% of Line 2. | |
| ж U.S. GOVERNMENT OBLIGATIONS | $3,349,027 |
| ж CORPORATE BONDS | $3,589,724 |
| ж MUTUAL FUNDS | $2,310,361 |
| **Other Investments** | |
| 4. Total Cost | $596,622 |
| 5. Total Book Value | $321,201 |
| 6. List each other investment which has a book value over $5000, of Line 5. Also list each Trust which is an investment. | |
| ж OFFICE OF THE CONTRACT ARBITRATOR | $231,201 |
| ж STATE OF ISRAEL BONDS | $90,000 |
| 7. Total of Lines 2 and 5 (Total will be automatically entered in Item 26, Column(D)) | $9,563,813 |

Form LM-2 (Revised 2003)

DOL Form Report (ERDS)

## SCHEDULE 6 - FIXED ASSETS

FILE NUMBER: 011-081

| Description (A) | Cost or Other Basis (B) | Total Depreciation or Amount Expensed (C) | Book Value (D) | Value (E) |
|---|---|---|---|---|
| 1. Land (give location) | $0 | | $0 | $0 |
| 3. LEASEHOLD IMPROVEMENTS (NEW YORK) | $24,407,464 | $17,156,491 | $7,250,963 | $7,250,963 |
| 3. BUILDING AND IMPROVEMENTS (WASHINGTON DC) | $1,705,755 | $36,299 | $1,669,456 | $1,669,456 |
| 5. Automobiles and Other Vehicles | $31,479 | $29,540 | $1,939 | $1,939 |
| 6. Office Furniture and Equipment | $8,763,923 | $7,744,926 | $1,018,997 | $1,018,997 |
| 7. Other Fixed Assets | $0 | $0 | $0 | $0 |
| 8. Totals of Lines 1 through 7 (Column(D) Total will be automatically entered in Item 27, Column(B)) | $34,908,511 | $24,967,256 | $9,941,355 | $9,941,355 |

Form: LM-2 (Revised 2003)

## SCHEDULE 7 - OTHER ASSETS

FILE NUMBER: 011-061

| Description<br>(A) | Book Value<br>(B) |
|---|---|
| PREPAID EXPENSES | $472,181 |
| DUE FROM AFFILIATES | $313,882 |
| STRIKE FUND REIMBURSEMENT RECEIVABLE | $285,708 |
| INVESTMENT INCOME RECEIVABLE | $126,445 |
| SECURITY DEPOSITS | $60,319 |
| RENTAL INCOME RECEIVABLE | $14,188 |
| Total Other Assets (Total will be automatically entered in Item 28, Column(B)) | $1,272,623 |

Form LM-2 (Revised 2003)

DOL Form Report (ERDS)

## SCHEDULE 8 - ACCOUNTS PAYABLE AGING SCHEDULE

FILE NUMBER: 011-664

| Entity or Individual Name (A) | Total Account Payable (B) | 90-180 Days Past Due (C) | 180+ Days Past Due (D) | Liquidated Account (E) |
|---|---|---|---|---|
| Total from all other accounts payable | $3,227,530 | $0 | $0 | $0 |
| Total Accounts Payable (Column(B) Total will be automatically entered in Item 39, Column(D)) | $3,227,530 | $0 | $0 | $0 |

Form LM-2 (Revised 2003)

## SCHEDULE 9 - LOANS PAYABLE

FILE NUMBER: 011-661

There was no data found for this schedule.

## SCHEDULE 10 – OTHER LIABILITIES

FILE NUMBER: 011-661

| Description (A) | Amount at End of Period (B) |
|---|---|
| SEVERANCE PAYABLE | $766,159 |
| DUE TO AFFILIATES | $475,364 |
| DUE TO SEIU LOCAL 74 | $400,000 |
| VACATION PAYABLE | $198,045 |
| DEFERRED COMPENSATION PLAN | $176,878 |
| PAYROLL DEDUCTIONS PAYABLE | $67,150 |
| SECURITY DEPOSITS | $19,412 |
| Total Other Liabilities [Total will be automatically entered in Item 33, Column (D)] | $2,091,008 |

Form LM-2 (Revised 2003)

DOL Form Report (ERDS)                                                  Page 15 of 48

## SCHEDULE 11 - ALL OFFICERS AND DISBURSEMENTS TO OFFICERS

FILE NUMBER: D11-981

| (A) Name | (B) Title | (C) Status | (D) Gross Salary Disbursements (before any deductions) | (E) Allowances Disbursed | (F) Disbursements for Official Business | (G) Other Disbursements not reported in (D) thru (F) | (H) TOTAL |
|---|---|---|---|---|---|---|---|
| A. MICHAEL P FISHMAN | B. PRESIDENT | C. | $199,920 | $7,800 | $5,696 | $0 | $213,476 |
| I. Schedule 15 Representational Activities | 40 % | Schedule 16 Political Activities and Lobbying | 10 % Schedule 17 Contributions | 5 % Schedule 18 General Overhead | 10 % Schedule 19 Administration | 35 % |
| A. KEVIN J DOYLE | B. EXEC VICE PRES | C. | $175,346 | $7,680 | $3,346 | $280 | $186,652 |
| I. Schedule 15 Representational Activities | 65 % | Schedule 16 Political Activities and Lobbying | 10 % Schedule 17 Contributions | 0 % Schedule 18 General Overhead | 0 % Schedule 19 Administration | 25 % |
| A. HECTOR FIGUEROA | B. SECRETARY-TREAS | C. | $178,598 | $7,800 | $722 | $0 | $187,116 |
| I. Schedule 15 Representational Activities | 80 % | Schedule 16 Political Activities and Lobbying | 4 % Schedule 17 Contributions | 1 % Schedule 18 General Overhead | 0 % Schedule 19 Administration | 15 % |
| A. KYLE E BRAGG | B. VICE PRESIDENT | C. | $143,149 | $7,800 | $3,738 | $0 | $154,687 |
| I. Schedule 15 Representational Activities | 70 % | Schedule 16 Political Activities and Lobbying | 10 % Schedule 17 Contributions | 0 % Schedule 18 General Overhead | 0 % Schedule 19 Administration | 20 % |
| A. LENORE FRIEDLAENDER | B. VICE PRESIDENT | C. | $131,537 | $7,950 | $35 | $728 | $140,250 |
| I. Schedule 15 Representational Activities | 90 % | Schedule 16 Political Activities and Lobbying | 5 % Schedule 17 Contributions | 0 % Schedule 18 General Overhead | 0 % Schedule 19 Administration | 5 % |
| A. BRIAN K LAMBERT | B. VICE PRESIDENT | C. | $157,706 | $7,800 | $653 | $0 | $166,159 |
| I. Schedule 15 | | Schedule 16 Political | | Schedule 17 | Schedule 18 | Schedule 19 | |

DOL Form Report (ERDS)                                                 Page 16 of 48

| | Representational Activities | 80 % | Activities and Lobbying | 0 % | Contributions | 0 % | General Overhead | 0 % | Administration | 20 % |
|---|---|---|---|---|---|---|---|---|---|---|
| A B D C N | VALARIE P LONG VICE PRESIDENT | | | $122,005 | | $7,000 | | $1,981 | | $0 | $132,089 |
| I | Schedule 15 Representational Activities | 25 % | Schedule 16 Political Activities and Lobbying | 10 % | Schedule 17 Contributions | 10 % | Schedule 18 General Overhead | 10 % | Schedule 19 Administration | 45 % |
| A B C P | KRYSTYNA ROSARIO SECRETARY | | | $108,829 | | $10,350 | | $0 | | $0 | $119,179 |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 98 % | Schedule 19 Administration | 2 % |
| A B C | JEFFREY ABRAMSON DIST REC SEC | | | $81,514 | | $5,800 | | $0 | | $0 | $87,314 |
| I | Schedule 15 Representational Activities | 92 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 4 % |
| A B C | NAPOLEAN ALSTON DIST REC SEC | | | $0 | | $2,100 | | $46 | | $0 | $2,146 |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 100 % |
| A B C | ALBERTO BERNARDEZ DIST REC SEC | | | $73,340 | | $10,400 | | $6,990 | | $0 | $90,730 |
| I | Schedule 15 Representational Activities | 90 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 1 % | Schedule 19 Administration | 5 % |
| A B C | FRANK BONURA DIST CHAIRPER | | | $56,441 | | $11,000 | | $0 | | $0 | $67,441 |
| I | Schedule 15 Representational Activities | 92 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 4 % |
| A B C | KEVIN R BROWN DIST CHAIRPER | | | $101,490 | | $10,400 | | $2,840 | | $0 | $114,730 |

| | Schedule 15 Representational Activities | 75 % | Schedule 16 Political Activities and Lobbying | 10 % | Schedule 17 Contributions | 1 % | Schedule 18 General Overhead | 4 % | Schedule 19 Administration | 10 % |
|---|---|---|---|---|---|---|---|---|---|---|
| A B C | PATRICIA CABRERRA DIST REC SEC N | | | $80,059 | | $10,500 | | $580 | | $0 | $91,145 |
| | Schedule 15 Representational Activities | 93 % | Schedule 16 Political Activities and Lobbying | 2 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 5 % |
| A B C | STEVEN CHARCALLA DIST BOARD MEM N | | | $0 | | $363 | | $0 | | $0 | $363 |
| | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 100 % |
| A B C | VINCENT CONKLIN DIST REC SEC P | | | $0 | | $175 | | $0 | | $0 | $175 |
| | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 100 % |
| A B C | JAIME CONTRERAS DIST CHAIRPER N | | | $95,808 | | $10,400 | | $1,874 | | $0 | $108,082 |
| | Schedule 15 Representational Activities | 70 % | Schedule 16 Political Activities and Lobbying | 2 % | Schedule 17 Contributions | 15 % | Schedule 18 General Overhead | 8 % | Schedule 19 Administration | 5 % |
| A B C | BRIAN CORCORAN DIST BOARD MEM C | | | $0 | | $1,452 | | $747 | | $0 | $2,199 |
| | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 100 % |
| A B C | MARC DAVIDSON DIST BOARD MEM P | | | $0 | | $1,331 | | $0 | | $0 | $1,331 |
| | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 100 % |
| A B C | EDWARD DOWLING DIST REC SEC C | | | $0 | | $2,100 | | $72 | | $0 | $2,172 |

| | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 100 % |
|---|---|---|---|---|---|---|---|---|---|---|
| A B C | JOHN EGAN AT-LARGE EXEC | | | $0 | | $1,452 | | $0 | | $0 | $1,452 |
| | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 100 % |
| A B C | CHRISTINE FORBES DIST BOARD MEM | | | $8,634 | | $805 | | $260 | | $0 | $7,800 |
| | Schedule 15 Representational Activities | 86 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 14 % |
| A B C | THOMAS M GIORDANO DIST CHAIRPER | | | $109,784 | | $7,800 | | $1,959 | | $0 | $119,553 |
| | Schedule 15 Representational Activities | 90 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 5 % |
| A B C | JUAN R HERNANDEZ DIST REC SEC | | | $80,058 | | $10,400 | | $161 | | $0 | $90,619 |
| | Schedule 15 Representational Activities | 90 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 1 % | Schedule 19 Administration | 5 % |
| A B N | KATHERINE HOWELL DIST REC SEC | | | $66,250 | | $11,000 | | $443 | | $0 | $77,693 |
| | Schedule 15 Representational Activities | 96 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B N | DENIS J JOHNSTON DIST CHAIRPER | | | $101,490 | | $7,800 | | $87 | | $0 | $109,377 |
| | Schedule 15 Representational Activities | 90 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 6 % |
| A B | DONALD KILLINGS AT-LARGE EXEC | ---- | | $0 | | $1,452 | | $487 | | $0 | $1,939 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| B | C | | | | | | | | | | |
| C | | | | | | | | | | | |
| | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 100 % |
| A | HENRY KOERNER | | | | | | | | | | |
| B | DIST REC SEC | | | $0 | | $2,400 | | $0 | | $0 | $2,400 |
| C | | | | | | | | | | | |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 100 % |
| A | BERNARD KURTZE | | | | | | | | | | |
| B | DIST CHAIRPER | | | $0 | | $2,450 | | $580 | | $0 | $2,980 |
| C | | | | | | | | | | | |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 100 % |
| A | LUCIA LAZO | | | | | | | | | | |
| B | DIST BOARD MEM | | | $0 | | $363 | | $0 | | $0 | $363 |
| N | | | | | | | | | | | |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 100 % |
| A | LEO J LOVE | | | | | | | | | | |
| B | DIST REC SEC | | | $55,265 | | $11,000 | | $0 | | $0 | $66,265 |
| C | | | | | | | | | | | |
| I | Schedule 15 Representational Activities | 70 % | Schedule 16 Political Activities and Lobbying | 10 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 10 % | Schedule 19 Administration | 10 % |
| A | JAMES LUNA | | | | | | | | | | |
| B | DIST BOARD MEM | | | $0 | | 51,452 | | $618 | | $0 | $2,070 |
| C | | | | | | | | | | | |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 100 % |
| A | WAYNE W MACMANIMAN JR | | | | | | | | | | |
| B | DIST CHAIRPER | | | $97,799 | | $10,400 | | $4,580 | | $0 | $112,779 |
| C | | | | | | | | | | | |
| I | Schedule 15 Representational Activities | 50 % | Schedule 16 Political Activities and Lobbying | 20 % | Schedule 17 Contributions | 10 % | Schedule 18 General Overhead | 10 % | Schedule 19 Administration | 10 % |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| A B C | DONALD MCCAFFREY DIST BOARD MEM | | | $0 | $1,452 | $47 | | $0 | $1,499 |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 100 % |
| A B C | GERARD MCENEANEY AT-LARGE EXEC | | | $80,089 | $7,800 | $52 | | $0 | $87,911 |
| I | Schedule 15 Representational Activities | 92 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 4 % |
| A B C | ELPIDIO MOLINA AT-LARGE EXEC | | | $7,850 | $2,002 | $1,061 | | $0 | $10,713 |
| I | Schedule 15 Representational Activities | 85 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 15 % |
| A B C P | FRANK A MONACO DIST REC SEC | | | $52,361 | $5,200 | $0 | | $0 | $57,561 |
| I | Schedule 15 Representational Activities | 92 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 4 % |
| A B C | WILSON MONTALVO DIST REC SEC | | | $80,059 | $5,800 | $0 | | $0 | $85,859 |
| I | Schedule 15 Representational Activities | 92 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 4 % |
| A B C | PATRICIA MURCHISON DIST BOARD MEM | | | $0 | $1,452 | $1,169 | | $0 | $2,620 |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 100 % |
| A B C P | ROBERT NARDUCCI DIST BOARD MEM | | | $0 | $1,331 | $0 | | $0 | $1,331 |
| I | Schedule 15 Representational | 0 % | Schedule 16 Political Activities and | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General | 0 % | Schedule 19 Administration | 100 % |

| | Activities | | Lobbying | | | | Overhead | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| A B N | NIGEL   NILES <br> DIST BOARD MEM | | | $0 | $363 | $2,056 | | $0 | | $2,429 |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 100 % |
| A B C | JOHN   PAGNOTTA <br> DIST CHAIRPER | | | $101,493 | $7,805 | $232 | | $0 | | $109,522 |
| I | Schedule 15 Representational Activities | 80 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 8 % |
| A B N | LOUIS   PARRON <br> DIST BOARD MEM | | | $0 | $1,331 | $34 | | $0 | | $1,365 |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 100 % |
| A B C | WILLIE   PETERSON <br> DIST BOARD MEM | | | $0 | $1,452 | $0 | | $0 | | $1,452 |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 100 % |
| A B P | ESTHER   RAMIREZ <br> DIST BOARD MEM | | | $0 | $1,331 | $0 | | $0 | | $1,331 |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 100 % |
| A B N | ABEL   RODRIGUEZ <br> DIST BOARD MEM | | | $0 | $1,467 | $560 | | $0 | | $2,027 |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 100 % |
| A B C | PERRY M  SAFFIOTI <br> DIST BOARD MEM | | | $8,592 | $913 | $0 | | $0 | | $9,505 |
| | Schedule 15 | | Schedule 15 | | | | Schedule 16 | | | |

| | Representational Activities | 85 % | Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | General Overhead | 0 % | Schedule 19 Administration | 15 % |
|---|---|---|---|---|---|---|---|---|---|---|
| A B C | ISRAEL    SANTIAGO DIST REC SEC | | | $61,826 | $11,000 | | $67 | | $0 | $72,893 |
| I | Schedule 15 Representational Activities | 86 % | Schedule 16 Political Activities and Lobbying | 10 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 5 % |
| A B C | JOHN    SANTOS DIST CHAIRPER | | | $101,490 | $9,300 | | $174 | | $0 | $110,964 |
| I | Schedule 15 Representational Activities | 90 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 6 % |
| A B C | ALFREDA    SIMPKINS DIST CHAIRPER | | | $0 | $2,000 | | $139 | | $0 | $2,159 |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 100 % |
| A B P | SAMUEL    SPANN DIST BOARD MEM | | | $0 | $1,332 | | $0 | | $0 | $1,334 |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 100 % |
| A B C | ANTHONY    SPATARO DIST CHAIRPER | | | $103,335 | $10,400 | | $67 | | $0 | $113,802 |
| I | Schedule 15 Representational Activities | 90 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 6 % |
| A B C | MARIA    STAWARZ DIST BOARD MEM | | | $0 | $1,452 | | $0 | | $0 | $1,452 |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 100 % |
| A B C | KEVN    STAVRIS DIST REC SEC N | | | $80,058 | $5,600 | | $0 | | $0 | $85,658 |

DOL Form Report (ERDS)                                                  Page 23 of 48

| | Schedule 15 Representational Activities | 92 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 4 % |
|---|---|---|---|---|---|---|---|---|---|---|
| A B C | GENE   SZYMANSKI DIST REC SEC | | | $80,058 | $11,000 | | $0 | | $0 | $91,058 |
| | Schedule 15 Representational Activities | 92 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 4 % |
| A B C | RICHARD   THOMPSON DIST BOARD MEM N | | | $1,799 | $271 | | $1,161 | | $0 | $3,231 |
| | Schedule 15 Representational Activities | 60 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 40 % |
| A B C | KURT  P  WESTBY DIST CHAIRPER G | | | $103,335 | $10,400 | | $194 | | $0 | $113,929 |
| | Schedule 15 Representational Activities | 70 % | Schedule 16 Political Activities and Lobbying | 10 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 10 % | Schedule 19 Administration | 10 % |
| A B C | ROBERT  J  WILSON DIST CHAIRPER | | | $103,335 | $7,800 | | $640 | | $0 | $111,775 |
| | Schedule 15 Representational Activities | 90 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 6 % |

| Total Officer Disbursements | $3,108,636 | $310,144 | $46,143 | $879 | $3,665,801 |
|---|---|---|---|---|---|
| Less Deductions | | | | | $1,240,753 |
| Net Disbursements | | | | | $2,315,148 |

Form LM-2 (Revised 2003)

DOL Form Report (ERDS)

## SCHEDULE 12 - DISBURSEMENTS TO EMPLOYEES

FILE NUMBER: 011-661

| (A) Name | (B) Title | (C) Other Payer | (D) Gross Salary Disbursements (before any deductions) | (E) Allowances Disbursed | (F) Disbursements for Official Business | (G) Other Disbursements not reported in (D) thru (F) | (H) TOTAL |
|---|---|---|---|---|---|---|---|
| A HECTOR ABREU B BRIGADE C n/a | | | $23,382 | $1,650 | $905 | $0 | $26,837 |
| I Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % Schedule 19 Administration | 0 % |
| A NANCY AGUILAR B HR STAFF C n/a | | | $35,330 | $0 | $0 | $0 | $35,330 |
| I Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 100 % Schedule 19 Administration | 0 % |
| A BIANCA AGUSTIN B LEAD RESEARCHER C n/a | | | $54,205 | $11,200 | $4,221 | $0 | $69,626 |
| I Schedule 15 Representational Activities | 95 % | Schedule 16 Political Activities and Lobbying | 5 % Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % Schedule 19 Administration | 0 % |
| A MARISOL ALCANTARA B DELEGATE C n/a | | | $60,426 | $10,500 | $0 | $0 | $70,926 |
| I Schedule 15 Representational Activities | 93 % | Schedule 16 Political Activities and Lobbying | 2 % Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % Schedule 19 Administration | 5 % |
| A SHIRLEY ALDEBOL B ORG COORDINATOR C n/a | | | $73,500 | $10,400 | $218 | $0 | $84,118 |
| I Schedule 15 Representational Activities | 70 % | Schedule 16 Political Activities and Lobbying | 20 % Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % Schedule 19 Administration | 10 % |
| A IVAN ALMENDAREZ B BRIGADE C n/a | | | $9,360 | $600 | $7,235 | $0 | $17,195 |
| I Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and | 0 % Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % Schedule 19 Administration | 0 % |

DOL Form Report (ERDS)

| | | Lobbying | | | | | |
|---|---|---|---|---|---|---|---|
| A B C | MARGARITA ALONZO ORG COORDINATOR n/a | | $88,444 | $10,430 | $7,671 | $0 | $86,715 |
| I | Schedule 15 Representational Activities | 95 % | Schedule 16 Political Activities and Lobbying | 3 % Schedule 17 Contributions | 1 % | Schedule 18 General Overhead | 0 % Schedule 19 Administration | 1 % |
| A B C | JAIME ALVARADO BRIGADE n/a | | $12,976 | $0 | $52 | $0 | $12,028 |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % Schedule 19 Administration | 0 % |
| A B C | WANDA ALZAMORA SECRETARY n/a | | $37,659 | $0 | $104 | $0 | $37,763 |
| I | Schedule 15 Representational Activities | 90 % | Schedule 16 Political Activities and Lobbying | 4 % Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 1 % Schedule 19 Administration | 5 % |
| A B C | FRANCISCO ANAYA BRIGADE n/a | | $7,300 | $559 | $5,094 | $0 | $12,952 |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % Schedule 19 Administration | 0 % |
| A B C | MARIA I BAEZ BRIGADE n/a | | $16,685 | $1,060 | $5,463 | $0 | $23,208 |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % Schedule 19 Administration | 0 % |
| A B C | ELIZABETH BAKER ASSC GEN COUNSEL n/a | | $115,455 | $0 | $151 | $0 | $115,806 |
| I | Schedule 15 Representational Activities | 99 % | Schedule 16 Political Activities and Lobbying | 1 % Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % Schedule 19 Administration | 0 % |
| A B C | MILADY BAUTISTA ASST DELEGATE n/a | | $43,788 | $5,800 | $730 | $0 | $50,518 |
| I | Schedule 15 | | Schedule 16 | | | Schedule 18 | | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| I | Representational Activities | 56 % | Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | General Overhead | 0 % | Schedule 19 Administration | 0 % | |
| A B C | ROSA   BAUTISTA CLERK n/a | | | | $36,987 | | $0 | | $0 | | $0 | $36,987 |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 20 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 80 % | |
| A B C | JONATHAN   BEAUFORD RESEARCH INTERN n/a | | | | $14,990 | | $0 | | $0 | | $0 | $14,990 |
| I | Schedule 15 Representational Activities | 95 % | Schedule 16 Political Activities and Lobbying | 5 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % | |
| A B C | FERNANDO   BELLO DELEGATE n/a | | | | $12,768 | $4,470 | | $394 | | $0 | | $17,630 |
| I | Schedule 15 Representational Activities | 100 % | Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % | |
| A B C | LAZARO   BENITES DELEGATE n/a | | | | $39,023 | $11,000 | | $2,876 | | $0 | | $52,899 |
| I | Schedule 15 Representational Activities | 90 % | Schedule 16 Political Activities and Lobbying | 2 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 4 % | Schedule 19 Administration | 4 % | |
| A B C | LUIS D BENITEZ ASST DELEGATE n/a | | | | $48,397 | $11,000 | | $0 | | $0 | | $59,397 |
| I | Schedule 15 Representational Activities | 96 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % | |
| A B C | LINDA D BERMAS CONTRACT COORD n/a | | | | $21,694 | $1,350 | | $0 | | $0 | | $23,044 |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % | |
| A B C | RAYMOND   BERRY BRIGADE n/a | | | | $11,648 | $1,900 | | $3,678 | | $0 | | $17,226 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % | | |
| A B C | MELISSA A SEYER LEGAL SECRETARY n/a | | | | $17,713 | | $0 | | $0 | | $0 | $17,713 |
| | Schedule 15 Representational Activities | 40 % | Schedule 16 Political Activities and Lobbying | 10 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 30 % | Schedule 19 Administration | 20 % | | |
| A B C | JAN BINDAS-TENNEY LEGAL ASSISTANT n/a | | | | $19,499 | $350 | | $8 | | $0 | | $19,857 |
| | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % | | |
| A B C | THOMAS BLACK MEMBERSHIP COORD n/a | | | | $40,615 | | $0 | | $33 | | $0 | $40,648 |
| | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 25 % | Schedule 19 Administration | 75 % | | |
| A B C | TREVOR E BOLDEN DELEGATE n/a | | | | $59,715 | $11,000 | | $48 | | $0 | | $70,763 |
| | Schedule 15 Representational Activities | 80 % | Schedule 16 Political Activities and Lobbying | 10 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 5 % | Schedule 19 Administration | 5 % | | |
| A B C | FRANK BOOTH DELEGATE n/a | | | | $62,387 | $5,900 | | $0 | | $0 | | $68,287 |
| | Schedule 15 Representational Activities | 92 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 4 % | | |
| A B C | DELORES R BOWIE BRIGADE n/a | | | | $12,288 | $600 | | $225 | | $0 | | $13,113 |
| | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % | | |
| A B C | ERICKA N BOZZI ORG COORDINATOR n/a | | | | $74,230 | $10,400 | | $1,702 | | $0 | | $86,332 |

DOL Form Report (ERDS)

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| C | | | | | | | | | |
| I | Schedule 15 Representational Activities | 95 % | Schedule 16 Political Activities and Lobbying | 3 % | Schedule 17 Contributions | 1 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 1 % |
| A | CESAR BRAVO | | | | | | | | |
| B | BRIGADE | | $8,720 | | $850 | | $2,895 | | $0 | $16,418 |
| C | n/a | | | | | | | | |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A | ALBERT R BROOKS | | | | | | | | |
| B | ORGANIZER | | $29,380 | | $3,660 | | $0 | | $0 | $33,040 |
| C | n/a | | | | | | | | |
| I | Schedule 15 Representational Activities | 98 % | Schedule 16 Political Activities and Lobbying | 2 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A | RICARDO BUCHANAN | | | | | | | | |
| B | BRIGADE | | $19,936 | | $1,000 | | $541 | | $0 | $20,477 |
| C | n/a | | | | | | | | |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A | SONIA Y BURGUILLO | | | | | | | | |
| B | ASST COMPLAINT MGR | | $52,861 | | $10,950 | | $298 | | $0 | $63,809 |
| C | n/a | | | | | | | | |
| I | Schedule 15 Representational Activities | 96 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A | ISSA L BURGUILLO | | | | | | | | |
| B | ASST COMPLAINT MGR | | $23,902 | | $6,130 | | $0 | | $0 | $32,032 |
| C | n/a | | | | | | | | |
| I | Schedule 15 Representational Activities | 96 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A | CARLOS CABRERA | | | | | | | | |
| B | BRIGADE | | $41,339 | | $4,850 | | $899 | | $0 | $46,689 |
| C | n/a | | | | | | | | |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A | JORGE R CABRERA | | $33,515 | | $2,120 | | $41 | | $0 | $35,676 |
| B | BRIGADE | | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| B | n/a | | | | | | | | |
| C | | | | | | | | | |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |

| | | | | | |
|---|---|---|---|---|---|
| A | SUSAN CASEY | | | | |
| B | RESEARCH INTERN | $24,720 | $0 | $1,576 | $0 | $26,296 |
| n/a | | | | | |
| I | Schedule 15 Representational Activities | 95 % | Schedule 16 Political Activities and Lobbying | 5 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |

| A | MICHAEL CASSADAY | | | | |
| B | RESEARCHER | $38,905 | $10,850 | $1,356 | $0 | $50,510 |
| n/a |
| I | Schedule 15 Representational Activities | 85 % | Schedule 16 Political Activities and Lobbying | 5 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |

| A | SANDRA CASTRO | | | | |
| B | GRIGADE | $6,720 | $800 | $3,160 | $0 | $10,680 |
| n/a |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |

| A | JOLANTA CHOBOT-PAWLOWSKA | | | | |
| B | DELEGATE | $62,301 | $5,830 | $0 | $0 | $68,161 |
| n/a |
| I | Schedule 15 Representational Activities | 92 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 4 % |

| A | DONALD B COAXUM | | | | |
| B | BRIGADE | $26,178 | $5,100 | $1,128 | $0 | $32,406 |
| n/a |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |

| A | PETER COLAVITO | | | | |
| B | DIR OF POLITICAL | $122,306 | $0 | $4,685 | $0 | $126,994 |
| n/a |
| F | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 100 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |

| A<br>B<br>C | DONOVAN  COLE<br>DELEGATE<br>n/a | | | | $60,082 | | $5,800 | | $0 | | $0 | | $65,882 |
| I | Schedule 15<br>Representational<br>Activities | 92 % | Schedule 16<br>Political<br>Activities and<br>Lobbying | 4 % | Schedule 17<br>Contributions | | 0 % | Schedule 18<br>General<br>Overhead | | 0 % | Schedule 19<br>Administration | | 4 % |
| A<br>B<br>C | HILDALYN   COLON-HERNANDEZ<br>POLITICAL ORGANI<br>n/a | | | | $33,000 | | $7,600 | | $1,879 | | $0 | | $47,479 |
| I | Schedule 15<br>Representational<br>Activities | 0 % | Schedule 16<br>Political<br>Activities and<br>Lobbying | 100 % | Schedule 17<br>Contributions | | 0 % | Schedule 18<br>General<br>Overhead | | 0 % | Schedule 19<br>Administration | | 0 % |
| A<br>B<br>C | WALTER   COOPER<br>POLITICAL ORGANI<br>n/a | | | | $40,316 | | $2,650 | | $121 | | $0 | | $43,087 |
| I | Schedule 15<br>Representational<br>Activities | 0 % | Schedule 16<br>Political<br>Activities and<br>Lobbying | 100 % | Schedule 17<br>Contributions | | 0 % | Schedule 18<br>General<br>Overhead | | 0 % | Schedule 19<br>Administration | | 0 % |
| A<br>B<br>C | CYNTHIA   COOPER<br>ORGANIZER<br>n/a | | | | $9,236 | | $100 | | $2,600 | | $0 | | $11,936 |
| I | Schedule 15<br>Representational<br>Activities | 100 % | Schedule 16<br>Political<br>Activities and<br>Lobbying | 0 % | Schedule 17<br>Contributions | | 0 % | Schedule 18<br>General<br>Overhead | | 0 % | Schedule 19<br>Administration | | 0 % |
| A<br>B<br>C | TCHIYUKA   CORNELIUS<br>LEAD ORGANIZER<br>n/a | | | | $52,150 | | $450 | | $0 | | $0 | | $52,600 |
| I | Schedule 15<br>Representational<br>Activities | 0 % | Schedule 16<br>Political<br>Activities and<br>Lobbying | 100 % | Schedule 17<br>Contributions | | 0 % | Schedule 18<br>General<br>Overhead | | 0 % | Schedule 19<br>Administration | | 0 % |
| A<br>B<br>C | MARISOL   COTTO<br>RECEPTIONIST<br>n/a | | | | $12,114 | | $0 | | $0 | | $0 | | $12,114 |
| I | Schedule 15<br>Representational<br>Activities | 100 % | Schedule 16<br>Political<br>Activities and<br>Lobbying | 0 % | Schedule 17<br>Contributions | | 0 % | Schedule 18<br>General<br>Overhead | | 0 % | Schedule 19<br>Administration | | 0 % |
| A<br>B<br>C | AHMED   CUMBERBATCH<br>DELEGATE<br>n/a | | | | $12,233 | | $680 | | $1,184 | | $0 | | $14,277 |
| I | Schedule 15<br>Representational | 100 % | Schedule 16<br>Political<br>Activities and | 0 % | Schedule 17<br>Contributions | | 0 % | Schedule 18<br>General | | 0 % | Schedule 20<br>Administration | | 0 % |

| | Activities | | Lobbying | | | Overhead | | | |
|---|---|---|---|---|---|---|---|---|---|
| A | ELVIS   DACOSTA | | | | | | | | |
| B | STAFF ACCOUNTANT | | $23,523 | $0 | | $0 | | $0 | $23,523 |
| C | n/a | | | | | | | | |
| | Schedule 16 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 10 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 80 % | Schedule 19 Administration | 10 % |
| A | JULIO  M  DAVILA | | | | | | | | |
| B | BRIGADE | | $8,849 | $650 | | $0 | | $0 | $10,499 |
| C | n/a | | | | | | | | |
| | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A | JOANNE   DAVIS | | | | | | | | |
| B | COMPLAINT COORD | | $57,693 | $0 | | $0 | | $0 | $57,693 |
| C | n/a | | | | | | | | |
| | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A | ANGELA  C  DAVIS | | | | | | | | |
| B | COMMUN ASSOCIATE | | $56,035 | $0 | | $87 | | $0 | $56,122 |
| C | n/a | | | | | | | | |
| | Schedule 15 Representational Activities | 75 % | Schedule 16 Political Activities and Lobbying | 5 % | Schedule 17 Contributions | 5 % | Schedule 18 General Overhead | 5 % | Schedule 19 Administration | 10 % |
| A | ANDRES   DAVOREN | | | | | | | | |
| B | BRIGADE | | $13,522 | $900 | | $45 | | $5 | $14,472 |
| C | n/a | | | | | | | | |
| | Schedule 15 Representational Activities | 22 % | Schedule 16 Political Activities and Lobbying | 78 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A | TERESITA  S  DE GUZMAN | | | | | | | | |
| B | PAYROLL LEAD | | $28,363 | $0 | | $0 | | $0 | $28,363 |
| C | n/a | | | | | | | | |
| | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 90 % | Schedule 19 Administration | 10 % |
| A | DIANA  D  DEGROAT | | | | | | | | |
| B | ADMIN ASST | | $99,674 | $1,350 | | $7 | | $0 | $101,031 |
| C | n/a | | | | | | | | |
| | Schedule 15 | | Schedule 16 | | | Schedule 18 | | | |

DOL Form Report (ERDS)                                                                 Pa

| | Representational Activities | 20 % | Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | General Overhead | 60 % | Schedule Administr |
|---|---|---|---|---|---|---|---|---|---|
| A B C | SAMUEL   DELANEY DELEGATE n/a | | | $61,882 | | $5,750 | | $0 | $0 |
| I | Schedule 15 Representational Activities | 92 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 4 % |
| A B C | ROSA  N  DELGADO BRIGADE n/a | | | $9,576 | | $600 | | $0 | $0 | $10,176 |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B C | JOSEPH   DELIA ORG COORDINATOR n/a | | | $39,553 | | $3,800 | | $159 | $0 | $43,292 |
| I | Schedule 15 Representational Activities | 98 % | Schedule 16 Political Activities and Lobbying | 2 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B C | CHRISTOPHER   DEMPSEY DELEGATE N/A | | | $5,965 | | $860 | | $1,184 | $0 | $11,009 |
| II | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B C | MIRADIJE   DERTI BRIGADE n/a | | | $9,515 | | $600 | | $0 | $0 | $10,115 |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B C | VASUDHA   DESIKAN RESEARCHER n/a | | | $17,505 | | $0 | | $0 | $0 | $17,505 |
| I | Schedule 15 Representational Activities | 95 % | Schedule 16 Political Activities and Lobbying | 5 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B C | DIMAS  N  DIAZ ASST REP DIRECTOR n/a | | | $63,192 | | $11,000 | | $928 | $0 | $75,120 |

| | Schedule 15 Representational Activities | 95 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
|---|---|---|---|---|---|---|---|---|---|---|
| A B C | OPHELIA DIAZ RECEPTIONIST n/a | | | $30,452 | | $0 | | $0 | | $0 | $30,452 |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 100 % | Schedule 19 Administration | 0 % |
| A B C | MARYJANE DIGEJO EXEC SECRETARY n/a | | | $57,229 | | $0 | | $82 | | $0 | $57,311 |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 100 % | Schedule 19 Administration | 0 % |
| A B C | BELKIS DOSSUS SECRETARY n/a | | | $12,750 | | $0 | | $0 | | $0 | $12,750 |
| I | Schedule 15 Representational Activities | 40 % | Schedule 16 Political Activities and Lobbying | 10 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 30 % | Schedule 19 Administration | 20 % |
| A B C | MICHAEL P DUFFY DISTRICT SUPERVI n/a | | | $101,490 | $10,400 | $6,304 | | $0 | | $118,284 |
| I | Schedule 15 Representational Activities | 80 % | Schedule 16 Political Activities and Lobbying | 10 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 5 % | Schedule 19 Administration | 5 % |
| A B C | KATY DUNN ASST GEN COUNSEL n/a | | | $17,050 | $200 | $2,673 | | $0 | | $19,923 |
| I | Schedule 15 Representational Activities | 85 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 15 % | Schedule 19 Administration | 0 % |
| A B C | LAURA ELDRIDGE POLITICAL ORGANI n/a | | | $45,290 | $4,200 | $521 | | $0 | | $50,011 |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 100 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B | LARRY ENGELSTEIN GENERAL COUNSEL n/a | | | $177,606 | $0 | $1,065 | | $0 | | $179,674 |

| | Schedule 15 Representational Activities | 50 % | Schedule 16 Political Activities and Lobbying | 8 % | Schedule 17 Contributions | 2 % | Schedule 18 General Overhead | 10 % | Schedule 19 Administration | 80 % |
|---|---|---|---|---|---|---|---|---|---|---|
| A B C | ROBERT    EPSTINE SR. BRIGADE n/a | | | | $10,171 | | $870 | $0 | | $0 | $11,041 |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B C | MARISOL    ESCALANTE SUPERVISOR DUES n/a | | | | $64,980 | | $0 | $0 | | $0 | $64,950 |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 20 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 80 % |
| A B C | JESSICA  A  FAIGE ASST DIR CONTRACTS n/a | | | | $86,166 | | $0 | $350 | | $0 | $86,516 |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B C | NATALIE    FARI COMMUN COORDINATOR n/a | | | | $15,889 | | $750 | $163 | | $0 | $16,307 |
| N | Schedule 15 Representational Activities | 80 % | Schedule 16 Political Activities and Lobbying | 5 % | Schedule 17 Contributions | 5 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 10 % |
| A B C | ANTHONY    FAULK ORGANIZER n/a | | | | $12,472 | | $800 | $2,600 | | $0 | $15,872 |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A D C | NATALIE    FEIN DIR OF DUES n/a | | | | $87,840 | | $0 | $0 | | $0 | $37,840 |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 3 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 97 % |
| A | EDWIN    FELICIANO DELEGATE | | | | $56,704 | | $11,000 | -$144 | | $0 | $67,848 |

| B | n/a | | | | | | | | | |
| C | | | | | | | | | | |

| | Schedule 15 Representational Activities | 93 % | Schedule 16 Political Activities and Lobbying | 2 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 5 % |

| A | MARIA A FERNANDEZ | | | | | | | | | |
| B | ASST DELEGATE | | | $56,874 | | $5,600 | | $630 | | $0 | $43,204 |
| C | n/a | | | | | | | | | |

| | Schedule 15 Representational Activities | 96 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |

| A | KATHRYN A FERRANTI | | | | | | | | | |
| B | DEPUTY DIRECTOR | | | $79,423 | | $600 | | $1,149 | | $0 | $91,172 |
| C | n/a | | | | | | | | | |

| I | Schedule 15 Representational Activities | 70 % | Schedule 16 Political Activities and Lobbying | 10 % | Schedule 17 Contributions | 5 % | Schedule 18 General Overhead | 5 % | Schedule 19 Administration | 10 % |

| A | MANUEL A FIGUEROA | | | | | | | | | |
| B | DELEGATE | | | $13,418 | | $3,850 | | $0 | | $0 | $17,268 |
| C | n/a | | | | | | | | | |

| I | Schedule 15 Representational Activities | 93 % | Schedule 16 Political Activities and Lobbying | 2 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 5 % |

| A | LIA M FIOL-MATTA | | | | | | | | | |
| B | ASSC GEN COUNSEL | | | $64,121 | | $0 | | $575 | | $0 | $64,696 |
| C | n/a | | | | | | | | | |

| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |

| A | XIOMARA M FLORES | | | | | | | | | |
| B | ADMIN ASST | | | $30,577 | | $0 | | $278 | | $0 | $30,855 |
| C | n/a | | | | | | | | | |

| I | Schedule 15 Representational Activities | 80 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 18 % | Schedule 19 Administration | 2 % |

| A | CALVIN O FOREHAND | | | | | | | | | |
| B | DELEGATE | | | $58,905 | | $11,000 | | $0 | | $0 | $69,905 |
| C | n/a | | | | | | | | | |

| I | Schedule 15 Representational Activities | 92 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 4 % |

DOL Form Report (ERDS)                                                    Page 36 of 48

| A<br>B<br>C | EDWARD   FOTI<br>DELEGATE<br>n/a | | | | $62,329 | $5,800 | $0 | $0 | $68,129 |
|---|---|---|---|---|---|---|---|---|---|
| I | Schedule 15<br>Representational<br>Activities | 92 % | Schedule 16<br>Political<br>Activities and<br>Lobbying | 4 % | Schedule 17<br>Contributions | 0 % | Schedule 18<br>General<br>Overhead | 0 % | Schedule 19<br>Administration | 4 % |
| A<br>B<br>C | DANILO   FRANCO<br>DELEGATE<br>n/a | | | | $82,361 | $5,800 | $106 | $0 | $88,266 |
| I | Schedule 15<br>Representational<br>Activities | 92 % | Schedule 16<br>Political<br>Activities and<br>Lobbying | 4 % | Schedule 17<br>Contributions | 0 % | Schedule 18<br>General<br>Overhead | 0 % | Schedule 19<br>Administration | 4 % |
| A<br>B<br>C | ANDREW  M  FRIEDMAN<br>ORGANIZER<br>n/a | | | | $11,907 | $2,350 | $0 | $0 | $14,257 |
| I | Schedule 15<br>Representational<br>Activities | 98 % | Schedule 16<br>Political<br>Activities and<br>Lobbying | 2 % | Schedule 17<br>Contributions | 0 % | Schedule 18<br>General<br>Overhead | 0 % | Schedule 19<br>Administration | 0 % |
| A<br>B<br>C | PEDRO   FUENTES<br>ASST TO DIRECTOR<br>n/a | | | | $57,165 | $0 | $75 | $0 | $57,241 |
| I | Schedule 15<br>Representational<br>Activities | 0 % | Schedule 16<br>Political<br>Activities and<br>Lobbying | 0 % | Schedule 17<br>Contributions | 0 % | Schedule 18<br>General<br>Overhead | 100<br>% | Schedule 19<br>Administration | 0 % |
| A<br>B<br>C | CHAVIS   FULTON<br>BRIGADE<br>n/a | | | | $9,016 | $1,800 | $418 | $0 | $11,234 |
| I | Schedule 15<br>Representational<br>Activities | 100<br>% | Schedule 16<br>Political<br>Activities and<br>Lobbying | 0 % | Schedule 17<br>Contributions | 0 % | Schedule 18<br>General<br>Overhead | 0 % | Schedule 19<br>Administration | 0 % |
| A<br>B<br>C | MIRSAD   GACEVIC<br>DELEGATE<br>n/a | | | | $51,703 | $4,800 | $0 | $0 | $56,503 |
| I | Schedule 15<br>Representational<br>Activities | 92 % | Schedule 16<br>Political<br>Activities and<br>Lobbying | 4 % | Schedule 17<br>Contributions | 0 % | Schedule 18<br>General<br>Overhead | 0 % | Schedule 19<br>Administration | 4 % |
| A<br>B<br>C | NORA  M  GAINES<br>ORGANIZER<br>n/a | | | | $34,129 | $11,000 | $2,856 | $0 | $47,995 |
| I | Schedule 15<br>Representational | 98 % | Schedule 16<br>Political<br>Activities and | 2 % | Schedule 17<br>Contributions | 0 % | Schedule 18<br>General | 0 % | Schedule 19<br>Administration | 0 % |

| | Activities | | Lobbying | | | | Overhead | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| A B C | LUZ GARATE<br>LEAD ORGANIZER<br>n/a | | | $59,699 | | ,$11,000 | | $527 | | $0 | $71,420 |
| | Schedule 15<br>Representational<br>Activities | 98 % | Schedule 16<br>Political<br>Activities and<br>Lobbying | 2 % | Schedule 17<br>Contributions | 0 % | Schedule 18<br>General<br>Overhead | 0 % | Schedule 19<br>Administration | 0 % |
| A B C | CALO GARCIA<br>DELEGATE<br>n/a | | | $52,361 | | $11,000 | | $0 | | $0 | $73,361 |
| | Schedule 15<br>Representational<br>Activities | 92 % | Schedule 16<br>Political<br>Activities and<br>Lobbying | 4 % | Schedule 17<br>Contributions | 0 % | Schedule 18<br>General<br>Overhead | 0 % | Schedule 19<br>Administration | 4 % |
| A B C | CATHERINE V GARCIA<br>ORGANIZER<br>n/a | | | $20,729 | | $4,250 | | $0 | | $0 | $24,979 |
| | Schedule 15<br>Representational<br>Activities | 93 % | Schedule 16<br>Political<br>Activities and<br>Lobbying | 2 % | Schedule 17<br>Contributions | 0 % | Schedule 18<br>General<br>Overhead | 0 % | Schedule 19<br>Administration | 5 % |
| A B C | JORGE A GARCIA<br>BRIGADE<br>n/a | | | $18,235 | | $1,050 | | $0 | | $0 | $19,285 |
| | Schedule 15<br>Representational<br>Activities | 100 % | Schedule 16<br>Political<br>Activities and<br>Lobbying | 0 % | Schedule 17<br>Contributions | 0 % | Schedule 18<br>General<br>Overhead | 0 % | Schedule 19<br>Administration | 0 % |
| A B C | PABLO U GASTON<br>RESEARCHER<br>n/a | | | $13,915 | | $4,200 | | $857 | | $0 | $18,972 |
| | Schedule 15<br>Representational<br>Activities | 95 % | Schedule 16<br>Political<br>Activities and<br>Lobbying | 5 % | Schedule 17<br>Contributions | 0 % | Schedule 18<br>General<br>Overhead | 0 % | Schedule 19<br>Administration | 0 % |
| A B C | ARIANA P GERARDO<br>ORGANIZER<br>n/a | | | $47,119 | | $10,160 | | $262 | | $0 | $57,541 |
| | Schedule 15<br>Representational<br>Activities | 93 % | Schedule 16<br>Political<br>Activities and<br>Lobbying | 2 % | Schedule 17<br>Contributions | 0 % | Schedule 18<br>General<br>Overhead | 0 % | Schedule 19<br>Administration | 5 % |
| A B C | JOHN GIBBONS<br>DIR OF IT<br>n/a | | | $41,215 | | $0 | | $504 | | $0 | $51,719 |
| | Schedule 15 .. | | Schedule 16 | | | | Schedule 18 | | | |

DOL Form Report (ERDS)

| I | Representational Activities | 0 % | Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | General Overhead | 100 % | Schedule 19 Administration | 0 % |
|---|---|---|---|---|---|---|---|---|---|---|
| A B C | RICHARD M. GIBSON ORG COORDINATOR n/a | | | $83,192 | | $11,000 | | $7,975 | $0 | | $82,187 |
| I | Schedule 15 Representational Activities | 95 % | Schedule 16 Political Activities and Lobbying | 3 % | Schedule 17 Contributions | 1 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 1 % |
| A B C | HERNANDO GIRALDO BRIGADE n/a | | | $9,645 | | $900 | | $1,806 | $0 | | $12,351 |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B C | SUZANA GJONI BRIGADE n/a | | | $11,063 | | $700 | | $9 | $0 | | $11,775 |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 100 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B C | PETER GOLDBERGER CHIEF OF STAFF n/a | | | $151,094 | | $7,500 | | $2,845 | $0 | | $162,339 |
| I | Schedule 15 Representational Activities | 15 % | Schedule 16 Political Activities and Lobbying | 5 % | Schedule 17 Contributions | 5 % | Schedule 18 General Overhead | 55 % | Schedule 19 Administration | 20 % |
| A B C | JODI P. GOLDMAN DIR OF CONTRACTS n/a | | | $126,589 | | $0 | | $693 | $0 | | $127,267 |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B C | AMINTA GONELL BRIGADE n/a | | | $28,838 | | $2,760 | | $4,377 | $0 | | $35,995 |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B C | ANGEL GONZALEZ COMPLAINT INTAKE n/a | | | $74,373 | | $0 | | $0 | $0 | | $74,373 |

DOL Form Report (ERDS)                                          Page 39 of 48

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B C | MICHAEL   GRAHAM ORGANIZER n/a | | | $19,093 | | $5,220 | | $1,320 | | $0 | $25,633 |
| I | Schedule 15 Representational Activities | 93 % | Schedule 16 Political Activities and Lobbying | 2 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 5 % |
| A B C | CLAUDIA  P  GRANADOS DEPUTY DIRECTOR n/a | | | $59,620 | | $0 | | $6,323 | | $0 | $85,943 |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 100 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B C | RHONDA   GREENBERG LEGA SECRETARY n/a | | | $57,700 | | $0 | | $0 | | $0 | $57,700 |
| I | Schedule 15 Representational Activities | 50 % | Schedule 16 Political Activities and Lobbying | 10 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 20 % | Schedule 19 Administration | 20 % |
| A B C | JOHN  E  GRIER DELEGATE n/a | | | $60,009 | | $5,800 | | $0 | | $0 | $65,909 |
| I | Schedule 15 Representational Activities | 92 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 4 % |
| A B C | ANNI   ORILLO DATA ANALYST n/a | | | $50,225 | | $0 | | $0 | | $0 | $50,225 |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B C | DANIEL  A  GROSS DELEGATE n/a | | | $65,494 | | $11,000 | | $35 | | $0 | $74,529 |
| I | Schedule 15 Representational Activities | 92 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 4 % |
| A B | BERNARD  R  HACKETT JR. ORGANIZER n/a | | | $39,734 | | $11,000 | | $578 | | $0 | $50,312 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Schedule 15 Representational Activities | 98 % | Schedule 16 Political Activities and Lobbying | 2 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| ARNOLD HAMILTON DELEGATE n/a | | | $43,968 | | $11,000 | | $844 | $0 | $55,812 |
| Schedule 15 Representational Activities | 96 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| SANDRA HENAO BRIGADE n/a | | | $15,018 | | $2,350 | | $0 | $0 | $17,956 |
| Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| TOYA HENDRICKS DELEGATE n/a | | | $43,788 | | $5,800 | | $0 | $0 | $49,588 |
| Schedule 15 Representational Activities | 80 % | Schedule 16 Political Activities and Lobbying | 10 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 10 % | Schedule 19 Administration | 0 % |
| LASHAWN HENRY DELEGATE n/a | | | $53,345 | | $11,050 | | $42 | $0 | $64,437 |
| Schedule 15 Representational Activities | 92 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 4 % |
| DIANA B HERNANDEZ ASST DELEGATE n/a | | | $54,139 | | $5,800 | | $0 | $0 | $59,939 |
| Schedule 15 Representational Activities | 96 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| ADRIANNA A HERNANDEZSTEWART ASST RESEARCHER n/a | | | $43,416 | | $3,200 | | $717 | $0 | $47,333 |
| Schedule 15 Representational Activities | 95 % | Schedule 16 Political Activities and Lobbying | 5 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| HUGO F HERRARA LEAD ORGANIZER | | | $48,923 | | $11,000 | | $717 | $0 | $60,640 |

| B | n/a | | | | | | | | | |
| C | | | | | | | | | | |
| I | Schedule 15 Representational Activities | 98 % | Schedule 16 Political Activities and Lobbying | 2 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |

| A | ROBERT J HILL | | | | | | | | | |
| B | DIR OF ORGANIZING | | | $117,916 | $10,600 | | $1,724 | | $0 | $130,240 |
| C | n/a | | | | | | | | | |
| I | Schedule 15 Representational Activities | 90 % | Schedule 16 Political Activities and Lobbying | 3 % | Schedule 17 Contributions | 1 % | Schedule 18 General Overhead | 1 % | Schedule 19 Administration | 5 % |

| A | KEVIN  HILLS | | | | | | | | | |
| B | BRIGADE | | | $12,995 | $450 | | $40 | | $0 | $13,495 |
| C | n/a | | | | | | | | | |
| I | Schedule 15 Representational Activities | 86 % | Schedule 16 Political Activities and Lobbying | 14 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |

| A | DESMA  HOLCOMB | | | | | | | | | |
| B | ASST D.R CONTRACTS | | | $14,436 | $0 | | $0 | | $0 | $14,436 |
| C | n/a | | | | | | | | | |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |

| A | ARI  HOLTZBLATT | | | | | | | | | |
| B | POLITICAL ORGANI | | | $56,075 | $0 | | $1,036 | | $0 | $57,111 |
| C | n/a | | | | | | | | | |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 100 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |

| A | STEVEN  W  HORBACHEFSKY | | | | | | | | | |
| B | DELEGATE | | | $58,905 | $11,000 | | $44 | | $0 | $69,949 |
| C | n/a | | | | | | | | | |
| I | Schedule 15 Representational Activities | 80 % | Schedule 16 Political Activities and Lobbying | 10 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 5 % | Schedule 19 Administration | 5 % |

| A | JACQUELINE  HORNE | | | | | | | | | |
| B | DELEGATE | | | $43,794 | $11,000 | | $0 | | $0 | $54,794 |
| C | n/a | | | | | | | | | |
| I | Schedule 15 Representational Activities | 85 % | Schedule 16 Political Activities and Lobbying | 10 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 5 % |

DOL Form Report (ERDS)

| A B C | JEFF HORNSTEIN ORG COORDINATOR n/a | | | $51,164 | | $11,350 | | $2,177 | | $0 | | $74,691 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I | Schedule 15 Representational Activities | 80% | Schedule 16 Political Activities and Lobbying | 20% | Schedule 17 Contributions | 0% | Schedule 18 General Overhead | 0% | Schedule 19 Administration | 0% | | |
| A B C | JAIME HUDSON BRIGADE n/a | | | $10,611 | | $800 | | $18 | | $0 | | $11,429 |
| I | Schedule 15 Representational Activities | 100% | Schedule 16 Political Activities and Lobbying | 0% | Schedule 17 Contributions | 0% | Schedule 18 General Overhead | 0% | Schedule 19 Administration | 0% | | |
| A B C | CARLOS IBARRA ORGANIZER n/a | | | $7,958 | | $1,340 | | $2,252 | | $0 | | $11,550 |
| I | Schedule 15 Representational Activities | 100% | Schedule 16 Political Activities and Lobbying | 0% | Schedule 17 Contributions | 0% | Schedule 18 General Overhead | 0% | Schedule 19 Administration | 0% | | |
| A B C | MICHAEL INDIA DELEGATE n/a | | | $62,329 | | $11,000 | | $0 | | $0 | | $73,329 |
| I | Schedule 15 Representational Activities | 92% | Schedule 16 Political Activities and Lobbying | 4% | Schedule 17 Contributions | 0% | Schedule 18 General Overhead | 0% | Schedule 19 Administration | 4% | | |
| A B C | HAZEL L INGRAM BRIGADE n/a | | | $9,576 | | $600 | | $151 | | $0 | | $10,327 |
| I | Schedule 15 Representational Activities | 100% | Schedule 16 Political Activities and Lobbying | 0% | Schedule 17 Contributions | 0% | Schedule 18 General Overhead | 0% | Schedule 19 Administration | 0% | | |
| A B C | ARUN IVATURY LEAD RESEARCHER n/a | | | $57,982 | | $2,930 | | $7,302 | | $0 | | $68,184 |
| I | Schedule 15 Representational Activities | 95% | Schedule 16 Political Activities and Lobbying | 5% | Schedule 17 Contributions | 0% | Schedule 18 General Overhead | 0% | Schedule 19 Administration | 0% | | |
| A B C | LESLIE JACK ADMIN ASST n/a | | | $41,199 | | $0 | | $0 | | $0 | | $41,199 |
| I | Schedule 15 Representational | 0% | Schedule 16 Political Activities and | 100% | Schedule 17 Contributions | 0% | Schedule 18 General | 0% | Schedule 19 Administration | 0% | | |

DOL Form Report (ERDS)                                              Page 43 of 48

| | Activities | | Lobbying | | | | Overhead | | | |
|---|---|---|---|---|---|---|---|---|---|---|

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| A B C | COLETTE    JAMES<br>ASST RESEARCHER<br>n/a | | | $36,400 | | $0 | | $0 | $0 | $36,400 |
| I | Schedule 15<br>Representational<br>Activities | 95 % | Schedule 16<br>Political<br>Activities and<br>Lobbying | 5 % | Schedule 17<br>Contributions | 0 % | Schedule 18<br>General<br>Overhead | 0 % | Schedule 19<br>Administration | 0 % |
| A B C | LAJWANTI    JEETOO<br>CLERK<br>n/a | | | $29,616 | | $0 | | $28 | $0 | $29,644 |
| I | Schedule 15<br>Representational<br>Activities | 0 % | Schedule 16<br>Political<br>Activities and<br>Lobbying | 20 % | Schedule 17<br>Contributions | 0 % | Schedule 18<br>General<br>Overhead | 0 % | Schedule 19<br>Administration | 80 % |
| A B C | THERESA  R  JEFFERSON<br>DEPUTY DIRECTOR<br>n/a | | | $76,442 | $10,500 | | $2,212 | | $0 | $89,154 |
| I | Schedule 15<br>Representational<br>Activities | 95 % | Schedule 16<br>Political<br>Activities and<br>Lobbying | 6 % | Schedule 17<br>Contributions | 0 % | Schedule 18<br>General<br>Overhead | 0 % | Schedule 19<br>Administration | 0 % |
| A B C | STEPHEN    JENKINS<br>DIR OF RESEARCH<br>n/a | | | $93,039 | | $0 | | $1,464 | $0 | $94,503 |
| I | Schedule 16<br>Representational<br>Activities | 90 % | Schedule 16<br>Political<br>Activities and<br>Lobbying | 10 % | Schedule 17<br>Contributions | 0 % | Schedule 18<br>General<br>Overhead | 0 % | Schedule 19<br>Administration | 0 % |
| A B C | TODD  R  JENNINGS<br>DELEGATE<br>n/a | | | $55,638 | $5,700 | | $86 | | $0 | $61,424 |
| I | Schedule 15<br>Representational<br>Activities | 92 % | Schedule 16<br>Political<br>Activities and<br>Lobbying | 4 % | Schedule 17<br>Contributions | 0 % | Schedule 18<br>General<br>Overhead | 0 % | Schedule 19<br>Administration | 4 % |
| A B C | IGNACIO    JIMENEZ<br>BRIGADE<br>n/a | | | $44,310 | $6,200 | | $1,266 | | $0 | $48,776 |
| I | Schedule 15<br>Representational<br>Activities | 100 % | Schedule 16<br>Political<br>Activities and<br>Lobbying | 0 % | Schedule 17<br>Contributions | 0 % | Schedule 18<br>General<br>Overhead | 0 % | Schedule 19<br>Administration | 0 % |
| A B C | DONZELLA M JOHNSON<br>CLERK<br>n/a | | | $38,284 | | $0 | | $0 | $0 | $38,284 |
| | Schedule 16 | | Schedule 16 | | | | Schedule 18 | | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Representational Activities | 0 % | Political Activities and Lobbying | 20 % | Schedule 17 Contributions | 0 % | General Overhead | 0 % | Schedule 19 Administration | 80 % |
| A B C | SIMONNE  JOHNSON BRIGADE n/a | | | $20,892 | $1,800 | $40 | | $0 | | $22,832 |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B C | OSCAR  O  JURADO BRIGADE n/a | | | $13,934 | $950 | $410 | | $0 | | $15,294 |
| I | Schedule 15 Representational Activities | 86 % | Schedule 16 Political Activities and Lobbying | 14 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B C | JULIE  KARANT COMMUN MANAGER n/a | | | $21,342 | $200 | $461 | | $0 | | $22,003 |
| I | Schedule 15 Representational Activities | 75 % | Schedule 16 Political Activities and Lobbying | 10 % | Schedule 17 Contributions | 5 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 10 % |
| A B C | MARY  KARTZIAN DELEGATE n/a | | | $62,361 | $5,700 | $0 | | $0 | | $68,061 |
| I | Schedule 15 Representational Activities | 92 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 4 % |
| A B C | IZABELLA  KEMEL SUPERVISOR DUES n/a | | | $30,228 | 60 | $0 | | $0 | | $30,228 |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 100 % |
| A B C | PATRICK  KHALIL RESEARCHER n/a | | | $26,776 | $0 | $0 | | $0 | | $26,776 |
| I | Schedule 15 Representational Activities | 95 % | Schedule 16 Political Activities and Lobbying | 5 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B C | SIMEONE  KOHEN BRIGADE n/a | | | $12,766 | $800 | $0 | | $0 | | $13,566 |

DOL Form Report (ERDS)                                                    Page 45 of 48

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B C | SEVDET KUKAJ DELEGATE n/a | | | $82,361 | | $5,800 | | $0 | | $0 | $88,161 |
| I | Schedule 16 Representational Activities | 92 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 4 % |
| A B C | BEVERLY LAING ROBO SUPERVISOR DUES n/a | | | $60,673 | | $0 | | $40 | | $0 | $60,713 |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 20 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 80 % |
| A B C | TATIANA LAMBERT BRIGADE n/a | | | $9,576 | | $600 | | $0 | | $0 | $10,176 |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B C | NOLAN LANGWEIL LEAD RESEARCHER n/a | | | $28,190 | | $5,750 | | $221 | | $0 | $35,161 |
| I | Schedule 15 Representational Activities | 95 % | Schedule 16 Political Activities and Lobbying | 5 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B C | ANTHONY LATTE DELEGATE n/a | | | $25,511 | | $200 | | $0 | | $0 | $25,711 |
| I | Schedule 15 Representational Activities | 92 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 4 % |
| A B C | TOMMIE LAWSON DELEGATE n/a | | | $62,361 | | $11,000 | | $0 | | $0 | $73,361 |
| I | Schedule 15 Representational Activities | 92 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 4 % |
| A B C | TSEE Y LEE RESEARCHER n/a | | | $41,605 | | $600 | | $833 | | $0 | $42,938 |

| C | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| I | Schedule 15 Representational Activities | 95 % | Schedule 16 Political Activities and Lobbying | 5 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |

| A | NYOK L LEE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| B | CLERK | | | $34,023 | | $0 | | $0 | | $0 | $34,023 |
| C | n/a | | | | | | | | |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |

| A | WILLIAM A LEE III | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| B | LEAD ORGANIZER | | | $72,416 | $10,400 | $416 | | $0 | $83,232 |
| C | n/a | | | | | | | | |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 100 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |

| A | GUILLERMO A LERVA | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| G | ORGANIZER | | | $52,403 | $7,000 | $3,861 | | $0 | $63,864 |
| C | n/a | | | | | | | | |
| I | Schedule 15 Representational Activities | 93 % | Schedule 16 Political Activities and Lobbying | 2 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 5 % |

| A | SUZHEN LIANG | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| B | CLERK | | | $37,905 | | $0 | | $0 | | $0 | $37,905 |
| C | n/a | | | | | | | | |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |

| A | JACOB LIEBERMAN | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| B | ORGANIZER | | | $42,252 | $8,900 | $1,394 | | $0 | $52,546 |
| C | n/a | | | | | | | | |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |

| A | DOUGLAS LIGUORI | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| B | CLERK | | | $36,209 | | $0 | | $30 | | $0 | $36,239 |
| C | n/a | | | | | | | | |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 36 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 50 % |

| A | KATCHEN A LOCKE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | ASSC GEN COUNSEL | | | $90,485 | $0 | $4,065 | | $0 | $94,550 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| B n/a |
| C | | | | | | | | | |
| I | Schedule 15 Representational Activities | 95 % | Schedule 16 Political Activities and Lobbying | 5 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B C | MAURICIO A LOPEZ ASST DELEGATE n/a | | | | $43,769 | $11,000 | $101 | | $0 | $54,889 |
| I | Schedule 15 Representational Activities | 96 % | Schedule 16 Political Activities and Lobbying | 4 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B C | DAISY LUGO EXEC ASSISTANT n/a | | | | $48,415 | $0 | $29 | | $0 | $48,444 |
| I | Schedule 15 Representational Activities | 20 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 60 % | Schedule 19 Administration | 20 % |
| A B C | KATARZYNA MADZIAR CLERK n/a | | | | $29,484 | $0 | $0 | | $0 | $29,484 |
| I | Schedule 15 Representational Activities | 0 % | Schedule 16 Political Activities and Lobbying | 20 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 80 % |
| A B C | DOUGLAS MAJOR ORGANIZER n/a | | | | $56,588 | $11,000 | $92 | | $0 | $67,680 |
| I | Schedule 15 Representational Activities | 98 % | Schedule 16 Political Activities and Lobbying | 2 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B C | DEBORAH MARAKOWITZ ASSC GEN COUNSEL n/a | | | | $84,672 | $800 | $359 | | $0 | $85,831 |
| I | Schedule 15 Representational Activities | 100 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |
| A B C | CHRISTINE MARINONI ORG COORDINATOR n/a | | | | $79,658 | $10,400 | $1,064 | | $0 | $91,122 |
| I | Schedule 15 Representational Activities | 95 % | Schedule 16 Political Activities and Lobbying | 3 % | Schedule 17 Contributions | 1 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 1 % |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| A | FRANCES    MARTINEZ. | | | $22,157 | $1,400 | $1,100 | | $0 | $24,637 |
| B | BRIGADE | | | | | | | | |
| C | n/a | | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| I | Schedule 15 Representational Activities | 79 % | Schedule 16 Political Activities and Lobbying | 21 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 0 % |

| | | | | | | |
|---|---|---|---|---|---|---|
| A | ROSA  S  MARTINEZ | | | $12,858 | $0 | $0 |
| B | RECEPTIONIST | | | | | |
| C | n/a | | | | | |

# KENNEDY, JENNIK & MURRAY, P.C.

ATTORNEYS AT LAW

113 UNIVERSITY PLACE
NEW YORK, NEW YORK 10003
(212) 358-1500

▸ ◂ ▸

FACSIMILE (212) 358-0207

THOMAS M. KENNEDY
JEAN M. JENNIK
THOMAS M. MURRAY
OF COUNSEL
LARRY MAGARIK

ELIZABETH M. PLECKI INJ, MA]
RACHELA KRETNER [OR]
OMAR A. JOSEPH IMA, D.C.]
CHRISTOPHER G. GANT INJ ONLY]
WILLIAM G. SCHIMMEL [IL, NY, NJ]
BERNHARD W. ROHRBACHER [CA ONLY]

July 12, 2007

**By Fax and Regular Mail**
Mark Steven Soroka
Taubman Kimelman & Soroka, LLP
30 Vesey Street, 6th floor
New York, NY 10007

Re: **Allied International Union**

Dear Mr. Soroka:

I write as counsel to Melvin Garland, Demarri Campbell, William Watson, Larry Binyard and Jesus Govea regarding the election of officers in the Allied International Union.

In response to your letter to Mr. Garland, dated July 6, 2007, I have enclosed copies of the Affidavits of Mr. Garland and Demarri Campbell, dated May 3, 2007. I have also enclosed a copy of the Nomination and Election Notice and the Rules for Nominations and the Election.

To arrange for interviews of Messrs. Garland, Campbell and Watson, please contact Omar Joseph, Esq. in this office.

I understand that you also sent a similar letter to Jesus Govea. I have not seen that letter and therefore will not be able to respond to it by July 13, 2007. Please send me a copy. I will contact you again after I review the letter.

Very truly yours,

Susan M. Jennik

Encls.

EXHIBIT
MM
7-18-07

## AFFIDAVIT

Damarri Campbell, being duly sworn, deposes and says as follows:

1.    I submit this affidavit in support of my protest of the election of officers of the Allied International Union, (herein, the "Union").

2.    I am currently a member in good standing of the Union and have been for approximately ten months.

3.    Pursuant to a Nomination and Election Notice issued by the Union, I attended a special nomination meeting on April 30, 2007, with the intention of nominating or seconding the nomination of Larry Binyard for Secretary Treasurer Melvin Garland for President of the Union.

4.    The notice said that the Special Nomination Meeting would be held on April 30th from 10 a.m. to 12 p.m. and from 6 p.m. to 8 p.m. The meeting was to held at the Bedford Stuyvesant Multi-Service Center.

5.    I arrived at the meeting at around 6:20 p.m. There were approximately 11 or 12 people present, including the Union's officers. Also in attendance at the special nominations meeting were members in good standing Larry Binyard, Dwayne Hilton, and William Watson. We had planned that the four of us would nominate and second the nominations of Garland for President and Binyard for Secretary Treasurer.

6.    When I arrived, President Peggy Vanson was answering questions that Watson and Binyard were asking them. I asked Binyard and Watson in front of Vanson, who was standing approximately two feet from me, if they had a chance to vote. Binyard said, "we did not get a chance to vote." Watson said the same thing, that he did not get the chance to vote. Vanson then said that the ballots were closed. Vanson went over to the head table to speak to the people at the head table, then came back and confirmed that the ballots were closed. I was upset.

I did not say anything further to Vanson. I was at the meeting for only approximately 15 minutes.

     7.     Although the Union had announced that the special nominations meeting would be held between 6:00 p.m. and 8:00 p.m., I had no opportunity to nominate anyone.

Dated: New York, New York
       May 3, 2007

                              Damarri Campbell

Subscribed and sworn to before me
this 3rd day of May, 2007

       Thomas M. Murray

            **THOMAS M. MURRAY**
      **NOTARY PUBLIC, STATE OF NEW YORK**
           **No. 02MU6058040**
       **QUALIFIED IN NEW YORK COUNTY**
     **CERTIFICATE FILED IN NEW YORK COUNTY**
      **COMMISSION EXPIRES APRIL 30, _2007_**

2

# AFFIDAVIT

Melvin Garland, being duly sworn, deposes and says as follows:

1.      I submit this affidavit in support of my protest of the election of officers of the Allied International Union ("the Union") conducted in April and May, 2007.

2.      I am a member in good standing of the Union.

3.      Pursuant to a Nomination and Election Notice issued by the Union, I attended a special nomination meeting on April 30, 2007, with the intention of nominating Larry Binyard for Secretary Treasurer of the Union for the upcoming officer election, and to be nominated for President of the Union.  A copy of the notice is attached hereto as Exhibit A.

4.      The Union's Constitution and By-Laws provides that nominations take place at a special membership meeting in April, that nominations be made by any member in good standing, and be seconded by two members in good standing.  The Constitution further provides that "nominations shall not be closed until a reasonable opportunity has been afforded for all nominations."  A copy of the Constitution is attached hereto as Exhibit B.

5.      Also in attendance at the special nominations meeting were members in good standing Larry Binyard, Demarri Campbell, and William Watson.  We had planned that the four of us would nominate and second my nomination for President and Binyard's nomination for Secretary Treasurer.  Binyard and myself were opponents of the incumbent officers and known to be so by the Union.

6.      Although the Union had announced that the special nominations meeting would be held between 6:00 p.m. and 8:00 p.m., the Union closed nominations three (3) minutes after nominations were opened.  This was insufficient time for members to nominate anyone other than the incumbents, much less follow what was going on.

Jul-12-17   04:04:m   From-Kennedy, Jenn & & Murray, P.C.   12123830500    T-637  P.306/067  7-256

Apr-25-17   01:23m   From-Kennedy, Jennek & Murray, P.C.   12123960207    T-606  P.002  5-200

Tel (516) 742-0220                                                     1 800-577-5464
Fax (516) 742-0204

# ALLIED INTERNATIONAL UNION
## 332 WILLIS AVENUE - MINEOLA, NEW YORK 11501

### NOMINATION AND ELECTION NOTICE

#### Special Nomination Meeting

Officers positions to be filled:          President
                                          Vice President
                                          Secretary-Treasurer

#### Schedule of Nomination Meeting

Dates:   April 25th –   Members who live and work in the Los Angeles, CA area

#### Location and Times of Nomination Meeting

Place:   Renaissance Los Angeles Hotel          Time: 1 p.m. – 3 p.m.
         9620 Airport Boulevard
         Los Angeles, CA 90045
         (Room # will be posted in lobby)



Jul-16-07   2:01pm   From-Kennedy, Jennes & Murray, P.C.         12139960207         T-637   P.00°/007   F-965

Apr-25-07   01:25pm   From-Kennedy  Jennek & Murray, P.C          12125552207         T-023   P 023    F-290

EB'd  TTOT.

## Rules for Nominations and the Election

To be eligible to run for office, a candidate must be a member in good standing continuously for a period of at least one (1) year immediately preceding the nomination meeting; a candidate cannot be three (3) months or more in arrears in dues on the date of the nomination meeting; and a candidate must be employed in the industry as a guard, security officer, watchman, captain, lieutenant, sergeant, investigator or policeman, or be a full-time officer or paid employee of the Union.

To run for office, a candidate must be nominated and then seconded by two (2) members in good standing. No member can become a candidate unless he or she is nominated and seconded at the nomination meeting. A member who cannot attend the meeting may state his or her intention to accept a nomination for office if nominated and seconded at the meeting by filing written notice with the Chair of the Election Committee at Allied International Union, 332 Willis Avenue, Mineola, NY 11501 prior to such nomination or within five (5) days of the nomination.

Each member must present identification at the meeting and sign the attendance sheet. If there is no contest for any office and the candidates are found to be properly qualified, the nominees shall be declared elected.

If there is a contest for one (1) or more positions, an election will be held by mail ballot. Ballots will be mailed with instructions to all members in good standing on May 7th 2007. If a member does not receive a ballot, a duplicate can be requested by calling the Chair of the Election Committee at (515) 742-6120.

To be eligible to vote, a member must be in good standing. No write-in votes will be permitted. The ballots must be received by the Post Office no later than 9:00 a.m. on May 29th, 2007. The tally will be conducted at the Union office on May 30th, 2007 at 10:00a.m.

29 d   323A 868 8258  F.02                               11:35 AdAT 8EFH   8Ac11  1002-31-34H  11:35

JUL-12-07   73:99PM   From-Kennedy, Jennik & Murray, P.C.    12129580217    T-037   P.001/027   F-056

# Kennedy, Jennik & Murray, PC

113 University Place
New York, NY 10003
Ph: 212-358-1500
Fax: 212-358-0207
Contact: E. Saint, Ext. 21

Thomas M. Kennedy
Susan M Jennik
Thomas M. Murray
—
Of Counsel:
Larry Magarik

Elizabeth M. Pilecki (NJ,MA)
Pedro A. Elmest (OR)
William G. Schimmel (NY, IL, DC)
Reinhard W. Zeibucher (CA only)
Carm A. Joseph (MA, DC)
Christopher O. Gant (NJ only)

## facsimile transmission

Date        July 12  2037

To:         Mark Steven Soroka, 212-385-0552

From:       Susan M. Jennik

* * * COMMENTS * * *

Total pages: 8
Hard copy will not follow.

This information contained in this fax message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us by mail. Thank you.

# KENNEDY, JENNIK & MURRAY, P.C.

ATTORNEYS AT LAW

113 UNIVERSITY PLACE
NEW YORK, NEW YORK 10003
(212) 358-1500

\* \* \*

FACSIMILE (212) 358-0207

THOMAS M. KENNEDY
SUSAN JENNIK
THOMAS M. MURRAY
OF COUNSEL:
LARRY MAGARIK

ELIZABETH M. FILECK (NJ, MA)
RACHEL A. KRINER (DR)
OMAR A. JOSEF (MA, D.C.)
CHRISTOPHER G. GART (NJ ONLY)
WILLIAM G. SCHIMMEL (IL, MI, XJ)
BERNARD W. ROHRBACHER (CA ONLY)

May 4, 2007

**Via facsimile (516-742-0204) and regular mail**



Chair, Election Committee
Allied International Union
332 Willis Avenue
Mineola, NY 11501

Re:   **Allied International Union**

Dear Sir/Madam:

I write as counsel to Jesus Govea, nominee for Vice President in the upcoming officer election of the Allied International Union ("the Union"). Mr. Govea hereby requests the following:

1.   That on Monday, May 7, 2006, the Union distribute his campaign literature to the membership at his expense. However, in the event that the Union distributes any nominee's literature without charge, Mr. Govea requests that the Union distribute his literature also without charge. Mr. Govea further requests that the Union inform him immediately, through his undersigned counsel, of the procedure for submission and distribution of his literature to enable him to submit his literature for distribution by Monday, May 7, 2006.

2.   That on Monday, May 7, 2006, the Union allow him to inspect a list containing the names and last known addresses of all Union members. Mr. Govea requests that the Union inform him immediately, through his undersigned counsel, of the proposed time and place for said inspection.

3.   That the Union immediately provide him, through his undersigned counsel, with a list of any and all work sites at which Union members are employed or work.

4.   That the Union immediately inform him, through the undersigned counsel, of the times and places for preparation, mailing, receipt, opening, and counting of the ballots. Mr. Govea intends to exercise his right to have observers present at each of these events.

KENNEDY, JENNIK & MURRAY, P.C.
ATTORNEYS AT LAW

May 3, 2007
Page 2

Your prompt attention to this matter will be appreciate.

Very truly yours,

Susan M. Jennik

cc:    Alan Compagnon, Esq.
       Jesus Goves

Confirmation Report — Memory Send

```
                                    Page    : 001
                                    Date & Time: May-14-17  04:06pm
                                    Line 1  : 1212358E207
                                    Line 2  :
                                    E-mail  :
                                    Machine ID : Kennedy, Jennik & Murray, P.C.
```

| | | |
|---|---|---|
| Job number | : | 537 |
| Date | : | May-04 04:05pm |
| To | : | ☎1212425'583 |
| Number of pages | : | 003 |
| Start time | : | May-04 04:05pm |
| End time | : | May-04 04:06pm |
| Pages sent | : | 003 |
| Status | : | OK |
| Job number | : 517 | **\*\*\* SEND SUCCESSFUL \*\*\*** |

Kennedy, Jennik & Murray, PC
113 University Plaza
New York, NY 10003
Ph: 212-358-1500
Fax: 212-358-0207
Contact: J. Esposito, Ext. 33

Thomas M. Kennedy
Susan M. Jennik
Thomas M. Murray

of counsel
Larry Magarik

Elizabeth M. Pilecki (NJ,MA)
Roshni A. Kibner (CO)
William O. Kaupinen (NY, IL NJ)
Reinhard W. Rohrbacher (CA only)
Simon A. Joseph (MA, EE)
Christopher C. Ciem (NJ only)

_Facsimile transmission_

| | |
|---|---|
| Date: | May 4, 2007 |
| To: | Alan Gemignani, 212-425-1588 |
| From: | Susan M. Jennik |

- - - COMMENTS - - -

Total pages: 3
Hard copy will follow.

The information contained in this fax message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us by mail. Thank you.

Confirmation Report - Memory Send

```
Page      : 004
Date & Time: May-04-07  03:49pm
Line 1    : 12123567297
Line 2    :
E-mail    :
Machine ID : Kennedy, Jernik & Murray, P.C.
```

| | | |
|---|---|---|
| Job number | : | 536 |
| Date | : | May-04 03:47pm |
| To | : | 15167423254 |
| Number of pages | : | 003 |
| Start time | : | May-04 03:47pm |
| End time | : | May-04 03:49pm |
| Pages sent | : | 003 |
| Status | : | OK |

Job number    : 536           *** SEND SUCCESSFUL ***

**Kennedy, Jernik & Murray, PC**
113 University Place
New York, NY 10003
Ph: 212-358-1500
Fx: 212-358-0207
Contact: J. Bepatise, Ext. 38

Thomas M. Kennedy
Susan M. Jernik
Thomas M. Murray

Of Counsel
Larry Magrun

Elizabeth M. Niaud (NJ,PA)
Rachel A. Kreines (OR)
William C. Schlennel (NJ, IL, NY)
Bernhard W. Rosenberger (CA, DC)
Celine A. Joachim (NJ, NY)
Christopher G. Chiu (NJ only)

_Facsimile Transmission_

| | |
|---|---|
| Date: | May 4, 2007 |
| To: | Chair, Election Committee (1-516-742-0204) |
| From: | Susan M. Jernik |

* * - COMMENTS * * *

Total pages: 3
Hard copy will follow.

This information contained in this fax message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us by mail. Thank you.

# WEISSMAN & MINTZ LLC

### ATTORNEYS AT LAW
80 PINE STREET
33rd FLOOR
NEW YORK, NEW YORK 10005
(212) 509-0915
FAX (212) 425-1586

DAVID A. MINTZ
STEVEN P. WEISSMAN*
ALAN M. COMPAGNON
JAMES M. COONEY*
ROSEMARIE CIPPARULO*
WILLIAM G. SCHIMMEL*
ANNMARIE PINAREK

JOEL N. WEISSMAN (1903-1968)
MARK ROSENBAUM (1955-2002)
*ADMITTED TO NEW JERSEY BAR ALSO • NJ BAR

ONE EXECUTIVE DRIVE, SUITE 200
SOMERSET, NEW JERSEY 02873
(732) 568-4565
FAX (732) 560-9739



May 10, 2007

Susan M. Jennik, Esq.
Kennedy, Jennik & Murray, P.C.
113 University Place
New York, New York 10003

Re:  Allied International Union Election

Dear Ms. Jennik:

On behalf of Allied International Union ("Allied"), I am responding to your letter of May 4 regarding your campaign and election-related requests on behalf of Jesus Govea, candidate for Vice President in the above-referenced election.

1.    You request that Allied distribute Mr. Govea's campaign literature to the Allied membership at his expense and that Allied inform him immediately, through his counsel, of the procedure for submission and distribution of his literature.  As you know, Title IV, Section 401(c) requires a labor organization to comply with the reasonable request of a candidate to mail his campaign literature at the candidate's expense, and to provide equal treatment in this regard to all bona fide candidates. Allied's procedures governing campaign mailings are attached below.  However, it is unlawful under Section 401(g) for a labor organization or any employer to contribute or apply monies to promote any candidacy in a union election.

With respect to Mr. Govea's request, Allied has a good faith belief that the $2,057.00 in postage and the other costs associated with Mr. Govea's proposed mailing and the fees associated with your law firm's representation of Mr. Govea have been paid or will be paid by SEIU 32 BJ, or by an agent of SEIU 32 BJ – and at SEIU 32 BJ's direction.  Allied also believes that Mr. Govea's campaign, his proposed mailing, your coordinated representation of Mr. Govea (in Los Angeles) and Messrs. Garland and Binyard (in New York) – all under the direction of SEIU 32 BJ, constitutes an interstate conspiracy to violate Section 401(g) of Title IV.

Susan M. Jennik, Esq.
May 10, 2007
Page 2

For this reason, Allied is compelled to deny your request on behalf of Mr. Govea to distribute his campaign literature. Allied does not discriminate against Mr. Govea, but applies Title IV consistently to all bona fide candidates. Allied is also confident that any finder of facts would easily pierce this "corporate" veil and connect the dots between SEIU 32 BJ and these campaign expenditures should your clients seek intervention by a district court or the Secretary of Labor.

As we discussed on May 8, and notwithstanding the evidence of SEIU 32 BJ's unlawful interference in Allied's election, Allied would review its decision regarding Mr. Govea's request to mail his campaign material if you and Mr. Govea would certify that Mr. Govea's mailing and your legal representation of Mr. Govea and his colleagues during this election were funded solely at Mr. Govea's expense and in compliance with Title IV, or if you could provide evidence of any other sources of lawful funds supporting Mr. Govea's candidacy. To facilitate this review, and in response to your request to provide the proposed language in writing, Allied asks that Mr. Govea and your law firm each execute and notarize the following certifications:

> I, Jesus Govea, certify that all monies that have been expended and will be expended to produce and distribute my campaign literature in the election for Vice President of Allied International Union (including, but not limited to paper, printing and postage) and to retain Susan M. Jennik, Esq. during this election are my personal funds, and that my election campaign is not directed by SEIU, SEIU 32 BJ or an agent of SEIU or SEIU 32 BJ. To the extent that monies used in support of my campaign are not my personal funds, the funds provided to support my campaign and to pay for my legal representation during this election have come and shall continue to come from the following lawful sources: [list sources and amounts – the names of members of Allied International Union employed by an Allied-represented employer can be redacted]. I also certify that no monies came directly or indirectly from SEIU or SEIU Local 32 BJ, any agent of SEIU or SEIU 32 BJ, any organization to which SEIU or SEIU 32 BJ contributes funds, or any other union or employer.

> I, Susan Jennik, Esq., certify that all monies that have been expended and will be expended to produce and distribute Jesus Govea's campaign literature in the election for Vice President of Allied International Union (including, but not limited to paper, printing and postage) and to retain me and my law firm in matters relating to the 2007 union election at Allied International Union have come and shall continue to come from the personal funds of my clients, Jesus Govea, Melvin Garland and Larry

Susan M. Jennik, Esq.
May 10, 2007
Page 3

Binyard, and that my clients' election campaign and legal representation
is not directed by SEIU, SEIU 32 BJ or an agent of SEIU or SEIU 32 BJ.
To the extent that monies used in support of these campaigns and for my
legal services are not from my clients' personal funds, the monies
provided in support of their campaigns and to retain me and my law firm
have come and shall continue to come from the following lawful sources:
[list sources and amounts – the names of members of Allied International
Union employed by an Allied-represented employer can be redacted]. I
also certify that no monies have been directly or indirectly provided by
SEIU or SEIU Local 32 BJ, any agent of SEIU or SEIU 32 BJ, any
organization to which SEIU or SEIU 32 BJ contributes funds, or any other
union or employer.

If this approach is acceptable to you and your clients, please provide me with the
certifications as soon as possible. Allied would also consider an alternative
approach if it would serve an equivalent purpose and would be more acceptable to
you or your clients.

2.    You also request that Allied permit Mr. Govea's to inspect a list containing the
names and last known addresses of all Allied members. As you know, Title IV,
Section 401(c) provides that

every bona fide candidate shall have the right, once within 30 days
prior to an election of a labor organization in which he is a
candidate, to inspect a list containing the names and last known
addresses of all members of the labor organization who are subject
to a collective bargaining agreement requiring membership therein
as a condition of employment, which list shall be maintained and
kept at the principal office of such labor organization by a
designated official thereof.

The Code of Federal Regulations issued by the Office of Labor-Management
Relations on this matter also provides in 29 C.F.R. § 452.72 that

where a mail ballot system is employed under which ballots
are returnable as soon as received by members, the right to
inspect must be accorded within the 30-day period prior to
the mailing of the ballots to members.

In this election, Mr. Govea, as the bona fide candidate, would have been permitted
to inspect the membership list at Allied's principal and only office located at 332

Susan M. Jennik, Esq.
May 10, 2007
Page 4

Willis Avenue, Mineola, New York during the 30-day period between April 7 and
May 7, 2007. If you have any legal authority to dispute Allied's interpretation of
Title IV on this matter, please let me know as soon as possible.

3.    You also request that Allied provide you, on behalf Mr. Govea, with a list of any
and all work sites at which Allied members are employed or work. Please be
advised that Allied does not have such a list of sites.

4.    Finally, you request that Allied inform you, on behalf of Mr. Govea, of the times
and places for the preparation, mailing, receipt, opening and counting of the
ballots. As I advised you on May 7, the ballots were prepared and mailed on May
7 by an independent mailing house. The ballots will be opened and counted at
10:00 a.m. on May 30, 2007 at Allied's office located at 332 Willis Avenue,
Mineola, New York. If Mr. Govea wishes to have an observer present at the
opening and counting of the ballots, please let me know so that proper
accommodations can be made.

If I can be of further assistance, or if you wish to discuss this matter further, please do not
hesitate to call me.

Very truly yours,

David A. Mintz

Enclosure

# DISTRIBUTION OF CAMPAIGN LITERATURE

Procedures for a campaign mailing are as follows:

Allied International Union shall comply and assist with a reasonable request of a candidate to mail campaign literature to the membership at the candidate's expense. The conditions under which a mailing will be made shall be applied to all candidates. They are as follows

All mailings using the union's membership mailing list and address labels shall be supervised by Tara Parrulo.

Ms. Parrulo and her staff shall place the membership address labels on the candidate's mailing in the union office and shall deliver the candidate's mailing to the post office. The cost to the union associated with the time to place address labels on the envelopes and to deliver the envelopes to the post office shall be borne by the candidate. A candidate may observe the addressing of the mailing and the delivery to the post office.

In order to participate in this process, the candidate must:

1. Notify Ms. Parrulo at least **two business days** prior to the day on which the candidate wishes the mailing to go out. Ms. Parrulo can be reached at the union office or by leaving a message for her at the union office at (516) 742-3121.

2. The candidate's mailing must be brought to the union office **by 10 a.m.** of the day that the candidate wishes the mailing to go out.

3. The mailing must be brought to the union office in already **stuffed, sealed and stamped** envelopes. The only tasks remaining would be affixing the address labels to the envelopes and delivery to the post office.

4. The candidate may call Ms. Parrulo to determine in advance the number of pieces necessary for a complete mailing to the membership.

5. The candidate will be billed for the cost to the union associated with the mailing after completion of the mailing. The candidate is expected to promptly reimburse the union and must do so before additional mailings will be sent out.

# KENNEDY, JENNIK & MURRAY, P.C.

## ATTORNEYS AT LAW
113 UNIVERSITY PLACE
NEW YORK, NEW YORK 10003
(212) 358-1500.

⚬ ⚬ ⚬

FACSIMILE (212) 358-0207

THOMAS W. KENNEDY
I M. JENNIK
Th. JAS M. MURRAY
OF COUNSEL
LARRY MAGARIK

ELIZABETH M. PILECKI (NJ, MA)
RACHEL A. KIPTNER (OR)
OMAR A. JOSEFE (NA, DC)
CHRISTOPHER G. GARI (NJ ONLY)
WILLIAM G. SCHIMMEL III, MI, NJ)
BERNHARD W. HOHREACHER (CA ONLY)

May 15, 2007

Via facsimile (212-425-1588 and regular mail
David A. Mintz
Weissman & Mintz
80 Pine Street
New York, NY 10005



Re:    Allied International Union Election of Officers

Dear Mr. Mintz:

        I write as counsel to Jesus Govea, candidate for Vice President in the election of officers of the Allied International Union ("Union"), in response to your letter of May 10, 2007. I will address each numbered point in your letter:

        1.      Your request that Mr. Govea provide information to the Union about the sources of his campaign funds prior to a mailing is unreasonable and violates Section 401(c) of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 481(c). The Supreme Court has ruled that the Union may only consider whether the request of a candidate to do a mailing is reasonable and that the reasonableness of any restrictive rules imposed by the Union is not relevant. Masters, Mates & Pilots v. Brown, 498 U.S. 466 (1991). This proposal is a thinly veiled threat of retaliation for Mr. Govea's candidates and his supporters. The offer to redact the names of Union members does not diminish the coercive impact of requiring only Mr. Govea to identify his supporters which is an irrelevant matter for purposes of this request.

        I note that the "Distribution of Campaign Literature" rules you included with your letter contain no mention of the requirement for certification of the source of campaign funds. Moreover since Mary Beth Stafford, Mr. Govea's opponent in this election, has been permitted to do a campaign mailing the Union is discriminating in allowing access to the membership list. By refusing to comply with Mr. Govea's reasonable request for a mailing, the Union is jeopardizing the integrity of the election process and possibly subjecting the Union and the members to a rerun election supervised by the U.S. Department of Labor but at the expense of the Union. In addition, my clients have information that Ms. Stafford has done a mailing, traveled to California to campaign, and appeared at worksites during times that would normally be her working hours. Mr. Govea requests an investigation by Allied of the campaign activities of Ms. Stafford and whether she is using union or employer resources for her campaign.

KENNEDY, JENNIK & MURRAY, P.C.
ATTORNEYS AT LAW

May 15, 2007
Page 2

2.      The Union is also denying Mr. Govea's request that he be given the opportunity to inspect a list of the members pursuant to LMRDA § 401(c). Your quotation from the regulation regarding this right of inspection is incomplete. The regulation states: "It would be an unreasonable restriction to permit inspection of lists only after the ballots have been mailed or the balloting has commenced." 25 C.F.R. § 452.77. Here, since the nominations were not completed until April 30, 2007, just seven days before the ballots were sent out, it is unreasonable for the Union to deny Mr. Govea's request. It is also unreasonable to limit the right of inspection of the membership list to the Union's New York office, since the Union represents members throughout the country, including California where Mr. Govea resides.

3.      Your response to the request that Mr. Govea be provided with a list of worksites is not credible. Since Ms. Stafford apparently has access to information about the Union's worksites, which she is using for her campaign, the Union is again discriminating against Mr. Govea. I have also advised you that my clients would be willing to review the collective bargaining agreements, a right provided to them by LMRDA § 104. You have not responded to that request.

4.      The Union failed to provide Mr. Govea with the time and place of the printing and mailing of the ballots, other than to identify a "mailing house". This failure violates the regulation regarding election observers which states as follows:

          (c) In any secret ballot election which is conducted by mail, regardless of whether the ballots are returned by members to the labor organization office, to a mail box, or to an independent agency such as a firm of certified public accountants candidates must be permitted to have an observer present at the preparation and mailing of the ballots, their receipt by the counting agency and at the opening and counting of the ballots.

You have advised me that the ballots are being sent to a Post Office Box. Mr. Govea has a right to have an observer present when the ballots are picked up from the Post Office Box and to accompany the ballots when transported to the Union office for counting. Please advise when and where the ballots will be picked up. Mr. Govea will have an observer present for the ballot counting process.

                                              Very truly yours,

                                              Susan M. Jennik

cc:   Jesus Govea

Confirmation Report — Memory Send

                                    Page      : 001
                                    Date & Time: May-16-07  01:20pm
                                    line 1    : 1212350020?
                                    line 2    :
                                    E-mail    :
                                    Machine ID : Kennedy, Jennik & Murray, P.C.

Job number         :   775

Date               :   May-16 01:13pm

To                 :   ☎1212425158#

Number of pages    :   003

Start time         :   May-15 01:13pm

End time           :   May-15 01:20pm

Pages sent         :   003

Status             :   OK

Job number    : 775          *** SEND SUCCESSFUL ***

Kennedy, Jennik & Murray, PC          Thomas M. Kennedy
113 University Place                   Susan M. Jennik
New York, NY 10003                     Thomas M. Murray
Ph: 212-358-1500                       Of Counsel
Fax: 212-358-0207                      Larry Magarik
Contact: L Sahaf, Ext. 21
                                       Elizabeth M. Flood (NJ,PA)
                                       Rachel A. Kleve (OR)
                                       William D. Schimmel (NY, IL, MA)
                                       Marianne W. Schoecher (OA, entry)
                                       Oma A. Joseph (MA), (NC)
                                       Christopher G. Clani (NY, n-b)

Facsimile transmission

    Date,        May 16, 2007
    To:          David A. Mintz, 212-425-1588
    From:        Susan M. Jennik

         - - -  COMMENTS  - - -

              Total pages: 3
          Hard copy will follow.

The information contained in this fax message is intended only for the personal and confidential use of the designated recipient(s) named above. This message may be an attorney-client communication and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us by mail. Thank you.



STAPLES

that was easy.

Low prices. Every item. Every day.
110% Price-Match. Guaranteed.
5530 Sunrise Highway
Massapequa, NY 11758
(516) 799-9616

SALE

119885 4 005 16031
0146 05/09/07 02:08

*****************************

$5,000 SHOPPING SPREE AT STAPLES!
ENTER TO WIN!

We care about what you think!
Take a short survey and be entered
into a monthly drawing.  Just log on to
www.staples-survey.com
or call 1-800-900-7305

Your survey code: 0180 0898 6044 2681

***Toma nuestra encuesta en español en
la página del internet o por teléfono.
Consiga las reglas en la tienda.***

See store for rules.
Survey code expires 05/16/2007.
*****************************

OUR PRICE

QTY SKU

REWARDS NUMBER 2240035779
1900 501-1300 B&4 LTR B              65.00
    961023         0.035ea           65.00
SUBTOTAL                              5.31
    Standard Tax 8.625%             $70.61

TOTAL                               105.00

Cash

Cash Change                          24.39

TOTAL ITEMS    1000

---



that was easy.

Low prices. Every item. Every day.
110% Price-Match. Guaranteed.
5600 Sunrise Highway
Massapequa, NY 11758
(516) 799-9616

SALE

084711 4 005 18105
0146 05/09/07 09:40

QTY SKU                           OUR PRICE

REWARDS NUMBER 2260035779
901 501-1300 B2M2 BASE               62.63
    381005         0.125ea
901 MACHINE FOLDING                  10.02
    301720         0.020ea           72.65
SUBTOTAL                              6.27
    Standard Tax 8.625%             $76.92

TOTAL                                78.92

MasterCard
Card No.: XXXXXXXXXX8138 <S>
Auth No.: 035945

TOTAL ITEMS    1002

Compare and Save



EXHIBIT
55
7-16-07
FMD        EL

---

STAPLES

that was easy.

Low prices. Every item. Every day.
110% Price-Match. Guaranteed.
5500 Sunrise Highway
Massapequa, NY 11758
(516) 799-9616

SALE

084711 4 005 16939
0146 05/09/07 09:47

*****************************

$5,000 SHOPPING SPREE AT STAPLES!
ENTER TO WIN!

We care about what you think!
Take a short survey and be entered
into a monthly drawing.  Just log on to
www.staples-survey.com
or call 1-800-900-7305

Your survey code: 0180 8650 9375 112j

***Toma nuestra encuesta en español en
la página del internet o por teléfono.
Consiga las reglas en la tienda.***

See store for rules.
Survey code expires 05/16/2007.
*****************************

QTY SKU                           OUR PRICE

REWARDS NUMBER 2260035779
110 ENVELOPE 9EH #10 ~                E4.90
    716103031257     8.490ea
1500 1001-2000 B&4 LTR               30.00
    381024          0.060ea
1500 MACHINE FOLDING                 30.00
    381720          0.020ea
SUBTOTAL                            184.90
    Standard Tax 8.625%             15.95
TOTAL                              $200.85

MasterCard                          200.85
Card No.: XXXXXXXXXX8138 <S>
Auth No.: 045868

# TAUBMAN KIMELMAN & SOROKA, LLP

COUNSELLORS AT LAW

30 VESEY STREET, 6TH FLOOR

NEW YORK, NEW YORK 10007

(212) 233-8440

TELECOPIER (212) 385-0862

Website: TKSLawyers.com

PHILIP E. TAUBMAN
GLENN A. KINELMAN♦
DR. STEVEN SOROKA
———
ANTONETTE H. MILCETIC

♦ALSO ADMITTED IN NJ AND FL

OF COUNSEL
JULIUS SANTMAN
ANNETTE Z. KOLMAN
CHARLES LAYNE
ANTHONY G. GROSS

July 31, 2007

Larry Binyard
684 Alabama Avenue
Brooklyn, New York 11207

RE:    Protest to Nomination and
       Election of Officers recently held
       by the Allied International Union

Dear Mr. Binyard:

This office has been retained as counsel to a Committee of your fellow Members of the Allied International Union, who have been appointed to investigate all protests including yours, to the Nomination, Campaigning for and Election of Officers to the Allied International Union.

The Committee will be completing its investigation on August 3, 2007 and will not be questioning witnesses or accepting any exhibits after that date. Please bring all witnesses on August 3, 2007 and submit all exhibits on or prior to that date, both in support of your protests and relating to Union and/or Employer involvement in campaigning for Union Office. All witnesses who appear before the Committee may appear with counsel.

Very truly yours,

MARK STEVEN SOROKA

MSS:ec



# TAUBMAN KIMELMAN & SOROKA, LLP

COUNSELLORS AT LAW

30 VESEY STREET, 6TH FLOOR

NEW YORK NEW YORK 10007

(212) 227-5140

TELECOPIER (212) 385-0842

Website: TKSLawyers.com

PHILIP F. TAUBMAN
GLENN A. KIMELMAN*
R. STEVEN SOROKA

ANTONETTE M. MUGELLO

*ALSO ADMITTED IN N.J AND FL

OF COUNSEL
JULIUS GANTMAN
ANNETTE Z. KOLMAN
CHARLES LAVINE
ANTHONY G. GROSS

July 31, 2007

Jesus Govea
4783 West 133rd Street
Apt. 17
Hawthorne, California 90250

RE:     Protest to Nomination and
Election of Officers recently held
by the Allied International Union

Dear Mr. Govea:

This office has been retained as counsel to a Committee of your fellow
Members of the Allied International Union, who have been appointed to
investigate all protests including yours, to the Nomination, Campaigning for
and Election of Officers to the Allied International Union.

The Committee will be completing its investigation on August 3, 2007
and will not be questioning witnesses or accepting any exhibits after that date.
If you have any additional witnesses or exhibits, please bring any additional
witnesses on August 3, 2007 and submit any additional exhibits on or prior to
that date, both in support of your protests and relating to Union and/or
Employer involvement in campaigning for Union Office. As you will recollect,
when interviewed by the committee you promised to provide canceled checks,
paid receipts and other evidence of campaign expenditures you personally
made. Please provide such documentations by August 3, 2007. All witnesses
who appear before the Committee may appear with counsel.

Very truly yours,

MARK STEVEN SOROKA

MSS:ec



# TAUBMAN KIMELMAN & SOROKA, LLP

COUNSELLORS AT LAW

30 VESEY STREET, 8TH FLOOR

NEW YORK, NEW YORK 10007

(212) 227-8140

TELECOPIER (212) 385-0082

Website: TKSLawyers.com

PHILIP E. TAUBMAN
GLENN A. KIMELMAN*
*R STEVEN SOROKA

ANTOINETTE M. MILGETIC
— ——
*ALSO ADMITTED IN NJ AND FL

OF COUNSEL
JULIUS GANTMAN
ANNETTE Z. KOLMAN
CHARLES LAVINE
ANTHONY S GROSS

July 31, 2007

Mary Beth Stafford
79 Beach Road
Massapequa, New York 11758

RE:  Protest to Nomination and
Election of Officers recently held
by the Allied International Union

Dear Ms. Stafford:

This office has been retained as counsel to a Committee of your fellow Members of the Allied International Union, who have been appointed to investigate all protests including yours, to the Nomination, Campaigning for and Election of Officers to the Allied International Union.

The Committee will be completing its investigation on August 3, 2007 and will not be questioning witnesses or accepting any exhibits after that date. If you have any additional witnesses or exhibits, please bring any additional witnesses on August 3, 2007 and submit any additional exhibits on or prior to that date, both in support of your protests and relating to Union and/or Employer involvement in campaigning for Union Office. All witnesses who appear before the Committee may appear with counsel.

Very truly yours,

MARK STEVEN SOROKA

MSS:ec

EXHIBIT

## TAUBMAN KIMELMAN & SOROKA, LLP

COUNSELLORS AT LAW

30 VESEY STREET, 6TH FLOOR

NEW YORK, NEW YORK 10007

(212) 227-8140

TELECOPIER (212) 385-0682

Website: TKSLawyers.com

PHILIP F. TAUBMAN
GLENN A. KIMELMAN*
MARK STEVEN SOROKA

ANTONETTE M. MILCETIC

*ALSO ADMITTED IN NJ AND FL

OF COUNSEL
JULIUS EASTMAN
ANNETTE Z. KOLHAN
CHARLES LAYNE
ANTHONY R. GROSS

July 31, 2007

Melvin Garland
559 East 181st Street
Apt. 5K
Bronx, New York 10457

RE:   Protest to Nomination and
Election of Officers recently held
by the Allied International Union

Dear Mr. Garland:

This office has been retained as counsel to a Committee of your fellow Members of the Allied International Union, who have been appointed to investigate all protests including yours, to the Nomination, Campaigning for and Election of Officers to the Allied International Union.

The Committee will be completing its investigation on August 3, 2007 and will not be questioning witnesses or accepting any exhibits after that date. Please bring all witnesses on August 3, 2007 and submit all exhibits on or prior to that date, both in support of your protests and relating to Union and/or Employer involvement in campaigning for Union Office. All witnesses who appear before the Committee may appear with counsel.

Very truly yours,

MARK STEVEN SOROKA

MSS:ec

EXHIBIT

WW 8/14/07
(EF)

# TAUBMAN KIMELMAN & SOROKA, LLP

COUNSELLORS AT LAW

40 VESEY STREET, 6TH FLOOR

NEW YORK, NEW YORK 10007

(212) 227-8140

TELECOPIER (212) 965-0862

Website: TKSLawyers.com

PHILIP E. TAUBMAN
GLENN A. KIMELMAN
JHK STEVEN SOROKA
———
ANTONETTE M. MILOETIC
———
*ALSO ADMITTED IN NJ AND FL

OF COUNSEL
JULIUS GARTMAN
ANNETTE Z. KOLMAN
CHARLES LAVINE
ANTHONY G. GROSS

August 10, 2007

**Via: UPS Overnight Mail**
Melvin Garland
558 East 181st Street, Apt. 5K
Bronx, New York 10457

RE:    Protest to Nomination and
Election of Officers recently held
by the Allied International Union

Dear Mr. Garland:

This office has been retained as counsel to a Committee of your fellow Members of the Allied International Union, who have been appointed to investigate all protests including yours, to the Nomination, Campaigning for and Election of Officers to the Allied International Union.

This will confirm the scheduling of your interview by the Committee and its counsel for August 14, 2007 at 11:00 a.m. The interview will take place in the conference room of Taubman Kimelman & Soroka, LLP, at 30 Vesey Street (corner of Vesey Street and Church) on the 6th floor, New York, New York 10007. You will be questioned regarding the protests you filed and **protests filed by any other Member. Please bring with you any documents you wish to provide to the Committee in support of your protests.** There will be a Court Reporter present recording the questions and your answers at the interview. All witnesses who appear before the Committee may appear before the Committee with Counsel.

Very truly yours,

MARK STEVEN SOROKA

MSS:smj



## AFFIDAVIT

I, Boyce McFarlane, swear under the penalty of perjury that the following statements are true:

I am a member of Allied International Union and have been for the past twenty seven (27) years. On April 30, 2007, I attended the Nomination meeting of Allied International Union at the Bed-Stuy Multi Service Center in Brooklyn. I arrived at the meeting at around 6:40 p.m. with my friend. There were about twenty or so members in attendance when I arrived. Peggy Vanson and Joe Glennan were at the front of the meeting room discussing union matters with members in the audience. Not long after I arrived, Tara Pamulo stood up and asked if anyone had any nominations for the office of President, Vice President and Secretary Treasurer. There was no response from the members. Peggy and Joe again answered other member's questions about various union matters such as health insurance, sick days etc. At around 7:40 p.m. or so, Tara stood up again and asked if there were any other nominations for office of President, Vice President and Secretary Treasurer. Again there was no response from the audience. The meeting officially ended at about 7:50 p.m. or so, although everyone remained in the meeting area talking with one another for another few minutes. At around 8:00 p.m., I left the meeting room and waited in the front of the building to say goodbye to MaryBeth Stafford who was still inside the building talking to a member who I did not know. At around 8:10 p.m., MaryBeth walked out with Tara and the member they were speaking with. They said goodbye to me and I left with my friend.

In all of my 27 years of membership with Allied Union, I have attended the majority of General Membership and Nomination meetings. The Union always conducts two nomination meetings in New York to accommodate the officers working the day and night tours. At every nomination meeting that I have ever been to, every member is afforded several opportunities to be nominated. The meeting usually lasts for two hours and the Election Officer opens up nominations two or three times during the course of the meeting, affording each member an opportunity to nominate the candidate of their choice. On April 30th, every member in attendance was afforded several opportunities to be nominated during the time I was there.

_Boyce McFarlane_
Boyce McFarlane

Sworn to me this 9
Day of August, 2007

NOTARY PUBLIC
Lic # 01KR6064562
Qualified in Nassau Co.
Expires: 11/11/09

EX 7Y

## AFFIDAVIT

I, Haywood Gerst, swear under the penalty of perjury that the following statements are true:

I am a member of Allied International Union and have been for the past fifteen (15) years. On April 30, 2007, I attended the Nomination meeting of Allied International Union at the Bed-Stuy Multi Service Center in Brooklyn. I was late to the meeting, having arrived at around 6:40 p.m. When I arrived, there were about twenty members in attendance. Peggy Vauson and Joe Glennor were at the front of the meeting room answering the member's questions about medical insurance. Not long after I arrived, Tara Pamulo stood up and asked if anyone had any nominations for the office of President, Vice President and Secretary Treasurer. No one replied. Members then asked more questions of Peggy and Joe in regards to their contracts. Between 7:40 and 7:50 p.m., Tara stood up again and asked if there were any other nominations for office of President, Vice President and Secretary Treasurer. Again no one replied. Tara then asked the members in attendance to vote to adjourn the meeting. All the members voted yes to close the meeting. Most of the members stayed in the meeting room to talk to one another, including myself. At around 8:00 p.m., I left the meeting room and waited in the front of the building to say goodbye to everyone. At around 8:10 p.m., MaryBeth Stafford and Tara exited the building with another member who was unknown to me. I said goodbye to them and left.

Haywood Gerst

Sworn to me this 2nd
Day of August, 2007

LYNNE C. KRAMER
NOTARY PUBLIC
# 01KR6066692
NASSAU COUNTY
EXPIRES: 11/19/09

Ex 22

08/31/2007  15:97    2124251800    WEISSMAN & MINTZ LLC    PAGE  02/04

May-15-07  02:59pm  From-Kennedy, Jennik & Murray, P.C.    2123893817    T-808  P.002/005  F-535

# KENNEDY, JENNIK & MURRAY, P.C.

### ATTORNEYS AT LAW

113 UNIVERSITY PLACE
NEW YORK, NEW YORK 10003
(212) 358-1500

FACSIMILE (212) 358-2507

THOMAS M. KENNEDY
SUSAN H. JENNIK
THOMAS M. DE IMUS
OF COUNSEL:
LARRY MAGARIK

ELIZABETH M. RIEGO (NJ & NY)
RACHEL A. PARTNON (NY)
SINA A. JOSEPH (NY, D.C.)
LARRY TOMER D. CAST (NJ ONLY)
VIVIAN E. SCHRADE (IL, NY, NJ)
LEONHARD H. ROSSENALCHER (DC ONLY)

May 18, 2007

By Fax and Regular Mail
David A. Mintz
Weissman & Mintz
80 Pine Street
New York, NY 10005

Re:    Allied International Union Election of Officers

Dear Mr. Mintz:

I write as counsel to Jesus Govea, candidate for Vice President in the election of officers of the Allied International Union ("Union"). You have not responded to my letter of May 15, 2007, requesting information about when and where the ballots will be picked up from the Post Office. The ballots should not be picked up from the Post Office on May 29, 2007 and stored in the Union office overnight until they are counted on May 30, 2007. They should be picked up on the morning of May 30, 2007.

I also request on behalf of Mr. Govea, information about the number of ballots which have been received by the Post Office. Normally, the Post Office maintains a tally of the mail which has come in each day. I request that information now and on a weekly basis until the ballots are counted.

Finally, a number of members have reported that they are having difficulty requesting a ballot if they did not receive one. Members report that they have called the Union office during business hours and that no one has answered the phone or it has been busy for long periods of time. There is no answering machine for members to leave a message to request their ballot. Obviously, members should not be discouraged from requesting a ballot. The following members have not received ballots and have had difficulty reaching the Union office to request another one:

D Ramdas, 119 Ensted/Ford St, Apt B, Brooklyn, NY 11207
Joyce Farrell, 345 Classon Ave Apt 11A, Brooklyn, NY 11205
Keon Paul, 306 Miller Ave, Brooklyn, NY 11207
Lillian Torres, 474 W 150th St, Apt 2F, NY, NY 10031

06/02/2007  15:37    2124251505                    WEISSMAN & MINTZ LLC                    PAGE  03/14

May-18-07  02:09pm   From-Kennedy, Jennik & Murray, P.C.          12125502217          T-901  P.023/003  F-195

KENNEDY, JENNIK & MURRAY, P.C.
ATTORNEYS AT LAW

May 18, 2007
Page 2

Pedro Michez, 3340 Bailly Ave, Bronx, NY 10463
Winston Witron, 1419 New York Ave, Brooklyn, NY 13210
Alexandria Klzer, 2185 Reed Mill Lane, Bronx, NY 10475
Leola Milton, 4113 Foster Ave, Brooklyn, NY 11203
Francisco Melendez, 4113 Foster Ave, Brooklyn, NY 11203
Myriam Castillo, 1505 Grand Concourse, Bronx, NY 16452
Jessica Meyers, 238 W 116th St, Apt 3C, NY, NY 16025
Tommy Harvey, 952 St. Marks Ave, Apt C6, Brooklyn, NY 11213
Elizabeth Edwards, 680 Monroe St., Brooklyn, NY 11221
Kanika Coleman, 2425 Nostrand Ave, Apt 624, Brooklyn, NY 11210
Justine Nicholo, 60 McClellan St, Apt 2F, Bronx, NY 10452
Jeoffrey Barton, 774 E 225th St, Apt 1B, Bronx, NY 10466
Mikundy, Sylla, 1093 Sheridan Av, Apt 2D, Bronx, NY 10456
Tyronella Richardson, 2890 8th Ave, Apt 2C, ny, ny 10039
Cecil Edwards, 2386 Grand Ave, Apt 4D, Bronx, NY 10468
Thomas Gonsales, Jr., 2252 Haviland Ave, Apt J, Bronx, NY, 10462
Zachary Smith, 37 Watkins Pl, New Rochelle, NY 10801

Please ensure that ballots are sent to these members. Thank you for your cooperation in this matter.

Very truly yours,

Susan M. Jennik

cc: Jesus Govea

08/30/2007  16:37   2124251580          LEICHMAN & MINTZ LLC              PAGE  04/04

# KENNEDY, JENNIK & MURRAY, P.C.

### ATTORNEYS AT LAW
113 UNIVERSITY PLACE
NEW YORK, NEW YORK 10003
(212) 358-1500

· · ·

FACSIMILE (212) 358-0207
◊♦♦◊

THOMAS M. KENNEDY
SUSAN M. JENNIK
THOMAS M. MURRAY
OF COUNSEL
LARRY MAGARIK

ELIZABETH M. SILCOX (N.J. BAR)
RACHEL A. FORTHEM (OR)
OMAR A. JOSEPH (MA, D.C.)
CHRISTOPHER E. GART (NJ & NY)
WILLIAM S. SCHARME (IL, PA, NJ)
BERNHARD W. ROHRBACHER (CA ONLY)

May 29, 2007

**By Fax and Regular Mail**
David A. Mintz
Weinstein & Mintz - NY
80 Pine Street
New York, NY 10005

### Allied International Union Officer Election

Dear Mr. Mintz:

The observers for Jesus Govea at the ballot count for the above-referenced election are Melvin Garland and Anthony Sessions. Ramona McFarland is an alternate observer, if necessary.

Thank you for your cooperation in this matter.

Very truly yours,

Susan M. Jennik

cc:  Jesus Govea

EX 888

# AFFIDAVIT

I swear under the penalty of perjury that the following statements are true:

On May 21, 2007, while I was working for Summit Security at 1411 Broadway, a man who identified himself as a representative from SBIU Local 32BJ approached me and handed me a "Vote for Jesus" flyer. He told me to vote for Jesus in the Allied Union election. While working for Summit Security in the past I have been approached by 32BJ representatives while telling me to join their union.

_____

Joseph Guerrier

Sworn to me this 2nd
Day of August, 2007

_____  8/2/07

Notary Public

LYNNE C. KRAMER
Notary Public of N.Y.
Lic No. 01KR6066562
Qualified in Nassau County
Term Expires November 19, 2009