UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                        )
ALLIED INTERNATIONAL UNION,             )
                                        )
          Plaintiff,                    )
                                        )
v.                                      )    No. 1:08-cv-3357-AKH
                                        )    Hon. Alvin K. Hellerstein
SERVICE EMPLOYEES INTERNATIONAL         )    ECF CASE
UNION, LOCAL 32BJ, *et al.*,            )
                                        )
          Defendants.                   )
_____)

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF JOINT MOTION TO DISMISS

This memorandum is submitted on behalf of all six defendants – Service Employees International Union Local 32BJ ("Local 32BJ"), its parent affiliate Service Employees International Union ("SEIU"), another SEIU-affiliated local union in California, SEIU Local 1877 ("Local 1877"), and three individuals (collectively, "defendants") – in support of their joint motion to dismiss the complaint in its entirety under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

The 27-page racketeering complaint filed by plaintiff Allied International Union ("AIU") is as long on words as it is short on substance. While Count I of the complaint sounds in the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, the facts alleged do not, as they must under RICO, make out the claim that the defendants have engaged in any "racketeering activity" at all, much less that they have engaged in a "pattern" of racketeering activity.

Because the facts alleged in the complaint do not make out these fundamental elements of a RICO cause of action, Count I of the complaint must be dismissed under Rule 12(b)(6) for failure to state a claim.  And, that being the case, the Court should decline to exercise supplemental jurisdiction over the state-law causes of action pleaded in Counts II and III.

## THE COMPLAINT

The complaint alleges that, in the fall of 2006, AIU was the recognized exclusive bargaining representative of various private-sector employers' security guards, and that Local 32BJ, with financial assistance from SEIU, embarked upon a campaign to "raid" AIU – that is, to organize the guards AIU represented into Local 32BJ, to secure their employers' recognition of Local 32BJ as the guards' exclusive bargaining representative, and thus to displace AIU as the representative.  Complaint ¶¶ 50-54.[1]  The purpose of this campaign, according to the complaint, was to "increas[e] guard membership for SEIU International, SEIU 32BJ and other SEIU local unions, . . . thereby increasing their revenues."  ¶ 19.

As part of this campaign, it is alleged that Local 32BJ and the other defendants engaged in actions of two kinds:

- First, the defendants (i) recruited AIU members to run as candidates for AIU office and provided financial, organizational, and legal support for those candidates' campaigns, ¶¶ 59-64, 98(a), (c), (e), (f), (i), (j); and (ii) made false and defamatory statements to AIU members about the opposing candidates and incumbent AIU officers, ¶¶ 65, 98(b).

- Second, the defendants "applied coercive pressure" to the security companies that employed security guards represented by AIU and some of the entities that contracted with those security companies, ¶ 66, with the aim of "remov[ing] AIU as the bargaining representative of

---

[1] For purposes of this motion to dismiss we assume, as we must, the truth of the factual allegations pleaded in the complaint. *Koppel v. 4987 Corp.*, 167 F.3d 125, 130 (2d Cir. 1999).

[these] security guards," ¶ 67.  This "coercive pressure" consisted of defendants' (i) public opposition to the campus expansion plans of Fordham University, ¶¶ 67-68, 70, and negative publicity on the working conditions of AIU-represented security guards at Fordham, ¶ 69; (ii) "pressure[]" on security provider AlliedBarton – in ways that are not specified – to recognize Local 32BJ rather than AIU as bargaining representative of the security guards AlliedBarton provided to New York City, ¶¶ 71-76; and (iii) negative publicity about customer service problems and flight delays at JetBlue Airways, ¶¶ 77-79.

In addition, defendants are said to have (i) persuaded security guards represented by AIU to exercise their right to file petitions seeking decertification of AIU as their bargaining agent with the National Labor Relations Board ("NLRB"), ¶¶ 85-86; (ii) made misleading statements about the outcome of a resulting decertification proceeding, ¶ 87; (iii) "pressured" Summit Security in various ways, including the claim that it violated the labor laws, into suspending Summit Security's deduction of AIU dues from its employees' paychecks, ¶¶ 89-93; (iv) urged security guards represented by AIU to exercise their right not to sign dues deduction authorization forms for AIU, ¶¶ 94-95 & Exh. K; (v) "succeeded in pressuring and misleading third parties," in ways that are not specified, "to disrupt AIU's business," ¶ 96; (vi) "misled" security guards who were AIU members into exercising their right under the labor laws to request collective bargaining and financial information from AIU, ¶ 97; (vii) "misled" AIU members into believing that an AIU officer election was a choice between AIU and Local 32BJ as the members' exclusive bargaining representative, ¶ 98(d), (g); and (viii) solicited AIU members to become members of Local 32BJ, ¶ 98(h).

The complaint alleges, in Count I, that the acts described above constitute violations of two provisions of RICO, 18 U.S.C. § 1962(c) and (d).  Section 1962(c) makes it unlawful for the

defendants to conduct or participate in the affairs of an enterprise "though a pattern of racketeering activity." Under § 1962(d) it is unlawful to conspire to violate any of the provisions of subsections (a), (b) or (c) – all of which similarly rest on the defendants engaging in a "pattern of racketeering activitiy." Thus, whether AIU has succeeded in pleading a violation of either § 1962(c) or § 1962(d) depends on whether its complaint makes out the claim that the defendants engaged in or conspired to engage in "a pattern of racketeering activity." *GICC Capital Corp. v. Technology Fin. Group, Inc.*, 67 F.3d 463, 465 (2d Cir. 1995) ("Under any prong of § 1962, a plaintiff in a civil RICO suit must establish a 'pattern of racketeering activity.'").

As we now show, AIU has failed for two distinct reasons to make such a showing, each of which alone is sufficient to require dismissal of Count I in its entirety. First, the complaint does not make out the claim that the defendants have engaged in any "racketeering activity" at all. Second, the complaint does not in any event make out the claim that defendants have engaged in a "pattern" of such activity.

## ARGUMENT

### I. THE COMPLAINT'S ALLEGATIONS DO NOT MAKE OUT THE CLAIM THAT DEFENDANTS ENGAGED IN RACKETEERING ACTIVITY

"Racketeering activity" is defined by the statute to mean certain specifically enumerated felony crimes – generally referred to in the caselaw as RICO "predicate acts." *See* 18 U.S.C. § 1961(1). In this regard, the complaint asserts that defendants engaged in racketeering activity in the form of (1) extortion or attempted extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, the Travel Act, 18 U.S.C. § 1952, and New York state law, as well as "other extortionate activity"; and (2) schemes to defraud in violation of the Mail Fraud and Wire Fraud statutes, 18

U.S.C. §§ 1341, 1343.  Complaint ¶ 113.  But the facts alleged do not make out the crimes of either extortion or of mail and wire fraud.

### A.    The Complaint Alleges No Facts Constituting Extortionate Activity Cognizable As A RICO Predicate Act

The Hobbs Act defines "extortion" as, in pertinent part, "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear . . . ."  18 U.S.C. § 1951(b)(2).  And, as the Supreme Court has held, the Hobbs Act definition of extortion also constitutes the "generic definition" of extortion that must be met in order for violations of *state* extortion law to qualify as extortionate for purposes of the Travel Act or for RICO.  *Scheidler v. National Org. for Women, Inc.*, 537 U.S. 393, 409-10 (2003) (citing *United States v. Nardello*, 393 U.S. 286, 290, 296 (1969)).

AIU does not claim that defendants have in any way engaged in or threatened the wrongful use of force or violence.  Rather, AIU's extortion claim is that defendants have engaged in the "wrongful use of *fear of economic harm*" to obtain property from another.  Complaint ¶ 113 (emphasis added).  The facts alleged in the complaint are insufficient as a matter of law to make out that claim.

1.    To begin with, one searches the complaint in vain for any factual allegation that would support the contention that defendants have "use[d]" fear of economic harm as a means of obtaining property from AIU.  Fairly read, what the factual allegations of the complaint assert is that defendants set out on an aggressive campaign to "raid" AIU by organizing the security guards AIU represents and displacing AIU as their bargaining representative, and that – particularly in light of SEIU's successes in other such campaigns against other security-guard unions – this campaign placed AIU in fear that defendants would succeed and that AIU would lose its status as exclusive bargaining representative of these security guards.  What the

defendant unions are alleged to have done is to have attempted to take over AIU's business through their "raiding" activity – not through the consent of AIU induced by threats or fear.  It is alleged that AIU feared that defendants would succeed, ¶¶ 101-03, but no facts are alleged that would support the contention that defendants used that fear to obtain something of value from AIU.  Whatever this set of alleged facts may constitute, it is not extortion.

      **2.**      But even assuming *arguendo* that the facts alleged in the complaint are sufficient to aver that defendants did make use of fear of economic harm to obtain something of value from AIU, the complaint fails because the facts alleged are insufficient to support the claim that defendants did so through the *wrongful* use of fear of economic harm.

      In *United States v. Enmons*, 410 U.S. 396 (1973), the Supreme Court rejected the Government's attempt to apply the Hobbs Act to acts of violence during a labor dispute undertaken "for the purpose of inducing an employer's agreement to legitimate collective-bargaining demands."  *Id.* at 399.  The Government's reading of the Act, the Court explained, "slights the wording of the statute that proscribes obtaining property only by the 'wrongful' use of actual or threatened force, violence, or fear."  *Id.*  The Court pointed out that the term "wrongful" would be superfluous if it described only the "means used" to obtain the property of another, as "any violence or force to obtain property is 'wrongful,'" *id.* at 399-400:

> Rather, "wrongful" has meaning in the Act only if it limits the statute's coverage to those instances *where the obtaining of the property would itself be "wrongful"* because the alleged extortionist has no lawful claim to that property.

*Id.* at 400 (emphasis added).

      Thus, *Enmons* precludes a claim of extortion where the objectives pursued by the defendant are "legitimate economic ends."  *United States v. Clemente*, 640 F.2d 1069, 1078 (2d Cir. 1981).  That does not require that the defendant have an absolute right to the money or

property it seeks to obtain.  Rather, the relevant question is whether the defendant had a legal

right to seek to obtain that property, *see G-I Holdings, Inc. v. Baron & Budd*, 179 F. Supp. 2d

233, 258 (S.D.N.Y. 2001) (holding that "the alleged Hobbs Act violation can survive only if the

Defendants had no right to *seek* th[e] 'property'" at issue) (emphasis added), as this Court has

explained in distinguishing between extortion and "hard-bargaining":

> In a "hard-bargaining" scenario the alleged victim has no pre-existing right to
> pursue his business interests free of the fear he is quelling by receiving value in
> return for transferring property to the defendant, but in an extortion scenario the
> alleged victim has a pre-existing entitlement to pursue his business interests free
> of the fear he is quelling by receiving value in return for transferring property to
> the defendant.

*Viacom Int'l Inc. v. Icahn*, 747 F. Supp. 205, 213 (S.D.N.Y. 1990), *aff'd*, 946 F.2d 998 (2d Cir.

1991); *see also Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 524-25 (3d Cir.

1998) (adopting *Viacom* analysis); *George Lussier Enters., Inc. v. Subaru of New England, Inc.*,

393 F.3d 36, 50 (1st Cir. 2004) (same).

    *Enmons* illustrates this point:  While nothing legally compelled the employer in that case

to agree to the union's demands, the union had every legal right to pursue those demands.  The

employer had no "pre-existing right to pursue his business interests free of the fear" of union

demands for higher wages.  Attempting to win a better contract was a "legitimate union

objective[]."  410 U.S. at 400.[2]  Similarly here, the pertinent question is not whether the

defendant unions currently have the right to be the exclusive bargaining representative of the

security guards presently represented by AIU, but rather whether the defendant unions have the

lawful right to seek to become the representative of those security guards and to displace AIU in

that capacity.

---

[2] The *Enmons* Court contrasted such "legitimate union objectives" with attempts to obtain personal payoffs for union leaders or wage payments for "unwanted, superfluous and fictitious services."  410 U.S. at 400.

The answer to that question is not in doubt.  Defendants' goal of "increasing guard membership for SEIU International, SEIU 32BJ and other SEIU local unions," Complaint ¶ 19 – and specifically displacing AIU as collective bargaining representative and securing the representational rights it currently holds – is an entirely lawful objective, which the defendant unions have every legal right to pursue; indeed, federal labor policy regards "raiding" as socially valuable.  *See Great Lakes Indus., Inc. (Cadmium & Nickel Plating Div.)*, 124 N.L.R.B. 353, 354-55 (1959) (observing that private "no-raid" agreements "restrict[] employee free choice").[3] AIU has no "pre-existing right to pursue [its] business interests free of the fear," *Viacom*, 747 F. Supp. at 213, that the defendant unions would seek to "raid" its membership and obtain the bargaining rights AIU presently holds.  Accordingly, the defendant unions' alleged use of fear of economic harm to pursue that objective was not "wrongful" and did not amount to extortion.

While the reach of *Enmons* has been narrowed in this Circuit in cases where the "means used," 410 U.S. at 399, is force or violence (or the threat thereof), *see United States v. Zappola*, 677 F.2d 264, 269 (2d Cir. 1982) (limiting *Enmons* to its facts in cases where "inherently wrongful means" such as force or violence are employed), the Second Circuit has made it clear, in a line of cases beginning with *Clemente*, that *Enmons* continues to state the requirements for all extortion claims where the means used is – as it is here – fear of economic harm.

---

[3] We also note in this connection that, although § 9(b)(3) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 159(b)(3), prohibits the NLRB from certifying a union that represents non-guard employees as bargaining representative of security guards, the NLRA does not prohibit the representation of guards by such "mixed" unions or as part of "mixed" bargaining units, if the union's representation status is established other than through the NLRB's certification process.  Thus, "an employer and a union may voluntarily establish a unit that includes guards with other employees, since only units established by the Board fall within the statutory prohibition."  1 *The Developing Labor Law* 655 (John E. Higgins, Jr., ed., 5th ed. 2006); *see*, *e.g.*, *Colon Velez v. Puerto Rico Marine Mgmt., Inc.*, 957 F.2d 933, 937-39 (1st Cir. 1992); *University of Chicago*, 272 N.L.R.B. 873 (1984).

In *Clemente*, the court explained "that the use of fear of financial injury is not inherently wrongful. And precisely because of this fact, the 'objective' of the party employing fear of economic loss will have a bearing on the lawfulness of its use." 640 F.2d at 1077. Thus, while "[f]ear of economic loss is not an inherently wrongful means . . . , when *employed to achieve a wrongful purpose*, its 'use' is wrongful." *Id.* (emphasis added). Accordingly, the court approved the district court's jury instruction in that case that "the wrongfulness element of the crime would be satisfied upon finding that fear of economic loss was employed by the defendants to obtain money to which they were not lawfully entitled," but that the Hobbs Act "does not prohibit any person from using his position of power or influence to obtain legitimate economic ends." *Id.*

More recently, the Second Circuit elaborated on this point in *United States v. Jackson*:

> Under the Hobbs Act definition of extortion . . . , the use of a threat can be wrongful because it causes the victim to fear a harm that is itself wrongful, such as physical injury, or because the means is wrongful, such as violence. However, the Hobbs Act may also be violated by a threat that causes the victim to fear only an economic loss. Yet as we discussed in *United States v. Clemente*, a threat to cause economic loss is not inherently wrongful; it becomes wrongful only when it is used to obtain property to which the threatener is not entitled.

*United States v. Jackson*, 180 F.3d 55, 69-70 (2d Cir. 1999) (citations omitted), *reh'g granted on other grounds*, 196 F.3d 383 (2d Cir. 1999).[4]  *See also De Falco v. Bernas*, 244 F.3d 286, 318

---

[4] *Jackson* involved an alleged threat, prosecuted under 18 U.S.C. § 875(d), to extort money by threatening the victim's reputation, rather than threatening economic harm, but the court found the relevant inquiry into the wrongfulness of the act to be the same as under the Hobbs Act. 180 F.3d at 70. Looking to whether there existed a nexus between the threat and any claim of right to the money demanded, the court distinguished between a category of threats in which "the disclosures themselves – not only the threats – have the potential for causing payment of the money demanded," and a category in which "it is only the threat that has that potential, and actual disclosure would frustrate the prospect of payment." *Id.* at 70-71. In the former category the court placed a private club's threat to post a list of members who had not paid their dues, or a consumer's threat to publicize a manufacturer's defective product if it did not honor its warranty. *Id.* at 67, 70. As to the latter category, the court held that "[w]here there is no plausible claim of right and the only leverage to force the payment of money resides in the threat, where actual disclosure would be counterproductive, and where compliance with the

(2d Cir. 2001) (citing *Jackson* and *Clemente* for principle that jury should be instructed "that it must find that the defendants had no lawful claim of right to the property they obtained through wrongful use of fear"); *G-I Holdings*, 179 F. Supp. 2d at 259 (summarizing Second Circuit law as holding "that a threat of economic harm is wrongful only when used to obtain property to which the threatener is not entitled").

In this case, AIU alleges that the "pattern of extortionate activity and attempted extortion" in which defendants are allegedly engaged is "designed to drive AIU out of existence and obtain AIU's business [as an exclusive bargaining representative] for Defendants' own financial gain."  Complaint ¶ 84; *see also id.*, ¶ 107.  Such a campaign, as we noted above, *supra* at 8, would pursue the legitimate, fully lawful, objective of increasing the defendant unions' memberships and securing representation of additional bargaining units.  It is no different, for purposes of evaluating the wrongfulness of the actions, than the lawful objective of a business enterprise to "drive [a competitor] out of existence" by out-competing it in the marketplace. Whether in the business context or the union context, such competition is in pursuit of a fully lawful objective, and is indeed generally considered socially and economically desirable.  As the Third Circuit has put it, "the fear of economic loss is a driving force of our economy that plays an important role in many legitimate business transactions."  *Brokerage Concepts*, 140 F.3d at 523.

In short, because the complaint nowhere alleges either that defendants have employed any means other than fear of economic loss in pursuit of their alleged extortion scheme, or that they have done so in pursuit of an objective that is itself wrongful, the complaint fails as a matter of law to allege facts that make out the RICO predicate act of extortion.

---

threatener's demands provides no assurance against additional demands based on renewed threats of disclosure, we regard a threat to reputation as inherently wrongful."  *Id.* at 71.

**B.     The Complaint Fails To Allege Any Facts That Would Constitute The
RICO Predicate Acts Of Mail Fraud Or Wire Fraud**

Although the complaint focuses principally upon the assertion that defendants engaged in
the predicate act of extortion, it also asserts that defendants engaged in the predicate acts of mail
fraud and wire fraud.  Complaint ¶¶ 113, 117-18.  It fails in this latter regard in three ways.

1.     Allegations of mail fraud and wire fraud as RICO predicate acts are subject to the
requirement of Rule 9(b) of the Federal Rules of Civil Procedure that allegations of fraud be
pleaded with particularity.  *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d
Cir. 2008); *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178-79 (2d Cir.
2004).  Therefore, when a RICO complaint relies on violation of the fraud statutes for its
predicate acts,

> [t]he complaint must "(1) specify the statements that the plaintiff contends were
> fraudulent, (2) identify the speaker, (3) state where and when the statements were
> made, and (4) explain why the statements were fraudulent."

*Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999) (quoting *Shields v.
Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)); *accord Spool*, 520 F.3d at 185;
*Chamberlin v. The Hartford Fin. Servs., Inc.*, No. 05-cv-2650(AKH), 2005 WL 2007894, at *3
(S.D.N.Y. Aug. 19, 2005).

AIU's complaint does not come close to satisfying this heightened pleading standard.
While it is littered with assertions that defendants made various "misleading" or "false"
statements – at one point it even accuses Local 32BJ of having asked a "fraudulent question,"
¶ 95 – the complaint's sole attempt to plead mail and wire fraud rests on its allegations that
defendants made false or misleading statements in connection with AIU's May 2007 election of

officers.[5]  But there is nothing at all in any of the relevant paragraphs of the complaint – ¶¶ 59-64, 98, 117-18 – or anywhere else in the complaint to "explain why the[se] statements were fraudulent." *Anatian*, 193 F.3d at 88.[6]

And the complaint falls short, as well, with respect to the requirements that it "identify the speaker" and "state where and when the statements were made."  *Id.*  With respect to the former, the complaint alleges that statements were made by "[p]aid agents of SEIU 32BJ and SEIU International," ¶ 98(b), (c); by "[p]aid agents of SEIU International, SEIU 32BJ and SEIU Local 1877," ¶ 98(d); and by "SEIU 32BJ, by its agents," ¶ 98(g).  Only in paragraph 98(b), where it is alleged that the "paid agents" included defendant Friedman, is an individual speaker identified.  Similarly, the requisite allegations about "when and where the statements were made" are vague, ¶ 98(b) ("May 2007"), or nonexistent, ¶ 98(c), (d), (g).

In short, the complaint falls far short of pleading mail fraud and wire fraud with the requisite particularity, and to the extent the RICO claim rests on those predicate acts it must be dismissed for that reason alone.

----

[5]  The complaint's allegation of the use of the mails and wire communications in connection with a scheme to defraud is found in its paragraphs 117-18, which in turn refer the reader to Exhibit L.  That exhibit consists of the report of an AIU committee investigating protests filed in connection with the May 2007 officers election.  The complaint's allegations concerning defendants' alleged attempts to influence that election are found in paragraphs 59-64 and 98, and they include – in paragraph 98(b), (c), (d) and (g) – averments that defendants made false or misleading statements related to the election.

[6]  The complaint's incorporation by reference of the report attached as Exhibit L does nothing to add to the particularity with which the fraud allegations are pleaded.  Most of the paragraphs to which AIU cites (in the page of Exhibit L that precedes the report) as "specific instances" of wire fraud and mail fraud have little if anything to do with any alleged misrepresentations or otherwise fraudulent activity, but instead appear to be intended only to reference instances where some use was made of telephone or mail communications.  *E.g.*, Exh. L, p. 39 ¶ 2 ("Phone calls were being made to Allied Members from paid employees of Local 32 B-J SEIU.").

2.    Putting that pleading failure to the side, the complaint's fraud claims fail as a matter of law because using the mails or wires in connection with electioneering communications does not constitute a mail fraud or wire fraud violation.

The complaint alleges that defendants made false or misleading statements in the context of AIU's election of officers about the integrity of a candidate, and about what was at stake in the election. Thus, defendants are alleged to have told AIU members that candidate MaryBeth Stafford "was a corrupt and fake lawyer," ¶ 98(b), and to have misled AIU members into believing "that the AIU internal officer election was an election between AIU and SEIU 32BJ," ¶ 98(d); *see also* ¶ 98(g) (same).

"Defraud," as used in the mail fraud and wire fraud statutes, "usually signif[ies] the deprivation of something of value by trick, deceit, chicane or overreaching." *McNally v. United States*, 483 U.S. 350, 358 (1987). We assume for the sake of argument that the alleged statements in question here were false or misleading,[7] and as alleged they were obviously intended to influence the outcome of the election. But not every statement that is false or misleading is one that uses "trick, deceit, chicane or overreaching," to "depriv[e]" the hearer of "something of value," *id.* – and false statements made during an election campaign in an attempt to influence the choices of voters have never been considered as such. *E.g.*, *Rudisill v. Flynn*, 619 F.2d 692, 694 (7th Cir. 1980) ("We do not regard intentional misstatements of fact made during an election campaign as 'election frauds' in the ordinary sense.").

_____

[7] Even that assumption is at least questionable, however. The accusation that someone is "a corrupt and fake lawyer," without further specifics, is at least arguably a statement of opinion. *See, e.g.*, *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 402 n.7 (2d Cir. 2006) (discussing standards for distinguishing between "opinion" and "fact"). And, in light of the complaint's repeated insistence that Local 32BJ was supporting the candidacies of its "surrogates" in the AIU election, ¶ 98(a), (c), (e), (h), (j), the alleged assertions that the AIU election of officers amounted to a contest between AIU and Local 32BJ must, on the face of the complaint, be considered true.

On AIU's legal theory, any use of the mails or telecommunications during an election campaign to make a false or misleading statement about a candidate or about what was at stake in the election could be punished as mail fraud or wire fraud. That is not and cannot be the law. AIU's attempt to make defendants' alleged election-related statements into a "scheme or artifice to defraud," 18 U.S.C. §§ 1341, 1343, is, accordingly, untenable.

**3.** Putting both of the foregoing points to the side, only a plaintiff who can make a showing that it suffered harm to its "business or property" that was proximately caused by the plaintiff's or a third party's detrimental reliance upon the alleged fraudulent misrepresentations has standing to bring a civil action under 18 U.S.C. § 1964(c) for RICO violations based on predicate acts of mail or wire fraud. AIU has not alleged facts sufficient to establish its standing to bring suit based on that theory.

Section 1964(c) confers standing to bring a civil suit upon "[a]ny person injured in his business or property by reason of" a violation of section 1962, and "[t]he phrase 'by reason of' requires that there be a causal connection between the prohibited conduct and [the] plaintiff's injury." *Metromedia Co. v. Fugazy*, 983 F.2d 350, 368 (2d Cir. 1992) (quoting *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1311 (2d Cir. 1990)); *see also Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258, 268 (1992) (section 1964(c) requires showing of proximate cause). That means, "[i]n the context of an alleged RICO predicate act of mail fraud," that "to establish the required causal connection, the plaintiff [must] demonstrate that the defendant's misrepresentations were relied on." *Metromedia*, 983 F.2d at 368.

As we noted above in discussing the complaint's failure to meet the heightened pleading requirements for fraud, nowhere in the complaint does AIU even attempt to articulate a link

between the alleged fraudulent statements and any injury to its business or property that it claims

to have suffered.

Normally, that causation is made out by showing that the plaintiff relied to its detriment

on the alleged misrepresentation, and that it suffered injury to its business or property as a

proximate result of such reliance. But nowhere in the complaint is there any allegation whatever

that AIU relied on – much less was injured in its business or property by reliance on – any

misrepresentation made by defendants.

Instead of that, the complaint suggests that AIU was injured in its business or property by

the reliance of third parties on misrepresentations made by defendants. While there is some

support in Second Circuit caselaw for "third-party reliance" as a basis for a RICO mail fraud

claim, *see County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1311 (2d Cir. 1990)

(ratepayers' injury caused by state regulator's reliance upon defendant utility's

misrepresentations to it), in the circumstances presented here AIU's third-party reliance theory is

too attenuated to survive the Supreme Court's decision in *Anza v. Ideal Steel Supply Corp.*, 547

U.S. 451 (2006).

In *Anza*, the Court rejected an attempt to plead a RICO mail and wire fraud claim based

on a business competitor's misrepresentations to the state taxing authority. The plaintiff's theory

was that its competitor systematically failed to collect sales tax on cash purchases, submitted

fraudulent tax returns to the state, and thus was able to undermine plaintiff's market share by

reducing the prices it charged without affecting its profit margins. The Court held that, on these

allegations, the plaintiff's alleged injury had not been proximately caused by defendant's

misrepresentations to the state taxing authority, because the causal link between the two was too

attenuated. For example, the Court observed, not only could the defendant company have

"lowered its prices for any number of reasons unconnected to the asserted pattern of fraud," but the plaintiff's "lost sales could have resulted from factors other than [defendants'] alleged acts of fraud." *Id.* at 458-59.

The causal link between defendants' alleged misrepresentations and any injury to AIU's business or property is equally remote in this case. As noted above, AIU's mail and wire fraud claims are based on alleged misrepresentations made by defendants in connection with AIU's May 2007 election of officers.[8] Nowhere does the complaint even vaguely attempt to explain how such alleged misrepresentations regarding a candidate or the stakes in the election resulted in an injury to AIU – and that, in itself, is reason enough to find the allegations of mail fraud and wire fraud insufficient to constitute RICO predicate acts.[9] Nor, in any event, is it conceivable that any proximately caused injury to AIU's business or property could have been alleged, consistent with *Anza*. Just as the *Anza* plaintiff's "lost sales could have resulted from factors other than petitioners' alleged acts of fraud," *id.* at 459, AIU members could have voted in favor of the candidate allied with Local 32BJ for any number of reasons other than the misrepresentations alleged to have been made by defendants – such as, for example, a belief that

---

[8] Defendants attempted to influence the election, the complaint asserts, by "falsely stat[ing] to AIU members" that candidate MaryBeth Stafford "was a corrupt and fake lawyer," ¶ 98(b); by "fraudulently representing themselves as AIU members" in order to obtain ballots for distribution to AIU members supporting the candidates defendants favored, ¶ 98(c); and by misleading AIU members "to believe that the AIU internal officer election was an election between AIU and SEIU 32BJ" and was "an election to choose SEIU 32BJ as the exclusive bargaining representative of AIU members," ¶ 98(d), (g).

[9] Although not spelled out in the text of the complaint itself, the reason why there is no such allegation of injury resulting from the election outcome is apparent from the report of an AIU committee considering election protests – which is reproduced as part of Exhibit L to the complaint and is thus part of the complaint for all purposes. Fed. R. Civ. P. 10(c). It appears that AIU voided the election and declared Ms. Stafford elected without opposition, on the ground that the Local 32BJ-supported candidate had been improperly nominated. *See* Exh. L, at 82.

the incumbent AIU leadership had failed to represent members effectively and that a change was in order.

In short, whether AIU's theory is that defendants committed the predicate acts of mail fraud and wire fraud by misleading AIU or by misleading AIU's members, in neither case does the complaint allege facts showing that AIU suffered any injury to its business or property that was proximately caused by anyone's reliance on the alleged misrepresentations. For this reason as well, the attempt to plead mail fraud and wire fraud as RICO predicate acts must be rejected.

## II. THE FACTS ALLEGED IN THE COMPLAINT DO NOT CONSTITUTE A "PATTERN" OF RACKETEERING ACTIVITY

A RICO plaintiff must, in addition to alleging properly that the defendant committed at least two RICO predicate acts, also properly allege that the defendant by so doing engaged in a "pattern of racketeering activity." Establishing such a pattern requires a showing "that the racketeering predicates . . . amount to or pose a threat of continued criminal activity." *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). That showing can be made in either of two ways:

> [A] plaintiff in a RICO action must allege either an "open-ended" pattern of racketeering activity (*i.e.*, past criminal conduct coupled with a threat of future criminal conduct) or a "closed-ended" pattern of racketeering activity (*i.e.*, past criminal conduct "extending over a substantial period of time").

*GICC Capital Corp. v. Technology Fin. Group, Inc.*, 67 F.3d 463, 466 (2d Cir. 1995); *see generally Medinol Ltd. v. Boston Scientific Corp.*, 346 F. Supp. 2d 575, 614-15 (S.D.N.Y. 2004). As we now show – even assuming *arguendo* that the conduct alleged by AIU somehow constitutes extortion and/or mail and wire fraud – the facts alleged in the complaint do not establish either an open-ended or a closed-ended pattern of racketeering activity.

## A.    The Facts Alleged Do Not Establish An Open-Ended Pattern

The complaint has not, in the first place, alleged facts sufficient to establish an open-ended pattern of racketeering activity. "To satisfy open-ended continuity, the plaintiff need not show that the predicates extended over a substantial period of time but must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999). A plaintiff meets this requirement by showing that "the enterprise is engaged primarily in racketeering activity, and the predicate acts are inherently unlawful." *Id.* AIU has not made any such showing. As the complaint itself recognizes, the enterprise alleged here "has goals other than just racketeering, including, but not limited to, legitimate union organizing activities and political activism." Complaint ¶ 20. And, as we explained in Part I.A above, the predicate acts alleged in the complaint involve only the use of fear of economic harm and thus are not "inherently unlawful."

Alternatively, in a case like this where "the enterprise primarily conducts a legitimate business," the plaintiff must, in order to meet the open-ended continuity requirement, provide "some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Cofacredit*, 187 F.3d at 243; *see also De Falco v. Bernas*, 244 F.3d 286, 323 (2d Cir. 2001); *GICC Capital*, 67 F.3d at 466. In making this showing, the plaintiff can rely on "only the predicate racketeering activity that [it] did prove," *Cofacredit*, 187 F.3d at 244 – or, in the procedural posture of this motion, that it adequately alleged. Here, the complaint offers no such evidence.

AIU cannot, in the first place, show any "threat of continued criminal activity" based on defendants' campaign to "raid" AIU's membership, because a campaign of predicate acts "which targets a single business or person is deemed to be 'inherently terminable,' and thus incapable of presenting an open-ended threat of continuing criminal activity." *Leung v. Law*, 387 F. Supp. 2d 105, 125 (E.D.N.Y. 2005). Here, the complaint alleges a campaign that has a single, specific objective – "to drive AIU out of existence and obtain AIU's business [as exclusive bargaining representative] for Defendants' own financial gain," Complaint ¶ 84 – upon the achievement of which the campaign will terminate. Thus, it is alleged that "Defendants will not stop their campaign *until* AIU is 'crushed' or cedes representation of its members," Complaint, p. 13 (subheading D) (emphasis added; capitalization deleted); that "Defendants' campaign shows no sign of stopping, *unless* AIU accedes to their demands,"[10] Complaint ¶ 96 (emphasis added); and that "Defendants have made it clear to AIU that their extortionate activity will not stop *until* AIU 'gives in' to Defendants," Complaint ¶ 100 (emphasis added).

In sum, it is clear from the allegations of the complaint that the racketeering activity alleged therein has a finite objective and ending point. "[S]uch an 'inherently terminable' scheme does not imply a threat of continued racketeering activity." *Cofacredit*, 187 F.3d at 244; *see also Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 186 (2d Cir. 2008); *GICC Capital*, 67 F.3d at 466.

Nor can any such inference be drawn from other allegations in the complaint. The complaint includes several pages recounting the "history" of SEIU's "win-at-all-cost" strategy of recruiting new members, *see* Complaint ¶¶ 27-49, which appear to have no purpose other than to demonstrate SEIU's regular way of operating its business. But one searches the factual

---

[10] Notwithstanding this reference to "demands," nowhere does the complaint describe any demands defendants have presented to AIU.

allegations of these paragraphs 27-49 in vain for anything that resembles a RICO predicate act. This section of the complaint does no more than allege that some of the defendant unions have for some time been seeking to expand their membership by "raiding" other security-guard unions, *i.e.*, by soliciting security guards to become SEIU members and by seeking to displace other unions as exclusive bargaining representatives of those guards. There is nothing in these allegations that even remotely approaches extortion, fraud, or any other RICO predicate act.

In short, nothing in the complaint supports the notion that racketeering activity is defendants' "regular way of operating [their] business." *Cofacredit*, 187 F.3d at 243; *cf.* Complaint ¶ 20. The facts asserted in the complaint's "history" section do not even purport to allege any of the crimes listed in 18 U.S.C. § 1961(1) – the provision that defines "racketeering activity." Certainly, neither recruiting new members nor "raiding" other unions constitutes "racketeering activity" under § 1961(1). Without such predicate acts, the complaint's allegations of SEIU's aggressive attempts to expand its membership cannot – any more than anything else in the complaint – establish a threat of continued criminal activity.

**B.    The Facts Alleged Do Not Establish A Closed-Ended Pattern**

The complaint is equally barren of factual allegations that would establish a closed-ended pattern of racketeering activity.

In the first place, what is alleged is, as discussed above, but a single scheme pursued against a single victim. Even if it extended over a longer period of time, the racketeering activity alleged here would not make out a closed-ended scheme, for "where the RICO allegations concern only a single scheme with a discrete goal, the courts have refused to find a closed-ended pattern of racketeering even when the scheme took place over longer periods of time." *Jackson v. Bellsouth Telecomms.*, 372 F.3d 1250, 1267 (11th Cir. 2004); *see also First Capital Asset*

*Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004) ("[T]he mere fact that predicate acts span two years is insufficient, without more, to support a finding of a closed-ended pattern.").

In any event, the short duration of the alleged racketeering activity is in itself dispositive on this point.  As the Second Circuit has repeatedly noted, "closed-ended continuity is primarily a temporal concept," *Spool*, 520 F.3d at 184, and the court "has never found a closed-ended pattern where the predicate acts spanned fewer than two years."  *First Capital*, 385 F.3d at 181; *see also Spool*, 520 F.3d at 184; *De Falco*, 244 F.3d at 321; *Cofacredit*, 187 F.3d at 242.  It has specifically held that a period of a year and a half is insufficient.  *De Falco*, 244 F.3d at 322.  And, as the Second Circuit has also explained, "the duration of a pattern of racketeering activity is measured by the RICO predicate acts the defendants commit."  *Cofacredit*, 187 F.3d at 243.  Thus, "[t]he relevant period . . . is the time during which RICO predicate activity occurred, not the time during which the underlying scheme operated or the underlying dispute took place."  *Spool*, 520 F.3d at 184.

We emphasize in this regard that, as we showed above in Part I, the complaint does not sufficiently allege facts that make out any RICO predicate acts at all, and thus there can be no "pattern" of such acts of any duration whatever.  Beyond that point, however, even if one looks simply to the allegedly wrongful acts asserted in the complaint – without regard to whether they in fact constitute extortion, fraud, or any other predicate act – the duration of the alleged acts is in any event too short to constitute a closed-ended pattern.

The complaint's allegations of extortion and fraud center on defendants' alleged interference in AIU's election of officers and their alleged attempts to "pressure" employers and contractors who employed AIU-represented security guards.  The earliest allegations of such acts are in "early 2007," when, the complaint asserts, defendants began to attempt to influence AIU's

internal officer elections, Complaint ¶¶ 60 *et seq.*, and when they "pressured" AlliedBarton into

recognizing Local 32BJ as bargaining representative of certain security guards. Complaint ¶ 73.

The latest such acts alleged in the complaint, on the other hand, transpired in March 2008, when

Local 32BJ is said to have "pressured Summit Security" to suspend payroll deduction of AIU

members' dues. Complaint ¶ 89; *see also* ¶¶ 83, 86 (other developments in March 2008). The

duration of the alleged predicate acts thus spans no more than 14 or 15 months – far short of the

two-year minimum needed to establish a closed-ended pattern.[11]

The duration of the pattern of racketeering activity alleged in the complaint is, in sum, far

too short to establish the necessary element of continuity on the basis of a closed-ended pattern,

and for this reason as well the RICO claim in Count I of the complaint must be dismissed.

## III.    THE COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THE STATE-LAW CLAIMS OF TORTIOUS INTERFERENCE AND CIVIL CONSPIRACY

In addition to its federal RICO claim, the complaint contains, in its Counts II and III,

claims brought under state law for tortious interference with business relations and economic

advantage and for civil conspiracy. If, as we have shown above, the only federal claims that are

pleaded must be dismissed for failure to state a claim, then the Court should decline to exercise

supplemental jurisdiction over these state-law claims.

---

[11] Even if one were to look, for the starting point of the alleged racketeering activity, to the complaint's earliest allegations of any specific acts at all, the result would be the same. The first acts taken by defendants pursuant to their alleged campaign to "raid" AIU are said to have occurred in "September and October 2006" and "October and November 2006," when SEIU allegedly gave $200,000 to Local 32BJ to organize security guards, and Local 32BJ "dispatched over 20 paid organizers to raid AIU members." Complaint ¶¶ 52-53. Even were one to consider these fully lawful actions as in some way constituting RICO predicate acts, the duration of the pattern of racketeering activity would still be no more than a year and a half.

The federal supplemental jurisdiction statute provides that the Court "may decline to exercise supplemental jurisdiction over a claim" if, *inter alia*, "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). That is the proper course here. "[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 183 (2d Cir. 2004) (quoting *Castellano v. Board of Trustees*, 937 F.2d 752, 758 (2d Cir. 1991) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)). The court should balance the "values of judicial economy, convenience, fairness, and comity" in determining whether to exercise supplemental jurisdiction under § 1367(c)(3), but "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 & n.7 (1988)). A district court's exercise of supplemental jurisdiction in such a situation, absent adequately articulated particular circumstances, will be reversed for abuse of discretion. *Kolari*, 455 F.3d at 121-24.

Here, the federal RICO claim will – if the Court agrees with our analysis above – be dismissed at a very early stage, even before the pleadings are closed. As no countervailing consideration is apparent, the Court should decline to exercise supplemental jurisdiction over AIU's state-law claims.

## CONCLUSION

The RICO claim of Count I should be dismissed under Rule 12(b)(6) for failure to state a cause of action, and the Court should decline to exercise supplemental jurisdiction over the state-law claims of Counts II and III.

Respectfully submitted,

  /s/  Larry Engelstein             
LARRY ENGELSTEIN (SS0131)
Service Employees Int'l Union, Local 32BJ
101 Avenue of the Americas, 22nd Floor
New York, NY  10013
(212) 388-2128
*Counsel for Defendants SEIU Local 32BJ,*
*Michael Fishman, Andrew Friedman, Neil*
*Diaz, and SEIU Local 1877*


  /s/  James M. Reif             
JAMES M. REIF
Gladstein, Reif & Meginniss, LLP
817 Broadway, Sixth Floor
New York, NY  10003
(212) 228-7727
*Counsel for Defendant Service Employees*
*International Union*

  /s/  Robert M. Weinberg          
ROBERT M. WEINBERG
W. GARY KOHLMAN
JOHN M. WEST
TODD E. EDELMAN
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth Street, N.W.
Suite 1000
Washington, DC  20005
(202) 842-2600
*Counsel for Defendants SEIU Local 32BJ,*
*Michael Fishman, Andrew Friedman, Neil*
*Diaz, and SEIU Local 1877*