# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

ALLIED INTERNATIONAL UNION,
an unincorporated labor organization

              Plaintiff,

      - v -

SERVICE EMPLOYEES
INTERNATIONAL UNION, LOCAL
32BJ, an unincorporated labor
organization, MICHAEL FISHMAN, an
individual, ANDREW FRIEDMAN, an
individual, NEIL DIAZ, an individual,
SERVICE EMPLOYEES
INTERNATIONAL UNION, LOCAL
1877, an unincorporated labor
organization, and SERVICE
EMPLOYEES INTERNATIONAL
UNION, an unincorporated labor
organization,

              Defendants.

Case No. 1:08-cv-3357 (AKH)
Hon. Alvin K. Hellerstein
ECF Case

---

## MEMORANDUM OF LAW OF PLAINTIFF, ALLIED INTERNATIONAL UNION, IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT

---

STARK & STARK, PC
993 Lenox Drive, First Floor
Lawrenceville, NJ 08648-2389
(609) 895-7334

STROBL & SHARP, PC
300 East Long Lake Road, Suite 200
Bloomfield Hills, MI 48304-2376
(248) 540-2300

Attorneys for Plaintiff, Allied International Union

## TABLE OF CONTENTS

PAGE

TABLE OF CITATIONS............................................................................iii

STATEMENT OF FACTS........................................................................1

ARGUMENT .....................................................................................11

I.   AIU HAS SUFFICIENTLY ALLEGED THE EXISTENCE OF
     RACKETEERING ACTIVITY.......................................................12
     A.    AIU HAS SUFFICIENTLY ALLEGED FACTS CONSTITUTING
     RICO PREDICATE ACTS UNDER THE HOBBS
     ACT............................................................................................13
          1. Extortion by Wrongful Use of Fear of Economic Loss Falls Within the
             Hobbs Act's Prohibitions ...........................................14
          2. The Concept of Property Under The Hobbs Act is Broad and Includes
             Intangible Business Rights .........................................15
          3. SEIU's Groundless "Claim Of Right" Defense is Based Upon a
             Mischaracterization of AIU's Complaint Allegations..................17
          4. SEIU Has Not Identified a Manifest and Undisputed Claim of Right to
             AIU's Property, and Therefore SEIU's Claim of Right Defense Must
             Fail .............................................................................21
          5. The Closely Analogous *Smithfield* Decision Demonstrates the
             Applicability of the Hobbs Act to SEIU's Extortionate Campaign to
             Induce AIU to Give Up Its Valuable Business Property..............23
     B.    AIU HAS SUFFICIENTLY ALLEGED FACTS CONSTITUTING
     RICO PREDICATE ACTS OF MAIL/WIRE FRAUD...........................24
          1. AIU's Allegations of Mail/Wire Fraud Comport with the Applicable
             Pleading Standards....................................................24
          2. SEIU's Contention that Statements Made During a Union Election
             Campaign Can Never be Fraudulent or False is Plainly Wrong ......28
          3. AIU has Properly Pleaded that it Suffered Harm to its Business and
             Property, that was Proximately Caused by SEIU's Mail/Wire Fraud
             Committed in Furtherance of SEIU's Fraudulent Campaign..........30

II.  AIU HAS SUFFICIENTLY ALLEGED A PATTERN OF
     RACKETEERING ACTIVITY.......................................................33
     A.    Introduction.........................................................................33
     B.    The Statute .........................................................................34
     C.    Close-Ended vs. Open-Ended Pattern of Racketeering Activity.........34
     D.    SEIU's Allegations of a Pattern of Racketeering Activity Satisfies Either
           or Both the Closed-Ended and Open-Ended Continuity Tests Sufficient
           to Establish a Pattern of Racketeering Activity............................37

**III. SHOULD THIS COURT DISMISS ANY PORTION OF AIU'S COMPLAINT, AIU MUST BE PERMITTED THE OPPORTUNITY TO REPLEAD**.................................................................................**41**

**CONCLUSION**.................................................................................**42**

## TABLE OF CITATIONS

### CASES CITED                                                    PAGE

*Amalgamated Bank of New York v. Marsh*, 823 *F.Supp.* 209, 217 (S.D.N.Y. 1993)....................31
*Armstrong v. McAlpin*, 699 *F.2d* 79, 93-94 (2d Cir. 1983)............................................................46
*Bell Atlantic Corp. v. Twombly*, 127 *S.Ct.* 1955, 1969 (2007)................................................16, 17
*Bridge v. Phoenix Bond & Indem. Co.*, 128 *S.Ct.* 2131, 2139 (2008)...................................35
*Calabrese v. CSC Holdings, Inc.*, 283 *F.Supp.2d* 797, 809 (E.D.N.Y. 2003)..............................19
*Center Cadillac v. Bank Leumi Trust Co.*, 808 *F.Supp.* 213, 229 (S.D.N.Y. 1992) ....................31
*Cleveland v. Caplaw Enter.*, 448 *F.3d* 518, 521 (2d Cir. 2006)....................................................16
*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 *F.3d* 229, 242 (2d Cir. 1999) ................41
*Colombia v. Diageo North America Inc.*, 531 *F.Supp.2d* 365, 441 (E.D.N.Y. 2007)...................30
*Decker v. Massey-Ferguson, Ltd.*, 681 *F.2d* 111, 115 (2d Cir. 1982)............................................46
*Deem v. Lockheed Corp.*, 749 *F.Supp.* 1230 (S.D.N.Y. 1989).................................................27, 40
*DeFalco v. Bernas*, 244 *F.3d* 286, 313 (2nd Cir. 2001)............................................................19,40
*Design Pallets, Inc. v. GrayRobinson, P.A.*, 515 *F.Supp.2d* 1246 (M.D.Fla. 2007) ....................36
*DiVittorio v. Equidyne Extractive Indus.*, 822 *F.2d* 1242, 1247 (2d Cir.1987) .....................31, 33
*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 *F.3d* 159, 178 (2d Cir. 2004)...........17, 39
*Forman v. Davis*, 371 *U.S.* 178, 182 (1962)..................................................................................46
*Gertz v. Robert Welch, Inc.*, 418 *U.S.* 323, 347-349 (1974)..........................................................33
*GICC Capital Corp. v. Technology Finance Group, Inc.*, 67 *F.3d* 463, 467 (2d Cir. 1995) ........40
*Giuliano v. Everything Yogurt, Inc.*, 819 *F.Supp.* 240, 244 (E.D.N.Y. 1993) ............................32
*H J, Inc. v. Northwestern Bell*, 492 *U.S.* 229 (1989)....................................................................40
*Harte-Hanks Communications, Inc. v. Connaughton*, 491 *U.S.* 657 (1989) ................................34
*Hy Cite Corp. v. badbusinessbureau.com, L.L.C.*, 418 *F.Supp.2d* 1142, 1150 (D.Ariz.
    2005)..................................................................................................................................36
*In re Sumitomo Copper Litig.*, 995 *F.Supp.* 451, 456 (S.D.N.Y. 1998).......................................31
*Iqbal v. Hasty*, 490 *F.3d* 143, 157-58 (2d Cir. 2007) ...................................................................16
*Landy v. Mitchell Petroleum Technology Corp.*, 734 *F.Supp.* 608, 622-23 (S.D.N.Y.
    1990)..................................................................................................................................31
*Leung v. Law*, 387 *F.Supp.2d* 105, 115-16 (E.D.N.Y. 2005)........................................................30
*Lewis v. Lhu*, 696 *F.Supp.* 723, 725 (D.D.C. 1988) .....................................................................37
*Luce v. Edelstein*, 802 *F.2d* 49, 56 (2d Cir. 1986).........................................................................46
*M'Baye v. New Jersey Sports Production, Inc.*, 2007 *WL* 431881, *7 (S.D.N.Y. 2007) ..............32
*McLaughlin v. Anderson*, 962 *F.2d* 187, 194 (2nd Cir. 1992) .....................................................19
*Medinol Ltd. v. Boston Scientific Corp.*, 346 *F.Supp. 2d* 575 (S.D.N.Y. 2004)................38, 40, 41
*National Electrical Benefit Fund v. Heary Bros. Lighting Protection Company, Inc.*, 931
    *F. Supp.* 169, 188 (W.D.N.Y. 1995).................................................................................18
*Neder v. United States*, 527 *U.S.* 1, 24-25 (1999) .........................................................................35
*New York Times v. Sullivan*, 376 *U.S.* 254, 279-80 (1964) ..........................................................34
*Pandick, Inc. v. Rooney*, 632 *F.Supp.* 1430, 1433 (N.D.Ill.1986).................................................36
*Pisani v. Staten Island University Hosp.*, 2008 *WL* 1771922 (E.D.N.Y. 2008)...........................34
*Rodonich v. House Wreckers Union*, 627 *F.Supp.* 176, 178-79 (S.D.N.Y. 1985) ............20, 35, 45

*S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 *F.3d* 629, 633 (2d Cir. 1996)................30

*Scheidler v. National Organization for Women*, 537 *U.S.* 393 (2003)....................20, 22

*Schmuck v. United States*, 489 *U.S.* 705 (1989) .................................................................32

*Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 *U.S.* 479, 496 (1985).................................17, 36

*Shaw v. Rolex Watch, U.S.A., Inc.*, 673 *F.Supp.* 674 (S.D.N.Y. 1987) ...........................37

*Smithfield Foods, Inc. v. United Food and Commercial Workers Int'l Union*, 2008 *WL* 2233979, 184 L.R.R.M. 2354 (May 30, 2008)........................21,28,29,39,44,45,46

*Spira v. Nick*, 876 *F.Supp.* 553, 559-60 (S.D.N.Y. 1995) .................................................31

*Stein v. New York Stair Cushion Co., Inc.*, 2006 *WL* 319300, *5 (E.D.N.Y. 2006).....................32

*Stirone v. United States*, 361 *U.S.* 212, 215 (1960)..........................................................18

*Terre Du Lac Ass'n, Inc. v. Terre Du Lac, Inc.*, 772 *F.2d* 467, 472-3 (8th Cir.1985), *cert. denied*, 475 *U.S.* 1082 (1986) .........................................................................................36

*The Philatelic Foundation v. Kaplan*, 647 *F.Supp.* 1344 (S.D.N.Y. 1986) .................38

*Tribune Co. v. Purcigliotti*, 869 *F.Supp.* 1076, 1090 (S.D.N.Y. 1994).........................33

*United States v. Arena*, 180 *F.3d* 380, 392 (2nd Cir. 1999)...........................................20

*United States v. Baudin*, 486 *F.Supp.* 403, 405 (S.D.N.Y. 1980) .........................26, 27

*United States v. Capo*, 817 *F.2d* 947, 951 (2nd Cir. 1987) ...........................................19

*United States v. Castor*, 937 *F.2d* 293, 299 (7th Cir.1991)...........................................23

*United States v. Cerilli*, 603 *F.2d* 415, 419-20 (3d Cir.1979)........................................23

*United States v. Clemente*, 640 *F.2d* 1069, 1076 (2nd Cir. 1981)...........................23, 27

*United States v. Coffey*, 361 *F.Supp.2d* 102, 108 (E.D.N.Y. 2005) ...........................21

*United States v. Enmons*, 410 *U.S.* 396 (1973)..................................................23,26,27

*United States v. French*, 628 *F.2d* 1069, 1074-75 (8th Cir.1980).................................23

*United States v. Gotti*, 459 *F.3d* 296 (2nd Cir. 2006).............................................21, 22

*United States v. International Longshoremen's Assn.*, 518 *F.Supp.2d* 422, 483 (E.D.N.Y. 2007).............................................................................................................................19

*United States v. Jackson*, 180 *F.3d* 55, 70 (2nd Cir. 1999)...........................................26

*United States v. Rybicki*, 287 *F.3d* 257, 261 (2d Cir. 2002)..........................................30

*United States v. Scacchetti*, 668 *F.2d* 643 (2nd Cir. 1982) ...........................................19

*United States v. Tolub*, 309 *F.2d* 286 (2nd Cir. 1962) ...................................................20

*United States v. Warledo*, 557 *F.2d* 721, 729-30 (10th Cir.1977).................................24

*United States v. Zappola*, 677 *F.2d* 264, 269 (2nd Cir. 1982) ......................................23

*Viacom International, Inc. v. Icahn*, 747 *F.Supp.* 205 (S.D.N.Y. 1990)........................27

*Volmar Distributors, Inc. v. New York Post Co., Inc.*, 825 *F. Supp.* 1153, 1162 (S.D.N.Y. 1993).............................................................................................................................33

*Zito v. Leasecomm Corp.*, No. 02-8074, 2004 *WL* 2211650, *1, 11 (S.D.N.Y. 2004)................32

## <u>STATUTES</u>

18 *USC* § 1951...............................................................................................................18

18 *USC* § 1952...............................................................................................................18

18 *USC* §1961.................................................................................................................6

18 *USC* §1962(d).........................................................................................................17

29 *USC* § 411................................................................................................................21

*Fed.R.Civ.P.* 9(b).........................................................................................................46

*Fed.R.Civ.P.* 12(b)(6) ............................................................................................16, 44

New York Penal Law § 155.05(2)(e) ............................................................................18

## OTHER AUTHORITIES

5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1296 .....................31

Joann Wypijewski, *States of Disunion*, The Nation, August 29, 2005...........................................7

*Local Union Leader Rosselli Blasts SEIU Boss Andy Stern*, S.F. Weekly, February 20,
   2008)........................................................................................................................8

Matthew T. Bodie, *Information And The Market For Union Representation*, 94
   Va.L.Rev. 1, 56 (2008) ...........................................................................................24

Plaintiff, Allied International Union ("AIU"), by its attorneys, Strobl & Sharp, P.C., and Stark & Stark, P.C., submits this brief in opposition to the motion to dismiss filed by Defendants, Service Employees International Union Local 32BJ, Michael Fishman, Andrew Friedman, Neil Diaz, Service Employees International Union Local 1877 and Service Employees International Union (collectively, "SEIU"). [1] SEIU has committed numerous fraudulent and extortionate acts, in furtherance of SEIU's campaign to raid AIU and induce AIU to relinquish its role as the exclusive collective bargaining representative of its members. In response, AIU has brought suit seeking, *inter alia*, relief under the Racketeer Influenced and Corrupt Organizations Act, 18 USC §1961, *et seq.* ("RICO"). (Complaint, at ¶ 1). SEIU has moved to dismiss AIU's Complaint under Fed. *R.Civ.P.* 12(b)(6).

## STATEMENT OF FACTS

AIU is a labor organization specializing in the representation of security guards. (Complaint, at ¶ 6). AIU is the exclusive bargaining representative for approximately 6,800 security professionals employed by various security companies operating in New York, New Jersey, Washington, D.C. and California. (Complaint, at ¶21). SEIU is a national service workers union that represents a variety of service sector employees, including cleaners, doormen, porters, maintenance workers, and security guards. (Complaint, at ¶ 7).

For decades, SEIU had been an AFL-CIO affiliate. (Complaint, at ¶ 31). However, in June 2005, SEIU publicly broke from the AFL-CIO in part to become more aggressive in SEIU's

---

[1] SEIU Local 32BJ, located in New York, NY; SEIU Local 1877, located in Los Angeles, CA; Michael Fishman, President of SEIU 32BJ and a Vice President of SEIU International; Andrew Friedman, an Organizer of SEIU 32BJ and a Field Researcher of SEIU International; and Neil Diaz, an Organizer of SEIU 32BJ (alleged collectively, along with SEIU International, as "SEIU" for the sake of simplicity in this memorandum) are all alleged to be members of the RICO enterprise in this matter. That RICO enterprise has been identified in the Complaint as "Stand for Security." The existence of identity of the alleged RICO enterprise has not been challenged by SEIU. (Complaint, at ¶ 8-12).

organizing and raiding campaigns. SEIU has taken advantage of its independence from the AFL-CIO and its policies against inter-union raiding, and has set a new standard for ruthlessness in its relationships with employers and other unions.  SEIU employs all available means, including fraudulent and extortionate tactics, against any adversary that stands in the way of its goals. SEIU's "ends-justify-the-means" strategy is embodied in its outspoken President, Andrew Stern. According to an article in the magazine The Nation:

> [Stern] said SEIU had no interest in raiding, the age-old practice of hitting on another union's members to get them to switch affiliations. Yet as he spoke, his operatives in California were in the midst of raiding an AFSCME local for 10,000 home-care workers under contract with Riverside County.

Complaint, Exhibit B, Joann Wypijewski, *States of Disunion*, The Nation, August 29, 2005.

SEIU's extortionate "corporate campaigns" are designed to put so much pressure on the target employer or rival union that the entity will be forced to either cease operations or surrender to SEIU's demands. (Complaint, at ¶ 55). SEIU applies this pressure on a number of different fronts, through the covert creation of sham surrogates and entities. These sham surrogates and entities purport to be unrelated to SEIU and its illegal goals. In fact, these sham surrogates and entities act in concert in the furtherance of SEIU's corporate campaigns through public relations schemes; misinformation campaigns targeting employers, investors and other unions; the use of affiliated politicians; and groundless legislative and regulatory actions. (Complaint, at ¶ 55). SEIU can devote massive resources to these efforts, which makes the threat of such a campaign a powerful hammer that SEIU uses to extort concessions from its rivals. (Complaint, at ¶ 55).

Recently, Stern's controversial tactics went so far as to drive the president of a large SEIU local union in California to resign from the SEIU International Executive Committee. Sal Rosselli, President of the 140,000-member SEIU local United Healthcare Workers-West, resigned from his position on February 9, 2008, in protest over SEIU International's "overly

2

zealous focus on growth – growth at any cost, apparently . . ." (Complaint, Exhibit C). In Rosselli's scathing resignation letter, he condemned SEIU's "undemocratic practices," including the fact that SEIU International's officers and staff "manipulated voting procedures" at the local level. (Complaint, Exhibit C).    Rosselli further stated, in a local newspaper, that SEIU International has "charted a course that values growth above all other principles." (Complaint, Exhibit D, Matt Smith, *Local Union Leader Rosselli Blasts SEIU Boss Andy Stern*, S.F. Weekly, February 20, 2008).

In the past, SEIU has launched campaigns to expand its membership in different industries.    More recently, SEIU and Defendants have targeted the security guard industry through the "Stand for Security" campaign. In furtherance of this campaign, Defendants have attempted to drive independent, guard-only unions out of the security industry through the use of the intimidation and coercion of SEIU's corporate campaign strategy. (Complaint, at ¶ 27).

### SEIU's Past Campaigns Against Other Unions

In 2005, SEIU split from the AFL-CIO.    Prior to that time, SEIU was restrained from raiding other AFL-CIO unions by operation of the no-raiding provision of the AFL-CIO Constitution.    The day after SEIU's much-publicized split, it waged an aggressive raid against the American Federation of State, County, and Municipal Employees ("AFSCME") in Riverside County, California. AFSCME quickly reached an undisclosed agreement with SEIU International to stop SEIU's raid.

At or around this same time, SEIU also engaged in a win-at-all-cost battle to raid the membership of the Security, Police and Fire Professionals of America (SPFPA).  The SPFPA, like AIU, is a guards-only union.  (Complaint, at ¶ 28).  In August 2003, David L. Hickey, International President of the SPFPA, described SEIU's tactics in his union's newsletter:

> SEIU is attempting to take over the security industry and destroy independent security unions through threats, intimidation and other violations of the law.

3

(Complaint, at ¶ 29, Exhibit A). Hickey wrote to Thomas Balanoff, a Vice President of SEIU International, in July 2003, condemning SEIU's "five-year plan to take over the security industry and destroy independent security officer unions." (Complaint, Exhibit A). SPFPA eventually bent in the face of the pressure exerted by SEIU and agreed to an undisclosed settlement with SEIU. (Complaint, at ¶ 31).

From approximately 2005 to 2007, SEIU conducted an extortionate campaign against New York's Special & Superior Officers Benevolent Association ("SSOBA"). (Complaint, at ¶ 41). As a result, the SSOBA lost a substantial portion of its membership and was eventually forced to reach an undisclosed agreement with SEIU in order to halt its raiding campaign. (Complaint, at ¶¶ 43, 44).

Thereafter, in 2007 and 2008, SEIU conducted an extortionate campaign against Local One Security Officers ("Local One"), a guards-only labor union based in Brooklyn, New York. (Complaint, at ¶ 38). Part of SEIU's campaign included the attempted take over of Local One by unlawfully and covertly supporting a surrogate candidate running for president of Local One. (Complaint, at ¶ 40). As described below, SEIU employed these same tactics against AIU.

Additionally, SEIU conducted several other such campaigns in other cities, such as Houston and Philadelphia. (Complaint, at ¶ 45).

### SEIU's Fraudulent and Extortionate Campaign Against AIU

In early 2006, SEIU targeted New York as an area in which SEIU sought to increase its security guard membership. Accordingly, SEIU began a campaign against AIU, taken from its standard corporate campaign playbook. (Complaint, at ¶ 50). SEIU launched an attack to pressure and harass AIU to the point that it would be impossible for AIU to continue operations unless it acceded to SEIU's demands. Specifically, SEIU desired that AIU relinquish its role as the exclusive bargaining representative of most or all of its members. (Complaint, at ¶ 50). In

order to carry out the day-to-day operations of its extortionate campaign against AIU, SEIU dispatched well over 20 paid organizers and set up various sham surrogates and entities, investing substantial resources in support of these efforts.

As part of SEIU's extortionate campaign, when AIU resisted relinquishing its representative role to Defendants, Defendant Fishman threatened AIU leadership that SEIU would do "whatever it takes" to supplant AIU and take control of its membership. (Complaint, at ¶ 80). In addition, Defendant Friedman told AIU members that SEIU's goal is to "corner the market" on representation of security guards in the New York City area. (Complaint, at ¶ 81). In October 2007, Defendant Diaz threatened AIU representatives that it is in AIU's best interest to "give in to us." (Complaint, at ¶ 82). In about March 2008, SEIU's Vice President, Thomas Balanoff, stated that SEIU was "coming after Allied hard and will crush" AIU. (Complaint, at ¶ 83).

### SEIU's Illegal Manipulation of AIU Union Elections to Harass and Pressure AIU

Since SEIU is a mixed union, it cannot add new guards to its membership by utilizing the NLRB's secret-ballot election procedures. (Complaint, at ¶ 56). As such, Section 9(b)(3) of the National Labor Relations Act prevents SEIU from seeking to have AIU members choose between AIU and SEIU in a federally-conducted election. (Complaint, at ¶ 57). As a result, part of SEIU's raiding campaign included covertly recruiting individual members of AIU and essentially using these individuals as surrogates in AIU's internal union elections. Specifically, in early 2007, SEIU propositioned several AIU members, including William Watson and Larry Binyard, with bribes of increases in pay and benefits in exchange for assisting SEIU in taking over AIU. (Complaint, at ¶ 60).

In April 2007, in violation of the Labor Management Reporting and Disclosure Act, SEIU told these and other individuals that SEIU and/or its locals or affiliates would provide

assistance, financially or otherwise, for individuals running for officer positions within AIU. (Complaint, at ¶ 61). Defendant, Friedman, utilized the SEIU offices to organize and conduct numerous meetings with these surrogates. (Complaint, at ¶ 61). Friedman advised his "plants" that SEIU would "take care of everything," including creating and distributing fraudulent campaign flyers. (Complaint, at ¶ 61). Examples of campaign flyers, which contain Friedman's name and contact information. (Complaint, at ¶ 61, Exhibit E; Complaint, at ¶ 39, Exhibit L).

In April 2007, SEIU organized and conducted secret meetings with Jesus Govea, an SEIU surrogate, to provide support and resources in Govea's campaign for Vice President of AIU. (Complaint, at ¶ 62). SEIU surreptitiously campaigned for Govea at Los Angeles International Airport and elsewhere, held meetings with AIU members employed by Aviation Safeguards, Inc., and created and distributed fraudulent Govea campaign flyers. (Complaint, at ¶ 62). SEIU, and/or one of its sham organizing entities, also paid a New York law firm to represent SEIU election surrogates. (Complaint, at ¶ 63).

Further, in support of this extortionate activity, SEIU and its surrogates misrepresented Mary Beth Stafford, an AIU officer running for reelection, as a "corrupt, fake lawyer." (Complaint, Exhibit L, at 64, 71, 73, 80). SEIU often made these fraudulent statements by telephone. (Complaint, Exhibit L, at 73, 80). These numerous fraudulent and illegal attempts to manipulate AIU's officer elections resulted in prolonged and costly investigations of the election and its results. SEIU and its surrogates and affiliated sham entities have also engaged in a coordinated smear campaign of the three highest-ranking AIU officers to drive a wedge between AIU and its members, as well as the site owners and managers where AIU's members work. The smear campaign includes provably false and defamatory statements by SEIU agents to AIU members and others that AIU officers are engaged in adulterous sexual activity and, as described above, that AIU's vice president is a "corrupt" and "fake" lawyer. (Complaint, at ¶ 65).

### SEIU's Extortion of AIU Through Third Parties

SEIU has applied further coercive pressure to third parties, such as Fordham University, Columbia University, NYC Human Resources Administration, JetBlue Airways, FJC Security Services, Inc., Summit Security Services, Inc., Aviation Safeguards, Inc. and Allied Security, LLC d/b/a AlliedBarton Security Services. (Complaint, at ¶ 66). This extortionate activity also relied upon SEIU's creation of fraudulent websites, which hid SEIU's identity as the actual creator and owner of the websites, and which contained and disseminated contrived statements solely for the purpose of applying pressure to force AIU to accede to the demands of SEIU.

### Fordham University and Summit Security

For example, SEIU independently contacted Fordham University and advised them to take steps to remove AIU as the bargaining representative of security guards at Fordham's campuses, which Fordham staffed with AIU guards through Fordham's security contractor, Summit Security. SEIU threatened Fordham by stating that SEIU would use its influence among local politicians to block Fordham's planned expansion of its Lincoln Center campus buildings in New York City. (Complaint, at ¶ 67). Supporting this conclusion, in November 2007, at a Fordham University site, defendant, Friedman, yelled at several AIU members, saying that defendant, Fishman, "will be the president" of AIU.

SEIU thereafter proceeded to carry out its threat and engaged in a fraudulent public relations campaign against Fordham. To that end, SEIU created a fraudulent online petition, under the name of a sham entity, directed at Fordham University President, Father Joseph McShane. The petition claimed that Fordham's proposed building expansion would create overcrowding, noise and air pollution and would "exaggerate the fortress-like layout of the Lincoln Center campus." These contrived and fraudulent "concerns" were actually only advanced in order to obstruct and economically harm Fordham - in an attempt to pressure

7

Fordham and force it to accede to SEIU's demands. (Complaint, at ¶ 68). This extortionate disruption of the Lincoln Center expansion was eventually successful in forcing Fordham to open up bidding on its security contract with Summit Security, resulting in a loss of work for AIU and its members. (Complaint, at ¶ 90).

Additionally, in March 2008, SEIU pressured Summit Security into suspending its long-standing practice of deducting AIU dues from the paychecks of its AIU member employees. (Complaint, at ¶ 90). These dues had been deducted based on authorization forms unilaterally created and distributed by Summit Security, not AIU. (Complaint, at ¶ 90). Approximately one week prior to suspending Summit Security's long-standing practice of deducting AIU dues from the paychecks of its employees, Summit Security's President, Bob Auletta, told AIU President, Peggy Vanson, that in order for Summit Security to keep its contract with Fordham, AIU must carve out a portion of its Fordham guard unit to allow SEIU to represent those guards. (Complaint, at ¶ 91). Auletta further stated that if AIU refused, then SEIU threatened to "do something" to make Summit Security cease deducting representational dues. (Complaint, at ¶ 91).

Vanson also received multiple telephone calls from Auletta urging her to meet with SEIU to relinquish a major portion of AIU's membership to SEIU. Auletta stated that this was necessary because SEIU was intent on putting Summit Security out of business. (Complaint, at ¶ 92). Vanson refused the demand by Summit Security. Approximately one week later, Summit Security ceased dues deductions, as described above, which resulted in the loss of member dues to AIU. (Complaint, at ¶ 93).

On the same day that Summit Security ceased dues deductions, SEIU covertly distributed a flyer in an effort to persuade AIU Summit Members to stop making lawful voluntary dues payments to AIU. (Complaint, at Exhibit K, p. 1; ¶ 94). In the flyer, SEIU asked the misleading

and fraudulent question, "Has Allied International Union been taking your dues illegally?" –

directly and falsely implying illegal conduct on the part of AIU. (Complaint, at ¶ 95). In a

separate flyer mailed to AIU members, SEIU directly accused AIU of illegally taking dues from

its members. (Complaint, at Exhibit K, pp. 2-3; ¶ 95). SEIU's sole purpose for this action is to

cut off much-needed representational funds to AIU in an effort to coerce AIU into surrendering

to SEIU's extortionate demands. (Complaint, at ¶ 95).

### AlliedBarton

SEIU has also exerted similarly illegal pressure against AlliedBarton, another employer

of AIU-represented security guards. In December 2006, AlliedBarton succeeded Tri-Star

Security as the guard service provider for New York City's Department of Citywide

Administrative Services ("DCAS"). At that time, all guards working at DCAS sites were

represented by AIU. AlliedBarton hired over 50 percent of the AIU-represented guards who had

been employed by Tri-Star Security. (Complaint, at ¶ 71). Initially, AlliedBarton advised AIU

that AlliedBarton would fulfill its legal obligation to bargain with AIU over the terms and

conditions of employment of guard employees. (Complaint, at ¶ 72). Shortly thereafter, SEIU

used the extortionate corporate campaign techniques that have become its regular way of doing

business. These extortionate tactics resulted in AlliedBarton reaching an undisclosed settlement

that cast aside AIU and unlawfully recognized SEIU as the bargaining representative of the

DCAS guards. (Complaint, at ¶ 73). In response, AIU filed an Unfair Labor Practice Charge with

the National Labor Relations Board, protesting AlliedBarton's failure and refusal to bargain with

AIU. (Complaint, at ¶ 74). This action resulted in a settlement with AlliedBarton and SEIU

favorable to AIU. (Complaint, at ¶ 75).

### JetBlue and Summit Security

SEIU has also targeted JetBlue Airways with its extortionate campaign. JetBlue contracts with Summit Security for security guard services at JFK Airport. Approximately 100 AIU members are employed by Summit Security, a JetBlue contractor. (Complaint, at ¶ 77). SEIU's campaign against JetBlue included SEIU's fraudulent creation and maintenance of a sham website that purports to publicize poor customer service and flight delays at JetBlue. (Complaint, at ¶ 79). The Internet address of that website is www.itsnoteasybeingblue.info. (Complaint, at ¶ 79).

A November 19, 2007, Newsday article chronicled some of the events surrounding SEIU's effort to "replace Allied." (Complaint, at ¶ 78). In the article, a Summit Security spokesperson said that SEIU's campaign is "an effort to discredit our company and coerce our already unionized employees" to join SEIU. (Complaint, at ¶ 78). While SEIU's campaign purports to raise JetBlue customer service issues, the real intent is to further SEIU's financial interests by placing pressure on third parties, namely JetBlue and Summit Security, to replace AIU in favor of SEIU. (Complaint, at ¶ 79).

### The Results of SEIU's Ongoing Fraudulent and Extortionate Campaign Against AIU

In furtherance of its extended, fraudulent campaign, SEIU has created, funded and maintained various sham surrogates and entities that have spread damaging lies and false accusations against AIU, its members and officers. SEIU has sought to bribe AIU members. engage politicians to apply improper political pressure, and illegally manipulate AIU's internal elections. AIU has further threatened and extorted AIU, its members and third-parties, in SEIU's intentional, calculated and successful scheme to illegally pressure AIU.

As a direct result of SEIU's campaign, AIU has suffered injury to its business reputation and has incurred the substantial costs of extensive investigation in order to try to unravel SEIU's

fraudulent attempts to manipulate AIU's internal elections. AIU has also suffered the loss of work for its members and the loss of its members' dues. By all indications, AIU will continue to suffer these and other losses until SEIU is successful in forcing AIU to accede to SEIU's demands, or until SEIU's illegal campaign is stopped.

## ARGUMENT

SEIU seeks dismissal of AIU's Complaint under *Fed.R.Civ.* P. 12(b)(6). In reviewing a motion to dismiss under *Fed.R.Civ.P.* 12(b)(6), a court must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enter.*, 448 *F.3d* 518, 521 (2d Cir. 2006). The plaintiff must satisfy "a flexible 'plausibility' standard, which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis in original). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly*, 127 *S.Ct.* 1955, 1969 (2007). Therefore, courts do not require "heightened fact pleading of specifics, but only enough facts to state a claim for relief that is plausible on its face." *Id.* at 1974.

## I.    AIU HAS SUFFICIENTLY ALLEGED THE EXISTENCE OF RACKETEERING ACTIVITY.

AIU has asserted RICO claims under Sections 1962(c) and (d). Section 1962(c) prohibits a "person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 *U.S.C.* § 1962(c). To state a civil claim based on a violation of § 1962(c), a plaintiff must allege: 1) conduct; 2) of an enterprise; 3) through a pattern; 4) of racketeering activity. *Sedima, S.P.R.L. v.*

*Imrex Co., Inc.*, 473 *U.S.* 479, 496 (1985). Section 1962(d) prohibits any person from conspiring to violate any of the substantive RICO provisions (*e.g.*, Section 1962(c)).

A "pattern of racketeering activity" consists of at least two predicate acts of racketeering activity committed in a ten year period. *See First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 *F.3d* 159, 178 (2d Cir. 2004). In addition to mail and wire fraud claims, AIU alleges that SEIU's actions amounted to, *inter alia*, extortion or attempted extortion under the Hobbs Act. 18 *U.S.C.* § 1951.[2] SEIU concedes that Hobbs Act violations and mail and wire fraud are considered "racketeering activity" for purposes of RICO. SEIU contends, however, that AIU has not adequately pled the elements of extortion under the Hobbs Act, nor the elements of mail and wire fraud. For the following reasons, AIU has pled facts sufficient to establish predicate acts of Hobbs Act extortion and/or attempted extortion and mail and wire fraud.

**A.    AIU HAS SUFFICIENTLY ALLEGED FACTS CONSTITUTING RICO PREDICATE ACTS UNDER THE HOBBS ACT**

The Hobbs Act prohibits interference with interstate commerce by <u>extortion</u>, <u>attempted extortion</u>, or <u>conspiracy to commit extortion</u>. 18 *U.S.C.* § 1951(a).  According to the U.S. Supreme Court, the Hobbs Act "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence." *Stirone v. United States*, 361 *U.S.* 212, 215 (1960. Extortion is defined in the Hobbs Act as "the obtaining of property from another, with his consent, induced

---

[2] AIU also alleges that SEIU's conduct constitutes extortion or attempted extortion under New York Penal Law § 155.05(2)(e) The same allegations that suffice to plead predicate acts of Hobbs Act extortion are also sufficient to plead predicate acts of extortion under New York Penal Law § 155.05(2)(e). *National Electrical Benefit Fund v. Heary Bros. Lighting Protection Company, Inc.*, 931 *F. Supp.* 169, 188 (W.D.N.Y. 1995). Therefore, AIU will address its Hobbs Act allegations in this Memorandum of Law, although the same analysis applies to its extortion allegations under the New York Penal Law. Additionally, because AIU's Travel Act (18 *U.S.C.* § 1952) allegations are dependent upon a showing of extortion or attempted extortion, and because SEIU has made no argument that AIU's Travel Act allegations are insufficient, AIU need not address those allegations in this Memorandum of Law.

by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Id.* § 1951(b)(2).

In order to state a claim for extortion, a plaintiff must allege that the defendants induced (or attempted to induce) the victim, with the victim's consent, to part with property, through the wrongful use of actual or threatened force, violence or fear, including fear of economic loss, in such a way as to adversely effect interstate commerce.[3] *U.S. v. International Longshoremen's Assn.*, 518 *F.Supp.2d* 422, 483 (E.D.N.Y. 2007) *citing McLaughlin v. Anderson*, 962 *F.2d* 187, 194 (2nd Cir. 1992).

### 1. Extortion by Wrongful Use of Fear of Economic Loss Falls Within the Hobbs Act's Prohibitions

Under the Hobbs Act, the element of fear may be satisfied by a showing that the victim was placed in fear of economic harm. *Calabrese v. CSC Holdings, Inc.*, 283 *F.Supp.2d* 797, 809 (E.D.N.Y. 2003). "The absence or presence of fear of economic loss 'must be considered from the perspective of the victim, not the extortionist; the proof need establish that the victim reasonably believed: first, that the defendant had the power to harm the victim, and second, that the defendant would exploit that power to the victim's detriment.'" *DeFalco v. Bernas*, 244 *F.3d* 286, 313 (2nd Cir. 2001) *quoting United States v. Capo*, 817 *F.2d* 947, 951 (2nd Cir. 1987) (*en banc*. The fear which may result from lost business opportunities or intentional interference with a valuable contract right, for example, are encompassed by the Hobbs Act. *Id.*

No particular set of facts are required to be shown to establish that the defendant made extortionate threats. In fact, Hobbs Act extortion does not even require a verbal threat. *United*

---

[3] Nothing more than a minimal effect on interstate commerce is required. *United States v. Scacchetti*, 668 *F.2d* 643 (2nd Cir. 1982). SEIU has made no argument concerning the commerce element.

*States v. Tolub*, 309 *F.2d* 286 (2nd Cir. 1962). The statute requires only that the defendant induce or attempt to induce his victim to part with property through the use of fear. *Id.* at 289.

### 2.    The Concept of Property Under The Hobbs Act is Broad and Includes Intangible Business Rights

A Hobbs Act violation requires a showing that the defendant obtained or attempted to obtain the victim's "property." *Scheidler v. National Organization for Women*, 537 *U.S.* 393 (2003). In *Scheidler*, the court held that "obtaining of property" requires both deprivation by the victim and acquisition by the defendant (or attempts to do same). The Second Circuit has an "admittedly expansive view" of the concept of property under the Hobbs Act. *United States v. Arena*, 180 *F.3d* 380, 392 (2nd Cir. 1999). "Many courts have held intangible business rights to be property under the Hobbs Act." *Rodonich v. House Wreckers Union*, 627 *F.Supp.* 176, 178-79 (S.D.N.Y. 1985). In fact, the "right to pursue lawful business" is "property" within the meaning of the Hobbs Act. *U.S. v. Coffey*, 361 *F.Supp.2d* 102, 108 (E.D.N.Y. 2005).

Additionally, in a recent decision of the U.S. District Court, Eastern District of Virginia, the court in *Smithfield Foods, Inc. v. United Food and Commercial Workers Int'l Union*, 2008 *WL* 2233979, 184 L.R.R.M. 2354 (May 30, 2008) (a copy of the decision is attached as Exhibit A), denied the defendants'[4] motion to dismiss a RICO lawsuit arising from a corporate campaign waged against an employer. The *Smithfield* court, relying heavily upon Second Circuit case law, including *United States v. Gotti*, 459 *F.3d* 296 (2nd Cir. 2006), ruled that the employer's right to recognize a union (or not) is "property" under the Hobbs Act.

---

[4] The President of SEIU, Andrew Stern, and SEIU's Change To Win coalition, are among the defendants in the *Smithfield* case. *Smithfield* is one of several pending national RICO lawsuits against SEIU and/or its officials and affiliates based primarily upon Hobbs Act extortion allegations in connection with those defendants' corporate campaigns. In this case, AIU has alleged that SEIU has trained individuals to conduct corporate campaigns more effectively. Complaint, at ¶ 55. These other corporate campaigns conducted by SEIU are similar in nature, albeit with different targets, to SEIU's extortionate raiding campaign. In each case, SEIU seeks to induce its target to part with property by exploiting the target's fear of economic harm.

Moreover, it is now firmly established that the right of members of a union to democratic participation in a union election that is guaranteed by the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 *U.S.C.* § 411, is "property" under the Hobbs Act, and the fact that this right is intangible does not divest it of protection. In *Gotti*, *supra*, the Second Circuit Court of Appeals applied *Scheidler* to hold that extortion claims under the Hobbs Act may be premised on extortion of <u>intangible</u> property rights (*e.g.*, union member's right to democratic participation in union elections), and that the plaintiff must show that the defendant did not merely mean to deprive the victim of the property, but also sought to obtain it for himself. In *Gotti*, the court held that:

> [I]n evaluating an extortion count's conformity with *Scheidler II – i.e.*, whether it adequately alleges the "obtaining of property" for purposes of the Hobbs Act's definition of extortion -- the key inquiry is whether the defendant is (1) alleged to have carried out (or, in the case of attempted extortion, attempted to carry out) the deprivation of a property right from another, with (2) the intent to exercise, sell, transfer, or take some other analogous action with respect to that right.

*Id.* at 324.

AIU has pled facts that clearly establish that multiple predicate acts of extortion or attempted extortion were committed by SEIU, and continue to be committed by it. First, SEIU's raiding campaign has consisted largely of its attempt to induce AIU to part with its property through SEIU's use of fear of economic loss. In particular, SEIU has attempted to force AIU, through the wrongful use of fear of economic harm to AIU, to relinquish all or part of its role as the exclusive bargaining representative of security guards. *See, e.g.,* Complaint, at ¶ 114. Second, SEIU unlawfully interfered with AIU's officer elections in violation of the LMRDA by SEIU's wrongful use of economic fear to attempt to obtain from AIU members their right to democratic participation in those elections. *See, e.g.,* Complaint, at ¶ 115. This allegation of attempted extortion is based upon SEIU's conduct in early 2007, when it illegally funded and supported surrogates for AIU officer positions in a failed attempt to gain control of AIU. Importantly,

SEIU has <u>not</u> addressed this set of allegations in its motion, and, thus, SEIU has tacitly admitted that the Complaint contains allegations of Hobbs Act extortion in connection with SEIU's unlawful attempt to deprive AIU members of their right to democratic participation in the 2007 elections.

### 3.    SEIU's Groundless "Claim Of Right" Defense is Based Upon a Mischaracterization of AIU's Complaint Allegations

SEIU attempts to recast AIU's factual allegations to support a "claim of right" defense under *U. S. v. Enmons*, 410 *U.S.* 396 (1973). In *Enmons*, labor officials who used violence during a strike were charged with extortion. *Id.* at 397-98. The *Enmons* court held that the Hobbs Act did not prohibit the use of violence to achieve lawful labor union objectives, such as higher wages; rather, the Act only prohibits violence as a means of achieving illegal objectives, such as the exaction of personal payoffs. *Id.* at 400, 407. The Second Circuit, applying *Enmons*, explained that Hobbs Act extortion "consists of the use of wrongful means to achieve a wrongful objective." *United States v. Clemente*, 640 F.2d 1069, 1076 (2nd Cir. 1981).[5]

SEIU erroneously argues that its "objective" as alleged in AIU's Complaint is merely to grow SEIU's ranks by competing against AIU for members. SEIU claims that because "raiding" is not unlawful, its objective is also not unlawful and thus SEIU can assert a "claim of right" defense. This argument fails for several reasons.

---

[5] The *Clemente* Court noted the limited holding in *Enmons* – that the Hobbs Act is inapplicable where violence is used to achieve a union's objective of obtaining higher wages in return for genuine services. *Id.* at fn. 6. Indeed, several courts of appeals, including the Second Circuit, have held that the claim of right defense should be limited to the facts of *Enmons*, specifically the use of force, violence, or fear in the context of a <u>labor dispute</u>. *United States v. Zappola*, 677 *F.2d* 264, 269 (2nd Cir. 1982) ("*Enmons* merely carved out a labor exception to the traditional law of extortion codified in the Hobbs Act."); *United States v. Castor*, 937 *F.2d* 293, 299 (7th Cir.1991); *United States v. French*, 628 *F.2d* 1069, 1074-75 (8th Cir.1980); *United States v. Cerilli*, 603 *F.2d* 415, 419-20 (3d Cir.1979); *United States v. Warledo*, 557 *F.2d* 721, 729-30 (10th Cir.1977). Despite the presence of labor unions as parties in this case, Defendants' extortionate actions are not in the context of a "labor dispute" (i.e., union vs. employer).

Repeatedly throughout the Complaint, AIU has alleged that the objective of SEIU's raiding campaign is to force AIU to *relinquish its role* as the exclusive bargaining representative of some or all of its members. SEIU has expressly threatened AIU, either directly or through third parties such as Summit Security, that unless AIU gives up its representation of AIU members to SEIU, SEIU will cause AIU severe economic harm. SEIU wrongly claims in its motion that its objective is "socially valuable" raiding.  Raiding, however, is not SEIU's objective. Raiding is what SEIU is doing to achieve its objective. In other words, SEIU is using extortionate measures for the "objective" of forcing AIU to walk away from all or most of its members, or make a deal with SEIU that will have the same result. AIU has never alleged that raiding, in and of itself, is unlawful. Raiding is certainly frowned upon in the labor community, and it wastes union resources. *See,* Matthew T. Bodie, *Information And The Market For Union Representation*, 94 Va.L.Rev. 1, 56 (2008). Instead of organizing the non-union workforce, and in the process increasing union membership in the marketplace overall, a union engaged in lawful raiding merely seeks to persuade existing union members to replace their bargaining representative. SEIU, however, has not conducted this raiding effort in such a manner.  It is not seeking merely to lure members away from AIU, but instead SEIU is trying to induce AIU to give up its longstanding representation of its members by exploiting AIU's fear of economic loss. AIU has a legitimate property right to refrain from relinquishing its representative status.

The Complaint plainly and repeatedly alleges a wrongful objective on the part of SEIU. AIU has alleged that SEIU's raiding effort is an "attempt to extort from AIU a relinquishment of its role as the exclusive bargaining representative of its members."  Complaint, at ¶ 50. AIU has alleged that SEIU has worked in concert to disparage AIU and its officers and interfere with AIU's relationships "to bring about sufficient pressure to coerce AIU and others to cede the representation of their members to Defendants."  Complaint, at ¶ 58. Defendant, Fishman,

17

threatened AIU leadership that SEIU will do "whatever it takes" to supplant AIU and take control of its membership, and Defendant, Friedman, threatened that Fishman "will be the president" of AIU. In the midst of SEIU's extortionate activity, Defendant, Diaz, told AIU representatives that it is in AIU's best interest to "give in to us." Complaint, at ¶¶ 80-82. AIU further alleged that SEIU pressured Summit Security to demand that AIU "carve out a portion of its Fordham guard unit to allow SEIU 32BJ to represent those guards." Complaint, at ¶ 91. Under pressure from SEIU, Summit's President repeatedly called AIU's President, Peggy Vanson, "urging her to meet with SEIU 32BJ to relinquish a major portion of AIU's membership to SEIU 32BJ in order to save his company . . ." Complaint, at ¶ 92. These statements and actions reveal an objective by SEIU not merely to compete for members, but rather to force AIU to "give in" and voluntarily turn over to SEIU AIU's valuable position as the collective bargaining agent for thousands of security guards.

SEIU's "claim of right" defense is thus premised on its mischaracterization of AIU's Complaint. Because SEIU's objective is _not_ the lawful solicitation of AIU's members, SEIU's claim of right defense is not supported by its misleading argument that SEIU has the lawful right to seek to become the representative of AIU's members. *See* Defendants' Brief, p. 7.   It is irrelevant to this particular analysis that SEIU has the right to become the representatives of AIU's members. SEIU is _not_ entitled to AIU's business property, but that is the Hobbs Act "property" that SEIU is seeking. *See United States v. Jackson*, 180 *F.3d* 55, 70 (2nd Cir. 1999) (threat is wrongful when used to obtain property to which the threatener is not entitled).

**4.    SEIU Has Not Identified a Manifest and Undisputed Claim of Right to AIU's Property; Therefore, SEIU's Claim of Right Defense Must Fail**

Moreover, a claim of right defense will exist "only where the claim of right is manifest or beyond dispute, such as in *Enmons* . . ." *United States v. Baudin*, 486 *F.Supp.* 403, 405 (S.D.N.Y. 1980) (emphasis added).  In *Baudin*, this Court reasoned that:

> Not every claim of right will preclude the prosecution of a would-be-extortionist under the Hobbs Act. Indeed, if this were the case, then a defendant would have only to assert some claim, however frivolous, to the property he had attempted to extort.

*Id.*

SEIU cannot establish that it has the required *manifest* and *undisputed* claim of right to AIU's business property. SEIU attempts in vain to characterize this case as one in which they are simply "out-competing" AIU in the marketplace. Defendants' Brief, p. 10. However, as outlined above, the Complaint alleges much more egregious misconduct than "competitive" raiding. In reality, SEIU wants to skip past "competition" and force AIU to hand over most or all of its business property under fear, induced by SEIU, of economic harm. This case does not present a manifest and undisputed right to property, such as higher wages demanded from an employer in *Enmons*, and, therefore, SEIU's claim of right defense must fail. *See Baudin*, 486 *F.Supp.* at 405 ("Certainly, no one would dispute a union's ability, apart from any violence, to seek wages and benefits for its members. I am presented with quite a different situation in the case at bar.").

As further illustration of this point, this Court in *Viacom International, Inc. v. Icahn*, 747 *F.Supp.* 205 (S.D.N.Y. 1990), identified two scenarios in which a defendant has no lawful claim to property under the "*Enmons-Clemente* framework." *Id.* at 212. The first is when "the victim receives, in exchange for his property, something which is of no value to the victim." The *Viacom* Court noted that the extortion in *Deem v. Lockheed Corp.*, 749 *F.Supp.* 1230 (S.D.N.Y. 1989), in which the defendant used fear to obtain something for nothing, falls within this first scenario.

The second scenario identified in *Viacom* is when "the victim receives, in exchange for his property, something which the victim values." *Id.* at 212-13. In the <u>second</u> category, some acts constitute extortion and others are found to be 'hard-bargaining.'" *Id.*

SEIU misconstrues the holding in *Viacom* to argue that this case presents the type of "hard-bargaining" found in the second scenario. Defendants' Brief, p. 7. This is flatly wrong, of course, because the extortion alleged in AIU's Complaint falls within the <u>first</u> scenario identified in *Viacom*. In this regard, SEIU's attempted extortion would result in AIU receiving *nothing* in exchange for its business property. In other words, if SEIU succeeds in its extortion scheme, AIU will "give in" to SEIU and either carve out most of AIU's bargaining units or relinquish its representative role entirely to put an end to SEIU's extortionate raiding campaign. This is not a hard-bargaining scenario in which AIU receives "something of value" in return for ceding its representation to SEIU. To the contrary, SEIU seeks something for nothing, which the *Viacom* Court clearly recognized as extortion under the Hobbs Act.

> 5.    **The Closely Analogous *Smithfield* Decision Demonstrates the Applicability of the Hobbs Act to SEIU's Extortionate Campaign to Induce AIU to Give Up Its Valuable Business Property.**

Lastly, the recent *Smithfield* decision is compelling and persuasive authority supporting AIU's allegations of Hobbs Act predicate acts of racketeering activity. In that case, the defendants are alleged to have engaged in an extortionate campaign, similar to the actions of the SEIU in this case, to force the employer to recognize certain labor unions as the collective bargaining representatives of its employees. The defendants argued that the employer's right to recognize (or not) a union is not property that can be extorted. The court ruled, however, that the employer "has the property right not to recognize [the unions] and, on the issue of union recognition, to operate its business free from interference by, or the involvement of, the Defendants." *Id.*, p. 19. Further, because the employer alleged that the defendants threatened it with financial ruin unless it recognized the unions, the court ruled:

> By any reasonable interpretation of applicable state or federal law, the Complaint presents facts that plausibly posit the existence of extortion and thus racketeering activity. Because the Complaint adequately alleges that the Defendants are attempting to extort from Smithfield, its right to conduct its business as it is so

20

advised and its right to refrain from recognizing unions, the Complaint adequately alleges that the Defendants have committed predicate acts of extortion.

*Id.,* p. 20.

This case is closely analogous to *Smithfield*. AIU has the property right not to relinquish its role as the exclusive bargaining representative of its members, and to operate its business free from the involvement of SEIU. AIU has alleged that SEIU has threatened AIU with severe economic loss, and sought to exploit AIU's fear of economic harm, unless AIU "gives in" to SEIU and relinquishes most or all of AIU's members to SEIU. Like the plaintiff in *Smithfield*, AIU clearly has "alleged facts that plausibly posit the existence of extortion and thus racketeering activity." While the ultimate objectives of the *Smithfield* defendants and SEIU are somewhat different, they are nevertheless conceptually identical. The *Smithfield* defendants have no lawful claim of right to recognition by the employer, even though they can achieve the same status through other lawful means. Similarly, SEIU has no lawful claim of right to AIU's representative status, even though SEIU can achieve that status through card-check recognition agreements with the employers of AIU's members. Of course, the problem for SEIU is that in addition to being hindered by the restrictions of Section 9(b)(3) of the NLRA (See Complaint, at ¶¶ 23, 57-58), SEIU cannot obtain voluntary recognition from an employer that already has an existing bargaining obligation to AIU. As a consequence, SEIU has, contrary to the arguments in their motion, tried to avoid "competition" with AIU and instead continue to attempt to extort from AIU its valuable representative status.

Accordingly, AIU has plainly and adequately alleged sufficient facts to establish a cause of action of Hobbs Act extortion, and thus RICO predicate acts of racketeering activity.

**B.    AIU HAS SUFFICIENTLY ALLEGED FACTS CONSTITUTING RICO PREDICATE ACTS OF MAIL/WIRE FRAUD**

    **1.    AIU's Allegations of Mail/Wire Fraud Comport with the Applicable Pleading Standards**

The essential elements of mail fraud are: 1) the existence of a scheme to defraud; 2) defendant's knowing or intentional participation in the scheme; and 3) the use of interstate mails or transmission facilities in furtherance of the scheme. *See Colombia v. Diageo North America Inc.*, 531 *F.Supp.2d* 365, 441 (E.D.N.Y. 2007) (*quoting Leung v. Law*, 387 *F.Supp.2d* 105, 115-16 (E.D.N.Y. 2005); *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 *F.3d* 629, 633 (2d Cir. 1996)). Further, in order to state a RICO claim on the basis of mail/wire fraud, the use of the mails or wires need not be essential to the fraudulent scheme as long as the use is incident to an essential part of the scheme. *Id.* at 442; *see, also, United States v. Rybicki*, 287 *F.3d* 257, 261 (2d Cir. 2002) (elements are substantially the same for the crime of mail and wire fraud).

Here, AIU alleges literally dozens of instances of mail/wire fraud both in the actual counts of its Complaint, as well as through the lengthy exhibits attached, and explicitly incorporated by reference, to the Complaint. However, SEIU contends that AIU fails to allege these manifold instances of mail/wire fraud with sufficient particularity. Yet, the level of particularity that SEIU petitions this Court to apply, even if it were in any way possible or efficient, is simply not the controlling standard of pleading in this case:

> [I]t is difficult to see any useful purpose in requiring that a RICO complaint specifically allege each mailing in furtherance of a complex commercial scheme, at least where, as here, the complaint alleges that numerous mailings of particular kinds were made in furtherance of the scheme. Once the plaintiff alleges with particularity the circumstances constituting the fraudulent scheme, neither the reputational interests nor the notice function served by *Rule* 9(b) would be advanced in any material way by insisting that a complaint contain a list of letters or telephone calls. *See Amalgamated Bank of New York v. Marsh*, 823 *F.Supp.* 209, 217 (S.D.N.Y. 1993); *Center Cadillac v. Bank Leumi Trust Co.*, 808 *F.Supp.* 213, 229 (S.D.N.Y. 1992); *Landy v. Mitchell Petroleum Technology Corp.*, 734 *F.Supp.* 608, 622-23 (S.D.N.Y. 1990).

*See Spira v. Nick*, 876 *F.Supp.* 553, 559-60 (S.D.N.Y. 1995) (citing *DiVittorio v. Equidyne Extractive Indus.*, 822 *F.2d* 1242, 1247 (2d Cir.1987); 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1296; *see, also, In re Sumitomo Copper Litig.*, 995 *F.Supp.* 451, 456 (S.D.N.Y. 1998) ("In cases in which the plaintiff claims that the mails or wires were simply used in furtherance of a master plan to defraud .... a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy *Rule* 9(b)"); *Giuliano v. Everything Yogurt, Inc.*, 819 *F.Supp.* 240, 244 (E.D.N.Y. 1993) ("the complaint need not specify the time, place and content of each mail communication where the nature and mechanics of the underlying scheme is sufficiently detailed, and it is enough to plead the general content of the misrepresentation without stating the exact words used").

Thus, as AIU claims that the mail/wire fraud was used in furtherance of SEIU's complex fraudulent campaign, the Complaint does not have to be unduly, painstakingly specific with respect to each of the numerous instances of mail/wire fraud. *See Stein v. New York Stair Cushion Co., Inc.*, 2006 *WL* 319300, *5 (E.D.N.Y. 2006); *M'Baye v. New Jersey Sports Production, Inc.*, 2007 *WL* 431881, *7 (S.D.N.Y. 2007). Indeed, the mailings or wire transmissions in question need not, in and of themselves, constitute fraud or contain a misrepresentation, so long as they are essential to SEIU's overall fraudulent campaign. *See Schmuck v. United States*, 489 *U.S.* 705 (1989); *see, also, Zito v. Leasecomm Corp.*, No. 02-8074, 2004 *WL* 2211650, *1, 11 (S.D.N.Y. 2004) ("it is the fraudulence of the scheme itself, not any individual falsehood in any particular mail or wire communication, that must be alleged").

Moreover, where much of the factual information needed to fill out the Complaint lies peculiarly within the opposing parties' knowledge, as is often the case where fraud is involved, the strictures of pleading fraud with particularity are relaxed. *See Tribune Co. v. Purcigliotti*, 869

*F.Supp.* 1076, 1090 (S.D.N.Y. 1994) (*citing DiVittorio*, 822 *F.2d* at 1248*); see, also, Volmar Distributors, Inc. v. New York Post Co., Inc.*, 825 *F. Supp.* 1153, 1162 (S.D.N.Y. 1993). In its Complaint, AIU has laid out a comprehensive picture of SEIU's extortionate scheme – despite the fact that SEIU continues to take pains to keep the details of its fraudulent activities secret. SEIU has continually and covertly caused its sham surrogates and entities to use the mails and wires (including the internet) to carry out its scheme. Notwithstanding, AIU has specifically uncovered and particularly set forth dozens of specific instances of mail/wire fraud on the part of SEIU.

As such, it is clear that AIU's allegations of mail/wire fraud comport with the applicable pleading standards.

### 2. SEIU's Contention that Statements Made During a Union Election Campaign Can Never be Fraudulent or False is Plainly Wrong.

SEIU next contends that: 1) there is an absolute privilege for statements made during a union election campaign; and 2) the allegations in the Complaint set forth statements of opinion, not fact. While these arguments are based upon defenses to defamation claims, rather than mail/wire fraud or RICO claims, it is clear that even in the defamation realm there is no such absolute privilege. *See Gertz v. Robert Welch, Inc.*, 418 *U.S.* 323, 347-349 (1974) (stating that false statements about a private person on a matter of public concern may be subject to liability so long as liability is not imposed without a showing of fault or actual damages); *New York Times v. Sullivan*, 376 *U.S.* 254, 279-80 (1964) (stating that false statements about the official conduct of a public official may be subject to liability if made with false or reckless disregard for truth); *Harte-Hanks Communications, Inc. v. Connaughton*, 491 *U.S.* 657 (1989) (upholding a defamation judgment against a newspaper in a suit by a public official where the official showed that the newspaper acted with reckless disregard of the truth in publishing false statements about the official). Thus, there is no absolute privilege that excludes SEIU's fraudulent statements

made during the union election campaign from constituting the predicate RICO act of mail/wire fraud.

Furthermore, there is no basis for the contention, unsupported by any factual context, that the allegations concerning statements that SEIU personnel are "corrupt," professionally unqualified or involved in adulterous affairs, are merely statements of opinion rather than fact. *See, generally, Pisani v. Staten Island University Hosp.*, 2008 *WL* 1771922 (E.D.N.Y. 2008). It is difficult to determine how SEIU can contend, without more, that such statements are in any way related to a union election campaign or are merely assertions of opinion. Indeed, SEIU has not pointed to any specific factors that would indicate that these intentionally damaging statements constitute any type of political speech or are incapable of being provably fraudulent and untrue. As such, for the purposes of SEIU's motion, the statements must be viewed as unprotected speech that is fraudulent and untrue.

Finally, as set forth *infra*, any SEIU statements made pursuant to the union election campaign comprise only a facet of the mail/wire fraud encompassed within SEIU's extortionate and fraudulent campaign.

3.    **AIU has Properly Pleaded that it Suffered Harm to its Business and Property, that was Proximately Caused by SEIU's Mail/Wire Fraud Committed in Furtherance of SEIU's Fraudulent Campaign.**

SEIU next contends that AIU has not sufficiently pleaded justifiable reliance on SEIU's fraudulent statements and that SEIU has not sufficiently pleaded proximate causation of damages attributable to SEIU's fraudulent statements. First and foremost, the United States Supreme Court has held that the common law requirement of justifiable reliance plainly has no place in the mail or wire fraud statutes. *Bridge v. Phoenix Bond & Indem. Co.*, 128 *S.Ct.* 2131, 2139 (2008) (*citing Neder v. United States*, 527 *U.S.* 1, 24-25 (1999) ("Using the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud, and hence a predicate act of

racketeering under RICO, even if no one relied on any misrepresentation")). Therefore, reliance, on the part of AIU or the other defrauded third parties in SEIU's extortionate campaign, is simply not a required element in alleging mail/wire fraud.

As for the damages proximately caused by SEIU's fraudulent campaign, AIU has listed multiple examples of damages directly and proximately caused by SEIU's campaign, as well as damages specifically flowing from SEIU's mail/wire fraud. *See Rodonich v. House Wreckers Union, Local 95 of Laborers'*, 627 *F.Supp.* 176, 179-80 (S.D.N.Y. 1985) (*citing Sedima, S.P.R.L. v. IMREX Co.*, 741 *F.2d* 482 (2d Cir.1984), *rev'd*, 473 *U.S.* 479 (1985) (It is not necessary for plaintiffs to allege that the predicate acts are directly responsible for the injury as long as the injury flows from the predicate acts)); *see, also, Terre Du Lac Ass'n, Inc. v. Terre Du Lac, Inc.*, 772 *F.2d* 467, 472-3 (8th Cir.1985), *cert. denied*, 475 U.S. 1082 (1986); *Pandick, Inc. v. Rooney*, 632 *F.Supp.* 1430, 1433 (N.D.Ill.1986).

Significantly, SEIU contends that the only allegations of mail/wire fraud are made in the context of the union election campaign. In fact, the Complaint sets forth numerous examples of SEIU's intentional use of fraudulent and contrived websites, petitions and e-mails in furtherance of its attempts to pressure and extort Fordham University, Allied Barton, JetBlue and Summit Security – all part of SEIU's campaign to extort AIU by directly, and successfully, harming its business and property interests. Such actions clearly constitute mail/wire fraud. *See Design Pallets, Inc. v. GrayRobinson, P.A.*, 515 *F.Supp.2d* 1246 (M.D.Fla. 2007) (Plaintiff alleged predicate acts of racketeering activity, i.e. wire fraud, sufficiently to state a claim against defendant for RICO violation, where plaintiff alleged that defendant sent various documents, via United States mail and/or e-mail, which contained intentional misrepresentations); *Hy Cite Corp. v. badbusinessbureau.com, L.L.C.*, 418 *F.Supp.2d* 1142, 1150 (D.Ariz. 2005) (Plaintiff's allegations that defendant website operators intentionally used their site to disseminate contrived,

false and defamatory consumer complaints through the website and e-mails were sufficient to allege wire fraud, as predicate act under RICO).

Despite these allegations, SEIU contends that there were no damages alleged by AIU to be proximately caused by SEIU's mail/wire fraud, committed in furtherance of its fraudulent campaign. In fact, nothing could be farther from the truth. For example, SEIU's numerous fraudulent mailings and wire transmissions (including SEIU's contrived websites, petitions and e-mails), clearly were intended to and did directly and proximately cause damage to AIU. These damages include loss of work through third parties, loss of union dues and loss of business reputation. *See Shaw v. Rolex Watch, U.S.A., Inc.*, 673 *F.Supp.* 674 (S.D.N.Y. 1987) (seizure of just a few watches by customs officials allegedly as a result of the defendant's racketeering is an interference with the plaintiff's interest in the property sufficient to confer RICO standing on the plaintiff); *Lewis v. Lhu*, 696 *F.Supp.* 723, 725 (D.D.C. 1988) (Defendant's campaign to discredit plaintiffs gave rise to allegations of reputational and other damage stemming from defendant's actions, sufficient to meet the RICO standing requirement).

In addition, SEIU is similarly incorrect in its contention that there were no damages proximately caused by SEIU's illegal attempts to manipulate the union elections. While the outcome of the election may not have changed, there are both the damages to AIU's business reputation, as well as the considerable costs associated with the extended investigations of the SEIU sham surrogates and entities and their efforts to defame AIU personnel and management and improperly manipulate AIU's elections. *See The Philatelic Foundation v. Kaplan*, No. 85 Civ. 8571. *slip op.* (S.D.N.Y. May 9. 1986). *dismissed in part* 647 *F.Supp.* 1344 (S.D.N.Y. 1986) (The plaintiff's expenses investigating and rectifying the fraud, as well as repairing the damage to its business reputation, were properly claimed under RICO).

Therefore, it is clear that AIU has properly and thoroughly alleged that it is the target of SEIU's intentional, fraudulent campaign. Clear also are the allegations that this campaign, as well as the many specific examples of mail/wire fraud perpetrated by SEIU in furtherance of its overall scheme, have directly and proximately caused damage to AIU, its property, business interests and reputation.

## II.    AIU HAS SUFFICIENTLY ALLEGED A PATTERN OF RACKETEERING ACTIVITY

### A.    Introduction.

In their motion, SEIU argues that AIU's Complaint lacks sufficient facts to show SEIU engaged in a "pattern of racketeering activity" which "amount to or pose a threat of continued criminal activity." In support of their argument, SEIU suggests the alleged facts do not establish either an "open-ended" on "close-ended" pattern of racketeering activity. Defendants' Brief, pp. 17-22.

Ignored by SEIU is the controlling authority on this issue, which can be found in this Court's Opinion in the case of *Medinol Ltd. v. Boston Scientific Corp.,* 346 *F.Supp 2d* 575 (S.D.N.Y. 2004). This case is cited in passing by SEIU in a string cite on p. 17 of its Brief. This case together with the *Smithfield* decision, *supra*, decided the same date that SEIU filed the current motion, is worthy of this Court's consideration on the pattern of racketeering issue.

### B.    The Statute.

The pertinent statute on pattern of racketeering activity is 18 *U.S.C.* §1962(c) which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

### C.    Close-Ended vs. Open-Ended Pattern of Racketeering Activity.

In order to state a cause of action under RICO, a plaintiff must allege either an open-ended pattern of racketeering activity, i.e., past criminal conduct coupled with a threat of future criminal conduct, or a close-ended pattern of racketeering activity, i.e., past criminal conduct extending over a substantial period of time. *First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F3d 159, 180 (2nd Cir. 2004). Continuity sufficient to prove a pattern of racketeering activity on a "close-ended" basis can be demonstrated by predicate acts which amount to continued criminal activity by a particular defendant who engages in a series of related predicate acts which extend over a substantial period of time which were neither isolated nor sporadic, or can be "open-ended" where there was a threat of continuing criminal activity beyond the period of time which the predicate acts were engaged in. *DeFalco v. Bernas*, 244 F3d 286, 321-323 (2nd Cir. 2001), *cert. denied*, 122 S.Ct. 207 (2001). This continuity requirement may also be satisfied "where it is shown that the predicate acts are a regular way of conducting defendant's ongoing legitimate business . . ." *Deem v. Lockheed Corporation*, 749 F. Supp 1230, 1240 (S.D.N.Y. 1989) *citing H J, Inc. v. Northwestern Bell*, 492 U S 229 (1989).

AIU has alleged a comprehensive pattern of racketeering activity comprising more than two predicate acts of racketeering activity which are interrelated to one another, all of which are part and parcel of a much broader and continuous campaign of extortion by SEIU nationwide pursuant to SEIU's regular way of conducting business. As each victim targeted by SEIU succumbs to SEIU's extortionate activities, SEIU thereafter targets a new victim and then recycle the same or similar extortionate activities against its new target until that new target succumbs, and so on and so forth, albeit in a different venue. This is Defendants' regular way of conducting the affairs of the Stand for Security enterprise. The latest target, of course, is now AIU in this venue.

This Court in *Medinol*, *supra* at 614-615, laid out the roadmap by which Plaintiff's Complaint will be measured on the pattern of racketeering activity issue:

> In <u>closed-ended continuity cases</u>, the plaintiff must prove that the predicate acts which violated §1962 constituted "a series of related predicates extending over a substantial period of time" and "were neither isolated or sporadic." *De Falco v. Bernas*, 244 *F.3d* 286, 321 (2d Cir. 2001) (*quoting H.J., Inc.*, 492 *U.S.* at 242, and *GICC Capital Corp. v. Technology Finance Group, Inc.*, 67 *F.3d* 463, 467 (2d Cir. 1995)). *De Falco* explained:
>
> > Since the Supreme Court decided *H.J., Inc.*, this Court has never held a period of less than two years to constitute a "substantial period of time." Although closed-ended continuity is primarily a temporal concept, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists.
>
> *Id.* (*citing Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 *F.3d* 229, 242 (2d Cir. 1999)).
>
> To demonstrate *open-ended continuity*, *De Falco* held, "the plaintiff need not show that the predicates extended over a substantial period of time but must show that <u>there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed</u>." *Id.* at 323 (*quoting Cofacredit*, 187 *F.3d* at 242). The Court of Appeals instructed that particularly where the defendant's business was primarily legitimate, such cases should look first "to the nature of the predicate acts alleged or to the nature of the enterprise" to determine whether "it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implied a threat of continued criminal activity." *Id.* (*quoting GICC*, 67 *F.3d* at 466, *Cofacredit*, 187 *F.3d* at 242).
>
> \* \* \* \* \* \*
>
> Open-ended continuity does not require a finding that the predicate acts spanned a certain duration, but it does require a finding that they are likely to continue into the future, <u>or that they represent the primary way that defendants do business</u>. \* \* \*

(*emphasis supplied*). Leaving open the question of whether or not the *Medinol* Defendants committed the requisite predicate acts of mail and wire fraud, this Court held the predicate acts at issue in *Medinol* did not satisfy either the open-ended or closed-ended continuity test sufficient to establish a pattern of racketeering activity:

Neither finding is possible here. Project Independence was disclosed to Medinol in April 2000, <u>has not been revived in more than four years since then, and indeed could not be revived in the future because the relationship between the parties has been terminated. It thus cannot continue into the future.</u> And there are no facts on the record - even if Project Independence was as heinous as Medinol alleges - <u>which would suggest that BSC's regular way of doing business is through fraudulent acts that constitute racketeering activity,</u> or that criminal behavior similar to that alleged with regard to Project Independence will soon recur.

(*emphasis supplied*). *Id.*, at 615.

**D.    SEIU's Allegations of a Pattern of Racketeering Activity Satisfies Either or Both the Closed-Ended and Open-Ended Continuity Tests Sufficient to Establish a Pattern of Racketeering Activity.**

While the facts in *Medinol* are distinguishable from this case, its holding articulates the required facts and elements of "continuity" that must be pled. The facts not present in *Medinol*, which caused this Court to dismiss that action, have been sufficiently pled by AIU in this case. In *Medinol*, this Court found neither a close-ended or open-ended pattern of racketeering activity, in part because the allegedly unlawful project had been terminated, there was no possibility that it could be revived in the future, and the conduct as alleged was not demonstrated to be the regular way the *Medinol* defendants did business. In this case, Defendants' predicate acts of racketeering activity are and continue to be a regular part of the way in which they conducts their otherwise legitimate business. This conduct, by SEIU's own statements, is threatened to continue into the future. Complaint, at ¶ 80-83.

By way of example but not limitation, in addition to the regular and ongoing practices of SEIU, SEIU's extortionate activities have continued after the filing of the Complaint in this case on April 4, 2008, through the present date. For example, SEIU continues to file NLRB charges and decertification or deauthorization petitions against AIU. The most salient act by SEIU in furtherance of its ongoing extortion scheme is the June 5, 2008, filing of a decertification petition for the approximately 1,100 AIU members employed by AlliedBarton Security Services. NLRB Case No. 2-RD-1565.    AIU alleged in its Complaint that SEIU pressured AlliedBarton into

31

unlawfully recognizing SEIU. Complaint, at ¶ 73. AIU challenged the recognition before the NLRB, and AlliedBarton and SEIU signed a settlement agreement approved by the NLRB, in which SEIU agreed that AIU's bargaining status would be insulated from challenge for 120 days following commencement of good faith bargaining. Complaint, at ¶ 75. Well before the expiration of the 120-day insulated period, SEIU filed the June 5 decertification petition. In connection with SEIU's solicitation of the petition, they harassed, threatened, intimidated and coerced AIU members to refrain from supporting AIU. Based on these unlawful actions, AIU filed a currently-pending unfair labor practice charge with the NLRB. Case No. 2-CB-21548. The June 5 petition, and SEIU's unlawful actions taken to foster the decertification effort, represent a continuation of its extortionate raiding campaign.

Moreover, AIU has set forth in its Complaint allegations outlining SEIU's plan, dating back to 2003, to seize and take over the entire security industry and, in particular, to destroy independent security officer unions like AIU. Complaint, at ¶ 29-30. SEIU's raiding campaign is not merely competitive efforts to attract the members of rival unions. Instead, SEIU instills in its targets the fear of economic harm that will result from the exercise of its financial and political muscle to induce those targets to voluntarily agree to cede representation of part of its membership. As part of the regular way in which the SEIU conducts its business, SEIU systematically and methodically moved its extortionate campaign across the United States, from west to east, and on into New York's Five Boroughs in 2006. Complaint, ¶ 41.

Beginning in 2006, SEIU launched a massive attack upon AIU, misleading and harassing its members, slandering its officers, pressuring employers with whom AIU has contractual relationships and unleashing a barrage of legal proceedings before the NLRB and Department of Labor, all in an attempt to extort from AIU a relinquishment of its role as the exclusive bargaining representative of several of its members in and about New York's Five Boroughs.

Complaint, at ¶ 50. As stated elsewhere in this Brief as well as in AIU's Complaint, SEIU's

extortionate activities have continued from 2006 to the present. There is no reasonable basis to

believe that, even if AIU were to voluntarily relinquish a small percentage of its membership to

satisfy SEIU's demands, that the extortion would cease. SEIU has threatened that it will do

whatever it takes to obtain AIU's property, and that Defendant Fishman "will" be the president

of AIU. SEIU's campaign, therefore, will continue for an indefinite period of time so long as

AIU exists and represents guards in this marketplace.[6]

The recent decision in *Smithfield Foods, supra,* supports a finding in this case that AIU

has adequately alleged a "pattern" of racketeering activity. The *Smithfield* court, in denying the

defendants' 12(b)(6) motion to dismiss, held that the plaintiff had sufficient pled a pattern of

racketeering activity, because the alleged predicate acts were related and met the continuity

requirement, the court stating:

> The Complaint also alleges facts sufficient to meet the continuity requirement.
> The alleged conduct has continued for over 18 months. It also is alleged that the
> Defendants' conduct continued after the filing of the Complaint when the
> Defendants allegedly caused Smithfield to lose a critical marketing opportunity on
> the Oprah Winfrey show. . . . Indeed, at oral argument, Smithfield represented,
> without refutation by the Defendants, that conduct of the sort alleged in the
> Complaint continues even now.
>
> * * * * *
>
> An examination of the Complaint here discloses that it alleges many different,
> albeit related, kinds of threats and acts. The conduct seeks to accomplish
> different, albeit related, objectives. The Complaint alleges that the wide-ranging
> extortionate conduct had lasted for more than 18 months before the action was

---

[6]    For this reason, the case at bar is readily distinguishable from a recent decision of the U.S. District Court for the Western District of North Carolina in *US Airline Pilots Association v. AWAPPA, LLC,* et. al., Case No. 3:08cv246, in which the court dismissed a RICO action brought by a pilots union in part because of the plaintiff's failure to adequately allege open-ended continuity. The court based its decision on the fact that the plaintiff alleged only that the defendants' conduct was aimed directly at the single goal of destroying the plaintiff and rendering it incapable of discharging its legal duty to represent its members. In this case, however, Defendants' extortionate activity threatens to continue indefinitely.

<u>filed and was continuing as of the eve of the filing of the action. The unrefuted allegation is that, even during the pretrial proceedings herein, the conduct has continued</u>. Thus, considering this Complaint and the relatedness and continuity requirements that frame the pattern assessment, this case is quite different than [precedent relied upon by defendants].

*(emphasis supplied)*. *Id.*, pp. 23-26. *See also, Rodonich. v. House Wreckers Union Local 95 of Laborer's International Union,* 817 *F. 2d* 967 (2nd Cir. 1987) where a jury in the SDNY found two of the individual defendants had participated in Local 95's affairs through a pattern of racketeering activity in violation of RICO in a scheme to suppress dissent within Local 95 by unlawfully disciplining the Plaintiffs in violation of Federal Labor Law.

Many of the allegations in support of the Hobbs Act extortion claim in *Smithfield* relating to the release and dissemination of false and misleading information, interference with business relationships with major accounts, boycotts, condemnations of various personnel, etc. compare quite favorably with the allegations in Plaintiff's Complaint. See, summary of the allegations in the Complaint filed in *Smithfield Foods, supra*, pp. 4-8. As discussed above in Section I.A.5 of this Brief, the *Smithfield* defendants' alleged extortionate campaign is similar to the actions of the Defendants in this case.

In its Complaint, AIU has sufficiently set forth both a closed-ended and open-ended pattern of racketeering activity; first, a closed-ended pattern as demonstrated by SEIU's predicate acts of related extortionist activities which commenced, as respects AIU, in 2006 which acts are threatened to continue into the future and second, an open-ended pattern as demonstrated by both SEIU's predicate acts of related extortionist activities which commenced in 2003, if not earlier, and which are related and are continuing to the present date and, equally important, which extortionist acts were and continue to be a <u>regular part of the ordinary course of the manner in which the SEIU conducts its business</u>.

Like the complaint in *Smithfield, supra*, the allegations in AIU's Complaint   meet the requirements for both a closed-ended and open-ended pattern of racketeering activity. Accordingly, AIU's Complaint sufficiently establishes a pattern of racketeering activity and therefore, SEIU'S arguments to the contrary are without merit.

### III.    SHOULD THIS COURT DISMISS ANY PORTION OF AIU'S COMPLAINT, AIU MUST BE PERMITTED THE OPPORTUNITY TO REPLEAD

If the Court determines that the Complaint should be dismissed, AIU requests leave to amend the Complaint. *See, Luce v. Edelstein*, 802 *F.2d* 49, 56 (2d Cir. 1986) (stating that complaints dismissed under *Rule* 12(b)(6), especially those dismissed for failure to plead with particularity under *Rule* 9(b), are "almost always" dismissed with leave to amend). Moreover, it is well established that, unless a plaintiff has already had one opportunity to plead with greater specificity, the plaintiff must be allowed an opportunity to remedy deficiencies, especially when plaintiff has specifically requested the opportunity to amend its pleading. *Id.* (*citing Armstrong v. McAlpin*, 699 *F.2d* 79, 93-94 (2d Cir. 1983); *Decker v. Massey-Ferguson, Ltd.*, 681 *F.2d* 111, 115 (2d Cir. 1982); *Denny v. Barber*, 576 *F.2d* 465, 470-71 (2d Cir. 1978); *Forman v. Davis*, 371 *U.S.* 178, 182 (1962)). Therefore, should this Court dismiss any portion of AIU's Complaint pursuant to SEIU's arguments, this Court should also grant AIU leave to amend its pleadings.

### CONCLUSION

Based upon the foregoing arguments and controlling legal precedent, SEIU's motion to dismiss under *Rule* 12(b)(6) should be DENIED in its entirety.

Respectfully submitted,

STARK & STARK
A Professional Corporation
Attorneys for Plaintiff, Allied International Union

By: _____
KEVIN M. HART

Dated: July 16, 2008

| | |
|---|---|
| STARK & STARK, P.C. | STROBL & SHARP, P.C. |
| Kevin M. Hart | Dennis M. Devaney |
| Scott I. Unger | Michael M. Jacob |
| 993 Lenox Drive, First Floor | Jeffrey D. Wilson |
| Lawrenceville, NJ 08648-2389 | 300 E. Long Lake Road, Suite 200 |
| (609) 895-7334 | Bloomfield Hills, MI 48304 |
| | (248) 540-2300 |

Attorneys for Plaintiff, Allied International Union

E

X

H

I

B

I

T

A

**Exhibit "A"**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**FILED**

MAY 3 0 2008

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

SMITHFIELD FOODS, INC.
and SMITHFIELD PACKAGING
COMPANY,

     Plaintiffs,

v.                                Civil Action No. 3:07cv641

UNITED FOOD AND COMMERCIAL
WORKERS INTERNATIONAL UNION,
et al.,

     Defendants.

### MEMORANDUM OPINION

This matter is before the Court on the DEFENDANTS'
JOINT MOTION TO DISMISS UNDER FEDERAL RULE OF CIVIL
PROCEDURE 12(b)(6) (Docket No. 25) filed by Defendants
United Food and Commercial Workers International Union
("UFCW"), United Food and Commercial Workers Local No. 400
("Local 400"), Change to Win, Research Associates of
America, Jobs with Justice, Gene Bruskin, Joseph Hansen,
William T. McDonough, Leila McDowell, Patrick J. O'Neill,
Andrew L. Stern, and Tom Woodruff (collectively
"Defendants"). For the reasons set forth below, the motion
to dismiss will be denied in part and granted in part.

## STATEMENT OF FACTS

Smithfield Foods, Inc. is a Virginia corporation with its principal place of business in Smithfield, Virginia. (Amended Compl. at ¶ 8.) Smithfield Packaging Company is a wholly-owned subsidiary of Smithfield Foods.[1] (Id. at ¶ 9.) Smithfield's largest asset is its pork processing plant in Tar Heel, North Carolina. (Id.) The Tar Heel plant employs 4,650 hourly employees, and according to the Complaint, the Unions have been trying unsuccessfully to become the bargaining representative for over a decade. Smithfield also alleges that the Defendants view the employees of the Tar Heel plant as a potentially massive collective bargaining unit, representation of which will produce for the Unions significant monetary benefits and power.

The National Labor Relations Act ("NLRA") 29 U.S.C.A § 158(a)(3) permits a union to become a collective bargaining representative for an employer's employees if the union prevails in an election certified by the National Labor Relations Board ("NLRB"). The NLRA also permits an employer, under certain circumstances, to voluntarily recognize a union with need for an election. See 29

---

[1] Collectively Plaintiffs Smithfield Foods, Inc. and Smithfield Packaging Company are referred to as "Smithfield" or "Plaintiffs."

-2-

U.S.C.A. § 158(a)(3) (2008).[2]  Smithfield alleges that, after several unsuccessful attempts beginning in 1994 to achieve a majority vote of the hourly employees through the NLRB election process, UFCW and Local 400 and the other defendants, conspiring together, devised an unlawful scheme to extort an agreement from Smithfield to recognize UFCW and Local 400 as the exclusive bargaining agents of the hourly employees of the Tar Heel plant. (Amended Compl. at ¶ 66.)

According to the Complaint, the first manifestation of this strategy was when UFCW publicly announced a so-called "Corporate Campaign" against Smithfield in June 2006. (Id. at ¶ 38.)  It has been held that a Corporate Campaign includes a "wide and indefinite range of legal and potentially illegal tactics used by unions to exert pressure on an employer...[including] litigation, political

---

[2] 29 U.S.C.A. § 158(a)(3) provides that "[N]othing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization...to require as a condition of employment membership therein...(i) if such labor organization is the representative of the employees...in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held...within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement...."

appeals, requests that regulatory agencies investigate and pursue employer violations of state and federal law, and negative publicity campaigns aimed at reducing the employer's goodwill with employees, investors, or the general public." Food Lion, Inc. v. UFCW, 103 F.3d 1007, 1014 n.9 (D.C. Cir. 1997). The alleged object of the Corporate Campaign was either to force Smithfield to recognize UFCW as the collective bargaining representative of the employees at the Tar Heel plant or to force the plant, if not Smithfield, to become so unprofitable as to necessitate cessation of operations. (Amended Compl. at ¶¶ 38-41.)

While the Complaint details numerous allegations respecting the actions taken by UFCW and Local 400, and the other defendants, against Smithfield, the following outlines the most significant allegations.

(1)  UFCW retained Research Associates of America to prepare and release a false report to the public entitled "Packaged with Abuse: Safety and Health Conditions at Smithfield Packing's Tar Heel Plant." The report was released in August 2006 and was re-released in January 2007. It is further alleged that the defendants intentionally and maliciously caused the false report to be

-4-

published regarding the working conditions in the Tar Heel plant. In addition to charging that Smithfield violated safety laws and regulations, the report accused Smithfield of routinely and illegally denying, or causing to be denied, the workers compensation claims of its injured employees. (Amended Compl. at ¶¶ 88-95.)

(2) The Defendants allegedly interfered with Smithfield's business relationship with Harris Teeter, one of Smithfield's largest customers. Defendants are alleged to have continually and repeatedly attempted to cause Harris Teeter to cease doing business with Smithfield, inter alia, by organizing "Days of Action," which called for demonstrations to take place at Harris Teeter grocery stores across the southeast. The protests allegedly focused on Smithfield's treatment of its workers and accused Smithfield of racial bias with respect to Smithfield's African American and Latino workers. (Id. at ¶¶ 96-116.) All of these charges are alleged to be false.

(3) Smithfield alleges that the Defendants attempted to interfere with Smithfield's business

relationships with numerous other grocery stores
nationwide by sponsoring protests in Ann Arbor,
Atlanta, Boston, and Nashville. (Id. at ¶¶ 117-
124.)   The protests are alleged to have been
based on falsified grounds.

(4)  UFCW allegedly issued a nationwide directive in
August 2007 to all of its affiliated local unions
regarding the commencement of a "National
Boycott" of Smithfield products. Each affiliated
local union was directed to contact retailers in
its local jurisdiction that carry Smithfield's
products and instruct them to discontinue sales
of Smithfield's products or face demonstration
activity. (Id. at ¶¶ 125-130.) The retailers
allegedly were given false information to justify
the boycott.

(5)  The Defendants allegedly interfered with
Smithfield's business relationship with celebrity
chef, Paula Deen, who had entered a contractual
agreement to promote Smithfield's products on her
cooking shows. In an effort to interfere with the
business relationship, the Defendants are said to
have sponsored, and caused to take place, a series
of demonstrations at "Paula Deen Live Tour" events

and book signings in several cities. (Id. at ¶¶ 131-140.) These demonstrations too are alleged to have propounded false information.

(6)  The Defendants allegedly encouraged cities to effect and publish resolutions condemning Smithfield and banning the sale of its products within their municipal jurisdictions. The Defendants tried to effect such resolutions in New York City; Cambridge, Massachusetts; Somerville, Massachusetts; Chelsea, Massachusetts; and Boston, Massachusetts. The Defendants also encouraged members of the Potomac Association of the Central Atlantic Conference of the United Church of Christ to effect and publish a similar resolution condemning Smithfield. (Id. at ¶¶ 141-154.) The information provided in pursuit of these resolutions allegedly was untrue.

(7)  The Defendants allegedly attempted to devalue Smithfield's stock by mailing letters containing falsely disparaging information about the company to financial analysts who follow publicly traded companies in the food industry. (Id. at ¶¶ 155-158.)

(8)  The Defendants also are alleged to have orchestrated, sponsored, and conducted protests

against Smithfield which took place at the
company's 2006 and 2007 shareholders' meetings.
(Id. at ¶¶ 159-167.)

(9)  In or around June 2006, the Defendants issued
untrue and misleading press releases in numerous
markets as part of the so-called "Justice at
Smithfield" campaign.  (Id. at ¶¶ 190-196.)

It was these acts, and others, that allegedly were
undertaken for the purpose of causing Smithfield either to
recognize the unions without the use of NLRB supervised
elections or, alternatively, to cause Smithfield great
economic loss, if not financial ruin.  The conduct, says
Smithfield, violated the Racketeer Influenced and Corrupt
Organizations Act ("RICO") 18 U.S.C. § 1962 and certain
state laws.

## DISCUSSION

Smithfield has presented a nine count Complaint.
Counts One through Four allege RICO claims.  Counts Five
through Nine allege various state law claims.  Defendants
have moved to dismiss Counts One through Four, as legally
deficient, on the principal ground that the conduct alleged
therein does not constitute extortion, and, therefore, as a
matter of law, those counts allege no racketeering
activity.  Alternatively, the Defendants argue that, even

if the Complaint sufficiently alleges racketeering activities and the predicate crime of extortion, Counts One through Four should be dismissed on the ground that the Complaint does not adequately allege a pattern of racketeering activities, which is a necessary element of a RICO violation.    The Defendants also seek dismissal of Counts One through Four on the ground that they fail to state claims under 18 U.S.C. § 1962(d) for conspiracy to violate RICO because of the failure to state claims for substantive violations under 18 U.S.C. §§ 1962(a)-(c).    The Defendants ask that the state law claims, Counts Five through Nine, be dismissed because the RICO counts are frivolous and thus are so insubstantial that there is no warrant for retaining jurisdiction over the five state law claims.

I.    **The Standard For Assessing A Motion Under Fed. R. Civ. P. 12(b)(6)**

    In order to withstand a motion to dismiss under Rule 12(b)(6), it is necessary that a complaint allege "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1960 (2007).    In Bell Atlantic, the Supreme Court reversed the standard, established in Conley v. Gibson "that a complaint should not be dismissed for failure to

state a claim unless it appears beyond doubt that the plaintiff can prove *no set of facts* in support of his claim which would entitle him to relief." <u>Id.</u> at 1968 citing <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957) (emphasis added). <u>Bell Atlantic</u> held that <u>Conley</u> "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival."[3] <u>Bell Atlantic</u>, 127 S. Ct. at 1968. The Fourth Circuit has construed <u>Bell Atlantic</u> to mean that, in order to withstand a motion to dismiss, the plaintiffs' "[f]actual allegations must be enough to raise a right to relief above the speculative level." <u>Self v. Norfolk Southern, Corp.</u>, No. 07-1242, 2008 WL 410284 *1 (4th Cir. Feb. 13, 2008) quoting <u>Bell Atlantic Corp.</u>, 127 S. Ct. at 1955. "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." <u>Id.</u>

Of course, <u>Bell Atlantic</u> does not alter the principle that, in deciding a motion to dismiss under Rule 12(b)(6), the court must construe the complaint in the light most favorable to the plaintiff and the allegations of the

---

[3]    This, of course, is not an entirely clear line of demarcation because the first step in the opportunity to prove what a complaint claims is the survival of the complaint.

-10-

complaint must be taken as true.  Scheuer v. Rhodes, 416
U.S. 232, 236 (1974); Republican Party of North Carolina v.
Martin, 980 F.2d 943, 952 (4th Cir. 1992).  However, "legal
conclusions couched as factual allegations need not be
accepted as true."    Forest Ambulance Serv. v. Mercy
Ambulance, 952 F. Supp. 296, 299 (E.D. Va. 1997).

## II.  The Four RICO Counts In This Action

The four RICO counts have some separate elements and
they also have one element, or more, in common with the
other RICO counts.    Therefore, while addressing the
arguments for dismissal of the RICO claims, it is necessary
to keep in mind the elements of those claims.

Count One alleges a violation of 18 U.S.C. § 1962(d)
by  conspiring  to  violate  Section 1962(a).  Under
Section 1962(d), "It shall be unlawful for any person to
conspire to violate any of the provisions of subsection
(a), (b), or (c) of this section." See 18 U.S.C. § 1962(d)
(2006).  To state an offense under 18 U.S.C. § 1962(a), the
Complaint must allege that:  (1) the Defendants derived
income from a pattern of racketeering activity; (2) the
income was used or invested, directly or indirectly, in the
establishment or operation; (3) of an enterprise; (4) which
is engaged in or the activities of which affect interstate

or foreign commerce.  United States v. Vogt, 910 F.2d 1184, 1193 (4th Cir. 1990).

Count Two alleges a violation of 18 U.S.C. § 1962(d) by conspiring to violate Section 1962(b).  To establish a violation of Section 1962(b), the Complaint must allege that:  (1)  the  Defendants  engaged  in  a  pattern  of racketeering activity; (2) in order to acquire or maintain, directly or indirectly; (3) any interest or control over an enterprise; (4) which is engaged in, or the activities of which affect interstate or foreign commerce.  See 18 U.S.C. § 1962(b) (2006); see generally Davis v. Hudgins, 896 F. Supp. 561, 567 (E.D. Va. 1995).

Count  Three  alleges  a  violation  of  18  U.S.C. § 1962(c).  To make out a violation of Section 1962(c), the Complaint must allege "(1) conduct (2) of [the affairs of] an enterprise (3) through a pattern (4) of racketeering activity." Davis v. Hudgins, 896 F. Supp. 561, 567 (E.D. Va. 1995) quoting Sedima, S.P.R.L. v. Imrex, 473 U.S. 479, 496 (1985).  Count Four alleges a violation of 18 U.S.C. § 1962(d) by conspiring to violate  Section 1962(c).

Thus, to pass muster as legally sufficient, all four RICO counts must allege, inter alia:  (1) the existence of racketeering activity such that there were predicate acts undertaken by the Defendants; and (2) the existence of a

-12-

pattern of racketeering activity.  In the first section of the motion to dismiss Counts One through Four, the Defendants contend that, neither of those two elements are adequately pled and that, therefore, each of Counts One through Four fail as a matter of law.  The motion also attacks the sufficiency of each RICO count for different perceived inadequacies.

The opinion will discuss first the arguments which cut across all RICO counts (absence of racketeering activity and absence of pattern).  Then, the opinion will consider the alleged inadequacy of each of the four RICO counts on other grounds.  Finally, the arguments for dismissal of the state law claims will be addressed.

### III. Whether Counts One Through Four Adequately Allege The Existence Of Racketeering Activities

Under 18 U.S.C. § 1961(a), racketeering activity means "any act or threat involving...extortion...which is chargeable under State law and punishable by imprisonment for more than one year."  See 18 U.S.C. § 1961(a) (2006).  The Complaint alleges multiple, repeated, and continuous violations of North Carolina and Virginia extortion law.  Under North Carolina law, "Any person who threatens or communicates a threat or threats to another with the intention thereby wrongfully to obtain anything of value or

-13-

any acquittance, advantage, or immunity is guilty of extortion and such person shall be punished as a Class F felon." See N.C. GEN. STAT. § 14-118.4 (2007). Under Virginia law, "Any person who (i) threatens injury to the character, person, or property of another person, (ii) accuses him of any offense . . . and thereby extorts money, property, or pecuniary benefit . . . is guilty of a Class 5 felony." See VA. CODE ANN. § 18.2-59 (2007).

Defendants move to dismiss the RICO claims presented in each of Counts One through Four on the ground that the conduct alleged in the Complaint is merely coercive activity and not the racketeering activity of extortion. To support this asserted ground for dismissal, the Defendants rely principally on the decision in Scheidler v. National Organization of Women, 537 U.S. 393, 393-94 (2003), wherein the Supreme Court of the United States recognized the distinction between coercion and extortion, holding that the crime of extortion requires obtaining the property of another by depriving the owner of the property.

In Scheidler, the defendants engaged in a pattern of activities aimed at shutting down abortion clinics. Id. at 393. The Court held that, while the defendants' actions were coercive because they interfered with, disrupted, and, in some cases, completely deprived the plaintiffs of their

-14-

property rights, namely the right to operate the clinics, the actions did not rise to the level of extortion because they did not obtain, nor were they directed toward obtaining, the property at issue. Id. at 394.

The Defendants here argue that an employer's right to recognize a union is an intangible right which, for that reason, is not property that can be obtained, and that, therefore, they could not have engaged in extortion   even if they committed every act charged in the Complaint (Motion to Dismiss at 6-7.)  Virtually the same contention was addressed and rejected by the United States Court of Appeals for the Second Circuit in United States v. Gotti, 459 F.3d 296 (2d Cir. 2006). In Gotti, the Second Circuit examined the decision in Scheidler and concluded that, within the meaning of Scheidler, "LMRDA[4] rights can constitute extortable property under the Hobbs Act, notwithstanding the fact that LMRDA rights cannot be legally exercised by third parties" because intangible property can qualify as extortable property without consideration of whether its exercise, transfer, or sale would be legal. Id. at 325. The Second Circuit found that

---

[4]  LMDRA is the Labor-Management Reporting Disclosure Act, 29 U.S.C. § 401 et seq. The rights at issue in Gotti were the LMDRA rights to free speech and democratic participation in union affairs and to loyal representation by union officers.

the defendants had obtained, and thus extorted, the following: (i) union members' rights to participate in the affairs of the union by selecting representatives. _Id._ at 325; (ii) an actor's intangible right to decide with whom he will work. _Id._ at 327; and (iii) a business owner's intangible property rights to make business decisions. _Id._

The statute that provides the framework respecting the union organization of employees' for purposes of collective bargaining provides that unions can be recognized by corporations either by participating in (and winning) certified NLRB elections or by the employer-company's voluntary recognition of the union based upon a contemporaneous showing of majority support by the employees. The right to recognize a union (or not), especially when employees have rejected the union's organizing efforts, is a matter of considerable import and the exercise of that right carries with it significant consequences, fiscal and operational, for the employer and its employees. The right is intangible. But, of course, businesses have a host of intangible rights, the exercise of which are critical to the viability of the business, and, without doubt, those rights are the property of the proprietor -- the business owner. For example, business owners have, among others, the right to invest (or not) in

new equipment, to open or close manufacturing facilities, to hire and fire employees, to vote the shares that the company owns, and to provide (or not) pay raises, bonuses or other financial incentives to employees.

In reality, the right to recognize (or not) a union as bargaining representative is among the most valuable and important of rights possessed by business owners. The very existence of the Corporate Campaign concept is founded on the recognition that the exercise of that right is of great import and of great consequence. Like the host of other rights mentioned above, the right of voluntary recognition cannot, standing alone, be bought or sold or exercised by a third party. That certainly does not mean either that the right is not valuable or that it is any less of a property right than the other rights that compromise the essence of business ownership.

Contrary to the position of the Defendants, <u>Scheidler</u> did not remove extortion of intangible property rights from the reach of RICO. Before <u>Scheidler</u>, the Second Circuit confronted that question in <u>United States v. Tropiano</u>, 418 F.2d 1069, 1075-76 (2d Cir. 1969), wherein the court held that property, within the meaning of the Hobbs Act and hence RICO, included "in a broad sense, any valuable right considered as a source or element of wealth and does not

-17-

depend upon a direct benefit being conferred on the person who obtains the property." Id. In Tropiano, the property right at issue was the right to solicit customers as an integral component of the intangible right to do business. In United States v. Bellomo, 176 F.3d 590, 592-93 (1999), the Second Circuit found that the intangible right to participate in a union election was extortable property within the meaning of RICO. In United States v. Santoni, 585 F.2d 667, 673 (4th  Cir. 1978), the Fourth Circuit, citing Tropiano, held that, under the Hobbs Act and RICO, property included the "right of [a corporation] to make a business decision free from outside pressure wrongfully imposed. . . ."

In Gotti, the Second Circuit, in a thoughtful and thorough opinion, rejected the argument that, as a matter of law, Scheidler, in practical effect, had nullified Tropiano or overruled it sub silento. For the reasons explained by the Second Circuit in Gotti, it is quite clear that Scheidler did not vitiate either Tropiano or Santonio or any other decision[5] which held that intangible rights of

---

[5] See, Food Lion, Inc. v. United Food and Commercial Workers, No. 2:96-cv-0687 (D.S.C. Sept. 10, 2003); Titan Intl v. Becker, 189 F. Supp.2d 817, 826 (C.D. Ill. 2001); A. Terzi Production, Inc. v. Theatrical Protective Union, 2 F. Supp.2d 485 (S.D.N.Y. 1998); Bayou Steel Corp. v. United Steelworkers of America, No. Civ. A-95-496-RRM, 1996 WL

a business were property that was susceptible of extortion. The same reasoning which animated the Second Circuit's decision in _Gotti_ disposes of the Defendants' like contention here, and, for those reasons, the Defendants' argument is rejected here.[6]

Until the Unions prevail in a valid NLRB certified election at the Tar Heel plant, Smithfield has the property right not to recognize UFCW and Local 400 and, on the issue of union recognition, to operate its business free from interference by, or the involvement of, the Defendants. According to the Complaint, UFCW and Local 400 have sought to obtain from Smithfield the property right of recognizing, or refraining from recognizing, the Unions as bargaining representative of the Tar Heel employees. Those efforts are no less an effort to obtain a property right than were the efforts of the defendants in _Gotti_ to obtain the "intangible property rights to make various business

---

76344 (D. Del. Jan. 11, 1996); _Domestic Linen Supply & Laundry Co. v. Central States & Srv. Areas Pension Funds_, 722 F. Supp. 1472 (E.D. Mich. 1989).

[6] In their reply brief, the Defendants assert that the decision in _Overnite Trans. Co. v. Int'l Brotherhood of Teamsters_, 168 F. Supp.2d 826 (N.D. Tenn. 2001) requires a different result. _Overnite_ is a far different case with significantly different issues, and it does not affect the result reached here.

decisions...free from outside pressure.    United States v. Gotti, 459 F.3d at 327.

Those attempts are alleged to have been pursued by extortion that involved, inter alia, unlawfully interfering with Smithfield's business and its relationships with third parties, unlawfully attempting to inflict financial and reputational losses, and engaging in a wide variety of other allegedly unlawful conduct.  It also is alleged that the Unions threatened Smithfield with more of the same, even financial ruin, if Smithfield did not forego its property right not to recognize the Unions.

By any reasonable interpretation of applicable state or federal law, the Complaint presents facts that plausibly posit the existence of extortion and thus racketeering activity.  Because the Complaint adequately alleges that the Defendants are attempting to extort from Smithfield, its right to conduct its business as it is so advised and its right to refrain from recognizing unions, the Complaint adequately alleges that the Defendants have committed predicate acts of extortion.

**IV.  Whether Counts One Through Four Adequately Allege A Pattern Of Racketeering Activities**

Counts One through Four allege that Defendants engaged in a pattern of racketeering activity.  The existence of a

-20-

pattern of prohibited activity is an element of each of those four RICO counts because, under 18 U.S.C. § 1962(a), "[i]t shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity...to use or invest, directly or indirectly, any part of such income, or the proceeds of such income...." See 18 U.S.C. § 1962(a) (2006). A pattern of racketeering activity requires "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years...after the commission of a prior act of racketeering activity." See 18 U.S.C. § 1961(5) (2006). The Supreme Court addressed and clarified the pattern requirement in H.J., Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229 (1989) which controls the analysis here.

In H.J., Inc., customers of Northwestern Bell Telephone Company filed a class action against the telephone company alleging that it had attempted to influence members of the Minnesota Public Utilities Commission (MPUC) and thereby caused them to approve rates for the telephone company exceeding fair and reasonable amounts by making cash payments to commissioners, negotiating with them regarding future employment, and

purchasing airline and event tickets for the commissioners.
Id. at 232.   The plaintiffs alleged violations of RICO,
given that the predicate acts involved violations of the
bribery statute under Minnesota state law.    Id.    The
district court granted the defendant's motion to dismiss
under Rule 12(b)(6) on the ground that each fraudulent act
was committed in furtherance of a single scheme to
influence the MPUC to the detriment of Northwestern Bell's
customers; thus, there was no pattern of racketeering
activity.   Id. at 234.   The decision was affirmed by the
Court of Appeals.   Id. at 235.

The Supreme Court reversed, holding that, in order to
assess whether there is a pattern of racketeering activity,
it was necessary to analyze:   (1) the relationship of the
criminal acts and (2) the continuity of the acts.    The
relationship requirement is satisfied when "criminal
acts...have the same or similar purposes, results,
participants, victims, or methods of commission, or
otherwise are interrelated by distinguishing
characteristics and are not isolated events."   Id. at 240.
The continuity requirement refers to "a closed period of
repeated conduct, or to past conduct that by its nature
projects into the future a threat of repetition."   Id. at
241; See Walk v. The Baltimore and Ohio Railroad, 890 F.2d

-22-

688, 690 (4th Cir. 1989) (racketeering activity that continued over a ten year period met the requirements of continuity necessary to prove a pattern of racketeering activity, notwithstanding the fact that the conduct was "closed-ended."). A continuing racketeering activity may be demonstrated even without proof of multiple racketeering schemes. H.J., Inc., 492 U.S. at 240. The Supreme Court reversed the dismissal of H.J., Inc. because the plaintiffs had shown the ability to prove multiple predicate acts of bribery which satisfied the requirements of relatedness and continuity. Id. at 250.

In this case, Smithfield has sufficiently alleged that the predicate acts of extortion committed by the Defendants were related. The alleged predicate acts had the same or similar purpose. The acts were participated in generally by the same people. The alleged victim was the same. The alleged method of commission was the same or similar. The acts, as alleged, were not isolated events. The allegations of the Complaint, if proved, meet the requirement for relatedness specified in H.J., Inc.

The Complaint also alleges facts sufficient to meet the continuity requirement. The alleged conduct has continued for over 18 months. It also is alleged that the Defendants' conduct continued after the filing of the

-23-

Complaint when the Defendants allegedly caused Smithfield to lose a critical marketing opportunity on the <u>Oprah Winfrey</u> show. (Opposition at 12, n. 6.) Indeed, at oral argument, Smithfield represented, without refutation by the Defendants, that conduct of the sort alleged in the Complaint continues even now.

The principal authority on which the Defendants rely for their absence of pattern position is <u>DTEX, LLC v. BBVA Bancomer, S.A.</u>, 405 F. Supp.2d 639 (D.S.C. 2005), aff'd 214 Fed. Appx. 286, 2007 WL173711 Jan. 17, 2007) (unpublished opinion).[7] In <u>DTEX</u>, it was alleged that the defendant committed numerous criminal and corrupt practices to preclude the plaintiff from obtaining possession of equipment in which the plaintiff had a security interest.

The district court, in <u>DTEX</u>, first concluded that the complaint had not alleged but one predicate act, and that, therefore, there could be no pattern. That ground for rejecting the absence of a pattern in the pleading simply does not exist here. Instead, the Complaint in this case alleges many, related acts of extortion.

---

[7] Unpublished opinions are neither binding nor of precedential effect. They, of course, can be useful analytical tools. Here, the Court of Appeals adopted the reasoning of the district court so that reasoning will be addressed.

Then, in dicta, the <u>DTEX</u> opinion observed that the complaint failed to satisfy the continuity component of the pattern requirement because "the alleged scheme is narrowly focused on one goal and will end when and if that goal is accomplished." <u>DTEX, LLC v. BBVA Bancomer, S.A.</u>, 405 F. Supp.2d at 650. In support of that statement, the <u>DTEX</u> opinion cited decisions in which there was no threat of long-term extortionate activity[8] and in which the scheme was narrowly focused,[9] and concluded that, because the complaint in <u>DTEX</u> fit those parameters, the continuity requirement was not met.

An examination of the Complaint here discloses that it alleges many different, albeit related, kinds of threats and acts. The conduct seeks to accomplish different, albeit related, objectives. The Complaint alleges that the wide-ranging extortionate conduct had lasted for more than 18 months before the action was filed and was continuing as of the eve of the filing of the action. The unrefuted allegation is that, even during the pretrial proceedings herein, the conduct has continued. Thus, considering this

---

[8] <u>See e.g.</u>, <u>G.E. Inv. Private Placement Partners II v. Parker</u>, 247 F.3d 543, 549 (4th Cir. 2001); <u>Toucheque v. Price Bros.</u>, 5 F. Supp.2d 341 (D. Md. 1998).

[9] <u>Al-Abood v. El-Shamari</u>, 217 F.3d 225, 248 (4th Cir. 2000); <u>Menasco, Inc. v. Wasseronan</u>, 886 F.2d 681, 684 (4th Cir. 1989).

Complaint and the relatedness and continuity requirements that frame the pattern assessment, this case is quite different than DTEX.

For the foregoing reasons, the assertions that Counts One through Four are deficient for failure adequately to allege the presence of a pattern of racketeering activity are without merit.

## V.    Whether Count One Is Otherwise Deficient

Defendants have moved to dismiss Count One also on the grounds that it does not allege that: (1) UFCW or Local 400 received any income from a pattern of racketeering activity; or (2) there has been use or investment of any such income or the proceeds from such income. (Motion to Dismiss at 20.)

Count One is based on 18 U.S.C. § 1962(d) and charges that Defendants conspired to violate 18 U.S.C. § 1962(a) which states that:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity...to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise....

See 18 U.S.C. § 1962(a) (2006) (emphasis added). Under 18 U.S.C. § 1962(d), it is unlawful to conspire to violate any

-26-

provisions of § 1962(a).  See 18 U.S.C. § 1962(d) (2006).

Defendants assert that Count One fails adequately to allege that the Defendants agreed to receive use, or invest income derived from, a pattern of racketeering activity. The text of Count One alleges that "Defendants conspired among themselves that income would be received, directly or indirectly, from a pattern of activity unlawful under 28 U.S.C. §1961(1)(A)."  (Compl. ¶ 247).

Smithfield's opposition to this aspect of the motion to dismiss is based largely on Titan International, Inc. v. Becker, 189 F. Supp. 2d 817, 828 (C.D. Ill. 2001), in which the court held that there was a sufficient allegation of conspiracy to violate Section 1962(a) where "the primary reason for the Defendants' alleged extortionate activities was to invest money in the Steelworkers Pension Enterprise."  If a complaint does present a sufficient substantive allegation under Sections 1962(a) or (b), it need not allege that an injury occurred as a result of the use or investment of income from racketeering activities. Titan, 189 F. Supp. 2d at 829.

Smithfield argues that the conclusory assertion that the funds are to be received from union dues to be paid by employees upon recognition of the Unions will result in contribution to pension plans and increased salaries to the

-27-

individual defendants is sufficient allegation of a conspiracy to violate Section 1962(a). (Compl. ¶¶ 83-84). However, Smithfield has not alleged that there were agreements between the Defendants that the funds would be used thusly. Hence, as presented in the Complaint, Count One is inadequate.

However, in reply briefs and at oral argument, Smithfield demonstrated that it could cure this defect by amendment. Therefore, Count One of the Complaint was dismissed with leave to amend. Smithfield timely filed an Amended Complaint to address the defect identified by the Defendants.

Where, as in _Titan_ and as in the Amended Complaint in this case, it is alleged that the Defendants have violated Section 1962(d) by conspiring to violate Section 1962(a), the claim is legally sufficient if it alleges the presence of an agreement to use or invest the income derived from the racketeering activity, even if there is no alleged actual use or investment. _Id._ In the Amended Complaint, Smithfield alleges _inter alia_:

> An object of the said conspiracy was and is that income, or the proceeds of income, received by defendants UFCW and UFCW Local 400 be used or invested in the operation of the said enterprises for numerous legitimate and illegitimate purposes including, _inter alia_, the

-28-

> conduct of additional extortionate
> corporate campaigns, payment of salaries
> and fees to the other defendants for the
> purpose of engaging in further corporate
> campaigns and otherwise and the ongoing
> operation of the UFCW and UFCW [L]ocal 400
> enterprises. (Amended Compl. at ¶ 248.)

That is legally sufficient.

## VI. Whether Count Two Is Otherwise Deficient

Defendants move to dismiss Count Two also on the ground that Smithfield has not adequately alleged a conspiracy to violate Section 1962(b) because, even if the Defendants were successful in extorting 'voluntary' recognition of UFCW and Local 400 as the exclusive bargaining representatives of the employees at the Tar Heel plant, the Defendants would not gain an interest in, or control of, Smithfield itself. (Motion to Dismiss at 21.) The statute at issue, Section 1962(b) provides:

> It shall be unlawful for any person
> through a pattern of racketeering
> activity...to acquire or maintain,
> directly or indirectly, any interest in
> or control of any enterprise which is
> engaged in, or the activities of which
> affect, interstate or foreign commerce.

See 18 U.S.C. § 1962(b) (2006).

Under the reasoning of _Titan_, Smithfield has sufficiently alleged that the Defendants conspired to violate Section 1962(b). In _Titan_, the court held that:

-29-

> To properly state a claim for a
> conspiracy to violate § 1962(b),
> Plaintiffs' allegations of Defendants'
> agreement to control or participate in
> the enterprise need not rise to the level
> of formal control....To allege control,
> Plaintiffs must allege that Defendants
> agreed to manipulate Plaintiffs'
> activities through predicate acts which
> would cause Plaintiffs to make decisions
> it would not have otherwise made.

Titan, 189 F. Supp. 2d at 829. The court, in Titan, held

that the plaintiffs adequately stated a claim for a

conspiracy to violate Section 1962(b) by alleging that the

defendants, including United Steelworkers of America

("USWA") and USWA Locals 164 and 303, engaged in acts of

extortion, such as bomb threats, physical violence,

property damage, the filing of frivolous workers'

compensation claims, and unlawful interference with Titan's

business relations, in an attempt to manipulate the

plaintiffs' hiring and wage decisions. Id. at 821; 829;

see generally Marceau v. Int'l Bd. of Elec. Workers Local

1269, No. 05-02874-PHX-MHM, 2006 WL 1889600 *7 (D. Ariz.

July 7, 2006) ("control under § 1962(b) is best determined

by the circumstances of each case and does not require

formal control such as holding of majority stock or actual

designation as an officer or director.") (quoting Ikuno v.

Yip, 912 F.2d 306, 310 (9th Cir. 1990)).

On the facts alleged in the Complaint, if the

-30-

Defendants are able to extort voluntary recognition of the union, they will gain "substantial autonomy and control over [Smithfield's] business operations" and "considerable strategic and financial leverage when negotiating on behalf of other units of Smithfield employees currently represented by other local unions of Defendant UFCW." (Amended Compl. at ¶¶ 80-82.) Defendants are allegedly attempting to achieve these objectives, inter alia, by interfering with Smithfield's business relationships with third parties and damaging Smithfield's relations with its shareholders and in the institutional investment community, thereby inflicting significant financial losses on Smithfield in unlawful ways. These allegations state a claim for a conspiracy to violate Section 1962(b). Accordingly, that additional theory of dismissal is rejected, and the motion to dismiss Count Two for that reason will be denied.

## VII. Whether Counts Three and Four Are Otherwise Deficient

Defendants seek dismissal of Counts Three and Four on the independent ground that the three entity defendants (Research Associates of America, Jobs with Justice, and Change to Win) and the individual defendants (Leila McDowell, Andrew Stern, and Tom Woodruff) did not conduct

or participate in the conduct of the enterprises UFCW and Local 400. (Motion to Dismiss at 23-28.) The statute at issue in this part of the motion is 18 U.S.C. § 1962(c) which provides that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in...interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of 'such enterprise's affairs through a pattern of racketeering activity....

See 18 U.S.C. § 1962(c) (2006). Section 1962(d) makes it unlawful for any person to conspire to violate Section 1962(c).

The allegations made, inter alia, with respect to the three entity defendants are as follows:

(1) Research Associates of America authored the factual report entitled "Packaged with Abuse: Safety and Health Conditions at Smithfield Packing's Tar Heel Plant." The report was released in August 2006 and was re-released in January 2007. The report has "become the lynchpin" of the Corporate Campaign against Smithfield. (Amended Compl. at ¶ 95.)

(2) Jobs with Justice has through its agents led, orchestrated, or sponsored numerous protests.

-32-

(<u>Id.</u> at ¶¶ 108; 118-19; 123-24; 159.)   It has also met with various city councils to promote resolutions condemning Smithfield and has drafted such resolutions.   (<u>Id.</u> at ¶¶ 141-42; 145-47; 149; 151.)

(3)   Change to Win commissioned the drafting of the report by Research Associates of America.   (<u>Id.</u> at ¶¶ 88-89.)   The entity was also involved in protesting Smithfield Foods' shareholder meetings.  (<u>Id.</u> at ¶ 159.)

The allegations stated, <u>inter</u> <u>alia</u>, with respect to the three individual defendants are as follows:

(1)   Lelia McDowell is a spokeswoman for UFCW and the Communications Coordinator for the "Justice at Smithfield" Campaign.  (<u>Id.</u> at ¶ 18.)

(2)   Andrew Stern is a member of Change to Win's Leadership Council, which authorized the adoption of the Corporate Campaign as an official Change to Win Campaign.  (<u>Id.</u> at ¶¶ 20, 67.)

(3)   Tom Woodruff directs the Strategic Organizing Center of Change to Win.  (<u>Id.</u> at ¶¶ 21, 69.)

In <u>Reves v. Ernst & Young</u>, 507 U.S. 170, 178-79 (1993), the Supreme Court held that, in order to "conduct or participate" in an enterprise's affairs through a

-33-

pattern of racketeering activity, it is necessary to have some part in directing the affairs of the enterprise. In Reves, the Supreme Court held that outside auditor, Arthur Young, did not participate in the operation or management of the enterprise by creating the enterprise's financial statements, notwithstanding that the financial statements were the responsibility of the enterprise's management. Id. at 186. The Court made clear that it is necessary to distinguish between an individual or entity "acting in an advisory professional capacity (even if in a knowingly fraudulent way) and [one] acting as a direct participant in corporate affairs." In re American Honda Motor Co. Inc. Dealerships Relations Litigation, 941 F. Supp. 528, 560 (D. Md. 1996).

The Complaint in this action alleges that the entity and individual defendants listed above were not merely retained as professional advisors to UFCW and Local 400. Instead, it is alleged that the entity and individual defendants were participating in, and conducting, the Corporate Campaign, inter alia, by investigating Smithfield's operations and drafting factual reports regarding workplace safety violations, organizing protests at the sites of Smithfield's business partners and shareholder meetings, and proposing resolutions to city

-34-

councils and other organizations.  Thus, according to the
Complaint, the entity and individual defendants were
significant, active, independent participants in the
alleged conspiracy, rather than advisors to UFCW and Local
400.  The individual defendants likewise are alleged to
have been active, significant, independent participants in
the misconduct therein alleged.  Accordingly, the motion to
dismiss Count Three will be denied.

Smithfield also has sufficiently stated a claim in
Count Four for a conspiracy to violate Section 1962(c).  To
state a claim for conspiracy to violate Section 1962(c), it
is not necessary for every defendant to personally qualify
as an operator or manager of the RICO enterprise.  See
Brouwer v. Raffensperfer, Hughes & Co., 199 F.3d 961, 967
(7th Cir. 2000).  Rather, each defendant "must knowingly
agree to perform services of a kind which facilitate the
activities of those who are operating the enterprise in an
illegal manner."  Id.  Thus, when a claim involves a
conspiracy to violate Section 1962(c), it is only necessary
to show an agreement to perform services to facilitate
illegal activities, rather than showing the actual
involvement of each individual or entity in each such
activities.  In this case, Smithfield has sufficiently
stated a claim because each of the entity and individual

-35-

Defendants allegedly were either personally involved in the operation or management of UFCW and Local 400's Corporate Campaign or were, at least, alleged to be knowingly performing services to facilitate the activities of those involved in the Corporate Campaign. Consequently, the motion to dismiss Count Four on that ground will be denied.

## VIII.    State Law Claims

Defendants have moved for the dismissal of the state law claims, Counts Five through Nine, on the ground that Smithfield's RICO claims are "so insubstantial and so contrived as to warrant the dismissal of Smithfield's pendent state law claims for lack of subject matter jurisdiction." (Motion to Dismiss at 28.) Alternatively, the defendants argue that, under the reasoning of United Mine Workers of America v. Gibbs, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense the [pendent] state law claims should be dismissed as well." 383 U.S. 715, 726 (1966).

The doctrine of insubstantiality allows for the dismissal of claims only when they are frivolous. See Davis v. Pak, 856 F.2d 648, 651 (4th Cir. 1988) ("Cases which are doubtful on the merits, even those which cannot survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss for

-36-

failure to state a claim, still are substantial enough to support federal jurisdiction." (internal citations omitted)) If a complaint presents both federal and state law claims, the doctrine of insubstantiality is applicable "where a wholly frivolous federal claim serves as a pretext to allow a state law issue, the real focus of the claim, to be litigated in the federal system." Id.

Given that Smithfield has stated legally sufficient claims for relief under 18 U.S.C § 1962, it certainly cannot be held that the federal claims are frivolous. Further, it does not appear (and the defendants have not argued) that the plaintiffs have brought RICO claims as a pretext to allow for the litigation of the state law claims in this Court.[10] Accordingly, because there are no grounds to dismiss Counts Five through Nine of the Complaint, the motion to dismiss those counts will be denied.

### CONCLUSION

For the foregoing reasons and the reasons set forth on the record on January 29, 2008, the DEFENDANTS' JOINT MOTION TO DISMISS UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) (Docket No. 25) will be denied as to

---

[10] Because the federal counts remain, the principles of United Mine Workers of America v. Gibbs and supplemental jurisdiction under 28 U.S.C. § 1367 have no application here.

Counts Two through Nine and granted as to Count One with leave to file an Amended Complaint as to Count One (which Smithfield now has done).

It is so ORDERED.

_____ /s/ _____ *RΣP*

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: May 29, 2008

-38-